## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARTHUR BOMAR,** | : | **CIVIL ACTION** |
| **Petitioner** | : | **NO. 2004-CV-1730** |
| | : | **(CAPITAL CASE)** |
| | : | |
| | : | |
| **JOHN WETZEL, et. al.,** | : | |
| **Respondents** | : | |

### ANSWER TO PETITION SEEKING
### FEDERAL HABEAS CORPUS RELIEF

**TO THE HONORABLE JUAN R. SANCHEZ, JUDGE OF FEDERAL DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA:**

Respondents, through their attorney, William R. Toal, III, Assistant District Attorney, respectfully answer petitioner's federal habeas corpus petition as follows:

**Parties.**

**1-4.   ADMITTED.** Petitioner, Arthur Bomar, is a death sentenced state prisoner incarcerated in SCI – Greene.  John Wetzel is the Secretary of the Department of Corrections.  Robert Gilmore is the Superintendent of SCI Greene and Stephen Glunt is Superintendent at SCI – Rockview.

**Procedural History.**

**5-13. ADMITTED IN PART.** While petitioner's recitation of the procedural history accurately sets forth key aspects of the chronology of events, it fails to include or reference the numerous pre-trial motions which were litigated. Some of these pre-trial motions are at the core of claims now raised by petitioner in his habeas petition. Petitioner filed a Post-Conviction Relief Act (PCRA) petition on December 22, 2004. The Commonwealth responded on March 31, 2008.

Between the filing of the PCRA petition and the Commonwealth's response there was a great deal of related litigation. Petitioner has omitted the facts involving the Commonwealth's request, on March 7, 2005, to stay PCRA proceedings pending the resolution of the direct appeal, which was still pending when the PCRA petition was filed. The trial court granted the Commonwealth's request on March 31, 2005. In 2006, petitioner claimed not to be competent and he raised issues regarding his competency to even proceed in the PCRA litigation. These claims were investigated and litigated culminating in an evidentiary hearing conducted by Judge Hazel on July 17, 2007. Judge Hazel issued an order finding petitioner competent to proceed on November 15, 2007. Once petitioner's competence to proceed in PCRA litigation was determined, the Commonwealth filed its response to the PCRA petition on March 31, 2008. Testimony regarding petitioner's PCRA petition was heard by Judge Hazel on July 17, 2005, May 28, 2008, November 5-7, 2008, January 15-18, 2009, April 23-29, 2009, September 24, 2009, October 20-21, 2009, February 1 – 3, 2010, July 28, 2010, November 29, 2010, January 20, 2011, January 29, 2011.

**Statement regarding exhaustion of claims.**

**14-16. ADMITTED.** It is admitted that petitioner's habeas claims have been previously raised and rejected in state court and have been exhausted for purposes of federal habeas review.

**Grounds for relief.**

**17. DENIED.** It is specifically denied that petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights have been violated. It is further denied that the state court decisions denying petitioner's claims were either: (1) contrary to or an

unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (2) based upon unreasonable determinations of fact made by the state courts.

**Claims for relief.**

**Claim I. Competency to be tried.**

**18-19. DENIED.** It is specifically denied that petitioner was delusional or that his documented behavior while in prison was anything other than calculated attempts to manipulate those around him. The respondents' memorandum of law more fully addresses these assertions.

**A.      Pre-trial competency examinations.**

**20.      ADMITTED IN PART, DENIED IN PART.**  It is admitted that trial counsel requested a competency evaluation of petitioner based upon petitioner's statements accusing trial counsel of raping petitioner's wife and colluding with the district attorney and based upon petitioner's purported suicide attempt. It is denied that petitioner's claims regarding trial counsel were true or that petitioner truly tried to kill himself.  Petitioner was merely attempting to gain attention and to manipulate those around him because he did not like his circumstances and was, in his own words, "messing" with the guards.  Respondents' memorandum of law more fully addresses these allegations.

**21.      ADMITTED.** It is admitted that Judge Hazel appointed Dr. Robert Sadoff to evaluate petitioner regarding his competency following the allegations presented by trial counsel to Judge Hazel regarding petitioner's behavior and accusations about trial counsel.

**22-24.**  **ADMITTED IN PART**. It is admitted that Dr. Sadoff interviewed petitioner and was aware of petitioner's accusations about trial counsel and about the purported suicide attempts. It is admitted that Dr. Sadoff did not have all of the possible records regarding petitioner before determining that petitioner was competent. Dr. Sadoff, even after receiving additional records regarding petitioner provided by the federal defenders, still stands by his original determination that petitioner was competent to stand trial when he was examined by Dr. Sadoff and that the additional records were not required for him to make that determination. It is admitted that Dr. Sadoff was not present at the competency hearing with Judge Hazel because trial counsel agreed that petitioner was competent. Respondents' memorandum of law more fully addresses petitioner's assertions regarding these allegations.

**B.**     **Evidence of purported incompetency introduced post-trial.**

**25.**    **DENIED.** It is denied that petitioner decompensated between his evaluation by Dr. Sadoff and the commencement of trial. The observations and evaluation of petitioner by Dr. Cooke and the observations of petitioner made by trial counsel and by the trial court specifically rebutted and disproved petitioner's assertion that he decompensated prior to trial. These allegations are more fully addressed in respondents' memorandum of law.

**26.**    **DENIED**. It is specifically denied that the observed behaviors of petitioner evidenced psychotic behavior or incompetence. To the contrary, petitioner's behavior was violational and intended to garner attention in order to manipulate those around him. Respondents' memorandum of law more fully addresses these allegations.

27.    **ADMITTED IN PART, DENIED IN PART.** It is admitted that petitioner was treated with certain drugs while incarcerated to address his behavioral issues. It is denied that he was experiencing psychosis or suicidal ideations. He was, however, engaging in volational disruptive and self-abusive behavior to attract attention and to manipulate those around him. The behavior of petitioner was more credibly explained by Dr. Michals than by those experts presented by petitioner. Respondents' memorandum of law more fully addresses these allegations.

