**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ARTHUR BOMAR, | : | |
|         Petitioner | : | |
| | : | CIVIL ACTION |
|         VS. | : | DOCKET NO. |
| | : | 2004-CV-1730 |
| JOHN WETZEL, SECRETARY, et. al., | : | (Capital Case) |
|         Respondents | : | |

**RESPONDENTS' MEMORANDUM OF LAW IN OPPOSITION TO PETITION**
**SEEKING FEDERAL HABEAS CORPUS RELIEF**

**TO THE HONORABLE JUAN R. SANCHEZ, UNITED STATES DISTRICT COURT JUDGE:**

Respondents, through their attorney, William R. Toal, III, Assistant District Attorney, respectfully respond to the petition seeking federal habeas corpus relief, as follows:

**I.     COUNTER-STATEMENT OF THE CASE**

The procedural and factual history of this case was set forth by the Honorable Frank T. Hazel, in his comprehensive PCRA court opinion in which he quoted from his own trial court opinion and from the Pennsylvania Supreme direct appeal opinion, as follows:

> On March 28, 2012 after extensive evidentiary hearings the "Petition for Habeas Corpus Relief Pursuant to Article I, Section 14 of the Pennsylvania Constitution Statutory Post Conviction Relief under the Post-Conviction Relief Act, 42 Pa.C.S.A. §9541 et seq.," (hereinafter "PCRA petition") filed in the above matter was denied. Petitioner, Arthur Bomar appeals, necessitating this Opinion. Petitioner seeks relief from his conviction for first-degree murder and related offenses and the penalty of death was imposed after a jury trial.

On October 1, 1998 [petitioner] was convicted of first-degree murder [fn. 1], rape [fn. 2], aggravated assault [fn. 3], kidnapping [fn. 4], and abuse of corpse. [fn.  5] Trial in this matter spanned eleven days including three days of voir dire. After a two-day penalty hearing the jury returned a sentence of death as to the first-degree murder conviction. The death sentence was formally imposed on December 4, 1998 and at that time, sentence was imposed on the additional charges. The court ruled that [petitioner] was a high-risk dangerous offender pursuant to the then-governing provisions of 42 Pa.C.S.A. §9714, and [petitioner] was sentenced to consecutive terms of ten to twenty years each on the rape [fn. 6] and kidnapping convictions, and a consecutive term of one to two years on the abuse of corpse conviction.

[fn. 1]  18 Pa.C.S.A. §2502(a).

[fn. 2]  18 Pa.C.S.A. §3121(a).

[fn. 3]  18 Pa.C.S.A. §2702(a).

[fn. 4]  18 Pa.C.S.A. §2901(a).

[fn. 5]  18 Pa.C.S.A. §5510.

[fn. 6]  At sentencing on December 4, 1998 the court determined that [petitioner] was a "high risk dangerous offender" as that term was set forth in 42 Pa.C.S.A. §9714(c). N.T. 12/4/98 pp. 33-39.  The 120 to 240 month sentence, consecutive to the death sentence, on the rape conviction was a mandatory minimum pursuant to Section 9714.  Sentence on the kidnapping conviction was not imposed as a mandatory minimum.  See Id. at p. 56.

Post-sentence motions were filed. Petitioner alleged, *inter alia*, that he was denied his right to the effective assistance of trial counsel. More specifically, it was claimed that trial counsel was ineffective for failing to present witnesses, failing to present a diminished capacity defense, failing to move for a second change of venue or venire due to pre-trial publicity in Westmoreland County and for failing to request a continuance for additional neuropsychological testing at the penalty phase. These post-sentence motions were filed before the Pennsylvania Supreme Court's decision in Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002) and therefore this case was subject to the rule set forth in Commonwealth v. Hubbard, 372 A.2d 687 (Pa. 1977) (claims of trial counsel ineffectiveness are waived if not raised by new counsel on appeal).

Evidentiary hearings were conducted on March 4, 1999 and April 20, 1999 and the allegations of ineffective assistance were considered and rejected by the trial court.  On direct appeal the Pennsylvania Supreme Court considered, *inter alia*, the sufficiency of the evidence, claims of trial court error and claims that petitioner was denied the effective assistance of trial counsel and affirmed the judgment of sentence of death and vacated the judgment of sentence for rape, kidnapping and abuse of corpse, remanding the matter for resentencing, in light of Commonwealth v. Butler, 563 Pa. 324, 760 A.2d 384 (2000) (provisions of former 42 Pa.C.S.A. §9714, Sentences for second and subsequent offenses, which impose an enhanced mandatory sentence when a person is found to be a high risk dangerous offender unconstitutional; statutory scheme places the burden on defendant to rebut presumption that he is a high risk dangerous offender by clear and convincing evidence).  See Commonwealth v. Bomar, 826 A.2d 831 (Pa. May 30, 2003).  The United States Supreme Court denied petitioner's petition seeking a writ of certiorari on January 12, 2004.

Petitioner was re-sentenced on the remaining charges on April 1, 2004.  An aggregate term of incarceration of 252 to 504 months was imposed.  Petitioner appealed to the Superior Court.  On April 15, 2004 the Honorable Edward G. Rendell, Governor of Pennsylvania, signed an execution warrant scheduling implementation of the sentence of death by execution for June 10, 2004.  On April 21, 2004 petitioner filed a "Motion for the Appointment of Federal Habeas Corpus Counsel Under 21 U.S.C. §848(q); a Stay of Execution; and Leave to Proceed In Forma Pauperis", in the United States District Court for the Eastern District of Pennsylvania.  This motion was granted on May 10, 2004.  Therefore, on October 12, 2004 petitioner filed a counseled "Petition for Writ of Habeas Corpus" in federal court.  The petition set forth both exhausted and unexhausted claims and that petition was dismissed, without prejudice, and [petitioner] was directed to exhaust all state claims in the state court.

While the appeal from re-sentencing was pending, counsel from the Federal Community Defender Office for the Eastern District of Pennsylvania, Capital Habeas Unit filed the PCRA petition, *sub judice*, on December 22, 2004.  The Commonwealth moved to stay the proceedings until the conclusion of the direct appeal pending at that time and the motion was granted.  The Superior Court affirmed judgment of sentence as to the "non-death" sentences on May 25, 2005.  Thereafter, on December 29, 2005, the Pennsylvania Supreme Court denied petitioner's petition for allowance of appeal.

The previously imposed stay of PCRA proceedings was lifted on February 23, 2006 and the Commonwealth was ordered to respond to the PCRA petition. Upon PCRA counsel's motion, proceedings to determine petitioner's current competency to proceed with the PCRA petition followed. On November 15, 2007 an Order was entered denying "Petitioner's Motion for an Order Finding Him Incompetent to Proceed". The Commonwealth responded to the PCRA petition on March 31, 2008. Evidentiary hearings were conducted on July 17, 2007, May 28, 2008, November 5-7, 2008, January 15-16, 2009, April 28-29, 2009, September 24, 2009, October 20-21, 2009, February 1-3, 2010, July 28, 2010, November 29, 2010, January 20, 2011 and November 29, 2011. On March 28, 2012 the PCRA petition was denied. [A] timely appeal follow[ed].

To provide context, the facts that supported petitioner's conviction, as set forth in the Pennsylvania Supreme Court opinion affirming judgment of sentence, follow:

At approximately 10:30 p.m. on the evening of June 19, 1996, the victim, 22-year-old Aimee Willard, met several of her high school friends at a bar located on Lancaster Avenue in Wayne, Pennsylvania. Later that night, at approximately 1:25 a.m., Ms. Willard left the bar alone. She would not make it home.

At approximately 2:00 a.m., on June 20, 1996, the victim's car, a blue Honda Civic, was discovered on the southbound off-ramp of the Springfield-Lima Exit of Interstate 476 in Delaware County. The car's engine was still running, the driver's side door was open, the radio was playing and the interior lights and headlights were on. There was a rough abrasion on the back bumper of the victim's car. There was a pool of blood on the ground in front of the vehicle with drops of blood leading away from it. A tire iron was located near the pool of blood. Later that morning, police discovered a pair of sneakers and a pair of female underpants with a sanitary pad near the abandoned car. The sneakers were later identified as belonging to the victim and the underpants were later identified as belonging to the victim. Hairs found on the sanitary pad were consistent with the pubic hairs of the victim. The police also obtained tire impressions from the scene.

At approximately 5:00 p.m., on June 20, 1996, Aimee Willard's body was found naked, positioned face down, with two plastic bags covering her head, in a vacant lot at 16th Street and Indiana Avenue in Philadelphia. The victim's injuries included multiple blunt force injuries to her head, brain and face; an abraded contusion on her left shoulder and upper chest; a rectangular shaped contusion

beneath her left breast; a patterned, angular thermal injury resembling a flower petal on her right lower chest and upper abdomen; numerous fractures in her neck; bruises on her left and right thighs; and defensive wounds on her left and right forearms. There was intact degenerate sperm found in the victim's vaginal cavity. In addition, a tree branch had been forced into her vagina. There was no blood surrounding or beneath the body or leading up to or away from the body, indicating that the victim was not killed at the site but rather had been killed elsewhere and then moved to this location.

Several hours after the discovery of Aimee Willard's body, at approximately 11:25 p.m., on June 20, 1996, [petitioner] was coincidentally stopped by the police at the intersection of 20th Street and Erie Avenue in Philadelphia, eight blocks from where the victim's body had been found. [Petitioner] was driving a green 1993 Ford Escort. The police did not arrest [petitioner] at that time.

Nearly a year later, on June 5, 1997, [petitioner] was arrested in Ardmore, Pennsylvania, on an outstanding warrant for violating his parole from a conviction for second degree murder that occurred in Las Vegas, Nevada, and for an unrelated criminal trespass. That evening, investigators from the Delaware County Criminal Investigation Division (CID) questioned [petitioner] concerning the Willard murder. [Petitioner] told the investigators, among other things, that he drove a 1993 Ford Escort until March of 1997, that he had been to the same bar that the victim had been to on the night of June 19, 1996, previously with a former girlfriend, and that he routinely traveled on Interstate 476.

On July 10, 1997, two Pennsylvania State Police troopers met with [petitioner's] then-girlfriend, Mary Rumer. Rumer told the troopers that [petitioner] had confessed to her that he murdered Aimee Willard. She told police that [petitioner] related the following events to her: [petitioner] observed Aimee leave the bar, get into her car, and begin to drive away. He followed in his own car. [Petitioner] stopped Aimee's car on Interstate 476 and flashed a fake police badge. When Aimee asked why she was being stopped, [petitioner] told her that she was swerving on the road. Aimee then became angry, at which point [petitioner] punched her, knocking her unconscious. After placing the victim in his car, [petitioner] drove to an abandoned building. [Petitioner] took the victim's clothes, placed them in a trash bag and threw them away. [Petitioner] hit the victim's head with a hard object and killed her. He also admitted raping the victim to Rumer.

Rumer also told the troopers that [petitioner] had shown her the location on Interstate 476 where Aimee Willard's car was abandoned as well as the vacant lot where her body was recovered.

