## IN THE UNITED STATES DISTRICT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTHUR BOMAR, | : | |
| Petitioner | : | CIVIL ACTION |
| v. | : | No. 2004-cv-1730 |
| JOHN E. WETZEL, Secretary, Pennsylvania | : | Honorable Juan R. Sanchez, U.S.D.J. |
| Department of Corrections; ROBERT | | |
| GILMORE, Superintendent of the State | : | **THIS IS A CAPITAL CASE** |
| Correctional Institution at Greene; and | : | |
| STEVEN R. GLUNT, Superintendent of the | | |
| State Correctional Institution at Rockview, | : | |
| Respondents. | : | |

## REPLY IN SUPPORT OF
## PETITION FOR A WRIT OF HABEAS CORPUS

LEOR VELEANU
JENNIFER CHICCARINO
KATHERINE E. ENSLER
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut St., Suite 545W
Philadelphia, PA 19106
215-928-0520
leor_veleanu@fd.org
jennifer_chiccarino@fd.org
katherine_ensler@fd.org

*Counsel for Petitioner*

Dated: June 19, 2017

## PRELIMINARY STATEMENT

Notes of testimony of state court proceedings are cited as "NT" followed by the date and page number(s).  References to documents in the District Court docket are cited as "Doc. [number]," with the numbers corresponding to the District Court's docket index.

The Pennsylvania Supreme Court issued two opinions in this case.  *Commonwealth v. Bomar*, 826 A.2d 831 (Pa. 2003) (direct appeal), is cited as *Bomar I*; and *Commonwealth v. Bomar*, 104 A.3d 1179 (Pa. 2014) (PCRA appeal), is cited as *Bomar II*.

All other citations are either self-explanatory or will be explained.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION ..................................................................................................... 1

CLAIMS FOR RELIEF .......................................................................................... 2

Claim I.  Petitioner's Right to Due Process Was Violated When He Was Tried While Incompetent and Unable to Rationally Assist Counsel........................................... 2

Claim II.  Petitioner's Convictions and Death Sentence Violated Due Process of Law Because Two Witnesses Against Him Received Consideration for Their Testimony that Was Not Disclosed to The Jury, and the Prosecutor Failed to Correct Their False Testimony. ............................................................................... 4

Claim III.  Statements Were Taken From Petitioner on More Than One Occasion in Violation of Petitioner's Right to Due Process Under the Fifth and Fourteenth Amendments; Trial and Appellate Counsel Failed to Properly Raise a Due Process Claim........................................................................... 7

Claim IV.  Petitioner's Right to an Impartial Jury Under the Sixth and Fourteenth Amendments Was Violated Because the Jury Was Tainted by Prejudicial and Extraneous Information. ........................................................................ 9

Claim V.  Petitioner Was Denied a Fair Trial and Effective Assistance of Counsel, in Violation of the Sixth, Eighth, and Fourteenth Amendments, Because the Court Excused for Cause Jurors Who Expressed Reservation About the Death Penalty; Trial Counsel Was Ineffective for Failing to Object or Attempt to Rehabilitate the Jurors; Appellate Counsel Was Ineffective for Failing to Raise this Claim on Direct Appeal. ...................................................................... 10

Claim VI.  The Trial Court Erred in Denying Petitioner His Right to "Life Qualify" Potential Jurors During Voir Dire. ......................................................... 11

Claim VII.  Petitioner's Convictions and Death Sentence Violate the Sixth, Eighth, And Fourteenth Amendments Because Unreliable Forensic Evidence Was Presented to the Jury, and Trial Counsel Ineffectively Failed to Counter It. ........................... 12

Claim VIII.  Petitioner's Sixth Amendment Rights Were Violated Because the Sentences Imposed for the Rape, Kidnaping, and Abuse of a Corpse Charges Were Based Upon Factors Not Submitted to the Jury (Withdrawn). ...................................... 12

Claim IX.  Petitioner Was Denied Reliable Sentencing and Effective Assistance of Counsel in Violation of the Sixth, Eighth, and Fourteenth Amendments Because Trial

Counsel Failed to Adequately Investigate, Develop, and Present Mitigating Evidence, and Appellate Counsel Failed to Investigate or Properly Present this Claim. ................................................................................................................ 12

Claim X.    Petitioner Is Entitled to Relief Because of the Cumulative Prejudicial Effect of the Errors Described Herein. ................................................................................. 20

CONCLUSION ......................................................................................................................... 22

# TABLE OF AUTHORITIES

**Federal Cases**

*Abu-Jamal v. Sec'y, Dept. of Corrs.*, 643 F.3d 370 (3d Cir. 2011) ................................................. 2

*Albrecht v. Horn*, 485 F.3d 103 (3d Cir. 2007) ........................................................................... 21

*Blystone v. Horn*, 664 F.3d 397 (3d Cir. 2011) ............................................................................ 2

*Bond v. Beard*, 539 F.3d 256 (3d Cir. 2008) ....................................................................... 16, 17

*Brady v. Maryland*, 373 U.S. 83 (1963) ...................................................................................... 2

*Branch v. Sweeney*, 758 F.3d 226 (3d Cir. 2014) ........................................................................ 2

*Breakiron v. Horn*, 642 F.3d 126 (3d Cir. 2011) ......................................................................... 2

*Brumfield v. Cain*, 135 S. Ct. 2269 (2015) ................................................................................. 1

*Dennis v. Sec'y, Dept. of Corrs.*, 834 F.3d 263 (3d Cir. 2016) .............................................. 2, 21

*Fahy v. Horn*, 516 F.3d 169 (3d Cir. 2008) .............................................................................. 21

*Grant v. Lockett*, 709 F.3d 224 (3d Cir. 2013) ........................................................................... 2

*Kyles v. Whitley*, 514 U.S. 419 (1995) ....................................................................................... 5