28-29.   **ADMITTED IN PART.** It is admitted that during the PCRA evidentiary hearing that trial counsel, Mark Much, Esquire, and psychiatrists, Dr. Robert Sadoff and Dr. Richard Dudley, testified regarding petitioner's competency claims. Dr. Sadoff testified that petitioner was competent when he examined him but Dr. Sadoff refused to speculate regarding petitioner's competence at trial because he did not have the opportunity to observe or evaluate petitioner at trial.

30.    **ADMITTED IN PART, DENIED IN PART.** It is admitted that Dr. Dudley testified that, in his opinion, after examining petitioner more than 6 years after trial and reviewing records regarding petitioner from the time of trial, petitioner was not competent at the time of trial. It is denied that Dr. Dudley was correct. Respondents' memorandum of law more fully addresses the issues regarding petitioner's competency.

31.    **ADMITTED IN PART.** It is admitted that Judge Hazel, in his PCRA court opinion, summarized Dr. Dudley's findings as petitioner has asserted. Petitioner has, however, failed to include the key point which was that Judge Hazel found, as a fact, that Dr. Dudley was not credible. Moreover, Judge Hazel found, as a

matter of law, that Dr. Dudley's entire methodology and approach to determining whether petitioner was competent at the time of trial was flawed because it relied upon evaluations and evidence that was generated years after the trial and competency is a determination which must be made based upon contemporaneous assessments. Respondents' memorandum of law more fully addresses this assertion.

32.    **DENIED.** It is specifically denied that petitioner was incompetent at trial. Contrary to petitioner's assertions, the trial court had sufficient information at the time of trial to conclude that petitioner was competent to stand trial. The trial court properly relied upon statements from trial counsel, and Dr. Cooke, who determined petitioner to be competent after he examined petitioner before and during trial. The trial court also relied upon the trial court's own observations of petitioner in determining that petitioner was competent at trial. Respondents' memorandum of law more fully addresses this claim regarding petitioner's competence at trial.

**C.     Facing trial while allegedly incompetent.**

33.    **DENIED.** It is specifically denied that petitioner was incompetent to stand trial or that the process used to determine petitioner's competency was inadequate or unreliable. The trial court properly took appropriate steps to assure that petitioner was competent to stand trial and properly determined that petitioner was in fact competent at trial.  Respondents' memorandum of law more fully addresses these allegations.

34.    **DENIED.** It is specifically denied that petitioner was incompetent to stand trial or that the experts who evaluated him prior to trial (Dr. Cooke and Dr.

Sadoff) lacked the necessary information to properly determine petitioner's competency. It is further denied that petitioner decompensated prior to trial or was incompetent at the time of trial. Respondents' memorandum of law more fully addresses these allegations regarding petitioner's competence at trial.

**D.     State court adjudications.**

**35.     ADMITTED.** It is admitted that petitioner's claims regarding competency were raised in state court at trial and in PCRA proceedings and were addressed and rejected by the Pennsylvania Supreme Court.

**CLAIM II.     Purported undisclosed deals.**

**36-37. ADMITTED IN PART, DENIED IN PART.** It is admitted that petitioner has asserted that Commonwealth witnesses David O'Donald and Quincy Jamal Williams received consideration for testifying against petitioner in undisclosed deals with the prosecution and lied at trial. It is specifically denied that there were undisclosed deals between David O'Donald and the prosecution or Quincy Jamal Williams and the prosecution or that these witnesses lied at trial. It is also denied that the prosecution failed to correct purportedly false testimony offered by Mr. O'Donald and Mr. Williams. Respondents' memorandum of law more fully addresses these allegations.

**A.     David O'Donald.**

**38-55. ADMITTED IN PART, DENIED IN PART.** It is admitted that prior to petitioner being charged, David O'Donald acted as a "listening post" for the prosecution in this case while serving federal sentences in unrelated federal criminal matters. It is admitted that David O'Donald had a written plea agreement with federal prosecutors.  It is admitted that the federal prosecutor applied for a

downward departure from the federal sentencing guidelines for Mr. O'Donald as a result of Mr. O'Donald's cooperation with federal authorities regarding the investigation of the bank robberies that Mr. O'Donald participated in and revealed to prosecutors and later for his cooperation with the Bomar case. It is specifically denied that there was an undisclosed deal with the prosecution. It is denied that Mr. O'Donald was promised anything by the prosecutors in either state or federal court for his cooperation in the Bomar case. It is denied that Mr. O'Donald lied during his Bomar case testimony or that prosecutors failed to correct his purportedly false testimony. Through discovery, petitioner had the terms of Mr. O'Donald's plea agreement with federal prosecutors prior to trial and trial counsel used the terms of the plea agreement to effectively cross-examine Mr. O'Donald during petitioner's trial. Respondents' memorandum of law more fully addresses the details of the allegations raised regarding the purported undisclosed deal with Mr. O'Donald.

**B.     Quincy Jamal Williams.**

**56-60. ADMITTTED IN PART, DENIED IN PART**. It is admitted that Quincy Jamal Williams testified for the Commonwealth in the prosecution of petitioner. It is admitted that Mr. Williams was serving a sentence in Montgomery County and that prosecutors in Montgomery County provided no consideration to Mr. Williams in connection with his testimony in the Bomar case. It is denied that prosecutors promised Mr. Williams that they would help him out or that he would be released at the end of his minimum sentence. It is denied that Mr. Williams was given money by the prosecution or that he lied during his trial testimony.

Respondents' memorandum of law more fully addresses these allegations regarding the purported undisclosed deal with Mr. Williams.

**Alleged constitutional violations.**

**61-68. DENIED.** It is specifically denied that the Commonwealth had undisclosed deals with Mr. O'Donald or with Mr. Williams or that the Commonwealth failed to correct allegedly false testimony from these witnesses at trial.   Respondents' memorandum of law more fully addresses the allegations of the purported undisclosed deals and purported failures by the Commonwealth to correct allegedly false testimony by Commonwealth witnesses.

**State court adjudications.**

**69.     ADMITTED.** It is admitted that the issues regarding purported undisclosed deals with Mr. O'Donald and Mr. Williams and the Commonwealth's alleged failure to correct their allegedly false testimony were raised in PCRA litigation and were addressed and rejected by the Pennsylvania Supreme Court.