On July 11, 1997, the police conducted a search of [petitioner's] 1993 Ford Escort pursuant to a search warrant. The police seized and removed the following articles: the left front tire of the vehicle, a Firestone FR440 P17570R13; the oil pan from the undercarriage of the vehicle; and the right front door panel, which contained several brownish spots that later tested positive for blood. The tire taken from [petitioner's] car was consistent in tread design, size, and wear pattern with the tire impressions taken from the area where the victim's car was found abandoned. The repeating cross-rectangle shape features, the vertical lines, and the machined edge present on the oil pan taken from [petitioner's] vehicle matched the pattern injury on the right side of the victim's body. Most significantly, deoxyribonucleic acid ("DNA") testing of the bloodstains on the door panel indicated that Aimee Willard was a contributor to the stains.

On July 13, 1997, the police executed a search warrant for samples of [petitioner's] blood. DNA testing of the blood samples established that [petitioner's] DNA profile matched the DNA profile of the male fraction developed from vaginal swabs taken from Aimee Willard. There was but a one in 500 million chance that someone other than [petitioner] was the source of the genetic material taken from the victim.

Also in July of 1997, David O'Donald, [petitioner's] ex-brother-in-law, who was incarcerated in a federal prison for unrelated offenses, met with law enforcement officials to offer his assistance in the ongoing investigation of [petitioner's] involvement in the Willard murder. Pursuant to those discussions, O'Donald was transferred to the Montgomery County Correctional Facility where [petitioner] was being held. O'Donald was placed on the same cellblock as [petitioner] for approximately two weeks in July. On July 17, 1997, while petitioner was in O'Donald's cell, [petitioner] told him, "no body, no Grand Jury indictment." In addition, [petitioner] stated that, "if everyone does what I tell them, I'll be alright." Later that day, while O'Donald was in [petitioner's] cell, [petitioner] stated, "I grabbed the bitch and she said please don't do this." He told O'Donald that he then said to the victim, "I'll do whatever the fuck I want, just shut up", to which she replied, "just don't kill me, I'll do anything." [Petitioner] told O'Donald that at that point, "we did whatever we wanted with her, she did whatever we

told, and when we were done, I almost took her head off, and we crammed a tree branch up her cunt."

Commonwealth v. Bomar, 573 Pa. 426, 441-445, 826 A.2d 831, 840-842 (2003).

Additionally, in the Pa.R.A.P. 1925 opinion filed on July 14, 2000, the trial court included the following facts of record:

> On October 15, 1997, Captain John McKenna, Chief of the Delaware County CID, and Trooper Tedescung L. Bandy of the Pennsylvania State Police questioned [petitioner].   [Petitioner] stated that on the evening of June 19, 1996 and into the early morning hours of June 20, 1996, he was at a birthday gathering with his wife Joyce, his stepson Wayne, his stepdaughters Jackie and Jessica, and their families.   (N.T. 9/23/98, pp. 214-215; 9/29/98, pp. 77-78). [Petitioner] said that he was familiar with the area in which the victim's body was found that that he had been to Smokey Joe's bar previously.   [Petitioner] stated that he did not know the victim; had never met the victim; and the victim was never previously in the [petitioner's] 1993 Ford Escort.   (N.T. 9/23/98, pp. 214-217; 9/29/98, p. 79).
>
> [Petitioner's] ex-wife, Joyce O'Donald, her daughter, Jessica Ingoisi, and her son Wayne Roshong, refuted [petitioner's] alibi. Each testified that [petitioner] was not present during any birthday gathering on the evening of June 19, 1996 as there was no such gathering on June 19, 1996.   (N.T. 9/25/98, pp. 12, 40-41; 9/28/98, pp. 235-236).
>
> Testimony by Joyce O'Donald and Wayne Johnakin, a friend of [petitioner], corroborated that [petitioner] was indeed familiar with the area at issue.   (N.T. 9/25/98, pp. 13-14, 254-259).
>
> Trial Court Opinion (filed 7/14/00).

[PCRA court opinion, 9/4/12, p. 1-8].

On November 21, 2014, the Pennsylvania Supreme Court affirmed the order of the PCRA court and denied PCRA relief.  Commonwealth v. Bomar, 104 A.3d 1179 (Pa. 2014).

On May 1, 2015, petitioner filed a petition seeking <u>certiorari</u> review with the United States Supreme Court. On October 5, 2015, the United States Supreme Court denied that petition by <u>per curiam</u> order. [U.S. Supreme Court Dkt. No. 14-9649].

Petitioner filed a federal <u>habeas corpus</u> petition in the instant case on December 22, 2014, and filed a memorandum of law on May 17, 2016.

Respondents now reply to petitioner's allegations.

## II.   CLAIMS AND STANDARD OF REVIEW

Petitioner raises numerous claims and sub-claims.  Specifically, petitioner asserts the following in his memorandum of law:

> I.     Petitioner's right to due process was violated when he was tried while incompetent and unable to rationally assist counsel.

> II.    Petitioner's convictions and death sentence violated due process of law because two witnesses against him received consideration for their testimony that was not disclosed to the jury and the prosecutor failed to correct their false testimony.

> III.   Statements were taken from petitioner on more than one occasion in violation of petitioner's right to due process under the Fifth and Fourteenth Amendments; trial and appellate counsel failed to properly raise a due process claim.

> IV.    Petitioner's right to an impartial jury under the Sixth and Fourteenth Amendments was violated where the jury was tainted by prejudicial and extraneous information.

> V.     Petitioner was denied a fair trial and effective assistance of counsel, in violation of the Sixth, Eighth, and Fourteen Amendments, because the court excused for cause jurors who expressed reservation about the death penalty; trial counsel was ineffective for failing to object or attempt to rehabilitate the jurors; appellate counsel was ineffective for failing to raise this claim on direct appeal.

VI.     The trial court erred in denying petitioner his right to "life qualify" potential jurors during voir dire.

VII.    Petitioner's convictions and death sentence violate the Sixth, Eighth, and Fourteenth Amendments because unreliable forensic evidence was presented to the jury, and trial counsel ineffectively failed to counter it.

VIII.   Petitioner's Sixth Amendment rights were violated because the sentences imposed for the Rape, Kidnapping, and Abuse of Corpse charges were based upon factors not submitted to the jury.

IX.     Petitioner was denied reliable sentencing and effective assistance of counsel, in violation of the Sixth, Eighth, and Fourteenth Amendments because trial counsel failed to adequately investigate, develop, and present mitigating evidence, and appellate counsel failed to investigate or properly present this claim.

X.      Petitioner is entitled to relief because of the cumulative prejudicial effect of the errors described herein.

[Petitioner's Memorandum of Law, p. ii-v].

It should be noted that petitioner has withdrawn his claim, set forth as claim VIII, and, accordingly, respondents have not addressed that claim in this memorandum.

In each instance, the state court's have properly reviewed and rejected petitioner's claims on the merits. Under these circumstances, the proper standard of review to be applied to the state court's factual determinations and conclusions of law is set forth in the Anti-Terrorism Effective Death Penalty Act (AEDPA) found at 28 U.S.C. 2254.

A federal district court may entertain a state prisoner's habeas corpus petition only regarding grounds that the petitioner is in custody in violation of United States Constitution or the laws of the United States. 28 U.S.C. §2254(a).

If a claim presented in a federal habeas corpus petition has been adjudicated on the merits in state court, habeas relief cannot be granted under the Anti-Terrorism Effective Death Penalty Act (AEDPA), set forth in §2254, unless the adjudication of the claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the state court proceeding.

22 U.S.C. §2254(d).  See:  Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 187 L.Ed.2d 836 (2007); Matteo v. Superintendent, 171 F.3d 877 (3rd Cir. 1999).

Where the state court considers the merits of the claim in the alternative or in summary fashion, the §2254(d) deferential standard of review applies. Rolan v. Coleman, 680 F.3d 311, 319-321 (3rd Cir. 2012); Chadwick v. Janecka, 312 F.3d 597, 605-607 (3rd Cir. 2002) (AEDPA deferential standard applies when Pennsylvania Supreme Court rejected claim on merits without explanation); Hunterson v. Sabato, 308 F.3d 236, 246 (3rd Cir. 2002) (summary adjudications are subject to AEDPA standard of review).

In expressing how rare and difficult it is for a state prisoner habeas petitioner to prevail under the AEDPA standard, the United States Supreme Court has stated:

> Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.  AEDPA requires "a

> state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error…beyond any possibility for fair minded disagreement." Harrington v. Richter, 562 U.S. __, __, 131 S.Ct. 770, 786-787, 178 L.E.2d 624 (2011). "If this standard is difficult to meet: - and it is –"that is because it was meant to be." Id., at __, 131 S.Ct. at 786. We will not lightly conclude a state court's criminal justice system has experienced the "extreme malfunction" for which federal habeas relief is the remedy." Id., at __, 131 S.Ct. at 786. (internal quotation marks omitted).

Burt v. Titlow, __ U.S. __, __, 134 S.Ct. 10, 15-16, 187 L.Ed.2d 348, __ (2013).

The standard of review for considering a claim that counsel provided ineffective assistance is well-settled having been set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.

Id. at 686, 104 S.Ct. at 2064. Thus, a petitioner claiming ineffective assistance must show that counsel's performance was 'deficient' and that the deficiency deprived petitioner of a trial whose result is reliable. Id. at 687, 104 S.Ct. at 2064. To demonstrate that counsel's representation was deficient, petitioner must show that "counsel's representation fell below an objective standard of reasonableness" Id. at 688, 104 S.Ct. at 2064, based on the "facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690, 104 S.Ct. at 2066. Moreover, the Supreme Court has admonished that a federal court's scrutiny of counsel's performance must be highly deferential. Id. at 689, 104 S.Ct. at 2065. See: United States v. Kauffman, 109 F.3d 186, 189 (3rd Cir. 1997); Senk v. Zimmerman, 886 F.2d 611 (3rd Cir. 1989). Prior counsel cannot

be deemed ineffective for failing to pursue a meritless claim. Strickland v. Washington, supra; Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); Commonwealth v. Pursell, 508 Pa. 212, 495 A.2d 183 (1985). See: Chacker v. Petsock, 713 F.Supp. 775 (E.D. Pa. 1989).

In the context of AEDPA, the federal courts must use a "doubly deferential" standard of review when examining a determination that trial counsel provided constitutionally effective assistance. See: Burt v. Titlow, __ U.S. __, 134 S.Ct. 10, 187 L.Ed.2d 348 (2013); Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003); Williams v. Taylor, 529 U.S. 302, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (employing AEDPA standard of review to ineffectiveness claim previously rejected by state court requires doubly deferential review in habeas petition claim). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).

In addition, the standards by which prior counsel's effectiveness must be judged regarding mitigation evidence has been set forth by the United States Supreme Court in Bobby v. Van Hook, 558 U.S. 4, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009).

> In Bobby v. Van Hook, 558 U.S. 4, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009), the United States Supreme Court further clarified what Strickland requires regarding the investigation and preparation of penalty phase mitigating evidence:
>
> > The Sixth Amendment entitles criminal defendants to the "'effective assistance of counsel'" – that is, representation that does not fall "below an objective

standard of reasonableness" in light of "prevailing professional norms." That standard is necessarily a general one... Restatements of professional standards, we have recognized, can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.

Id. at 16 (citations omitted).