*Lambert v. Beard*, 537 F. App'x 78 (3d Cir. Sept. 20, 2013) ....................................................... 2

*Morgan v. Illinois*, 504 U.S. 719 (1992) ................................................................................... 11

*Napue v. Illinois*, 360 U.S. 264 (1959) ....................................................................................... 6

*Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006) ...................................................................... 14

*Pate v. Robinson*, 383 U.S. 375 (1966) ...................................................................................... 3

*Porter v. McCollum*, 558 U.S. 30 (2009) ............................................................... 15, 16, 17, 18

*Rompilla v. Beard*, 545 U.S. 374 (2005) ............................................................................ 14, 15

*Saranchak v. Sec'y, Dep't of Corrs.*, 802 F.3d 579 (3d Cir. 2015) ............................................ 14

*Schriro v. Landrigan*, 550 U.S. 465 (2007) ....................................................................... 13, 14

*Sears v. Upton*, 561 U.S. 945 (2010) ....................................................................................... 15

*Showers v. Beard*, 635 F.3d 625 (3d Cir. 2011) ......................................................................... 1

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................................................ 2

*Taylor v. Horn*, 504 F.3d 416 (3d Cir. 2007) ....................................................................... 14, 15

*United States v. Nolan-Cooper*, 155 F.3d 221 (3d Cir. 1998) ....................................................... 9

*United States ex rel.* Sullivan *v. Cuyler*, 631 F.2d 14 (3d Cir. 1980) ........................................ 21

*Wiggins v. Smith*, 539 U.S. 510 (2003) .................................................................................... 15

*Williams (Terry) v. Taylor*, 529 U.S. 362 (2001) ....................................................................... 1

**State Cases**

*Commonwealth v. Bomar*, 104 A.3d 1179 (Pa. 2014) ........................................................ *passim*

*Commonwealth v. Bomar*, 826 A.2d 831 (Pa. 2003) ................................................................... 1

*Commonwealth v. Bond*, 819 A.2d 33 (Pa. 2002) ............................................................... 15, 16

*In re Holtz' Estate*, 222 A.2d 885 (Pa. 1966) ........................................................................ 17

*Robinson v. Robinson*, 645 A.2d 836 (1994) ......................................................................... 17

**Statutes**

28 U.S.C. §§ 2254(d) ....................................................................................................... 5, 7

# INTRODUCTION

Petitioner, Arthur Bomar, through undersigned counsel, files this Reply to the Respondent's Memorandum of Law in Opposition to Petition Seeking Federal Habeas Corpus Relief ("Response") (Docs. 45-1/45-2).  Petitioner relies upon the procedural history set forth in his Petition (Doc. 17) with the addition of the Respondent's Answer (Doc. 45) and Respondent's Memorandum of Law (Docs. 45-1/45-2) filed on February 8, 2017.  The Respondent also filed an Appendix on March 2, 2017 (Doc. 47-1).

To the extent that Respondent argues "how rare and difficult it is for a state prisoner habeas petitioner to prevail under AEDPA standard," Doc. 45-1 at 10, Petitioner submits that "the [AEDPA] statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law.  If, after carefully weighing all the reasons for accepting a state court's judgement, a federal court is convinced that a prisoner's custody – or . . . his sentence of death – violates the Constitution, that independent judgment should prevail."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 389 (2001).  "'[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'"  *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

"[H]abeas review 'remains robust [as] evidenced by the many cases in which the Supreme Court granted relief because a state court adjudication of a meritorious constitutional claim was 'unreasonable' or 'contrary to' Supreme Court precedent, or was based upon an unreasonable factual determination.'"  *Showers v. Beard*, 635 F.3d 625, 629 (3d Cir. 2011) (citing habeas petitioner Showers' briefing).  Indeed, acknowledging the robust nature of habeas

1

corpus review, the Third Circuit has granted relief in a number of recent cases.  *See, e.g.*, *Dennis v. Sec'y, Dept. of Corrs.*, 834 F.3d 263 (3d Cir. 2016) (suppression of documents in violation of *Brady*[1] required federal habeas relief); *Branch v. Sweeney*, 758 F.3d 226, 238, 241 (3d Cir. 2014) (finding a *prima facie* case of trial counsel's ineffectiveness, determining that the state court's ruling was an unreasonable application of federal law, and remanding for an evidentiary hearing); *Grant v. Lockett*, 709 F.3d 224, 234-37 (3d Cir. 2013) (granting guilt-phase relief on the defendant's ineffectiveness claim and finding that the state court's ruling was based on unreasonable fact findings and an unreasonable application of *Strickland*[2]); *Showers*, 635 F.3d at 634 (granting guilt-phase relief and finding that 28 U.S.C. § 2254(d)(1) had been met); *Lambert v. Beard*, 537 F. App'x 78, 87 (3d Cir. Sept. 20, 2013) (same); *Abu-Jamal v. Sec'y, Dept. of Corrs.*, 643 F.3d 370, 381 (3d Cir. 2011) (same for penalty-phase relief in a capital case); *Blystone v. Horn*, 664 F.3d 397 (3d Cir. 2011) (granting penalty-phase relief in a capital case under §§ 2254(d)(1) and (2)); *Breakiron v. Horn*, 642 F.3d 126, 142 (3d Cir. 2011) (granting guilt-phase relief, *inter alia*, by finding that the state court's ruling on an ineffectiveness claim was an unreasonable application of *Strickland*).

## CLAIMS FOR RELIEF

**CLAIM I.     PETITIONER'S RIGHT TO DUE PROCESS WAS VIOLATED WHEN HE WAS TRIED WHILE INCOMPETENT AND UNABLE TO RATIONALLY ASSIST COUNSEL.**

Respondents do not dispute the fact that Petitioner did not receive an adversarial hearing on his competency to stand trial at the time of his trial, but only deny "that the process used to determine petitioner's competency was inadequate or unreliable."   Doc. 45 at 6; *see* Doc. 45-1 at

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] *Strickland v. Washington*, 466 U.S. 668 (1984).