**CLAIM III.     Statements from Petitioner and Allegedly Fradulent Transport Order.**

**70-75. DENIED.**  It is specifically denied that the Commonwealth engaged in improper trickery or in outrageous conduct in using either David O'Donald or Quincy Jamal Williams to obtain statements from petitioner.   As previously indicated, the conduct of Mr. O'Donald and Mr. Williams and the prosecution was in accordance with the law and the Commonwealth engaged in neither improper trickery nor outrageous conduct.  Respondents' memorandum of law addresses these allegations in greater detail.

 **C. Allegedly false court order.**

**D.    Alleged violations of constitutional rights.**

**76-82.    DENIED.**  It is specifically denied that petitioner was transported from SCI-Camp Hill to Delaware County for questioning by CID detectives as a result of a fraudulent or false transport order.   The transport order had the word "hearing" on it only because the District Attorney's office staff secretary, Bette Bosse, (now deceased) did not know the reason for the transport and her practice often was to simply put the word "hearing" in when she was unaware of the actual reason for transporting someone. Nobody was deceived or misled and there was no intent to deceive or mislead anyone.  Petitioner was told why he was being transported and he was agreeable to travel to Delaware County. Petitioner was provided with Miranda warnings, which he acknowledged understanding and agreed to waive, in order to speak to detectives. It is specifically denied that the statements provided by petitioner were the result of outrageous governmental misconduct. It is specifically denied that petitioner's statements should have been suppressed. Respondents' memorandum of law provides further details regarding these allegations.

**E.    Allegations of ineffective assistance.**

**83-88.    DENIED.** It is specifically denied that the government engaged in outrageous conduct which violated petitioner's due process rights. Both trial counsel and appellate counsel for petitioner knew that there was no intent by the Commonwealth to deceive or mislead anyone regarding the transport order.  The specious allegations regarding Mr. O'Donald and Mr. Williams, when combined with the meritless claims regarding the alleged fraudulent transport order, do not constitute anything which can accurately be characterized as outrageous

government misconduct. Respondents' memorandum of law provides further discussion and details regarding these allegations.

**F.     State court adjudications.**

**89.     ADMITTED.** It is admitted that petitioner's claims regarding Mr. O'Donald, Mr. Williams and the allegedly fraudulent transport order were raised in PCRA litigation and were addressed and rejected by the PCRA court and by the Pennsylvania Supreme Court.

**CLAIM IV.  Allegations of improper prejudicial extraneous influence on the jury.**

**90-92.  ADMITTED IN PART, DENIED IN PART.** It is admitted that a defendant is entitled by a fair and impartial jury. It is admitted that petitioner filed a motion seeking a change in venue or venire.  It is denied that the jury in the instant case was subjected to extraneous prejudicial information which entitles him to relief. The respondents' memorandum of law provides a more detailed discussion regarding the issue of alleged prejudicial extraneous information affecting the jury.

**A.     Allegations that jury was tainted by extraneous, prejudical information.**

**93-94.  ADMITTED IN PART, DENIED IN PART.** It is admitted that one juror testified in the PCRA evidentiary hearing regarding a conversation that he supposedly had with a sheriff's deputy regarding why there appeared to be additional security associated with the Bomar case at one point during trial.  It is denied that the entire jury was exposed to the information. It is denied that the alleged extraneous information was prejudicial or that such information did or would have had any adverse effect on the jury's consideration of the case. The

respondents' memorandum of the law provides further details regarding this allegation.

**B.    State court adjudications.**

**95. ADMITTED.** It is admitted that this issue regarding alleged extraneous and prejudicial information was addressed by the PCRA court and by the Pennsylvania Supreme Court and has been rejected as meritless.

**Claim V.   Allegations that the trial court improperly dismissed certain prospective jurors because of their reservations regarding the death penalty and that trial counsel was ineffective.**

**96-106.   ADMITTED IN PART, DENIED IN PART.** It is admitted that the six prospective jurors identified by petitioner were struck for cause by Judge Hazel. It is denied that they were improperly struck for cause or that the striking of these prospective jurors prejudiced petitioner or deprived him of a fair and impartial jury or violated his constitutional rights. It is also denied that trial counsel was ineffective in representing petitioner during the voir dire process. The voir dire questions posed by trial counsel and by the trial court established that these particular prospective jurors either could not or would not follow the instructions from the trial court regarding the requirement for the jury to consider a penalty of death if the facts and law supported such a verdict. Additional questioning by either trial counsel or the trial court would not have "rehabilitated" these prospective jurors to prevent them from being struck for cause. Respondents' memorandum of law provides greater detail regarding the issues surrounding the striking of the six identified prospective jurors.

**C.    State court adjudications.**

**107. ADMITTED.** It is admitted that the issues regarding the striking of the prospective jurors were addressed and rejected during PCRA litigation and by the Pennsylvania Supreme Court.

**CLAIM VI. Alleged trial court error regarding "life qualifying" prospective jurors during voir dire.**

**108-116. ADMITTED IN PART, DENIED IN PART.** It is admitted that certain voir dire questions proposed by trial counsel were objected to by the Commonwealth and that these the objections were sustained by the trial court. It is denied that the proposed questions which were precluded were proper voir dire questions or that the trial court precluded petitioner from "life qualifying" prospective jurors. The trial court asked appropriate "life qualifying" voir dire questions of prospective jurors which petitioner has not acknowledged. Respondents' memorandum of law provides a more full and complete discussion of the issues related to the allegations of errors concerning "life qualifying" questions during voir dire.

**A.      State court adjudications.**

It is admitted that issues regarding the alleged improper curtailing of "life qualification" questions during voir dire were litigated during direct appeal and exhausted for federal habeas purposes.

**CLAIM VII.  Alleged unreliable DNA evidence and ineffective assistance claims.**

**117. ADMITTED.** It is admitted that the allegations of fact previously set forth are incorporated for this claim.

**118. DENIED.** It is specifically denied that the DNA test results presented by the Commonwealth at trial were unreliable and misleading. To the contrary, the

results are accurate, correct and have been independently confirmed by DNA experts hired by petitioner. Respondents' memorandum of law more fully addresses the claims regarding the DNA evidence.