Williams and Wiggins did not establish a new federal constitutional standard by which to measure counsel's stewardship in preparing for the penalty phase; they simply applied Strickland's well-settled ineffectiveness standard to later cases involving the specific question of counsel's duty to investigate mitigating evidence in a capital case. This standard is a general one, and must be flexible enough to consider the prevailing professional norms at the time of counsel's performance. See Strickland, at 689, 104 S.Ct. 2052 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Commonwealth v. Birdsong, 24 A.3d 319, 346-347 (Pa. 2011) quoting Bobby v.

Van Hook, supra. at _____, 130 S.Ct. at 16.

III.   DISCUSSION

A.   THE STATE COURTS PROPERLY DETERMINED THAT PETITIONER WAS COMPETENT TO STAND TRIAL.

Petitioner claims that he was incompetent to stand trial and that Pennsylvania courts have erred by ruling otherwise. According to petitioner, a competency evaluation conducted 8 months prior to trial was insufficient to determine petitioner's competence at the time of trial. Moreover, according to petitioner, his behavior prior to trial and the testimony of several experts who

reviewed petitioner's prison records years later established his incompetence to stand trial. He is wrong.

The requirement that a criminal defendant be competent to stand trial is well-settled.

> The Supreme Court set the basic standard for competency in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960): To be competent to plead guilty or stand trial, a defendant must have "a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and must possess "a rational as well as factual understanding of the proceedings against him." Id. at 402, 80 S.Ct. at 788 (internal quotation marks omitted); see: also: Drope, 420 U.S. at 171, 95 S.Ct. 396 ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial.").

Taylor v. Horn, 504 F.3d 416, 430-431 (3rd Cir. 2007).

> "Competency is a state court factual finding that, if supported by the record, is presumed correct" under 28 U.S.C. §2254(e)(1) unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence."

Taylor v. Horn, supra at 433, citing Thompson v. Keohane, 516 U.S. 99, 111, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) and Demosthenes v. Baal, 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990) (per curiam).

In the instant case, in rejecting petitioner's claim that he was not competent to stand trial, the PCRA court determined that:

> [I]t is… significant that petitioner has been subject to competency evaluations and assessments several times beginning in October of 1978 when he faced a murder charge in Nevada and up to and including the retrospective assessment of Dr. Dudley that is reflected in his October 2006 report and PCRA testimony of July 17, 2007. With the exception of Dr. Dudley, on each occasion, petitioner has been found to be competent to stand trial. In each instance the expert evaluator determined current competency based on a

contemporaneous assessment. Examining psychiatrists have come to the same conclusion, i.e., that petitioner was competent at each juncture, while suggesting or finding diagnoses that include personality disorders: specifically anti-social personality disorder and/or borderline personality disorder. These findings reflect the well-accepted principle that mental illness does not preclude a finding of competency. See e.g. Commonwealth v. Frey, 904 A.2d 866, 873 n.10 (Pa. 2006); Commonwealth v. Santiago, 855 A.2d 682, 697 (Pa. 2004) (fact that a defendant has experienced mental illness does not render him incompetent).

For the reasons discussed above, the PCRA court did not accept as credible Dr. Dudley's opinion that because petitioner suffers from a range of psychiatric symptoms characterized by dissociative episodes that render him unable to recall significant portions of his personal history he is unable to assist counsel in his defense and therefore, incompetent. See N.T. 10/21/09, pp. 156, 171. Similarly, we reject his hindsight assessment of petitioner's competency to stand trial and find more persuasive the evaluations conducted months before and during trial rather than six years later. See Commonwealth v. Bracey, 795 A.2d 935, 945 (Pa. 2001) (focal time for evaluating competency was time of trial; rejecting opinion of defense experts who conducted evaluation five years later in favor of testimony of trial counsel and mental health experts who evaluated defendant at trial of trial).

[PCRA court opinion, 9/4/12, p. 24-25].

It was Dr. Sadoff's opinion that while symptoms of a paranoid personality disorder were present, petitioner did not suffer from a psychosis and was competent to stand trial. A report was prepared setting forth his findings. See PCRA Exhibit Packet 2, p. 754. Dr. Sadoff's assessment was based on the aforesaid evaluation. While Dr. Sadoff did not have records to consider while conducting this evaluation, he was advised of petitioner's suicide attempt, the resulting hospitalization, the accusations against trial counsel, and petitioner's "acting out" and disruptive behavior at the prison. See N.T. 11/7/08, pp. 64, 75, 127.

\*       \*       \*       \*       \*

More recently, in the November 7, 2008 hearing upon the PCRA petition, after reviewing and considering additional records provided by PCRA counsel, Dr. Sadoff testified that while he would consider any records he is given in assessing competency, records are not necessary to an assessment. N.T. 11/7/08, p. 102. When asked whether his opinion as to petitioner's competency in January 1998

was changed in light of the currently available records he unequivocally stated that his opinion that petitioner was competent at the time of his examination remains unchanged.  See N.T. 11/7/08, pp. 104, 114.    While Dr. Sadoff found behaviors documented in the records consistent with personality disorders with which petitioner has been diagnosed, the presence of those disorders does not preclude a finding of competency.  Id. at 112-113.

Dr. Gerald Cooke examined petitioner on April 30, 1998 and on September 26, 1998 in anticipation of testifying at the penalty phase of trial.  In post-sentence testimony he stated "[t]here was no question whatsoever" that petitioner was competent to stand trial. N.T. 4/20/[99], p. 117.  In PCRA testimony Dr. Cooke confirmed the fact that he evaluated petitioner for competency on April 30, 1998 and on September 26, 1998.  N.T. 11/6/08, pp. 224-227.  Although he testified that at the time of these evaluations he did not have all of the records provided to him since by PCRA counsel, additional records were not necessary to determine competency.  Dr. Cooke did clinical evaluations and administered a battery of psychological tests.  In his opinion petitioner was competent to stand trial, in that he knew the nature and object of the proceedings against him and was able to communicate with counsel and participate in his defense.  See N.T. 11/6/08, pp. 224-229.  At the time of his PCRA testimony, after he was provided with the additional records, Dr. Cooke's opinion remained unchanged.  Significantly, Dr. Cooke's September 26, 1998 evaluation took place in the midst of trial, after several days were spent in Westmoreland County for jury selection, after opening arguments were made and after five days of testimony during which forty-eight Commonwealth witnesses were heard.  N.T. 4/20/99, p. 117.

*     *     *     *     *

Trial counsel's testimony in both post-sentence and PCRA proceedings corroborates the opinions of Dr. Sadoff and Dr. Cooke. In March of 1999, trial counsel testified that he had concerns about petitioner's competency after petitioner attempted suicide on December 31, 1997.  His concern continued for only about a week or two when petitioner accused trial counsel of working for the district attorney and of raping petitioner's wife.  N.T. 3/4/99, p. 140. Mr. Much informed Dr. Sadoff of the suicide attempt and the rape accusations before his competency evaluation took place.  Id. at 141.    Trial counsel filed the petition requesting a competency evaluation and ultimately Dr. Sadoff opined that petitioner was competent.    Trial counsel testified: "Other than that during the

16

whole course of my representation of Arthur from December of 1997 until December of 1998, he cooperated with me, he participated in the decision-making process of his defense. I – I had no concerns regarding his mental state whatsoever." Id. See also N.T. 11/5/08, pp. 119-122. In 1999 trial counsel explained why he was satisfied that petitioner was competent and described at length petitioner's participation at trial. Trial counsel was present during Dr. Sadoff's evaluation. Trial counsel recognized the fact that competency could vary over time and was satisfied with Dr. Sadoff's conclusions, knowing that an additional evaluation would be conducted by Dr. Cooke. N.T. 3/4/99, p. 129-29.

Trial counsel conferred with Dr. Cooke afterwards. N.T. 3/4/99, pp. 132, 190. Dr. Cooke confirmed trial counsel's belief that petitioner was competent. Id. at 132, 135. Trial counsel spoke with petitioner more than fifty times. Id. at 101. As this matter proceeded toward the jury trial, petitioner participated in virtually every decision that was made. Trial counsel explained to and consulted with petitioner regarding the various issues that arose and sought petitioner's input. Petitioner actively participated in jury selection, testified at a suppression hearing, decided to forego an alibi defense after an extensive investigation and consultation with counsel, adamantly proclaimed his innocence and refused to consider a mental health defense. He had the "final say" on every important aspect of the case after consultation with counsel, provided information concerning the possibility of an alibi defense, provided information in an attempt to counter the Commonwealth's evidence as part of the overall defense strategy, gave approval regarding trial strategy, the decision not to call witnesses or to testify at trial, and to pursue a defense based on "reasonable doubt". See e.g. N.T. 3/4/99, pp. 62-63, 98, 162-64, 101, 122, 138, 143-46, 149, 151, 164-65, 167-68, 71-81, 88-89. See generally Id. at 12-220, 222-275. See also N.T. 11/5/08, pp. 138-43, 178-179, 192-96, 205-06, 213-19. The observations of the court concerning petitioner's active participation in pre-trial and trial proceedings and jury selection were consistent with the testimony of trial counsel.

In his 1999 post-sentence motion testimony, Dr. Cooke testified that there was no question that petitioner was competent to stand trial. At the November 5, 2008 PCRA hearing trial counsel was repeatedly confronted with evidence from jail records documenting behaviors that took place during petitioner's pre-trial incarceration. These incidents included head-banging and other destructive behaviors. Trial counsel was aware of these incidents as they occurred and explained his belief that petitioner was nevertheless competent. When trial counsel was advised of such behaviors he

confronted petitioner. Petitioner explained that he was "messing" with the guards because they were "messing" with him and he was unhappy with the conditions surrounding him during his incarceration. See N.T. 11/5/08, pp. 99-101, 211-19. Concerning the accusations of rape, petitioner claimed he was testing trial counsel and it was "entertaining" for him to act out. Id. at 128-29. Similarly, at one point during the early stages of trial preparation, petitioner admitted to murdering Aimee Willard in a detailed account of the surrounding events. Later, he recanted his admission and told counsel this was a "test" to see if trial counsel would continue to represent him. Id. at 134-36. At the same time, before and throughout trial, petitioner cooperated with counsel in preparation of the guilt phase defense. Id. at 100-01. Over the course of a year, trial counsel visited petitioner at least weekly, spending several hours at a time with him on occasion. While they disagreed at times, [petitioner's] views were always based on reason. Id. at 114-115, 143, 179. Petitioner understood the nature of the charges he faced, the roles of the parties, the implications of a diminished capacity defense, and the possibility that he would be sentenced to death if the guilt phase did not result in a favorable outcome. Id. at 119-22, 130. As issues arose in preparing for trial, counsel gave petitioner materials to read and to consider. Petitioner read the materials, discussed the issues with counsel and responded appropriately. Id. at 206-09. In light of all of the foregoing, trial counsel's assessment was that petitioner's behavior, while admittedly bizarre at times, was the manifestation of his attempts to manipulate those around him as opposed to being rooted in mental illness. Id. at 101-02.

Petitioner has failed to meet his burden of proving that he was in fact incompetent at the time he stood trial. To the extent that Dr. Dudley finds evidence of petitioner's tendency to decompose to a transitory "dissociative state", we explicitly reject his testimony in favor of evidence of the evaluations performed before trial, the testimony of trial counsel and the contrary testimony of Drs. Michals, Cooke and Sadoff regarding this issue. See N.T. 2/3/10, pp. 14-38; 11/6/08, p. 227; 11/7/08, p. 116.