2

13-14.  In relying solely on the state courts' analysis, Respondents summarily conclude that "[t]he factual findings of the PCRA court are supported by the record and the conclusions of law are not erroneous . . . [and that t]he same is true of the Pennsylvania Supreme Court."  Doc. 45-1 at 20-21.[3]  Respondents quote the Pennsylvania Supreme Court, which held that, assuming Dr. Sadoff's competency evaluation from eight months prior to trial failed to establish Petitioner's competence at the time of trial, Petitioner had "failed to object to Dr. Sadoff's evaluation and testimony at the pre-trial competency hearing and, thus, he has waived the argument."  Doc. 45-1 at 19 (quoting *Bomar II*, 104 A.3d at 1196-97).  The Pennsylvania Supreme Court went on to note that evaluations closer in proximity to Petitioner's trial and conducted by defense expert Dr. Cooke confirmed Petitioner's competence, *see Bomar II*, 104 A.3d 1197, yet Dr. Cooke's post-conviction conclusions that Petitioner was competent could have had no bearing on the soundness of the trial court's decision not to assess Petitioner's competence at the time of his trial.  NT 11/6/08 at 90 (the first time Dr. Cooke testified to Petitioner's competency).

Under clearly established federal law, where a defendant may be incompetent, he cannot "knowingly and intelligently 'waive' his right to have the court determine his capacity to stand trial."  *Pate v. Robinson*, 383 U.S. 375, 384 (1966).  Likewise, a defendant's "demeanor at trial might be relevant to the ultimate decision as to his sanity, [but] it cannot be relied upon to dispense with a hearing on the very issue."  *Id.* at 382-86.   In *Pate*, the Supreme Court emphasized that the defendant's "mental alertness and understanding displayed" during

---

[3] Respondents note that the PCRA court found Dr. Dudley incredible. Doc. 45 at 5; *but see infra* pp. 17-18.

colloquies with the trial judge "offer[ed] no justification for ignoring the uncontradicted testimony of [the defendant's] history of pronounced irrational behavior."  *Id.*

Petitioner did not receive an adequate hearing on his competency to stand trial at the time of trial despite the trial court's knowledge of Petitioner's "history of pronounced irrational behavior" and the *non*-adversarial competency hearing eight months prior to trial.  For a full accounting of Petitioner's irrational behavior see Doc. 17 at 7-10.  The Pennsylvania Supreme Court's merits analysis was contrary to and an unreasonable application of clearly established federal law, and thus not entitled to AEDPA deference.  The trial court's failure to invoke state procedures designed to protect Petitioner from standing trial while incompetent therefore violated Petitioner's right to due process of law.

**CLAIM II.    PETITIONER'S CONVICTIONS AND DEATH SENTENCE VIOLATED DUE PROCESS OF LAW BECAUSE TWO WITNESSES AGAINST HIM RECEIVED CONSIDERATION FOR THEIR TESTIMONY THAT WAS NOT DISCLOSED TO THE JURY, AND THE PROSECUTOR FAILED TO CORRECT THEIR FALSE TESTIMONY.**

The prosecutor violated Petitioner's right to due process of law by failing to disclose consideration it offered two key Commonwealth witnesses.   Moreover, not only did the prosecutor fail to disclose favorable evidence, he failed to correct false testimony.

In response to Petitioner's *Brady* claim, Respondents argue that the Pennsylvania Supreme Court did address the claim on the merits when it found that even if there was an undisclosed deal with Mr. O'Donald that there was no actual prejudice to Petitioner.  Doc. 45-1 at 33.  For the reasons set forth in Petitioner's Memorandum of Law (Doc. 39), Respondents' argument is without merit.  Doc. 39 at 12-14.   The Pennsylvania Supreme Court did not reach the question of whether there was an undisclosed agreement between the prosecution and Mr. O'Donald thus review is *de novo*.   The court acknowledged that it was not reaching the issue of

4

whether a deal existed and said that the "evidence strongly suggests the existence of such an agreement." *Bomar II*, 104 A.3d at 1192.

 Respondents' argument that Petitioner suffered no prejudice as a result of this undisclosed deal is wrong. Doc. 45-1 at 33-37. Respondents relied on the Pennsylvania Supreme Court's opinion, but the court's finding that the evidence was not material was contrary to or an unreasonable application of clearly established law, and involved an unreasonable determination of the facts. §§ 2254(d)(1), (2). The materiality inquiry is not just a matter of determining whether, after discounting items of evidence tainted by nondisclosure, the remaining evidence is sufficient to support a guilty verdict. *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995). The Pennsylvania Supreme Court unreasonably applied *Brady*'s materiality prong. The Court said any violation did not prejudice Petitioner due to the extensive DNA and circumstantial evidence against him. *Bomar II*, 104 A.3d at 1192.

Under the proper test, there is a reasonable probability that the nondisclosure of Mr. O'Donald's agreement and the true motivation for his testimony affected the judgment of the jury. The details of Mr. O'Donald's testimony were the only direct evidence offered by the prosecution to show malice and specific intent, both of which are essential elements of first-degree murder in Pennsylvania. If the jury had known Mr. O'Donald lied at trial, and his motivation for testifying was for a reduction in his sentence, it is reasonably probable they jury would have rejected his testimony.

Respondents further argue that Petitioner merely asserts, without demonstrating, that the PCRA court's factual findings are unreasonable, and that "he simply makes up his own facts." Doc. 45-1 at 32. Petitioner did not make up facts. Petitioner presented analysis and argument demonstrating why the PCRA court's factual findings were unreasonable. For example,

5

Petitioner explained why the PCRA court failed to articulate any reasonable analysis as to why Mr. Williams would come forward after he completed his sentence and testify that he lied at Petitioner's trial.  *See* Doc. 39 at 17.