**Factual background at trial.**

**119. ADMITTED.** The Commonwealth's DNA expert, Sarah Gotwald, conducted DNA testing using both the RFLP and PCR methods of DNA testing.  Using RFLP testing, 3 genetic loci did not yield results due to the low levels of DNA present while 3 loci yielded a match between petitioner's DNA profile and the sample from crime scene evidence tested.  Using the PCR method of DNA testing, the DNA profile developed from the crime scene matched petitioner's DNA profile at all 6 areas tested.  Moreover, using the product rule to combine the statistical results from both types of DNA testing, the statistical likelihood of the matching DNA profiles having someone other than petitioner as the source of the DNA was incredibly unlikely:  1 in 1.6 billion from the Caucasian population, 1 in 500 million in the African-American population, and 1 in 800 million in the Hispanic population. Respondents' memorandum of law more fully addresses the claims regarding the DNA evidence.

**120. ADMITTED IN PART, DENIED IN PART**. It is admitted that Ms. Gotwald used an overhead projection during trial to illustrate one of the matches between petitioner's DNA profile and an autorad of the DNA profile obtained from the crime scene evidence. It is admitted that the Commonwealth did not show the jury the other 2 autorads and, instead, had Ms. Gotwald indicate to the jury that the other two autorads produced similar matches. It is denied that the use of an overhead projector to display an autorad match as an illustrative example was

misleading or represented an unreliable or substandard presentation of the forensic science involved.   Respondents' memorandum of law more fully addresses issues related to the DNA evidence.

**B. PCRA hearing evidence.**

**121. ADMITTED IN PART.** It is admitted that prior appellate counsel, Mr. Leach, consulted with Dr. Goldstein in connection with post-sentence motions filed by Mr. Leach regarding the DNA testing.  It is admitted that Dr. Goldstein was not presented as a witness by Mr. Leach during post-sentence evidentiary hearings but was called to testify during PCRA evidentiary hearings.

**122. ADMITTED IN PART, DENIED IN PART**.  It is admitted that Dr. Goldstein reviewed the autorads introduced at trial at the Pennsylvania State Police (PSP) Greensburg Lab and that, contrary to the accepted methodology for conducting such a review, he did not use a light box in doing so. It is denied that Dr. Goldstein found problems with the DNA testing or results because there were no problems with the protocols or procedures used by the PSP lab in conducting its DNA testing or in the results reported. It is admitted that Dr. Goldstein was critical of the way in which the DNA testing was conducted by the PSP lab and that he disagreed with the reported results, but he did not find actual problems. The respondents' memorandum of law more fully addresses the observations and criticisms of Dr. Goldstein and explains why Dr. Goldstein's testimony was properly determined by the state courts to be not credible.

**123.   ADMITTED IN PART, DENIED IN PART.** It is admitted that Dr. Goldstein reviewed the testimony of PSP DNA expert Sarah Gotwald and that he disagreed with her conclusions and criticized the use of an overhead projector during trial to

illustrate the autorads and matching DNA profiles.  It is denied that these criticisms were supported by the evidence.  Respondents' memorandum of law more fully addresses Dr. Goldstein's opinions and explains why they were not credible.

**124-128.  DENIED.** It is specifically denied that the Commonwealth's DNA evidence was unreliable or misleading or that petitioner's constitutional rights were violated. It is denied that the trial counsel was ineffective for failing to effectively cross-examine Ms. Gotwald or for failing to otherwise "counter" the Commonwealth's DNA evidence.  Although the two autorads which were not shown to the jury on the overhead projector screen were weaker than the autorad that was shown on the overhead projector as an example, the other two autorads were also of matches between crime scene DNA profiles and petitioner's DNA profile and those match declarations were confirmed by an independent DNA expert hired by petitioner. Trial counsel was not ineffective for failing to pursue more extensive cross-examination of the Commonwealth's expert regarding what trial counsel knew to be valid match declarations. Petitioner's own DNA expert, Lisa Grossweiler from Cellmark, confirmed that the Commonwealth's DNA evidence was reliable and inculpatory of petitioner. Neither trial counsel nor appellate counsel could be deemed ineffective under these circumstances. Plus, Dr. Goldstein was simply wrong and not credible. Respondents' memorandum of law more fully addresses issues regarding the DNA evidence presented and petitioner's claims regarding alleged unreliable evidence and the alleged ineffective assistance of prior counsel.

**State court adjudications**.

**129.   ADMITTED**.  It is admitted that the issues regarding DNA evidence and allegations of ineffective assistance were exhausted in PCRA litigation and were addressed by the Pennsylvania Supreme Court.

**CLAIM VIII.  Allegations regarding Rape, Kidnapping, Abuse of Corpse.**

**130-137.** Petitioner has withdrawn this claim from his habeas corpus claim.  See: petitioner's memorandum of law.

**CLAIM IX.  Allegations of ineffective assistance regarding investigation and presentation of mitigation evidence.**

**138-139. DENIED.**  It is denied that prior counsel failed to properly investigate and present an accurate depiction of petitioner's childhood development in violation of his right to effective assistance of counsel. Prior counsel conducted a constitutionally effective and reasonable investigation and presentation of mitigation evidence despite the efforts of petitioner and petitioner's family to prevent prior counsel from doing so. It is denied that the jury was deprived of significant mitigation evidence to consider. Respondents' memorandum of law more fully addresses these allegations.

**140.   DENIED.** It is specifically denied that appellate counsel unnecessarily pursued ineffective assistance claims in post-sentence motions prior to direct appeal. At the time that appellate counsel raised these claims of ineffective assistance in post-sentence motions, he was required to do so under state law. If appellate counsel failed to raise a claim of ineffective assistance at the earliest opportunity to do so, under then existing state law, the claim would have been waived on appeal. See:  Commonwealth v. Hubbard, 472 Pa. 259, 372 A.2d 687 (1997). It is denied that either trial counsel or appellate counsel was ineffective in their handling of issues regarding mitigation evidence. Respondents'

memorandum of law provides a more detailed discussion of the allegations of ineffective assistance of counsel related to mitigation evidence.