[PCRA court opinion, 9/4/12, p. 26-32].

In rejecting petitioner's claim that he lacked competence to stand trial, the

Pennsylvania Supreme Court stated:

A defendant is presumed to be competent to stand trial and bears the burden of proving otherwise. Commonwealth v. Smith, 609 Pa.

605, 17 A.3d 873, 899 (2011). To establish that he was incompetent, [petitioner] must prove by preponderance of the evidence, "that he was either unable to understand the nature of the proceedings against him or to participate in his own defense." Rainey, 928 A.2d at 236. Here, [petitioner] has failed to meet this burden. In arguing he was incompetent to stand trial, [petitioner] relies primarily upon Dr. Dudley's competency evaluations which took place six years after [petitioner's] trial. As the Commonwealth observes, however, a defendant's competency to stand trial must be evaluated at the time of trial. Commonwealth v. Bracey, 568 Pa. 264, 795 A.2d 935, 945-46 (2001) (rejecting competency evaluation from five years after trial). In providing Dr. Dudley's hindsight assessment of [petitioner's] competency to stand trial, [petitioner] plainly overlooks this requirement.  See: Id.; Brown, 872 A.2d at 1156 (rejecting competency assessment from eight years after trial).

To the extent that Dr. Sadoff's competency evaluation from eight months before trial similarly failed to establish [petitioner's] competency at the time of trial, and to the extent that he asserts the evaluation was inadequate because the prison records were not made available to Dr. Sadoff, we note that [petitioner] failed to object to Dr. Sadoff's evaluation and testimony at the pre-trial competency hearing and, thus, he has waived the argument [fn. 18].

> [fn. 18].   [Petitioner] concedes counsel's failure to object, but nonetheless raises no claim of ineffectiveness herein.

See: Pa.R.A.P. 302(a). Moreover, as noted above, the burden is on [petitioner] to establish his incompetency, rather than on the Commonwealth to establish [petitioner's] competency. See: Smith, 17 A.3d at 899. In any event, as the PCRA court observed below, additional competency evaluations were conducted in April 1998 and September 1998, closer in proximity to [petitioner's] trial, which confirmed [petitioner's] competence, and Dr. Sadoff testified during the PCRA hearing that he was informed of the events contained in the prison records prior to conducting his examination of [petitioner], and they did not impact his conclusion. Accordingly we decline to find that the PCRA court erred in rejecting [petitoner's] competency claim.

Commonwealth v. Bomar, 104 A.3d 1179, 1196-1197 (Pa. 2014).

The factual findings of the PCRA court are supported by the record and its conclusions of law are not erroneous. The same is true of the Pennsylvania Supreme Court's decision.

Findings of fact made by the state courts are entitled to a statutory presumption of correctness under 28 U.S.C. §2254(d) to the extent that such facts are supported by the record. Alston v. Redman, 34 F.3d 1237, 1253 (3rd Cir. 1994). Mere disagreement with the inferential leap of credibility determinations of the state courts provides no basis for the grant of federal habeas corpus relief. Porter v. Horn, 275 F.Supp.2d 278, 296 (U.S.D.C. E.D. Pa. 2003).

Even if this Court viewed the state courts' decisions regarding these matters as wrong, that view would not necessarily authorize this Court to grant habeas relief. The United States Supreme Court has ruled that an application of federal law may be incorrect and still not be unreasonable Schriro v. Landrigan, supra at 473, 127 S.Ct. at 1939, 167 L.Ed.2d at __.

> "A federal habeas court may not issue the writ simply because in its independent judgment that the state court decision applied [the law] incorrectly," Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S.Ct. 35-37, 154 L.Ed.2d 279 (2002) (per curiam).  Relief is available under §2254(d)(1) only if the state courts' decision was objectively unreasonable. See:  Williams, supra, at 410, 120 S.Ct. 1495; Andrade, 538 U.S. at 75, 123 S.Ct. 1166.

Yarborough v. Alvarado, 541 U.S. 652, __, 124 S.Ct. 2140, 2150, 158 L.Ed.2d 938, __ (2004).

Applying the proper standard of review under AEDPA, it cannot be said that the state courts' decision, that petitioner was competent to stand trial, was

either: (1) contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (2) based upon unreasonable findings of fact by the state courts. Accordingly, petitioner's claim of incompetence to stand trial must be rejected as meritless.

## B. THERE WERE NO UNDISCLOSED DEALS BETWEEN THE COMMONWEALTH AND THE COMMONWEALTH WITNESSES AND THE PROSECUTOR DID NOT FAIL TO CORRECT FALSE TESTIMONY AT TRIAL FROM THE WITNESSES.

Petitioner claims that his due process rights were violated by the Commonwealth's failure to disclose consideration that it offered to two Commonwealth witnesses during trial. Moreover, petitioner claims the Pennsylvania Supreme Court did not address the claim on the merits and did not properly address it in resolving the matter. According to petitioner, these claims are not subject to the deferential AEDPA standard of review and he is entitled to habeas relief. He is wrong.

The PCRA court specifically rejected petitioner's claims that: (1) the Commonwealth had undisclosed deals with witnesses David O'Donald and Quincy Jamal Williams, (2) that the prosecutor failed to correct false testimony from O'Doanld and Williams, and (3) that prior counsel were ineffective in representing petitioner regarding these claims. Judge Hazel found that:

> Petitioner has failed to meet his burden of proving by a preponderance of the evidence that, in fact, undisclosed agreements existed and, therefore that O'Donald and Williams testified falsely regarding those agreements and that the prosecutor engaged in misconduct by failing to correct false testimony. Under these circumstances, the claims that both trial counsel and appellate counsel were ineffective in their representation fail.

[PCRA court opinion, 9/4/12, p. 33].

With regard to Mr. O'Donald, Judge Hazel found as a fact that there was no undisclosed deal with state prosecutors. Prior to his sentencing on federal bank robbery charges, Mr. O'Donald and his attorney provided federal prosecutors with information regarding additional uncharged bank robberies which allowed federal prosecutors to close their investigations regarding 12 previously unsolved bank robberies. In his federal sentencing proceedings, Mr. O'Donald made an agreement with federal prosecutors that, in exchange for his cooperation regarding the federal bank robberies, the federal prosecutors would inform the federal sentencing court judge and allow the federal court to impose a sentence below the applicable mandatory minimums sentence and make a downward departure of the federal sentencing guidelines. The federal government's obligation under the agreement was conditioned on its determination that Mr. O'Donald fulfilled his obligation under the agreement and this determination was solely within the discretion of the federal prosecutors. Mr. O'Donald entered a guilty plea before United States District Court Judge Franklin Van Antwerpen, per the terms of the agreement, on February 29, 1997. The federal sentencing agreement was presented to trial counsel for petitioner, Mark Much, Esquire, during discovery.

Following PCRA evidentiary hearings, Judge Hazel found as a fact that:

When O'Donald entered his federal plea, he did not know about petitioner's suspected involvement in the murder of Aimee Willard. N.T. 8/29/97, p. 291. He became aware of petitioner's involvement sometime in June of 1997. Id. At the conclusion of one interview or "proffer," O'Donald told [Assistant United States Attorney] Poluka that Arthur Bomar was his brother-in-law. This information was unsolicited. N.T. 7/16/09, p. 11. O'Donald initiated discussions

about the Bomar case because he thought that he would get a downward departure, a reduction in his sentencing by cooperating. N.T.1/16/09, p. 86-91. Poluka passed the information on to authorities investigating the murder of Aimee Willard. N.T. 1/16/09, p. 11-12. O'Donald's cooperation with local authorities in the Willard investigation flowed from the February 1997 plea agreement. N.T. 1/16/09, p. 54-57. Poluka knew of no "side" agreements between O'Donald and any other governmental agency. Id.

[PCRA court opinion, 9/4/12, p. 38].

When Delaware County First Assistant District Attorney Joseph McGettigan met with Mr. O'Donald and other law enforcement officials on July 2, 1997, to discuss Mr. O'Donald possibly serving as a "passive listening post", he made it clear that he did not have the authority to make any recommendations or effect Mr. O'Donald's pending federal sentence despite O'Donald's expectations.

McGettigan explained that he was not a member of the United States Attorney's Office and therefore had no authority to appear in court or make a recommendation on O'Donald's behalf at that sentencing. He explained that he did have the ability to provide his opinion regarding the sincerity and candor of O'Donald's cooperation to federal prosecutors and that any benefit O'Donald would receive from this cooperation would flow from his sincere and candid cooperation and not from the information he might provide. McGettigan continued: "Do you understand that no additional benefit will flow to you as a result of any information that you may provide?" He then described O'Donald's role as a passive listening post and instructed him not to ask any questions, direct the conversation or induce or attempt to induce incriminating statements from petitioner. See: exhibit 92.

[PCRA court opinion, 9/4/12, p. 39].

In rejecting petitioner's claim regarding an alleged undisclosed deal with Mr. O'Donald, Judge Hazel explained:

O'Donald did receive consideration for his cooperation in the Bomar matter at his October 17, 1997 sentencing hearing before Judge Van Antwerpen. As Mr. Poluka testified, O'Donald's cooperation in

this matter flowed from his February 1997 plea agreement in that, during the course of interviews with federal prosecutor Poluka, he offered to cooperate with local law enforcement in the Bomar investigation. This agreement was in the hands of trial counsel and was used with great effectiveness in cross-examination. Except for the testimony of O'Donald, which we find lacking in credibility, the evidence demonstrates that before trial no prosecutor, local or federal, promised O'Donald that a motion seeking a further reduction would be filed on his behalf if he testified at trial. See N.T. 1/16/09 p. 69. Petitioner claims that the evidence demonstrates that at the July 2, 1997 meeting O'Donald was told that his cooperation would be reported to the federal prosecutor and the federal prosecutor would "in turn" report it to the federal judge via a Rule 35 motion. The facts of record do not support this conclusion. Rather, prosecutor McGettigan told O'Donald "that he was not a member of the United States Attorney's Office and that he had no authority to appear in court or to make recommendations regarding O'Donald's sentencing." Additionally McGettigan advised O'Donald that he did have the ability to advise the United States Attorney's Office of his "opinion of the sincerity and candor of [O'Donald's] cooperation" and that any benefit O'Donald might receive would come, not from the information he provided, but would flow solely from his "sincere and candid cooperation in terms of [his] willingness to serve as a 'listening post' for Bowmar(sic)." In accord with this representation O'Donald's cooperation was brought before Judge Van Antwerpen at the October 1997 sentencing and, in addition to his cooperation in the bank robberies, this information was considered by the court. The government's motion for a downward departure was granted and a reduced sentence was imposed.