This Court must analyze this claim under *Napue*[4] as well as *Brady*.  Because the prosecutor failed to correct the witness's false testimony, a reviewing court must grant relief if there is "any reasonable likelihood" the non-disclosure could have affected the outcome.  As to materiality under *Napue*, the Pennsylvania Supreme Court unreasonably applied the standard by holding that even if an agreement between Mr. O'Donald and the prosecution did exist; its nondisclosure did not affect the judgment of the jury in light of the wealth of significant other evidence implicating Petitioner in the murder.  *Bomar II*, 104 A.3d at 1195.  Respondents echo this analysis.  Doc. 45-1 at 34-37.  The court's and Respondents' analysis is incorrect.  Despite other inculpatory evidence, it cannot be said that the suppression of his deal and false nature of O'Donald's testimony did not affect the judgment of the jury.  The undisclosed agreement with Mr. O'Donald was material to both guilt and penalty phases of Petitioner's trial.

Respondents also note that the PCRA court found the testimony of Mr. O'Donald and Mr. Williams regarding their undisclosed deal with the Commonwealth not credible.  Doc. 45-1 at 32.  However, these are unreasonable credibility findings and should not be given deference.  Both of these witnesses had much to gain at the time of trial by not disclosing that they had a deal with the Commonwealth.  But, many years later, by the time of the PCRA hearing, neither had anything to gain.  Their cases were over.  Neither were incarcerated and gained nothing from

---

[4] *Napue v. Illinois*, 360 U.S. 264 (1959).

coming to court and testifying that they both had deals with the Commonwealth that were never disclosed.

**CLAIM III.   STATEMENTS WERE TAKEN FROM PETITIONER ON MORE THAN ONE OCCASION IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS; TRIAL AND APPELLATE COUNSEL FAILED TO PROPERLY RAISE A DUE PROCESS CLAIM.**

The Commonwealth deliberately engaged in trickery, false representations, and outrageous conduct to obtain inflammatory and prejudicial evidence in violation of Petitioner's right to due process.  Petitioner's claim involves three deceptive acts by the Commonwealth that violate due process. The first involves the Commonwealth's use of a false transport order that a Common Pleas Court judge signed, for a non-existent court hearing. The second and third deceptions involve the Commonwealth's knowing misuse of inmate-informants who testified falsely against Petitioner at this trial.  Here, Petitioner focuses on the false court order. The false testimony from the inmate-informants is covered in Claim 2.  Individually and collectively, the Commonwealth's outrageous conduct violated Petitioner's right to due process.

Respondents deny using trickery and outrageous conduct in obtaining a statement from Petitioner after using a false court order to transport Petitioner away from his place of custody. Respondents do not and cannot deny that the court order was indeed false – as a matter of undeniable fact, there was no court hearing.  Respondents nonetheless assert that the transportation of prisoners is merely an administrative matter and there was no intent to deceive. Moreover, Respondents cite to the Pennsylvania Supreme Court opinion that found Petitioner was not misled regarding why he was being transported, and expressly agreed to go with the detectives.  Doc. 45-1 at 43.  The Respondents' argument and the Pennsylvania Supreme Court's fact-finding are unreasonable and ignore the context in which the false order was issued. The

7

state court's ruling accordingly rested on an unreasonable determination of the facts.

§ 2254(d)(2).  First, viewed in the context of the Delaware County detectives' previous attempts

to see Petitioner at the Montgomery County Prison – where Petitioner refused to see them,

became agitated, and indicated that he would rather spend time in 24-hour lockup than meet with

them – the detectives had a motive to trick Petitioner into an interrogation.  Respondents ignore

this history of Petitioner's asserting his rights not to speak with the Delaware County detectives.

It was in this framework that the detectives had the motive and intent to deceive.  Bringing Judge

Kenneth A. Clouse, of the Delaware County Court of Common Pleas, an order for the release of

Petitioner for transportation for a "hearing" was the method the detectives could implement to

remove Petitioner from his surroundings, and overcome his previous refusals to talk.

 The state court finding that Petitioner expressly "agreed" to be transported is likewise an

unreasonable determination of the facts.  From the perspective of an incarcerated inmate, being

shown a court order for transportation to a court hearing is not something an inmate volunteers

for or refuses.  Had Petitioner refused to "voluntarily" go with the law enforcement agents, he

would have been extracted from his cell, physically subdued and maced, then transported to the

hearing one way or another.  The state court's fact finding is unreasonable.  Moreover, to the

extent Petitioner could "volunteer" to go with the detectives, he was tricked.  After refusing to

talk with the detectives on multiple occasions, Petitioner should not have had to assume that a

court order indicating a court hearing was false.  Again, the actions of the Commonwealth are

indicative of an intent and motive to deceive.

 Respondents also assert that Petitioner "failed to articulate what the due process violation

actually was."  Doc. 45-1 at 38.  Respondents simply put their head in the sand regarding the

detectives' deliberate trickery, false representations, and outrageous conduct. That outrageous

8

conduct is itself a due process violation.  As held by the Third Circuit: "[i]t is the law of this circuit that a criminal defendant may raise a due process challenge to an indictment against her based on a claim that the government employed outrageous law enforcement investigative techniques."  *United States v. Nolan-Cooper*, 155 F.3d 221, 229 (3d Cir. 1998).  Here, the use of a false court order by law enforcement agents to trick Petitioner into an interrogation, after previous refusals to cooperate, is outrageous conduct in violation of Petitioner's rights.  This trickery in itself, and in combination with the use of inmate informants who falsely testified that Petitioner confessed to murder, denied Petitioner of a fair trial.

**CLAIM IV.   PETITIONER'S RIGHT TO AN IMPARTIAL JURY UNDER THE SIXTH AND FOURTEENTH AMENDMENTS WAS VIOLATED BECAUSE THE JURY WAS TAINTED BY PREJUDICIAL AND EXTRANEOUS INFORMATION.**

The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact-finding process.  During the course of Petitioner's trial, at least one juror heard extraneous prejudicial information from law enforcement in violation of Petitioner's constitutional rights.