**A. Mitigation evidence presentation at penalty hearing.**

**141.   ADMITTED IN PART, DENIED IN PART.** It is admitted that Shawn McLaughlin, Esquire, served as petitioner's penalty phase counsel and that she previously served as penalty phase counsel in at least three other capital cases. It is admitted that during the penalty phase of trial Ms. McLaughlin called as witnesses for petitioner: Dr. Gerald Cooke, Joyce Batchelor, Carol Butterworth, Linda Robinson, Sonny Ganges, Carrie Ganges, Caroline Ripley, and Glen Servino.

**142.   ADMITTED IN PART.** It is admitted that Dr. Cooke testified at trial that he was limited regarding what he could say to a reasonable degree of professional certainty because petitioner refused to complete certain tests that prevented Dr. Cooke from providing a more complete evaluation of petitioner. Although Dr. Cooke suspected that petitioner may have had organic brain damage, he could not conclude as much because of petitioner's refusal to cooperate with certain testing which Dr. Cooke believed was esential. Dr. Cooke did find petitioner to have anti-social and borderline personality disorders. Respondents' memorandum of law provides a more detailed discussion of the mitigation evidence issues related to petitioner's lack of cooperation and Dr. Cooke's testimony.

**143.   ADMITTED IN PART.** It is admitted that Joyce Batchelor, petitioner's half-sister, testified for petitioner during the penalty phase hearing. She testified only because she was subject to a material witness warrant. It is admitted that Ms.

Batchelor provided graphic details of the very dysfunctional family setting and abusive childhood that petitioner grew up experiencing. Respondents' memorandum of law provides additional discussion regarding the testimony of Ms. Batchelor and her interactions with Ms. McLaughlin in this matter.

**144. ADMITTED IN PART.** It is admitted that petitioner's mother, Carrie Ganges, testified during the penalty phase and that she made references to Hitler and Mussolini and asserted that petitioner was innocent. Further details regarding Ms. Ganges and her interaction with prior counsel are set forth in respondents' memorandum of law.

**145. ADMITTED IN PART.** It is admitted that petitioner's much younger half-brother, Sonny Ganges, testified about not wanting petitioner to die, believing in his innocence and loving petitioner. It is admitted that Sonny Granges did not provide testimony regarding petitioner's upbringing.

**146. ADMITTED.** It is admitted that Carol Butterworth testified that petitioner was polite, respectful and nice.

**147. ADMITTED.** It is admitted that Linda Robinson testified that petitioner found and returned her wallet with all of its contents intact.

**148. ADMITTED.** It is admitted that Ms. Ripley is an ordained pastor and counsellor who met petitioner through church activities that petitioner attended with his wife Joyce in the 1990's. She testified that petitioner responded well to structure.

**149. ADMITTED.** It is admitted that pastor Glen Servino testified that he attended church with petitioner and his wife in 1991. Pastor Servino testified that petitioner came to church in 1997 to pray "to get some things right with the Lord."

**B. Mitigation evidence presentation in PCRA proceedings.**

**150.   ADMITTED IN PART.**  It is admitted that during the PCRA evidentiary hearings the federal defenders presented evidence regarding petitioner's difficult childhood which included a dysfunctional family. Many of the asserted claims, however, were not documented and cannot be considered factual, credible, or reliable.

**151-156.   ADMITTED IN PART.**  It is admitted that Ms. Kaib is a mitigation expert who testified for the petitioner during PCRA evidentiary hearings. Many of the reports she provided, however, were hearsay accounts and were not supported by sworn testimony from the individuals who spoke to Ms. Kaib. The general picture of petitioner's childhood was one of neglect and violence in the home although many of the specific claims were not supported by sworn testimony from first-hand observers but were instead based upon hearsay accounts.   Respondents' memorandum of law addresses claims regarding petitioner's background in greater detail.

**157-161. ADMITTED IN PART, DENIED IN PART.** It is admitted that Dr. Dudley interviewed petitioner and testified during the PCRA evidentiary hearings.  It is denied that Dr. Dudley's "findings" were accurate or were supported by the data and evidence. Dr. Dudley was found to be not credible and his methodologies were found by the courts to be inappropriate, including his testimony concerning petitioner's competency. Dr. Dudley's opinions were rejected as contrary to the evidence by the state courts. Respondents' memorandum of law provides more detailed information regarding Dr. Dudley and why his testimony was not credible and why his opinions were not accepted by the state courts.

**162-163. ADMITTED IN PART.** It is admitted that Dr. Cooke testified for petitioner during the PCRA proceedings. It is admitted that Dr. Cooke testified that he thought he could have provided a more favorable opinion for petitioner in terms of mitigation during trial if he had during trial the information later provided by the federal defenders during PCRA litigation. It is denied that Dr. Cooke was correct. Judge Hazel found that Dr. Cooke actually did have information provided by prior counsel that he claimed not to have received. It is also incorrect to say that Dr. Cooke could have better explained petitioner's behavior if he had only had additional information from trial counsel. Even one of petitioner's own other experts, Dr. Martell, testified that Dr. Cooke had the information he needed to arrive at an opinion at trial even though Dr. Cooke stated otherwise. Respondents' memorandum of law provides greater detail regarding Dr. Cooke's testimony and why the PCRA court found that he was incorrect and that his opinion was contrary to the facts and credible evidence.

**164-165. ADMITTED IN PART.** It is admitted that Dr. Dougherty interviewed petitioner pre-trial and that he testified during the PCRA evidentiary hearings. Contrary to what he testified to during the PCRA hearing, Dr. Dougherty told prior counsel that she would not want him to write a report because the results would not be favorable to petitioner. Respondents' memorandum of law addresses Dr. Dougherty's testimony in greater detail.