Mr. Poluka filed the October 1998 Federal Rule 35(b) motion following trial at the request of [O'Donald's attorney] Mr. Dimitriou, within one year of sentencing as the rule requires. As the federal prosecutor assigned to O'Donald's case, Mr. Poluka was called upon by Mr. Dimitriou to file the motion. This motion left the decision to reduce O'Donald's sentence within the discretion of the sentencing judge. Rule 35(b) of the Federal Rules of Criminal procedure was in effect at the time of trial. When read in conjunction with Rule 35(b), the plea agreement gave petitioner notice of the existing plea agreement, the consideration that O'Donald had already received for his cooperation and the possibility that O'Donald might seek a further reduction pursuant to the federal rules. See Commonwealth v. Tielsch, 934 A.2d 81 (Pa.Super. 2007) (Commonwealth was under no obligation to postulate alternative motivations for [witness's] testimony" where

plea agreement was disclosed, trial counsel "meticulously cross-examined" witness regarding details of plea agreement and motivation for testifying where witness subsequently sought reduction of sentence in federal court).

While O'Donald testified that he believed he was promised an incremental reduction in his sentence each time he "gave" something to the Government, see N.T. 1/15/09 p. 109, we find his subjective belief does not support the conclusion that promises of this nature were made. Rather, O'Donald worked in his own self-interest, providing information in this and other cases and then tenaciously attempted to maximize his benefit.  His repeated claims of the ineffective assistance of counsel in federal court and his expressed dissatisfaction with his own sentence as compared with co-defendants' [sentences] support this conclusion. In the early 1980's O'Donald provided information to officials in Montgomery County and to Drug Enforcement Agency officials and avoided charges for a firearms violation in exchange for his cooperation. N.T. 1/15/09 pp. 36-39, 98. O'Donald continuously sought reductions in his federal sentence.  He provided evidence to federal prosecutors regarding the bank robberies and identified   co-defendants, he provided the inculpatory statements of a fellow inmate concerning the armed robbery of a TGI Friday's, and he cooperated in this case. In each instance he took the opportunity to request a reduction in his sentence under federal rules by contacting the federal prosecutor through his attorney and asking for a Rule 35 motion to be filed or by proceeding pro se. O'Donald's actions do not evidence the existence of an undisclosed agreement but reflect the fact that subjectively, Mr. O'Donald was never satisfied with his sentence and he persistently sought reductions using all methods within his means. O'Donald did not consider the reductions in sentence he obtained "substantial" in light of the lesser sentences his co-conspirator bank-robbers received. Rather, he expected a sentence of eight years and was disappointed when this was never realized. See e.g. N.T. 1/15/09 p. 32-35, 91-95, 102, 105. See Commonwealth v. Miller  987 A.2d 638, 655 (Pa. 2009) (credibility determinations are within the province of the PCRA court).

Trial counsel testified that he investigated the terms of O'Donald's plea agreement and the consideration he had received and argued those facts to the jury. N.T. 11/5/08 pp. 183-87. Trial counsel acknowledged the fact that any defendant who cooperates in a federal investigation could file a petition for a reduction of sentence offering his cooperation as grounds. Id. O'Donald's credibility was challenged at trial through vigorous, and in fact blistering, cross-

examination highlighting the fact that O'Donald, a man who committed among other crimes, twelve armed bank robberies, had already benefitted from his cooperation and had tailored and timed his statements to maximize his benefit. O'Donald related his dissatisfaction with the sentence he received to the jury and testified that a motion challenging his sentence was pending at the time of trial. O'Donald admitted he knew that his sentencing dates were continued pending his "level of cooperation" in the Bomar case and he believed "the level of his cooperation in the Bomar case would or should have some impact on the sentence [he] received in federal court." N.T. 9/28/98 p. 297. This testimony resulted in an instruction directing the jury to consider O'Donald's testimony with caution. See Commonwealth v. Champney, 832 A.2d 403 (Pa. 2003) (trial court instructed the jury to view witness's testimony with caution where he hoped for a reduction of sentence in federal court). See also Commonwealth v. Burkhardt 833 A.2d 233, 244 (Pa.Super. 2003)( witness's "subjective hope and even expectation of more lenient treatment is not something the Commonwealth is required, or even able, to disclose;" where witness testified as to limited promises made by the Commonwealth in exchange for his testimony and his hope that he would "be allowed to plead guilty to lesser charges" and was subject to cross-examination as to his expectation of leniency, there was no reasonable probability that the outcome would have been different had jury been informed of alleged Commonwealth promise to consider witness's testimony in proceeding against him after trial). Thus, in light of the foregoing, even if it is assumed, arguendo, that by filing the Rule 35(b) motion after trial, Poluka provided "consideration" for O'Donald's testimony and that this not yet realized possibility was not put before the jury, it may not be concluded that there is any reasonable likelihood that  the incremental damage to O'Donald's credibility which this possibility may have supplied, would have affected the verdict.

Abundant additional evidence of petitioner's guilt was offered at trial. In addition to vast circumstantial and DNA evidence,  the jury heard testimony concerning admissions that petitioner made to Quincy Williams and Mary Rumer.   The credibility of these witnesses is completely unaffected by the testimony of O'Donald. Rather, petitioner's admissions to O'Donald were corroborated by independent admissions made to Quincy Williams and Mary Rumer and by the extensive circumstantial and physical evidence of guilt offered at trial. See generally, Commonwealth v. Weiss, 986 A.2d 808 (Pa. 2009) (mere possibility that undisclosed information might have helped the defense or affected the outcome of trial does not establish materiality in the constitutional sense; to be entitled to

new trial for failure to disclose evidence affecting a witness's credibility, the defendant must demonstrate that the reliability of the witness may well be determinative of defendant's guilt or innocence; salient inquiry is, whether absent impeachment evidence regarding witness's credibility, defendant had a "fair trial worthy of confidence in the verdict"). Compare Commonwealth v. Strong, 761 A.2d 1167 (Pa. 2000) (Commonwealth's failure to disclose evidence of negotiations of "mere promise or understanding" of leniency between Commonwealth and key witness who "put gun in appellant's hand at the moment of the murder was a violation of the Fourteenth Amendment under Brady). We recognize the fact that only O'Donald testified that petitioner shared the admission that "we crammed a tree branch up her cunt and then we dumped the bitch." See N.T. 9/28/98 p. 252. However, this admission was corroborated by three witnesses who testified that the victim's body was discovered with a tree-branch "stuck in her vagina." See N.T. 9/22/98 pp. 75-76, 93-94, 219. Additionally, this was but one of many statements petitioner made in which he admitted that he murdered Aimee Willard. The additional admissions were made independently to several people and remain unrelated to O'Donald and are therefore unaffected by O'Donald's credibility or lack thereof. Therefore, in light of the overwhelming evidence at trial, coming from a plethora of sources, the rigorous cross-examination and argument of trial counsel and the cautionary instruction delivered by the court concerning the jury's consideration of O'Donald's testimony, the absence of this evidence at trial had, in our view, no impact on the verdict. Petitioner received the fair trial to which he was entitled.

In light of the record, we also reject the claim that the prosecutor engaged in prosecutorial misconduct for failing to correct the allegedly false testimony. The fact that consideration was not offered for future testimony did not preclude O'Donald, given his experience, from recognizing an opportunity and acting on it. This proclivity was before the jury when, upon questioning from the court, he admitted that he expected that his level of cooperation in this case should have some impact upon his federal sentence. See N.T. 9/28/98 p. 297. In his closing argument the prosecutor accurately portrayed O'Donald's situation. He had been sentenced, he was unhappy with his sentence and he was seeking relief in federal court. Because no agreement for further consideration existed the prosecutor had no obligation to speculate and advise the jury that O'Donald might seek a further reduction in federal court.

Trial counsel's representation was not constitutionally deficient. Again, on cross-examination trial counsel put O'Donald's long criminal history before the jury portraying him as a despicable character, a thief who robbed banks at gunpoint and who would say anything and offered his services in this matter in exchange for substantial relief from what could have been a 110 year federal sentence. Under these circumstances and with this evidence in mind, trial counsel cannot be faulted for failing to pursue the possibility that O'Donald might pursue further incremental relief through an additional motion for a downward departure. Trial counsel's strategy was reasonably based and petitioner has failed to meet his burden of proving resulting prejudice. Likewise, appellate counsel did not provide ineffective assistance for failing to discover an agreement that did not exist.

[PCRA court opinion, 9/4/12, p. 49-56].

With regard to Quincy Jamal Williams, Judge Hazel also found as a fact that there was no undisclosed deal with the Commonwealth. In rejecting petitioner's claim, Judge Hazel wrote the following:

The credible evidence supports the conclusion that no agreement existed. On October 21, 1998 Mr. McDevitt did write a letter to the Department of Corrections, requesting that Williams and petitioner be housed "separate and apart" from each other for the duration of Williams' incarceration in light of the fact that Williams had testified against petitioner at trial. See P-Exhibit packet #4, tab 24. Thereafter, in 2000, Williams' mother, Joanne Williams, contacted Mr. McDevitt and asked that he advise the Pennsylvania Board of Probation and Parole of Williams part in this matter. Mr. McDevitt wrote a letter and addressed it "To Whom it May Concern" care of Joanne Williams. In November of 2002 Mr. McDevitt confirmed authorship of that letter at the request of the Department of Corrections. There is no credible evidence that this letter and confirmation were part of an agreement between Williams and any member of law enforcement. Rather, Mr. McDevitt testified credibly, that he never promised that in exchange for testimony, he would ensure Williams would serve only his minimum by intervening with the Board of Probation and Parole on Williams' behalf. N.T. 1/15/09 pp. 163-165.

At the PCRA hearing, when confronted with testimony given under oath from both petitioner's trial and his own sentencing, Williams stated that he lied each time he represented that no promises were

made by law enforcement for his testimony. He confirmed that he sat silently when Mr. McDevitt testified before the sentencing judge that no deal had been made and that Williams received no consideration for his testimony. See N.T. 9/24/09 pp. 22-23, 34-45. In a letter dated June 5, 2003 Mr. McDevitt responded to correspondence from Williams wherein Williams asks him to contact the Parole Board as he had promised. See Exhibit P-87. Mr. McDevitt responded, confirming the fact that no "deal" existed.

While Williams may have harbored the subjective hope [fn. 4] that at some point his testimony would garner a benefit, there is no credible evidence supporting the conclusion that Mr. McDevitt, or anyone in law enforcement, promised him parole upon the service of his minimum sentence.

> [fn. 4]  We note that the jury was also instructed to view Williams' testimony with caution: "you should examine his testimony closely and carefully and receive it with caution, if you find that he had any agreement, either explicit or implicit in nature, with law enforcement authorities that he would receive favorable treatment in any criminal matters in which he was or is involved, in return for his cooperation and/or testimony in this case. In addition, you should examine his testimony closely and carefully and receive it with caution if you find that he believed in his own mind, regardless of any agreement with law enforcement authorities, that he would receive favorable treatment in any criminal matters in which he was or is involved, in return for his cooperation or testimony in this matter." N.T. 9/30/98, pp. 160-61.

Williams testified that during his incarceration and currently on the street, he has been labeled a "snitch" and that he has suffered negative consequences as a result of testifying. See N.T. 1/15/09 pp. 16-17, 21-13. Apparently he now hopes that by disavowing his prior testimony he will alleviate the consequences that remain. His PCRA testimony was wholly incredible and will not support Petitioner's claim for relief. See generally Commonwealth v. Barksdale, 275 A.2d 291, 292 (Pa. 1971) (where there is no clear proof that the prosecutor's office made any deal with testifying co-defendant, fact that she received more lenient sentence did not support finding that witness testified falsely that she was not offered consideration in exchange for testimony). Finally, neither trial counsel nor appellate counsel can be found ineffective for failing to pursue this issue as it lacks arguable merit.