In the Petition and Memorandum of Law, Petitioner argued that while the Pennsylvania Supreme Court adjudicated this claim on the merits, it applied only state law.  Accordingly, this Court should review Petitioner's claim *de novo* and not defer to state court findings.  Respondents do not dispute that the Pennsylvania Supreme Court relied only on state law in adjudicating Petitioner's claim.  Rather, they assert "that the state courts properly adhered to the constitutional requirements of *Mattox* and the law as expressed both by Pennsylvania state law precedents and by the Third Circuit."  Doc. 45-1 at 47.  Moreover, neither the state courts, nor

Respondents now, dispute the fact that a juror was exposed to improper extraneous influence. The critical issue is whether Petitioner was prejudiced by this exposure.

In addressing whether Petitioner was prejudiced by the extraneous influence, Respondents simply cite to the Pennsylvania Supreme Court's analysis of the claim, and assert that the state court's analysis was neither contrary to nor an unreasonable application of clearly established law. This Court should not defer to the state court's finding because it was based solely on state law, and should instead assess prejudice *de novo*. Moreover, Respondents do not engage with Petitioner's arguments regarding prejudice as detailed in the Petition and Memorandum of Law. Rather than repeat the arguments regarding prejudice here, Petitioner refers the Court to his Memorandum of Law. *See* Doc. 39 at 27.

**CLAIM V.   PETITIONER WAS DENIED A FAIR TRIAL AND EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS, BECAUSE THE COURT EXCUSED FOR CAUSE JURORS WHO EXPRESSED RESERVATION ABOUT THE DEATH PENALTY; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT OR ATTEMPT TO REHABILITATE THE JURORS; APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM ON DIRECT APPEAL.**

Claim V avers that Petitioner's Sixth and Fourteenth Amendment rights to a fair trial and an impartial jury were violated when the trial judge excluded prospective jurors for cause simply because they voiced general, conscientious, or religious objections to the death penalty. The crux of Petitioner's claim is that the trial court's questions to the jury failed to focus on whether the jurors would be able to follow the law as explained by the court. Instead, the voir dire questions explored whether the jurors would be able to set aside their reservations and impose a death sentence – a question distinct from whether these jurors' beliefs would impair their ability to follow the law.

10

Respondents generally defend the state court conclusions as to the propriety of the trial court's jury questions. The question of whether the state court's finding that it was proper for the court to inquire if a potential juror could set aside his or her reservations and impose a death sentence *rather* than whether the potential juror could set aside his or her reservations and follow the law is squarely before this Court. Accordingly, Petitioner relies on the arguments and authorities contained in his Memorandum and reincorporates them herein.

## CLAIM VI.   THE TRIAL COURT ERRED IN DENYING PETITIONER HIS RIGHT TO "LIFE QUALIFY" POTENTIAL JURORS DURING VOIR DIRE.

In Claim VI, Petitioner averred that he was restricted from questioning potential jurors about specific underlying aggravating circumstances and about particular kinds of mitigating evidence, limiting his ability to fully and fairly assess the jurors' positions about the death penalty.  The right to an impartial jury entitles a capital defendant to a sentencing jury that is capable of following the law and imposing a life sentence, just as the state is entitled to a jury that is capable of imposing a death sentence.  Petitioner's claim is based upon the Pennsylvania Supreme Court's unreasonable application of *Morgan v. Illinois*, 504 U.S. 719, 728 (1992), where the United States Supreme Court addressed the adequacy of voir dire in determining whether potential jurors would fairly consider voting for a life sentence just as they would fairly consider voting for a death sentence.

Respondents simply deny that the voir dire in Petitioner's case was inadequate and assert that the Pennsylvania Supreme Court reasonably applied *Morgan.*  Doc. 45-2 at 67. Other than this bare assertion that there was no unreasonable state court application of *Morgan*, Respondents do not engage with Petitioner's arguments regarding why the Pennsylvania Supreme Court's finding was unreasonable.  Petitioner's argument was adequately addressed in

11

his Memorandum of Law and he now relies on those arguments and authorities and

reincorporates them herein.

**CLAIM VII.  PETITIONER'S CONVICTIONS AND DEATH SENTENCE VIOLATE THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS BECAUSE UNRELIABLE FORENSIC EVIDENCE WAS PRESENTED TO THE JURY, AND TRIAL COUNSEL INEFFECTIVELY FAILED TO COUNTER IT.**

Petitioner's claim and legal arguments were adequately described in his Petition and

Memorandum of Law.  Petitioner relies on those arguments and authorities and reincorporates

them herein.

**CLAIM VIII.         PETITIONER'S SIXTH AMENDMENT RIGHTS WERE VIOLATED BECAUSE THE SENTENCES IMPOSED FOR THE RAPE, KIDNAPING, AND ABUSE OF A CORPSE CHARGES WERE BASED UPON FACTORS NOT SUBMITTED TO THE JURY.**

Upon further consideration and after conferring with Mr. Bomar, undersigned counsel

withdrew Claim VIII from this petition for writ of habeas corpus.

**CLAIM IX.  PETITIONER WAS DENIED RELIABLE SENTENCING AND EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS BECAUSE TRIAL COUNSEL FAILED TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT MITIGATING EVIDENCE, AND APPELLATE COUNSEL FAILED TO INVESTIGATE OR PROPERLY PRESENT THIS CLAIM.**

Petitioner's trial counsel failed to investigate and present to the jury an accurate depiction

of Petitioner's traumatic childhood, family dysfunction, and serious mental impairment, in

violation of his right to effective assistance of counsel.  Counsel also failed to explain to the jury

how or why any of the facts she did present were mitigating.  As a result, the jury was deprived

of significant mitigating information and gave little weight to the highly mitigating

circumstances that were presented.