**166-167. ADMITTED IN PART.** Dr. Michals testified as a Commonwealth expert during the competency hearing and PCRA evidentiary hearings. Dr. Michals interviewed petitioner and reviewed records and determined that petitioner had been competent to stand trial and was competent proceed in PCRA litigation

based upon the contemporary evidence regarding his competence. Dr. Michals rejected petitioner's claims regarding acting under extreme emotional distress or disturbance at the time of the crime based upon the facts of the case and the absence of any documentation to support the claims, including petitioner's history of treatment while incarcerated. While petitioner was raised in less than ideal circumstances, the documented evidence in this case does not support a finding of organic brain damage. Dr. Michals' opinion, disputing the opinions of Dr. Cooke and Dr. Dudley, was based in part on the absence of medical or other documentation such as brain scans or studies to support Dr. Dudley's and Dr. Cooke's opinions. Mr. Michals' own review of Dr. Cooke's and Dr. Dudley's raw data and their methodologies in arriving at their opinions also allowed Dr. Michals to reject their conclusions. Dr. Dudley kept changing his diagnosis of petitioner and did not ultimately diagnose petitioner with a recognized mental illness. Dr. Michals determined petitioner's actions to be volitional and not the product of mental illness. Dr. Michals' explanations and findings regarding petitioner's behavior were determined to be credible and supported by the evidence. Respondents' memorandum of law provides greater detail regarding Dr. Michals' findings and conclusions and his rejection of Dr. Cooke's and Dr. Dudley's opinions.

**168. ADMITTED IN PART, DENIED IN PART.** It is admitted that Dr. Martell, a neuropsychologist, testified as an expert witness for petitioner during the PCRA evidentiary hearings. It is admitted that Dr. Martell reviewed Dr. Cooke's raw data and Dr. Michals' PCRA testimony and disagreed with Dr. Michals' opinion. It is denied that Dr. Martell could accurately diagnose petitioner without

conducting a clinical evaluation which involves actually interviewing and observing petitioner. Dr. Martell's own PCRA testimony indicated that a clinical evaluation is necessary to properly diagnose an individual. Moreover, Dr. Martell stated that in order for an accurate diagnosis to be determined, you need a clinical evaluation and a cooperative patient. In this case, Dr.Martell did not clinically evaluate petitioner and petitioner had not been cooperative for Dr. Cooke.    Therefore, Dr. Martell's criticism of Dr. Cooke for not diagnosing petitioner as having organic brain damage based upon the known documentation and observations is contrary to Dr. Martell's own stated protocol and was not helpful. Respondents' memorandum of law addresses the issues surrounding Dr. Cooke's PCRA testimony more fully.

2. **Record presented in PCRA proceedings.**

**169. ADMITTED IN PART, DENIED IN PART.** It is admitted that trial counsel did not have 1990 records from Aldie Counseling Center where petitioner was evaluated for drug and alcohol dependency as a condition of parole while under sentence in Nevada.   It is denied that the information provided by petitioner regarding his family history was accurate. Petitioner refused to provide much information regarding his family because he, not unreasonably, believed that the information would be used against him.

**170. DENIED.** It is denied that the records from Aldie Counseling were mitigating in their own right.   It is denied that Aldie records are such that they would have allowed Dr. Cooke to render a different opinion than that which he provided at trial if he had the Aldie records prior to trial. It should also be noted that petitioner, for this paragraph of his habeas petition, is citing to Dr. Cooke's

declaration from the PCRA petition rather than to Dr. Cooke's actual PCRA testimony. Dr. Cooke's declaration is not evidence in this case. Respondents' memorandum of law more fully addresses the issue surrounding Dr. Cooke's PCRA testimony about how he claimed that documents he obtained after trial would have changed his trial testimony.

**171.   ADMITTED IN PART, DENIED IN PART.**  It is admitted that Dr. Dudley reviewed the Aldie Counseling Center reports.  It must be noted that in paragraph 171 of his <u>habeas</u> petition petitioner has cited to a declaration of Dr. Dudley that was a part of the PCRA petition rather than actual sworn PCRA testimony from Dr. Dudley in this case.   It is denied that Dr. Dudley's observations and comments and opinions were accurate as they were based up anecdotal information, unsworn statements from witnesses who did not testify during the PCRA evidentiary hearings and reports from other counselors and individuals whose raw data and credentials were not verified. Respondents' memorandum of law provides a more detailed discussion of the shortcomings of Dr. Dudley's opinions and purported findings.

**172-173. ADMITTED IN PART, DENIED IN PART.**  It is denied that an intake report from July 25, 1979, prepared by psychologist Dr. Robert G. Whittemore, regarding petitioner's 1979 attempted murder charges, demonstrates that petitioner suffered from cognitive impairments at the time.  It is admitted that trial counsel did not obtain these records prior to trial and that Dr. Cooke did not have the Whittemore report prior to trial.  Dr. Cooke did not have any raw data to review regarding Dr. Whittemore's conclusions to be able to determine the correctness of Dr. Whittemore's conclusions.  Also, in his <u>habeas</u> petition,

petitioner has referred to a declaration from Dr. Cooke that was attached to the PCRA petition rather than to any of Dr. Cooke's actual sworn PCRA testimony. Respondents' memorandum of law provides more detailed discussion of Dr. Cooke's PCRA testimony regarding why he claimed to be able to provide a different opinion than what he provided during trial.

**174. ADMITTED IN PART.** It is admitted that trial counsel did not obtain an April 6, 1979 psychiatric evaluation by Dr. John Chappel of the University of Nevada, Reno. Dr. Chappel determined petitioner to be competent to stand trial for two attempted murders, and concluded that petitioner "may" have an anti-social personality disorder. It is admitted that Dr. Cooke did not see the report prior to trial. It is denied that the absence of this report made a difference in Dr. Cooke's ability to fully diagnose petitioner prior to trial. Respondents' memorandum of law more fully addresses Dr. Cooke's post-trial diagnosis of petitioner, the reasonableness of the efforts by trial counsel to obtain records prior to trial and petitioner's failure to cooperate with prior counsel's efforts.

**175. ADMITTED IN PART, DENIED IN PART.** It is admitted that Ms. McLaughlin had prison records from Delaware County which she did not provide to Dr. Cooke prior to his evaluation of petitioner. Dr. Cooke, however, never asked to see the prison housing reports of petitioner. When Dr. Cooke asked Ms. McLaughlin to provide him with employment records and early education records she did so. Ms. McLaughlin provided Dr. Cooke with whatever records he said he needed which she could obtain. It is denied that the records at issue which were not provided were of great importance in evaluating petitioner.

Respondents' memorandum of law provides greater detail regarding the interaction between Dr. Cooke and penalty counsel.