[PCRA court opinion 9/4/12, p. 58-60].

The Pennsylvania Supreme Court also rejected petitioner's claims regarding both Mr. O'Donald and Mr. Williams. The Pennsylvania Supreme Court did not expressly adopt the factual findings of the PCRA court regarding the fact that there was no undisclosed deal with Mr. O'Donald and, instead, simply ruled that even if here had been such a deal, there was no prejudice to petitioner because of the overwhelming evidence of his guilt and the lack of any reasonable possibility that the outcome would have been different if the purported Brady material had been disclosed and presented at trial.

Regarding the purported deal with Mr. O'Donald, the Pennsylvania Supreme Court wrote:

> [W]e need not reach a definitive conclusion as to whether or not an agreement existed between O'Donald and prosecutors because, even if such an agreement did exist, any Brady violation in this regard did not prejudice [petitioner] in light of the extensive DNA and circumstantial evidence against him, including, inter alia, sperm recovered from the victim's vagina which matched [petitioner's] DNA profile; DNA from the victim found on the right door panel of [petitioner's] vehicle; tire patterns at the murder scene which matched tire patterns from [petitioner's] vehicle, and testimony from [petitioner's] ex-girlfriend revealing that [petitioner] confessed to raping and murdering the victim, and described specific details surrounding the incident. Moreover, O'Donald admitted during direct examination that he had a plea agreement with federal prosecutors, that his cooperation in [petitioner's] case was brought to the federal judge's attention during October 1997 sentencing hearing, that he was dissatisfied with his current sentence, and that a motion for further reduction of his sentence was pending, N.T. 9/28/98, at 273, 285-87, prompting the trial court to instruct the jury to consider O'Donald's testimony with caution because O'Donald "believed the level of his cooperation with law enforcement authorities in this case would have a postive impact on the sentence he would receive in federal court." PCRA opinion, 9/4/12, at 44 (quoting N.T. 9/30/98, at 160). Thus, in light of the substantial

> evidence against [petitioner] and the fact that the trial court highlighted possible bias in O'Donald's testimony and directed the jury to view the testimony with caution, we find that it is not probable that the result of [petitioner's] trial would have been different if the alleged <u>Brady</u> material had been disclosed to him.

<u>Commonwealth v. Bomar II</u>, <u>supra</u> at 158-159, 104 A.3d at 1192-1193.

Regarding the assertion of an undisclosed deal with Quincy Jamal Williams, the Pennsylvania Supreme Court totally adopted the factual findings of the PCRA court and rejected petitioner's claims as meritless.

> While [petitioner] bases his claims on Williams' testimony, the PCRA court specifically found the testimony was incredible. [Petitioner's] reliance on his earlier plea agreement and Assistant District Attorney McDevitt's letter to the Parole Board is similarly unavailing. Indeed, Williams entered his open guilty plea and was sentenced in July 1998, months before [petitioner's] trial began and Assistant District Attorney McDevitt's parole letter makes no reference to an agreement with Williams and, in fact, states that Williams' cooperation with law enforcement was entirely voluntary. Further, although as noted, Williams referenced a deal in his letter to Assistant District Attorney McDevitt, Assistant District Attorney McDevitt's letter in response explicitly rejected the existence of an agreement between Williams and the Commonwealth. Accordingly, because [petitioner] has failed to establish with credible evidence that an agreement existed between Williams and the Commonwealth, his claim fails.

<u>Commonwealth v. Bomar II</u>, <u>supra</u> at 160-161, 104 A.3d at 1193-1194.

The factual findings of the PCRA court are supported by the record and must be given a presumption of correctness in <u>habeas</u> review even if the Pennsylvania Supreme Court did not specifically adopt or address those factual findings. A PCRA court's factual findings are entitled to deference under 28 U.S.C. §2254(e)(1) and presumed correct unless a petitioner rebuts the presumption of correctness by clear and convincing evidence. <u>Taylor v. Horn</u>, 504 F.3d 416, 429 (3rd Cir. 2007); <u>Weeks v. Snyder</u>, 219 F.3d 245, 259 (3rd Cir.

200); Forbes v. DiGuglielmo, (2011 WL 7447152) (U.S.D.C. E.D. Pa. J. Slomksy order adopting report and recommendation n. 10 of U.S.M.J. Restrepo) ("the §2254(e)(1) presumption of correctness applies [to a state court's factual findings] regardless of whether there has been an 'adjudication on the merits' for purposes of §2254(d)." See Thomas, 570 F.3d at 116 (quoting Nara v. Frank, 488 F.3d 187 (3rd Cir. 2007)).

In this case, the PCRA court specifically found as a fact that there was no undisclosed deal with either Mr. O'Donald or Mr. Williams.  In arriving at its factual determinations, the PCRA court found the testimony of Mr. O'Donald and Mr. Williams on this point to be not credible while finding the testimony of Assistant District Attorney McDevitt and Assistant United States Attorney Poluka to be credible. "Except for the testimony of O'Donald, which we find lacking in credibility, the evidence demonstrates that before trial no prosecutor, local or federal, promised O'Donald that a motion seeking a further reduction would be filed on his behalf if he testified at trial." [PCRA court opnion, 9/4/12, p. 49].

While petitioner now asserts that the PCRA court made unreasonable factual findings, he has not demonstrated by clear and convincing evidence that the PCRA court's factual and credibility determinations are wrong or should not be given the presumption of correctness and deference that they are due upon habeas review under §2254(e)(1). Instead, he merely asserts that the PCRA court's factual findings are unreasonable and, rather than accepting the PCRA court's factual findings, he simply makes up his own facts. Petitioner's claims regarding purported unreasonable factual determinations by the state courts are

totally meritless and should be rejected by this Court as a basis upon which to grant habeas relief.

Petitioner's assertion, that the Pennsylvania Supreme Court did not resolve the questions regarding purported Brady violations on the merits, is simply wrong. It is true that the Pennsylvania Supreme Court did not specifically address the factual assertions regarding the purported undisclosed deal with Mr. O'Donald, but the Pennsylvania Supreme Court did address the claim on the merits when it found that, even if there had been an undisclosed deal with Mr. O'Donald, that there was no actual prejudice to petitioner because the credible and untainted evidence was so overwhelming that the outcome of the case would not likely have been different even if the purported undisclosed deal had been presented to the jury at trial. The Pennsylvania Supreme Court did not reject the PCRA court's factual findings and it did not accept petitioner's claim of an undisclosed deal. The Supreme Court rejected petitioner's claim based upon the lack of prejudice to petitioner even if the claim of petitioner was accepted arguendo.   Thus, contrary to petitioner's claims, the Pennsylvania Supreme Court did decide the purported undisclosed deal with Mr. O'Donald issue on the merits.

A claim has been "adjudicated on the merits" under §2254(d) when a state court decision: "(1) finally resolves the claim, and (2) resolves the claim on the basis of its substance, rather than on a procedural, or other ground." Thomas v. Horn, 570 F.3d 105, 115 (3rd Cir. 2009).

The PCRA court resolved the Brady/Napue claims by finding that there were no credible facts to support such claims. The Pennsylvania Supreme Court resolved petitioner's Brady/Napue claim by determining that, even if there had been a Brady/Napue violation, there was no actual prejudice to petitioner because there was not a reasonable probability that the result of the trial would have been different even if the allegedly undisclosed information had been presented. This was a decision on then merits rather than on procedural grounds and, therefore, this claim is subject to the deferential standard of review set forth under AEDPA.

Petitioner also claims to be entitled to habeas relief relying upon the "reasonable likelihood" standard from Napue and Giglio. His reliance is misplaced.

In a federal habeas proceeding, a claim of this type is reviewed differently than it would be on direct appeal. In a federal habeas proceeding, the court must assess the actual prejudicial impact that a constitutional error in state court had under the harmless error standard articulated in Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Under Brecht, habeas relief is not available unless the federal habeas court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." O'Neal v. McAnninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 997 (1995).

It should also be noted that federal courts do not conduct a Brecht inquiry when analyzing a Brady claim because the materiality/prejudice standard

subsumes <u>Brecht</u> and obviates the need for a separate harmless error review under <u>Brecht</u>. <u>See</u>: <u>Kyles v. Whitley</u>, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); <u>Whitney v. Horn</u>, 280 F.3d 240, 258-59, n. 18 (3rd Cir. 2002); <u>Albrecht v. Horn</u>, 485 F.3d 103, 139 (3rd Cir. 2007).

The Third Circuit has previously addressed the issue of materiality for purposes of examining possible prejudice to the petitioner in the context of a purported <u>Brady</u> violation as follows:

> "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately, in the defendant's acquittal." <u>Kyles</u>, 514 U.S. at 434, 115 S.Ct. 1555. Rather, the "touchstone of materiality is a 'reasonable probability' of a different result. <u>Id</u>. "The question is...whether in [the evidence's] absence, [the petitioner] received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" (<u>Id</u>. (quoting <u>Bagley</u>, 473 U.S. at 678, 105 S.Ct. 3375):

> "The materiality of <u>Brady</u> material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." <u>Rocha v. Thaler</u>, 619 F.3d 387, 396 (5th Cir. 2010) (internal quotation marks and citation omitted). Suppression evidence that would be cumulative of other evidence or could be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for <u>Brady</u> purposes. <u>Id</u>. at 396-97. Conversely, however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration. <u>Id</u>. at 397.

> A court must "evaluate the tendency and force the undisclosed evidence item by item" to determine whether the evidence is material. <u>Kyles</u>, 514 U.S. at 436 no. 10, 115 S.Ct. 1555. In addition, a court must" evaluate its cumulative effect for purposes of materiality separately. <u>Id</u>. Individual items of suppressed evidence may not be material on their own, but may, in the aggregate, "undermine confidence in the outcome of the trial." <u>Bagley</u>, 473 U.S. at 678, 105 S.Ct. 3375.

Johnson v. Folina, 705 F.3d 117, 128-129 (3rd Cir. 2013).

In this case, applying AEDPA's deferential standard of review regarding factual findings, it cannot be said that the PCRA court's factual findings were unreasonable or contrary to the record. This Court must, therefore, accept those factual findings when conducting its review of the petitioner's Brady/Napue claims.

Applying AEDPA's deferential standard of review to the state courts' conclusions of law, and using the factual and credibility determinations of the PCRA court, it cannot be said that the state courts' conclusions, that there was no Brady/Napue violations and that even if there were, there is not a reasonable possibility that the outcome of the trial would have been different, were either: (1) contrary to an unreasonable application of federal law as established by the United States Supreme Court, or (2) based upon unreasonable factual findings by the state court.

There was overwhelming evidence of petitioner's guilt which was based upon DNA evidence and petitioner's admission to others, including his ex-girlfriend of having raped and killed the victim, which was unaffected by any alleged suppression of an alleged undisclosed deal. Petitioner's sperm was found in the victim's vagina. The victim's blood was found in petitioner's car. Petitioner admitted to being at the bar where the victim was last seen alive. Petitioner lied about his whereabouts on the date of the murder. Petitioner was familiar with the crime scene where the victim's body was found and he was seen in the area around the time the victim's body was recovered. The statements

made by petitioner admitting the killing included details of the crime not made known to the public, such as the victim having a tree branch forced into her vaginal area.