12

Respondents argue that trial counsel was not ineffective because Petitioner was uncooperative. Doc. 45-2 at 74.[5]  Respondents equate Petitioner's case to *Schriro v. Landrigan*, 550 U.S. 465 (2007), in which the defendant instructed his family not to testify and "instructed his attorney not to present any evidence at the sentencing hearing." *Id.* at 470-71 (internal quotations omitted) (noting Landrigan also interrupted his counsel each time he tried to offer mitigating information during the sentencing proceedings).  Landrigan also told the sentencing court to "bring on" the death penalty. *Id.* at 479-80.  Relying in part on *Landrigan*, Respondents argue that Petitioner's unwillingness to aid trial counsel in her mitigation investigation means that she "cannot be deemed ineffective for failing to learn that which the client was unwilling to disclose." Doc. 45-2 at 74.

Respondents' reliance on *Landrigan* is misplaced.  Petitioner and the defendant in *Landrigan* had significantly different responses to their respective mitigation investigations and presentations.  While Petitioner was not generally forthcoming about his childhood and told his family not to discuss his childhood, *Bomar II*, 104 A.3d at 1202-03, he *did not object* to counsel's mitigation presentation at the penalty phase, which included the presentation of Dr. Cooke and several lay witnesses, including family members.  *See* NT 3/04/99 at 236.  Nor, unlike Landrigan, did he actively seek the death penalty.  Petitioner's reluctance to identify possible avenues of mitigation "d[id] not absolve [trial counsel] from pursuing those avenues,

_____

[5] Respondents argue both that "Ms. McLaughlin recognized that without the cooperation from family members and the petitioner additional investigations and contact with family members would not be productive," (in arguing that counsel did not stop investigating only because of a lack of funds), Doc. 45 at 27, yet later Respondents argue that "counsel did not quit attempting to investigate and present possible mitigating evidence in spite of petitioner's efforts," Doc. 45-2 at 97.  Respondents cannot argue out of both sides of their mouths to justify counsel's deficiencies.

particularly where counsel [wa]s already aware of facts demonstrating that such an investigation may be fruitful." *Saranchak v. Sec'y, Dep't of Corrs.*, 802 F.3d 579, 595 (3d Cir. 2015); *Outten v. Kearney*, 464 F.3d 401, 418 (3d Cir. 2006); *cf. Rompilla v. Beard*, 545 U.S. 374, 377 (2005).

Likewise, in *Taylor v. Horn*, 504 F.3d 416 (3d Cir. 2007),which Respondents cite for additional support, the defendant "was adamant about not *presenting* witnesses, and even telephoned scheduled witnesses the night before the degree-of-guilt and penalty hearing, telling them not to appear." *Id.* at 451. He also "unambiguously instructed his attorney not to present mitigating evidence at the penalty phase because he wanted to receive the death penalty as punishment for his crimes." *Id.* at 456. The Third Circuit found the defendant's "determination not to present mitigating evidence was just as strong" as that of the defendant in *Landrigan*. *Id.* at 455. "Thus whatever counsel could have uncovered, Taylor *would not have permitted any witnesses to testify*, and was therefore not prejudiced by any inadequacy in counsel's investigation or decision not to present mitigation evidence." *Id.* at 455 (citing *Landrigan*, 127 S. Ct. at 1941).

*Landrigan* and *Taylor* stand in stark contrast to Petitioner's case. He did not seek death or forbid a mitigation presentation and, in fact, allowed eight witnesses to testify on his behalf at sentencing. Petitioner's inability to discuss his childhood is rooted in his traumatic upbringing, and his reluctance to assist in the mitigation investigation does not excuse counsel's deficient performance, *see* Doc. 39 at 40, particularly those failures that were not affected by Petitioner's lack of cooperation, *see id.* at 47-48 (failing to obtain records she was aware existed[6]); *id.* at 48

---

[6] Respondents summarily deny that trial counsel was responsible for the delay in receiving the Aldie counseling records or the Nevada prison records, Doc. 45 at 28-29, but provide no basis for such a conclusion and do not dispute that counsel failed to provide an adequate release to Aldie Counseling Center, which caused the delay. Doc. 45-1 at 47. In a

(failing to provide records in her possession to experts); *id.* at 49 (failing to follow up on relevant reports provided in discovery); *id.* at 52 (failing to elicit known and highly mitigating information from Petitioner's sister on the stand), or those failures that were even more detrimental given Petitioner's reluctance to open up, *see id.* at 49 (failing to retain a mitigation specialist).

Counsel unreasonably failed *either* to hire a mitigation specialist or to conduct a reasonable background investigation through other means.  Counsel's mitigation investigation and presentation fell below the objective standards of reasonableness expressed in Supreme Court precedent and the ABA's professional guidelines. *See* Doc. 39 at 57-58 (citing *Sears*, *Porter*, *Rompilla*, *Wiggins*[7]).  The state court's conclusion that counsel's investigation and presentation were not deficient in light of the totality of mitigation evidence presented during the post-conviction proceedings – based almost exclusively on Petitioner's lack of cooperation – is contrary to, and an unreasonable application of, Supreme Court precedent. *See* Doc. 39 at 50-51, 54, 67.

While the Pennsylvania Supreme Court relied, and Respondents now primarily rely, on *Commonwealth v. Bond*, 819 A.2d 33, 45-46 (Pa. 2002), to support counsel's effectiveness given defendant's lack of cooperation, *Bomar II*, 104 A.3d 1203-03; Doc. 45-2 at 97, neither acknowledge that the Third Circuit subsequently found the state court unreasonably applied *Strickland* under § 2254(d), holding that it

---

similar vein, Respondents summarily deny that "the information provided by petitioner [in the Aldie Counseling records] regarding his family history was accurate," Doc. 45 at 23, but provide no basis for such an attack on the veracity of Petitioner's contemporaneous reporting.