**176.   DENIED.** It is denied that the prison records at issue reflect upon petitioner's competency. Neither Dr. Sadoff nor Dr. Cooke testified that they needed these records in order to conduct an evaluation of petitioner's competence.   Respondents' memorandum of law more fully addresses the issues surrounding petitioner's competence and the evaluations by Dr. Sadoff and Dr. Cooke.  Also, petitioner has cited to Dr. Cooke's declaration as opposed to his actual PCRA or trial testimony and the declaration is not credible or proper evidence in this case.

**177.   DENIED.** It is denied that the prison housing records, including the incidents of purported suicide attempts and disruption, were significant in regard to petitioner's diagnoses by mental health experts. Respondents' memorandum of law more fully addresses petitioner's documented behavior while incarcerated and how the behavior was volitional misbehavior rather than a product of mental illness.

**178.   DENIED.** It is denied that prior counsel failed to follow up on efforts to contact people who had interaction with petitioner who might have supported a mental health mitigation claim.  Also, petitioner, in his habeas petition, has cited to declarations from individuals who did not testify at the PCRA hearing and, therefore, their statements are not credible evidence in this case.  Also, reliance by experts upon those hearsay statements is not well founded and petitioner even cites to Dr. Dudley's unsworn declaration instead of actual PCRA testimony.

**179.   ADMITTED IN PART, DENIED IN PART.** It is admitted that Ms. McLaughlin provided Dr. Cooke with some but not all prison record information from SCI – Camp Hill.  It is denied that petitioner's behavior documented in the additional reports was significant or different than what had been reported elsewhere about petitioner's volitional behavior and selective memory.

**Alleged Deficient Performance.**

**180.   DENIED.** It is denied that penalty counsel provided constitutionally ineffective assistance.  It is denied that counsel failed to explain the significance of petitioner's dysfunctional upbringing or the mitigating circumstances presented.

**181-183. ADMITTED IN PART, DENIED IN PART.** It is admitted that Ms. McLaughlin used court funds for investigators and did not hire a mitigation specialist. It is denied that investigations were stopped solely because of a lack of funds. Ms. McLaughlin recognized that without cooperation from family members and the petitioner additional investigations and contact with family members would not be productive. Respondents' memorandum of law more fully addresses the issue of the reasonableness of efforts made by prior counsel to obtain mitigation evidence.

**184. ADMITTED IN PART.** It is admitted that prior counsel compiled a witness list of:  Willie Mae Bomar (sister), Alonzo Bomar (brother), Anna Wilson (aunt), Joyce Batchelor (half-sister), Jerome Bomar (father's relative), Margaret Sherman (aunt), Loraine Kirkland (half-sister), petitioner's first wife, teachers, co-workers and employees. These were not the only witnesses that prior counsel sought or contacted. Prior counsel also had witnesses from church and Linda

Robinson, a woman to whom petitioner returned a lost purse, in addition to the expert witnesses prior counsel used and relied upon.

**185. ADMITTED IN PART.** It is admitted that Ms. McLaughlin spoke with Ms. Batchelor but was unable to reach some of the other witnesses on her original list or those individuals simply did not return her calls and messages despite her efforts to contact them.

**186. ADMITTED IN PART.** It is admitted that Ms. Batchelor spoke to Ms. McLaughlin pre-trial and mentioned something about petitioner possibly being raped by a guard. When Ms. Batchelor testified at trial, pursuant to a material witness warrant, she did not mention it.

**187-189. DENIED.** While petitioner claims that Ms. Wilson was not contacted and was available to testify at trial, there is no credible evidence of that of record. Petitioner has relied upon hearsay and an unsworn declarations rather than upon actual sworn testimony from Ms. Wilson. The same is true for Ms. Bette McCullum, Ms. Cotton, and Mr. Levy who did not testify at the PCRA evidentiary hearing. Petitioner has relied up declarations which are not record evidence in this case and which cannot be accepted as factually accurate or credible.

**190-191. ADMITTED IN PART, DENIED IN PART.** It is admitted that trial counsel did not create or present a comprehensive social history of petitioner. The failure to do so was in large part due to petitioner and his family refusing to cooperate and provide accurate, relevant, credible information to prior counsel which was uniquely within their knowledge and control. It is admitted that records for Aldie Counsel Center did not arrive until after trial. It is denied that trial counsel was responsible for the delay in receiving records.

**192. DENIED.** It is denied that trial counsel failed to disclose to defense experts evidence of petitioner's abusive upbringing. Trial counsel specifically asked her experts what information they needed to perform the necessary evaluations of petitioner and she attempted to provide them with the information requested. Respondents' memorandum of law more fully addresses issues relating to the efforts of trial counsel and her interaction with defense experts.

**193. ADMITTED IN PART.** It is admitted that during PCRA evidentiary hearings that Dr. Cooke and Dr. Dudley explained the significance of an abusive upbringing upon an individual.

**194. DENIED.** It is denied that prior counsel was at fault for not timely receiving Aldie records or Nevada prison records. It is denied that prior counsel failed to provide Dr. Cooke with information which she had regarding petitioner's mental health. The PCRA court found that Dr. Cooke received information from Ms. McLaughlin which Dr. Cooke denied having prior to trial.

**D.     Prejudice.**

**195. DENIED.** It is specifically denied that prior counsel's penalty phase presentation was unreasonable. Ms. McLaughlin did the best she could with the information she had given the lack of cooperation from petitioner and his family and the generally negative results and opinions regarding petitioner offered by Dr. Cooke and Dr. Dougherty.

**196. DENIED.** It is denied that the information which was presented during the PCRA evidentiary hearings which was not presented at trial would have made a difference in outcome or would have provided a more compelling story regarding petitioner's upbringing.

**197. ADMITTED IN PART.** It is admitted that Dr. Martell believes that Dr. Cooke had sufficient information to render a diagnosis of organic brain damage and that Dr. Cooke believes the Whittemore report would have made a difference. It is denied that these assertions are true.

**198. DENIED.** It is denied that petitioner experienced episodes of psychosis or that his behavior while incarcerated was evidence of a psychiatric episode or was mitigation evidence. To the contrary, petitioner's conduct was evidence of volitional manipulative behavior which trial counsel wisely did not present to the jury.