Contrary to petitioner's argument, the state court's rejection of petitioner's Brady/Napue claim was not based on the mere "sufficiency" of the evidence beyond the allegedly suppressed undisclosed evidence. It was instead, based upon the overwhelming and compelling nature of the evidence against petitioner which, under any analysis, provides confidence in the jury's verdict and in the fairness and outcome of the trial. DNA evidence, admissions by petitioner, circumstantial evidence, evidence corroborated by sources unimpeached by petitioner all established petitioner's guilt in a fashion that assures confidence in the verdict despite the alleged Brady/Napue violations which, as found by the PCRA court, simply did not happen. Petitioner's claims must be rejected as meritless.

## C. PRIOR COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO PURSUE A MERITLESS CLAIM REGARDING PETITIONER'S TRANSPORT FROM A STATE PRISON TO DELAWARE COUNTY FOR QUESTIONING CONCERNING THE MURDER OF AIMEE WILLARD.

Petitioner claims that he was transported to Delaware County's CID offices from a state prison based upon a "false court order." During questioning by CID detectives, petitioner made false statements about where he supposedly was at the time of the murder and those statements were later used against him at trial. According to petitioner, transporting him and questioning him were due process violations and prior counsel were ineffective for failing to pursue these

claims. Moreover, petitioner characterizes the Commonwealth's conduct in transporting him as "outrageous." According to petitioner, the statements obtained during questioning by the CID detectives should have been suppressed. He is mistaken.

The actions taken by the Commonwealth in transporting petitioner from a state prison to Delaware County for questioning in connection with the Willard murder investigation were not violative of petitioner's due process rights. The transportation of prisoners for questioning is purely an administrative matter. Commonwealth v. Karash, 513 Pa. 6, 518 A.2d 537 (1986).

There was no intent to deceive anyone with respect to the transport order signed by the Honorable Kenneth J. Clouse. The transport order indicated on its face that petitioner was being taken to the Offices of the CID. As noted in the Pennsylvania Supreme Court opinion, "[petitioner] was not misled regarding the true purpose of his transfer. The police specifically informed [petitioner] that they would be transporting him to the CID Offices to discuss the Willard murder and [petitioner] expressly agreed to go with them." Commonwealth v. Bomar, 573 Pa. 426, 451, 826 A.2d 831, 846 (2003).

Petitioner asserts that a due process violation occurred by virtue of his transport to Delaware County, but petitioner has failed to articulate what the purported due process violation actually was. Petitioner has also failed to establish in what way he was supposedly prejudiced. It cannot be claimed that CID detectives were prohibited from questioning petitioner regarding the Aimee Willard murder. And it cannot be claimed that the police acted improperly in their dealings

with or interrogation of petitioner or that his statement was not voluntarily made. Instead, petitioner focuses entirely upon the transportation of petitioner to Delaware County from a state prison under circumstances which clearly established that there was no fraud or intent to deceive involved in doing so.

In addressing the matter during his PCRA testimony, trial counsel Mark Much was asked about this incident and testified as follows:

THE WITNESS:

> The – the Hearing Notice had indicated – I mean the Take-Down Order had indicated that there was a Hearing scheduled, and that it was to occur in the CID Offices.

> \*     \*     \*     \*     \*

[PROSECUTOR]:

> Q.     All right. And what did – did that cause you to think that there was an effort on the part of the Commonwealth or somebody to deceive the Court?

> A.     Well, I argued it.  I – what I argued to the – what I – I know there's no Courtrooms in the CID.  And I know the person from the District Attorney's office, Betty Bosse (ph), that does the Take-Down Orders.  And, you know, I didn't feel then, and I don't feel now, that Betty Bosse put in Hearing to dupe anybody.  I believe that she had put in Hearing because she didn't know why they were bringing him down.  And she just put something in there.  There was no – there was no hearing scheduled that day for Arthur Bomar.  It wasn't even a Criminal Complaint.  I don't believe it had even been filed yet. There was no – there were no Hearing rooms in CID, but I still challenged the admissibility of that statement based on a Fourth Amendment violation.  And I did not argue a due process violation.

> Q.     Because?

> A.     Like I said, I, at the time, I just didn't think I had it.

[N.T. 11/5/08, p. 187-188].

Although the Pennsylvania Supreme Court, in a footnote, suggested that there might be a due process claim resulting from the transport, it did not elaborate or indicate that there was any sort of prejudice to petitioner. Petitioner failed to establish that the Judge Clouse (now deceased) was deceived by the use of the word "hearing" on the transport order or that long time district attorney office staff secretary Bette Bosse (long since retired and now deceased) intended to deceive anyone by including the word "hearing" in the transport order she prepared for Judge Clouse's signature. There was no due process violation and certainly was no prejudice to petitioner.

In rejecting this claim, the PCRA court found as a fact that petitioner was specifically informed that the reason he was being taken to Delaware County was to be questioned regarding the Aimee Willard murder and that petitioner agreed to accompany police to Delaware County. [PCRA court opinion, 9/4/12 p. 181-182]. Upon arrival in Delaware County, petitioner was advised of his Miranda warnings and he indicated his understanding of his constitutional rights and stated his willingness to speak to the police without counsel in order to clear his name. [PCRA court opinion, 9/4/12, p. 182]. Petitioner proceeded to answer questions, but at one point he became upset and invoked his right not to answer any further questions. [PCRA court opinion, 9/4/12, p. 182]. The trial court properly suppressed the statement of petitioner invoking his rights and the trial court properly suppressed the statements petitioner made following his invocation of his rights. However, those statements made by petitioner prior to

invoking his rights were properly deemed admissible. [PCRA court opinion, 9/4/12, p. 182].

During the suppression hearing, the notation of 'hearing' on the 'take down' order was characterized by the prosecution as a "mistake" or an "oversight" and, when offered an opportunity to dispute that assertion, petitioner declined. [PCRA court opinion, 9/4/12, p. 182-183]. Both trial counsel and appellate counsel testified during the PCRA hearing that they chose not to pursue a due process claim regarding the 'bring down' order because they believed it to be meritless. [PCRA court opinion, 9/4/12, p. 183].

Judge Hazel also found this PCRA due process claim to be meritless and wrote:

> Based on the existing record, we draw the same factual conclusion that was drawn when the facts were considered previously. That is, there is no record evidence supporting the allegation that the error in the "bring down" order was the result of "false representations" or other intentional wrongdoing on the part of the Commonwealth and was not merely a "mistake" or "oversight." As the Supreme Court noted: ["Petitioner] 'was not misled regarding the true purpose of his transfer. The police specifically informed [him] that they would be transporting him to the CID offices to discuss the Willard murder and [petitioner] expressly agreed to go with them.'" 826 A.2d at 846. He was advised of his *Miranda* rights, expressly indicated that he understood those rights and that he was willing to speak to the police regarding the Willard murder. He was interviewed until he expressed his intention to bring the interview to an end. Any statements made following the invocation of his rights were suppressed. The evidence of record falls far-short of the outrageous government misconduct petitioner alleges. Further, trial counsel testified that he was familiar with the clerk in the District Attorney's Office who prepared the "take-down" and was familiar with that procedure. He believed that no violation of due process occurred. N.T. 11/5/08 p. 91. In a pre-trial motion to suppress this statement, trial counsel raised, *inter alia*, a claim that the writ utilized to bring the petitioner to Delaware County CID was based upon intentionally false and misleading information. See Trial Court

Opinion at p. 25. The trial court concluded that the writ was merely an administrative process, used as a means to ensure the petitioner's availability for questioning. Significantly, the trial court found and the Supreme Court recognized in its opinion affirming judgment of sentence, that the evidence demonstrated that petitioner was not misled as to the purpose of his transfer and expressly agreed to go to Delaware County. Upon arrival at CID petitioner was advised of his *Miranda* rights and he was interviewed until he expressed his intention to end the interview.  The record is devoid of evidence of outrageous, arbitrary or oppressive government conduct that offends deep-rooted principles of justice so as to offend notions of fair play and decency.

"The due process clauses of the United States and Pennsylvania constitutions, [... generally] embody the principle of fundamental fairness, entitling every individual to be free from arbitrary or oppressive government conduct. The due process inquiry, in its most general form, entails an assessment as to whether the challenged proceeding or conduct " 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,'" and that "define [s] the community's sense of fair play and decency." <u>Commonwealth v. Kratsas</u>  764 A.2d 20, 27 (Pa. 2001) (citations omitted).  No evidence has been offered and there is none of record that leads to the conclusion that this order was anything other than an administrative means through which petitioner was transported to CID for questioning. <u>See</u> <u>Kratsas</u>, <u>supra</u> *citing* <u>Commonwealth v. Broaddus</u>, 342 A.2d 746, 749 (Pa. 1974) ( "bring-up" order  "is merely an administrative process"). Following evidentiary hearings, petitioner was directed to supply the Court with a memorandum law addressing this claim. That submission sets forth no legal authority or analysis in support of the claim but merely alleges that trial and appellate counsel were ineffective for failure to pursue it. Obviously, petitioner has failed to demonstrate arguable merit.

Finally, included in the Court's charge was a "voluntariness" instruction apprising the jury that in order to consider the October 15th statement as evidence in this case, it must first consider whether this statement was voluntarily made. <u>See</u> N.T. 9/30/98 pp. 170-173. The jury was instructed that it could only consider this statement if it first concluded that it was voluntarily made and in making that determination it should consider all of the circumstances to determine whether the statement was the product of an essentially free will.  We conclude therefore, that this due process claim has no arguable merit and petitioner has suffered no

prejudice. Neither trial nor appellate counsel were ineffective in their failure to raise this meritless claim.

[PCRA court opinion, 9/4/12, p. 183-185].

The Pennsylvania Supreme Court likewise rejected as meritless petitioner's claims of a due process violation and of ineffective assistance regarding the "bring down" order and petitioner's questioning by detectives. The Pennsylvania Supreme Court found the due process claim and the claim of trial counsel's ineffectiveness to be waived because these issues were not properly previously raised.  In rejecting the claim of ineffectiveness of appellate counsel, the Pennsylvania Supreme Court stated:

> One specific subset of due process claims, raised in the instant case, concerns "outrageous government misconduct." Kratsas, 764 A.2d at 27. To establish such a due process violation, an appellant must prove that such conduct was "so grossly shocking and so outrageous as to violate the universal sense of justice." Commonwealth v. Mance, 422 Pa.Super. 684, 619 A.2d 1378, 1381, 619 A.2d 1378, 1381 (1993) quoting Commonwealth v. Benchino, 399 Pa.Super. 521, 582 A.2d 1067 (1990) (quoting United States v. Ramirez, 710 F.2d 535 539 (9th Cir. 1983)), affirmed, 539 Pa. 282, 652 A.2d 299 (1995).