[7] *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam); *Porter v. McCollum*, 558 U.S. 30 (2009); *Wiggins v. Smith*, 539 U.S. 510 (2003).

15

w[ould] not excuse [counsel's failure to present significant mitigation at penalty
phase and failure to call a witness to provide comprehensive social or psychiatric
history] on the ground that Bond and his family members did not tell counsel that
his background provided fertile territory for mitigation arguments.  Neither Bond
nor his family had a duty to instruct counsel how to perform such a basic element
of competent representation as the inquiry into a defendant's background.  They
did not, as the Commonwealth suggests, have to volunteer "red flags" about
through a basic inquiry into his background.  Trial counsel's investigation itself
was unreasonable.

*Bond v. Beard*, 539 F.3d 256, 287 (3d Cir. 2008), *as amended* (Oct. 17, 2008).  The Pennsylvania

Supreme Court's reliance on its decision in *Bond*, 819 A.2d at 45-46 – which itself was held to

be unreasonable – was unreasonable.

Respondents argue that there is "no way of knowing what a mitigation expert would have

been able to do at the time that petitioner and his family were actively working against prior

counsel's efforts to prepare and present mitigation evidence."  Doc. 45 at 30.  They argue that

"[t]he fact that family members cooperated after petitioner was convicted and sentenced to death

is not evidence that the result would have been different if a mitigation specialist had been

involved earlier in the process."  *Id.*  But a post-conviction court's role is to inquire into what

could have been presented at trial and what the results would have been had such actions been

taken in order to determine whether a petitioner was prejudiced.  *Porter*, 558 U.S. at 41 ("To

assess th[e] probability [of a different result], we consider 'the totality of the available mitigation

evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and

'reweig[h] it against the evidence in aggravation.'").  The importance of hiring a mitigation

specialist is that he or she is often able to discover mitigation that would not otherwise have been

discovered.

More specifically, Respondents argue that "things Ms. Batchelor subsequently told the

federal defenders about petitioner, she *chose* not to tell Ms. McLaughlin," Doc. 45-2 at 77, but

Respondents neglect to mention the when asked whether Ms. Batchelor discussed these things

with her, Ms. McLaughlin testified that Ms. Batchelor stopped the phone conversation "maybe

because of time." NT 11/6/08 at 103. There is no indication that Ms. McLaughlin ever asked

Ms. Batchelor about the things that undersigned counsel's mitigation specialist asked her about.

*Id.* For example, Respondents admit that Ms. Batchelor conveyed to Ms. McLaughlin that

Petitioner was raped by a guard, but then Respondents argued that Ms. Batchelor "did not

mention it" when she testified at trial. However, Respondents neglect to mention that it was

counsel that failed to ask Ms. Batchelor about the incident on the stand. *See* Doc. 45 at 28.

Likewise, Respondents argue that no family member ever told counsel Petitioner had

been hit in the head or sustained head trauma, Doc. 45-2 at 78, but again there is no indication

Ms. McLaughlin ever asked a family member whether Petitioner ever sustained injuries to his

head. *See* NT 11/6/08 at 103. *See Bond*, 539 F.3d at 282 (noting neither trial counsel asked

witnesses about head injuries, among other things).

In regard to the expert testimony offered by Petitioner in post-conviction, Respondents

note that the PCRA court found the testimony of Drs. Dudley and Cooke not credible. Doc. 45

at 20, 21; Doc. 45-2 at 84, 89. The PCRA court unreasonably characterized its determinations as

credibility findings. Finders of fact generally make credibility determinations about the truth or

accuracy of witnesses' testimony, which are generally deferred to because the finders of fact

were able to observe the witnesses' demeanor while testifying. *See Robinson v. Robinson*, 645

A.2d 836, 838 (1994); *In re Holtz' Estate*, 222 A.2d 885, 889-90 (Pa. 1966) ("The matter

of credibility is for the trial court. The discretion possessed by that court * * * is particularly

broad because his is the best opportunity to observe the demeanor of the witnesses called before

him." (internal quotations and citations omitted)).

17

Here, the court's focus was on the persuasiveness of the experts, not their credibility in the commonly understood sense.  For example, Respondents argue that in finding Dr. Dudley and Dr. Cooke incredible, the PCRA court deemed Dr. Dudley's methodologies to be "inappropriate, including his testimony about petitioner's competency," Doc. 45 at 20, yet the court credited Dr. Michaels's similar methodology, which resulted in a different opinion.  Moreover, Drs. Dudley and Cooke based their opinions in large part on records made contemporaneous to the events, which the records documented, and which are uncontroverted.  *See, e.g.*, NT 11/6/08 at 186-87, 191; NT 10/21/09 at 47-48, 51-54.  Here the PCRA court, rather than making credibility determinations, was determining what weight to accord the different experts' testimony in resolving the factual disputes.  The court found Dr. Michaels's findings more persuasive in relation to those of Dr. Dudley and Dr. Cooke, but it made no credibility findings with respect to any expert.

The PCRA court's failure to give any consideration to the testimony of Petitioner's experts was the type of absolute discounting the Supreme Court deemed unreasonable in *Porter*. 558 U.S. at 42-43("Yet neither the postconviction trial court nor the Florida Supreme Court gave any consideration for the purpose of nonstatutory mitigation to Dr. Dee's testimony regarding the existence of a brain abnormality and cognitive defects.  While the State's experts identified perceived problems with the tests that Dr. Dee used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge.").