**199. DENIED.** There is no way of knowing what a mitigation expert would have been able to do at the time that petitioner and his family were actively working against prior counsel's efforts to prepare and present mitigation evidence. The fact that family members cooperated after petitioner was convicted and sentenced to death is not evidence that the result would have been different if a mitigation specialist had been involved earlier in the process.

**200. DENIED.** It is denied that trial counsel's failure to construct a social history caused her to be unable to obtain information about petitioner's childhood and family history. To the contrary, petitioner's refusal to cooperate and petitioner's family's refusal to cooperate caused prior counsel not to be able to construct a social history of petitioner and his family.

**201. DENIED.** Dr. Dudley did not testify during the PCRA evidentiary hearings as stated in the declaration cited by petitioner. Dr. Dudley ultimately did not diagnose petitioner with any specific mental illness and his testimony was found to be not credible.

**202.  ADMITTED IN PART.**  It is admitted that Dr. Cooke testified during the PCRA evidentiary hearing that if he had the petitioner's family history he could have testified at trial that petitioner suffered from organic brain damage. It is denied that he is correct. According to petitioner's own expert, Dr. Martell, Dr. Cooke had enough information already without the family history to diagnose petitioner with organic brain damage. The absence of that information, however, was not the difference behind Dr. Cooke being made to diagnose petitioner and not being able to do so. Instead, it was petitioner's lack of cooperation in undergoing certain tests conducted by Dr. Cooke that was what caused Dr. Cooke to be unable to diagnose petitioner. As noted by Judge Hazel, the information that Dr. Cooke says he needed was not that significant or different from what he already had and was not verified, credible or competent evidence which would have changed Dr. Cooke's opinion.  Respondents' memorandum of law more fully addresses Dr. Cooke's PCRA testimony.

**203.   DENIED.**  It is specifically denied that the evidence which petitioner presented during PCRA hearings regarding his upbringing and family history would have changed the outcome of the penalty phase or changed the view of a single juror.  Both the PCRA court and Pennsylvania Supreme Court considered and rejected this claim.

**E.  Appellate counsel's alleged ineffectiveness for failing to develop and present evidence of trial counsel's alleged ineffectiveness in post-sentence proceedings and on direct appeal.**

**204.  DENIED.**  It is denied that Mr. Leach was ineffective in pursuing claims of trial counsel's alleged ineffectiveness. Mr. Leach properly pursued claims and presented evidence regarding aspects of possible claims not pursued by trial

counsel. Mr. Leach investigated the claims and called witnesses separate and apart from interviewing prior counsel. Respondents' memorandum of law discusses these allegations in more detail.

**205. ADMITTED IN PART.** It is admitted that Mr. Leach focused upon guilt phase issues although he also raised issues regarding petitioner's competence.

**206. DENIED.** It is denied that petitioner was prejudiced by appellate counsel's handling of ineffective assistance claims. Because of the change in the law regarding the pursuit and consideration of ineffective assistance claims, petitioner actually was able to raise all of claims that he wanted to pursue in PCRA evidentiary hearings despite already having had a post-sentence evidentiary hearing on ineffective assistance claims. Between the Commonwealth's not claiming waiver and the change in the state law, petitioner got two bites at the apple and was not prejudiced, and actually had greater opportunities to pursue ineffective assistance claims than most defendants and post-conviction petitioners have.

**F. State court adjudications.**

**207. ADMITTED.** It is admitted that petitioner's claims of ineffective assistance pertaining to investigation and presentation of mitigation evidence were raised and addressed by the PCRA court and the Pennsylvania Supreme Court and are exhausted for federal habeas review purposes.

**Claim X. Alleged cumulative prejudicial effect of errors claim.**

**208-210. DENIED.** It is specifically denied that petitioner is entitled to habeas relief on grounds of alleged prejudicial cumulative effect of errors. Contrary to petitioner's assertion, there are no errors to cumulate prejudice from. Moreover,

the claim is not one that the United States Supreme Court has decided post-AEDPA and, therefore, there is no well-established federal law to which the state courts' decision is either contrary or an unreasonable application of. Respondents' memorandum of law provides a more detailed discussion of these allegations.

**A.  State court adjudications.**

**211.  ADMITTED.** It is admitted that the claim regarding the alleged cumulative prejudicial effect of alleged errors was addressed by the PCRA court and by the Pennsylvania Supreme Court and is exhausted for purposes of federal habeas review.

**Request for an Evidentiary Hearing and Discovery.**

Respondents oppose petitioner's suggestion that an evidentiary hearing or additional discovery is required or necessary. The record in this matter is comprehensive and complete.

**Request for Relief.**

For all of the aforementioned reasons, petitioner's habeas corpus petition should be denied without an evidentiary hearing and no certificate of appealability should be granted.

Respectfully submitted,

William R. Toal, III
Assistant District Attorney
Attorney for Respondents

## PROOF OF SERVICE

**WILLIAM R. TOAL, III,** Assistant District Attorney, hereby certifies that on February 8, 2017, this document was electronically filed and is available for viewing and downloading from the ECF system. I served the persons in the manner indicated below as required by the Federal Rules of Civil Procedure Rule 5.

**BY ELECTRONIC FILING OR
FIRST-CLASS MAIL
AS FOLLOWS:**

Honorable Juan R. Sanchez
District Court Judge
United States District Court,
Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 11614
Philadelphia, PA 19106-1711

Leor Veleanu, Esquire
Assistant Federal Defender
Federal Community Defenders' Office
601 Walnut Street, Suite 545 West
Philadelphia, PA. 19106
(215)  928-1100
(Attorney for Petitioner)

Jennifer Chiccarino
Supervisory Federal Defender
Federal Community Defenders' Office
601 Walnut Street, Suite 545 West
Philadelphia, PA. 19106
(215)  928-1100
(Attorney for Petitioner)

/s/  William R. Toal, III
William R. Toal, III      ID # 42549
Assistant District Attorney
Office of the District Attorney
Delaware County Courthouse
201 West Front Street
Media, PA 19063-2783
(610) 891-4210
(Attorney for respondents)