> [Petitioner] has failed to meet this burden.  Although [petitioner] maintains he was "tricked" into going to CID headquarters, as we stated on direct appeal, [petitioner] failed to prove "the order was the result of false representations or other intentional wrongdoing on the part of the Commonwealth." Bomar I, 826 A.2d at 845.  We stated further that [petitioner] was not misled regarding the true purpose of his transfer. The police specifically informed [petitioner] that they would be transporting him to the CID offices to discuss the Willard murder and [petitioner] expressly agreed to go with them. Id. at 846. Moreover, upon his arrival at CID headquarters, [petitioner] was advised of his Miranda rights and agreed to speak to investigators. Accordingly, while we do not suggest the misuse of a court order could never violate an inmate's due process rights, we find nothing from the circumstances in the case sub judice that would indicate the Commonwealth acted offensively or outrageously so as to deny [petitioner] due process in this instance.

> Because [petitioner's] underlying due process claim lacks merit, [petitioner's] claim that appellate counsel was ineffective for failing to raise the issue on appeal also fails.

Commonwealth v. Bomar, 104 A.3d 1179, 1209-1210 (Pa. 2014).

Applying the proper standard of review under AEDPA, it cannot be said that the state courts' decisions, that there was no due process violation in transporting petitioner or in the use of the "bring down" order to do so, or in questioning petitioner regarding the Aimeee Willard murder, and prior counsel were not ineffective for failing to pursue the meritless due process claims, were either: (1) contrary to or an unreasonable application of firmly established federal law as determined by the United States Supreme Court, or (2) based on unreasonable factual findings made by the state courts. Accordingly, petitioner's due process and ineffectiveness claims must be rejected as meritless.

To the extent that petitioner attempts to lump this transport order claim with his previous claims regarding David O'Donald and Quincy Jamal Williams in order to assert an additional separate claim of a due process violation based on the purported "outrageous" government misconduct, the combined claim is also meritless. As previously noted, the claims involving David O'Donald and Quincy Jamal Williams were meritless and were properly determined to be factually unsupported by the record. The alleged outrageous government wrong-doing asserted by petitioner simply never happened. The Commonwealth has abided by the requirements of the constitution in its dealings with witnesses, in its dealings with petitioner, and in its dealings with the courts. Petitioner's claims must be rejected as meritless.

**D.   THE STATE COURTS PROPERLY DENIED PETITIONER'S CLAIM OF A PREJUDICIAL EXTRANEOUS INFLUENCE UPON THE JURY.**

Petitioner claims that the jury was subjected to an extraneous influence which was objectively prejudicial to him. According to petitioner, a sheriff deputy's comment to a juror, regarding the presence of additional security for the jury due to an alleged threat to the jury's safety, constituted a prejudicial extraneous influence upon the jury. Further, petitioner contends that the Pennsylvania Supreme Court, in denying his claim, applied only state law and, in doing so, unreasonably applied the United States Supreme Court decision of Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed.917 (1892), which forbids "external causes tending to disturb the ['jury's] exercise of deliberate and unbiased judgement....at least until their harmlessness is made to appear." Id. at 149. He is mistaken.

Pennsylvania's test for determining whether a defendant is entitled to relief based upon a prejudicial extraneous influence upon the jury is set forth in Bomar II, supra, as follows:

> To prevail on a claim that an extraneous influence compromised the impartiality and integrity of the jury, [petitioner] must prove the extraneous influence caused a "reasonable likelihood of prejudice." Commonwealth v. Sneed, 616 Pa. 1, 45 A.3d 1096, 1115 (2012). (internal quotations omitted).  In determining whether there was a "reasonable likelihood of prejudice," we consider: "(1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and [(3)] whether the extraneous influence was emotional or inflammatory in nature." Id. (quoting Carter by Carter v. U.S. Steel Corp., 529 Pa. 409, 604 A.2d 1010, 1016-17 (1992). (plurality)).  In employing this test, the reviewing court "is precluded from considering evidence concerning the subjective impact of an extraneous influence on any juror."  Carter by Carter, 604 A.2d at

1016.   Rather, the reviewing court "must determine how an objective, typical juror would be affected by such an influence." Id.

Commonwealth v. Bomar II, supra at 1211.

In addressing the issue regarding alleged prejudicial extraneous influences upon a jury, the Third Circuit has stated:

> "A new trial is warranted if the defendant likely suffered 'substantial prejudice' as a result of the jury's exposure to the extraneous information." Id. (quoting United States v. Lloyd, 269 F.3d 228, 230 (3rd Cir. 2001)). "In examining for prejudice, we must conduct an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror." Id. (quoting Lloyd, 269 F.3d at 238 (internal quotation omitted)). Yet, the "court may inquire only into the existence of extraneous information" and not "into the subjective effect of such information on the particular jurors." Wilson v. Vermont Castings, Inc., 170 F.3d 391, 314 (3rd Cir. 1999).

U.S. v. Fumo, 655 F.3d 288, 304 (3rd Cir. 2011).

In further addressing the approach to determining whether substantial prejudice exists, the Third Circuit explained:

> The factors we have looked to in determining whether there was substantial prejudice include whether: (1) "the extraneous information…relates to one of the elements of the case that was decided against the party moving for a new trial," Lloyd, 269 F.3d at 239; (2) "the extent of the jury's exposure to the extraneous information; [3] the time at which the jury receives the extraneous information; [(4)] the length of the jury's deliberations and the structure of the verdict; [(5)] the existence of instructions from the court that the jury should consider only evidence developed in the case.[.]" Urban, 404 F.3d at 778 (quoting Lloyd, 269 F.3d at 240-241; and (6) whether there is "a heavy volume of incriminating evidence[. ]" Lloyd, 269 F.3d at 241. (internal quotations omitted).

U.S. v. Fumo, supra, at 307.

In examining for 'prejudice', courts must conduct "an objective analysis by considering the probable affect of the allegedly prejudicial information on a

46

hypothetical average juror." <u>U.S. v. Lloyd</u>, <u>supra</u> at 238. And, the burden of demonstrating prejudice is upon the party claiming entitlement to a new trial. <u>Id.</u>

Whether employing the state court approach or the Third Circuit's approach to addressing an issue regarding a possible prejudicial extraneous influence upon a jury, the result is the same and, in the instant case, the state courts properly denied petitioner's claim.

First, the burden is upon the petitioner to establish that the purported extraneous influence caused a "reasonable likelihood of prejudice" or that he "likely suffered substantial prejudice." Second, the court must examine for prejudice by determining whether the extraneous information related to a central issue in the case or an essential element and whether such information was emotional, or inflammatory and whether the jury was instructed to consider only the evidence admitted during trial. And finally, the court must use an objective analysis to determine whether an average juror would be affected by the extraneous information.

In applying these standards to the decision by the state courts in <u>Bomar II</u>, it is clear that the state courts properly adhered to the constitutional requirements of <u>Mattox</u> and the law as expressed both by Pennsylvania case law precedents and by the Third Circuit.

In rejecting petitioner's claim, the Pennsylvania Supreme Court determined that there was not a reasonable likelihood of prejudice and that petitioner did not likely suffer substantial prejudice. <u>Commonwealth v. Bomar, II</u>, <u>supra</u> at 1212. The nature of the alleged extraneous prejudicial influence in this

case was not related to a central issue or element in the case. The nature of the threat was vague, its origins were unknown and it was not communicated to the entire jury but rather to a single juror by a sheriff's deputy thus minimizing any inflammatory nature of the threat. And, in employing an objective analysis to the issue, and considering whether an average juror would be effected, the Pennsylvania Supreme Court properly determined that an average juror would not be influenced by the information. "[W]e find that there was no reasonable likelihood that an objective, typical juror would have been influenced by the threat; thus, regardless of the PCRA court's consideration of subjective factors, the court ultimately reached the appropriate result. Accordingly, no relief is due on this claim." Commonwealth v. Bomar II, supra at 1212.  Moreover, there was a "wealth of significant other evidence" of petitioner's guilt. Id. at 104 A.3d at 1194.

In Pennington v. Bickell, (2012 WL 1416775) (U.S.D.C. W.D. Pa.)(report and recommendation by U.S.M.J. Eddy, filed 4/5/12 (2012 WL 1425482)), the issue of an alleged prejudicial extraneous influence was raised in a federal habeas corpus petition. The trial court addressed the issue employing Pennsylvania state law standards and precedents. The federal habeas court reviewed the allegation in light of the standards set forth in U.S. v. Lloyd, supra and applied the AEDPA standard of review. The report and recommendation by United States Magistrate Judge Eddy was later adopted as the opinion of the District Court. Pennington v. Bickell, (2012 WL 1425482) (memorandum and order of the Honorable Arthur Schwab, U.S.D.C. W.D. Pa.,filed 4/24/12). This

Court should do likewise and apply the factors set forth in <u>Lloyd</u> and use the AEDPA standard of review.

Application of the factors set forth in <u>Lloyd</u>, and the standard of review under AEDPA, clearly reveals that the state courts' determination, that there was no reasonable likelihood that an objective typical juror would have been influenced by the threat, was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Nor was the state courts' determination based upon unreasonable findings of fact.  Applying the proper standard of review under AEDPA, petitioner's claim must be rejected as meritless.

**E.    THE TRIAL COURT PROPERLY EXCUSED SIX PROSPECTIVE JURORS FOR CAUSE WHO, BASED UPON THEIR <u>VOIR DIRE</u> RESPONSES, WERE UNABLE TO PERFORM THEIR DUTIES AS JURORS IN ACCORDANCE WITH INSTRUCTIONS BY THE TRIAL COURT AND PRIOR COUNSEL CANNOT BE DEEMED INEFFECTIVE FOR FAILING TO PURSUE MERITLESS CLAIMS REGARDING THE PURPORTED ERRORS RELATED TO THE EXCUSING OF THESE PROSPECTIVE JURORS.**

Petitioner claims that the trial court erred by excusing for cause six prospective jurors who, based upon the <u>voir dire</u> responses, were unable to follow the trial court's instructions and impose a death penalty, even if the facts and law established that the death penalty was appropriate and called for. According to petitioner, the trial court failed to explore with the six prospective jurors their ability to put aside their beliefs and reservations about the death penalty and follow the law. Petitioner also claims that prior counsel were ineffective for failing to pursue the issue. According to petitioner, trial counsel should have asked questions of these prospective jurors to establish that they

would follow the law despite their beliefs about the death penalty and prior counsel should have objected when the prospective jurors were excused for cause. Similarly, petitioner claims appellate counsel should have raised claims of trial counsel's ineffectiveness regarding the excusing of the six prospective jurors. He is mistaken.

The United States Supreme Court recently addressed an issue involving a trial court's excusing of a prospective juror for cause in a capital case based upon statements that the prospective juror provided which did not provide sufficient assurance to the trial court judge that the prospective juror could or would consider imposing the death penalty. In White v. Wheeler, __ U.S. ___, 136 S.Ct. 456, 193 L.Ed.2d 384 (2015), during voir dire the prospective juror said he was not absolutely sure if he could realistically consider the death penalty. Later, after questioning by defense counsel in an attempt to rehabilitate him, the prospective juror said he thought he could consider all penalty options. The trial court judge, after taking time to consider the matter, excused the prospective juror for cause based upon the totality of the voir dire interview and the trial court judge specifically determined that the prospective juror could not consider the entire range of sentencing options.

The defendant in Wheeler was found guilty of the murders that he was charged with committing and he was subsequently sentenced to death. The Kentucky Supreme Court affirmed the judgment of sentence and ruled that the trial judge "appropriately struck for cause those jurors that could not impose the death penalty…there was no error and the rights of the defendant to a fair trial by