Respondents also point out that many of the lay family affidavits on which the experts relied were not supported by sworn testimony, *see, e.g.*, Doc. 45 at 20, 24, 26, 28.  However, the Pennsylvania Supreme Court did not cite this as a consideration or reason for not considering the

mitigation evidence the family provided, *see Bomar II*, 104 A.3d at 1198-2000, 1203-04, and experts in the fields of forensic psychology and psychiatry typically rely on such documentation in reaching their conclusions.[8]  For example, under the American Psychological Association guidelines, forensic psychologists can rely on supporting documents, such as affidavits, to render opinions to a reasonable degree of psychological certainty.  *See, e.g.*, NT 4/28/09 at 163-64; *see also* NT 11/6/08 at 183 (Dr. Cooke's request for an affidavit from Ms. Batchelor).  Furthermore, in explaining his reliance on the Petitioner's family members' affidavits, Dr. Dudley explained that the fact that each affidavit "independently report[ed] similar sorts of things," and that uncontroverted official records also supported the information in the affidavits supported the affidavits' veracity. NT 10/21/09 at 61-62, 206-07.

Respondents' focus on Petitioner's citation to Dr. Cooke's and Dr. Dudley's affidavits is also a red herring.  *See, e.g.*, Doc. 45 at 23-25, 26, 30.  Drs. Dudley and Cooke testified to the same underlying mitigation evidence as was included in their respective affidavits.  For example, Dr. Dudley testified to the underlying mitigating evidence contained in his affidavit – evidence of numerous traumatic childhood events, including  psychological, physical and sexual abuse, neglect, abandonment;  and the longstanding psychiatric symptoms Petitioner had, including longstanding memory difficulties to the point of amnesia, dissociation, mood lability, mood disorder, psychosis, suicidal ideation, depersonalization, learning problems, attachment issues, impulsivity, and extreme paranoia to the point of delusion.  *See, e.g.*, NT 10/21/01 at 23-24, 31-39.  While Dr. Dudley did not testify that Petitioner had a specific mental health diagnosis, Doc.

---

[8] Respondents provide no basis for their contention that the "reliance by experts upon those hearsay statements is not well founded." Doc. 45 at 26.

45 at 30, his conclusions that Petitioner suffers from a longstanding emotional disturbance and that at the time of the crime investigation he suffered from "extreme mental or emotional disturbance" and his capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law" was "substantially impaired," were based upon the above symptoms and Petitioner's history of childhood abuse, abandonment, neglect, trauma, family dysfunction, sexual abuse, and instability, rather than a specific mental illness diagnosis. *See* Doc. 39 at 56.

Lastly, Respondents argue that appellate counsel was not ineffective in bringing ineffective assistance of counsel claims in post-trial motions because at the time he was required to do so or they would have been waived. Doc. 45 at 17. However, a requirement to raise a claim does not negate counsel's duty to do so effectively. Respondents acknowledge that appellate counsel focused solely on guilt-phase issues with the exception of Petitioner's competency claim. Doc. 45 at 32. In failing to conduct his own mitigation investigation or investigate trial counsel's mitigation presentation, appellate counsel was ineffective.

**CLAIM X.   PETITIONER IS ENTITLED TO RELIEF BECAUSE OF THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS DESCRIBED HEREIN.**

Claim X avers that the cumulative effect of the errors described in the preceding claims entitles Petitioner to relief. Each claim presented in the Petition individually entitles Petitioner to relief. However, if this Court finds that Petitioner is not entitled to relief under any particular claim, the cumulative effect of these errors requires the grant of a new trial.

There is no dispute from Respondents that U.S. Supreme Court precedent requires habeas courts to assess prejudice cumulatively. Although confusing, Respondents argue that "since there is no United States Supreme Court precedent regarding a cumulative error effect claim

20

post-AEDPA that it cannot be said that the state courts' decision, that there is no prejudicial cumulative error effect in this case, was contrary to or an unreasonable application of established federal law as determined by the United States Supreme Court." Doc. 45-2 at 100.  However, the state court here did not hold that there was no requirement to assess prejudice cumulatively, rather, the state court held that that even if there was error, it did not warrant relief. *Bomar II*, 104 A.3d at 197.  Thus, Respondents' argument is misplaced.  Stated simply, Petitioner does not argue that the state court ruling was unreasonable because it refused to assess error cumulatively; rather, the state court ruling was unreasonable because based on the prejudice emanating from the *Brady/Napue* violation, as well as error from the *Strickland* claims, the state court refused to grant relief based on cumulative error.

Notwithstanding Respondents' argument that there is "no United States Supreme Court precedent regarding a cumulative error effect claim post-AEDPA," this Court analyzing this habeas petition must assess error cumulatively.  *Dennis*, 834 F.3d at 311-12 (cumulative effect of suppression of documents in violation of *Brady* required federal habeas relief); *see also Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (reviewing claim of cumulative error); *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (same); *United States ex rel. Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir. 1980) (remanding the case to the district court to consider the cumulative prejudicial effect of various claims of counsel's ineffectiveness, along with claims of other trial court and prosecutorial errors).

Petitioner has demonstrated throughout his Petition, Memorandum of Law, and in this Reply, how constitutional errors undermined his right to a fair trial, and that the merits and waiver rulings by the Pennsylvania Supreme Court are erroneous.  The cumulative prejudicial effect of the errors in Petitioner's case warrants habeas relief.

## CONCLUSION

For the reasons set forth herein and in Petitioner's prior submissions, this Court should grant Petitioner habeas relief.

Respectfully Submitted,

/s/Leor Veleanu
LEOR VELEANU
JENNIFER CHICCARINO
KATHERINE E. ENSLER
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut St., Suite 545W
Philadelphia, PA 19106
215-928-0520

Dated: June 19, 2017

**CERTIFICATE OF SERVICE**

I, Leor Veleanu, hereby certify that on this 19th day of June, 2017, I served a copy of the

foregoing petition upon the following by ECF:

William R. Toal, III., Esq.
Assistant District Attorney
Office of the Delaware County District Attorney
Delaware County Courthouse
201 West Front Street
Media, Pennsylvania 19063

/s/ Leor Veleanu
LEOR VELEANU