IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTHUR BOMAR | : | CIVIL ACTION |
| | : | |
| v. | : | No. 04-1730 |
| | : | |
| JOHN E. WETZEL, Secretary, | : | **THIS IS A CAPITAL CASE** |
| Pennsylvania Department of Corrections, | : | |
| et al. | : | |

<u>**MEMORANDUM**</u>

**Juan R. Sánchez, C.J.**                                    **March 31, 2023**

In October 1998, after a jury trial in the Delaware County Court of Common Pleas,
Petitioner Arthur Bomar was convicted of the kidnapping, rape, and murder of Aimee Willard and
was sentenced to death. After exhausting his appeals and state post-conviction remedies, Bomar
filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking relief
from his conviction and death sentence. He asserts nine claims for relief. For the reasons set forth
below, the petition will be denied.

**FACTUAL AND PROCEDURAL HISTORY**

The facts underlying Bomar's conviction, as summarized by the Pennsylvania Supreme
Court on direct appeal, *Commonwealth v. Bomar*, 826 A.2d 831 (Pa. 2003) (*Bomar I*), and on
appeal from the denial of his petition for collateral relief under Pennsylvania's Post Conviction
Relief Act (PCRA), 42 Pa. Cons. Stat. §§ 9541 et seq., *Commonwealth v. Bomar*, 104 A.3d 1179
(Pa. 2014) (*Bomar II*), are as follows:

> At approximately 10:30 p.m. on the evening of June 19, 1996, the victim, 22-year-
> old Aimee Willard, met several of her high school friends at a bar located on
> Lancaster Avenue in Wayne, Pennsylvania. Later that night, at approximately 1:25
> a.m., Ms. Willard left the bar alone. She would not make it home.
>
> At approximately 2:00 a.m., on June 20, 1996, the victim's car, a blue
> Honda Civic, was discovered on the southbound off-ramp of the Springfield–Lima
> Exit of Interstate 476 in Delaware County. The car's engine was still running, the

driver's side door was open, the radio was playing and the interior lights and headlights were on.  There was a rough abrasion on the back bumper of the victim's car.  There was a pool of blood on the ground in front of the vehicle with drops of blood leading away from it.  A tire iron was located near the pool of blood.  Later that morning, police discovered a pair of sneakers and a pair of female underpants with a sanitary pad near the abandoned car.  The sneakers were later identified as belonging to the victim and the underpants were later identified as the size worn by the victim.  Hairs found on the sanitary pad were consistent with the pubic hairs of the victim.  The police also obtained tire impressions from the scene.

At approximately 5:00 p.m., on June 20, 1996, Aimee Willard's body was found naked, positioned face down, with two plastic bags covering her head, in a vacant lot at 16th Street and Indiana Avenue in Philadelphia.  The victim's injuries included multiple blunt force injuries to her head, brain and face; an abraded contusion on her left shoulder and upper chest; a rectangular shaped contusion beneath her left breast; a patterned, angular thermal injury resembling a flower petal on her right lower chest and upper abdomen; numerous fractures in her neck; bruises on her left and right thighs; and defensive wounds on her left and right forearms.  There was intact degenerate sperm found in the victim's vaginal cavity.  In addition, a tree branch had been forced into her vagina.  There was no blood surrounding or beneath the body or leading up to or away from the body, indicating that the victim was not killed at the site but rather had been killed elsewhere and then moved to this location.

Several hours after the discovery of Aimee Willard's body, at approximately 11:25 p.m., on June 20, 1996, [Petitioner] was coincidentally stopped by the police at the intersection of 20th Street and Erie Avenue in Philadelphia, eight blocks from where the victim's body had been found.  [Petitioner] was driving a green 1993 Ford Escort.  The police did not arrest [Petitioner] at that time.

Nearly a year later, on June 5, 1997, [Petitioner] was arrested in Ardmore, Pennsylvania, on an outstanding warrant for violating his parole from a conviction for second degree murder that occurred in Las Vegas, Nevada, and for an unrelated criminal trespass.[1]  That evening, investigators from the Delaware County Criminal Investigation Division (CID) questioned [Petitioner] concerning the Willard murder.  [Petitioner] told the investigators, among other things, that he drove a 1993 Ford Escort until March of 1997, that he had been to the same bar that the victim had been to on the night of June 19, 1996, previously with a former girlfriend, and that he routinely traveled on Interstate 476.

---

[1] After this arrest, Bomar initially identified himself using the alias "Peter Thomas Love" to Lower Merion Township and Philadelphia authorities.  *See* Resp'ts' Ex. Y at 7, 18, 19 n.19, ECF Nos. 47-14 and 47-15 (citing N.T. 3/30/98 at 32-39; 5/26/98 at 6-13, 38-40; N.T. 9/23/98).

2

On July 10, 1997, two Pennsylvania State Police troopers met with [Petitioner's] then-girlfriend, Mary Rumer.   Rumer told the troopers that [Petitioner] had confessed to her that he murdered Aimee Willard.  She told police that [Petitioner] related the following events to her: [Petitioner] observed Aimee leave the bar, get into her car, and begin to drive away.  He followed in his own car.  [Petitioner] stopped Aimee's car on Interstate 476 and flashed a fake police badge.  When Aimee asked why she was being stopped, [Petitioner] told her that she was swerving on the road.  Aimee then became angry, at which point [Petitioner] punched her, knocking her unconscious.  After placing the victim in his car, [Petitioner] drove to an abandoned building.  [Petitioner] took the victim's clothes, placed them in a trash bag and threw them away.  [Petitioner] hit the victim's head with a hard object and killed her.  He also admitted raping the victim to Rumer.

Rumer also told the troopers that [Petitioner] had shown her the location on Interstate 476 where Aimee Willard's car was abandoned as well as the vacant lot where her body was recovered.

On July 11, 1997, the police conducted a search of [Petitioner's] 1993 Ford Escort pursuant to a search warrant. The police seized and removed the following articles: the left front tire of the vehicle, a Firestone FR440 P17570R13; the oil pan from the undercarriage of the vehicle; and the right front door panel, which contained several brownish spots that later tested positive for blood.  The tire taken from [Petitioner's] car was consistent in tread design, size, and wear pattern with the tire impressions taken from the area where the victim's car was found abandoned.  The repeating cross-rectangle shape features, the vertical lines, and the machined edge present on the oil pan taken from [Petitioner's] vehicle matched the pattern injury on the right side of the victim's body. Most significantly, deoxyribonucleic acid ("DNA") testing of the bloodstains on the door panel indicated that Aimee Willard was a contributor to the stains.

On July 13, 1997, the police executed a search warrant for samples of [Petitioner's] blood.  DNA testing of the blood samples established that [Petitioner's] DNA profile matched the DNA profile of the male fraction developed from vaginal swabs taken from Aimee Willard.  There was but a one in 500 million chance that someone other than [Petitioner] was the source of the genetic material taken from the victim.

Also in July of 1997, David O'Donald, [Petitioner's] ex-brother-in-law, who was incarcerated in a federal prison for unrelated offenses, met with law enforcement officials to offer his assistance in the ongoing investigation of [Petitioner's] involvement in the Willard murder.  Pursuant to those discussions, O'Donald was transferred to the Montgomery County Correctional Facility where [Petitioner] was being held.  O'Donald was placed on the same cellblock as [Petitioner] for approximately two weeks in July.  On July 17, 1997, while [Petitioner] was in O'Donald's cell, [Petitioner] told him, "if I had disposed of the

body, there would be no problem," and "no body, no Grand Jury indictment." In addition, [Petitioner] stated that, "if everyone does what I tell them, I'll be alright." Later that day, while O'Donald was in [Petitioner's] cell, [Petitioner] stated, "I grabbed the bitch and she said please don't do this." He told O'Donald that he then said to the victim, "I'll do whatever the fuck I want, just shut up," to which she replied, "just don't kill me, I'll do anything." [Petitioner] told O'Donald that at that point, "we did whatever we wanted with her, she did whatever we told, and when we were done, I almost took her head off, and we crammed a tree branch up her cunt." [2]

*Bomar I*, 826 A.2d at 840–42. In addition, "Quincy Jamal Williams, another inmate incarcerated with [Petitioner] in Montgomery County, also reported to police that [Petitioner] confessed to murdering the victim." *Bomar II*, 104 A.3d at 1186.

On December 10, 1997, Delaware County, Pennsylvania, authorities charged Bomar by criminal complaint with kidnapping, raping, and murdering Aimee Willard and abusing her corpse. *See* Resp'ts' Ex. C, ECF No. 47-7. A few weeks later, upon learning that Bomar had reportedly attempted suicide in prison, defense counsel, Mark P. Much, Esquire,[3] requested a competency examination. Resp'ts' Ex. E, ECF No. 47-7. After a hearing on the motion, the court[4] granted counsel's request and appointed Robert L. Sadoff, M.D., a psychiatrist, to conduct an examination

---

[2] The fact that Willard's body was found with a tree branch between her legs was not publicly reported, and police neither disclosed this detail to O'Donald nor showed him any photographs of Willard's body. Resp'ts' Ex. Y at 5 n.8, 13 n.14, ECF No. 47-14 (citing N.T. 9/23/98 at 158-59; N.T. 9/28/98 at 253-54; and N.T 9/29 at 33-34, 180-81).

[3] Bomar was represented at trial by Much and a second attorney who served as penalty phase counsel. Bomar's original penalty phase counsel was Mary Welch, Esquire. Welch withdrew from the case in May 1998 for personal reasons, and Shawn McLaughlin, Esquire, replaced her as penalty phase counsel.

[4] Bomar's case was assigned to the Honorable Frank T. Hazel, who presided over the trial and all PCRA proceedings and wrote the trial and PCRA court opinions for state appellate review.

of Bomar to determine his competency to stand trial.[5]  Resp'ts' Exs. F, G, ECF No. 47-9.  Dr. Sadoff performed the examination on January 10, 1998, and issued a report two days later, on January 12, 1998, concluding that Bomar was competent.  Sadoff Report, Jan. 12, 1998.  The parties then appeared in court for a competency hearing on January 16, 1998.  At the outset of the hearing, Bomar's counsel advised the court that the defense "d[id] not have a substantial objection to the conclusions reached by Dr. Sadoff," was not requesting funds for a defense competency expert, and was waiving Dr. Sadoff's presence at the hearing and the right to cross-examine him. N.T. 1/16/98 at 3-4.  Based on the January 6 proceedings, counsel's representations, and Dr. Sadoff's report, the court found Petitioner was "competent to proceed in that he understands the nature or object of the proceedings against him, and is capable of assisting and participating in his defense." *Id.* at 5.

The case proceeded through the pretrial phase and ultimately to trial in September 1998. Although the case was tried in the Delaware County Court of Common Pleas, the court granted a defense motion for a change of venue before trial, and the jury was selected from Westmoreland County in western Pennsylvania.

At trial, the Commonwealth presented evidence of the facts set forth above.  Numerous law enforcement and other witnesses testified about the investigation of the crime, including the collection and processing of physical evidence from the crime scenes and Bomar's Ford Escort. Law enforcement witnesses also attested to statements Bomar made to them during the course of the investigation.  The medical examiner testified about the collection of evidence from Willard's

---

[5] As discussed *infra*, at the hearing on the motion for a competency examination, defense counsel elaborated that the basis for the motion was Bomar's suicide attempt as well as his interactions with counsel during which he appeared to be delusional.

body and about her autopsy, describing her extensive injuries and opining that she died as a result of blunt force injuries and that the manner of death was homicide.  N.T. 9/23/98 at 50.

A series of forensic experts testified about the testing and analysis of the physical evidence in the case, linking this evidence to Bomar.  An expert in tire track identification testified that the Firestone FR440 tire taken from Bomar's car was consistent in tread, design, size, and wear with an impression taken from the site where Willard's car was found abandoned and, based on the noise treatment on the tire, identified a particular segment of the tire that could have produced the impression taken from the crime scene.  N.T. 9/24/98 at 235-43.  A forensic pathologist and pattern injuries identification specialist testified that features of the oil pan taken from Bomar's car—a repeating pattern of a rectangle with a cross in it, vertical lines, and machined edges—matched the features of the pattern injury on the right side of Willard's thorax and opined that the oil pan could have caused the injury.  N.T. 9/25/98 at 87-89.  With regard to the DNA evidence, experts in the field of DNA analysis testified Bomar's DNA profile matched the DNA profile for the male fraction of the vaginal swab sample taken from Willard in all genetic locations for which results could be obtained.  N.T. 9/28/98 at 60, 62-63, 167.  An expert in population genetics and statistics related to DNA analysis testified that the probability of randomly selecting an unrelated individual with that DNA profile was one in 1.6 billion for the Caucasian population, one in 500 million for the African American population, and one in 800 million for the Hispanic population.  *Id.* at 205.[6]

---

[6] As discussed in greater detail *infra*, two different types of DNA testing were performed on Bomar's blood sample and the vaginal swabs: preliminary chain reaction (or "PCR") testing and restriction fragment length polymorphism (or "RFLP") testing.  N.T. 9/28/98 at 10, 33, 51, 55-56, 58-59.  RFLP testing is more discriminating but requires a larger sample, whereas PCR testing can be done on small or degraded blood samples.  *See id.* at 10-11, 18.  Experts for the Commonwealth determined that Bomar's DNA profile matched the DNA profile developed for the male fraction of the vaginal swabs in all six genetic locations tested by PCR testing and in the three genetic regions for which results could be obtained for the vaginal swabs using RFLP testing.  *Id.* at 60, 62-63.  (Because of the low level of DNA present on the swabs, the RFLP testing yielded no results

Another expert in DNA analysis testified that the bloodstains from Bomar's car were consistent with Willard's DNA profile and inconsistent with Bomar's DNA profile, and that the probability of randomly selecting an unrelated individual with a DNA profile consistent with the DNA profile from the bloodstains was approximately one in 12 for the Caucasian population, one in 29 for the African American population, and one in 18 for the Hispanic population.  N.T. 9/29/98 at 17-18, 23; *see also* N.T. 9/28/98 at 213-14.

In addition to presenting this physical and forensic evidence, the Commonwealth called Mary Rumer, David O'Donald, and Quincy Williams, each of whom testified about the inculpatory statements Bomar made to him or her.  Numerous other witnesses testified to Bomar's familiarity with the bar where Willard spent the evening just before her abduction, Interstate 476, and the area of North Philadelphia where Willard's body was found.  For example, several law enforcement witnesses testified that, during questioning, Bomar admitted having been to the bar in question at least once with a former girlfriend.  N.T. 9/23/98 at 164-65, 216; N.T. 9/29/98 at 78-79.  Laura Winters, the former girlfriend, confirmed that she and Bomar had been to the bar once or twice and stated Bomar seemed familiar with the bar and told her he had been there a number of times with friends.  N.T. 9/24/98 at 33-35, 37.  Philadelphia Police Officer James Banks testified about the encounter he had with Bomar only eight blocks from the vacant lot where Willard's body was found, on the night it was discovered.  N.T. 9/22/98 at 231-36.  At the time of the encounter, Bomar was driving the same green Ford Escort in which blood consistent with Willard's DNA profile was later recovered.  *See id.* at 232.  Several other witnesses also testified regarding Bomar's

---

for the remaining three genetic regions tested.  *Id.* at 62-64.)  Using the results from both forms of testing, the Commonwealth's experts opined that the probability of finding an unrelated individual with the combined profile developed for the male fraction of the vaginal swabs was extremely low, as stated above.  *Id.* at 202-05.

connections to the area surrounding the vacant lot.  The lot was about eight or nine blocks from

Bomar's aunt's house, N.T. 9/25/98 at 255, six or seven blocks from clubs Bomar frequented and

from an area where Bomar did work for a private investigator, N.T. 9/24/98 at 21-22; N.T. 9/25/98

at 255-56, 264; N.T. 9/29/98 at 50-51, and within a mile of his sister's home, N.T. 9/29/98 at 49.

The Commonwealth also presented evidence of various false statements Bomar made to

law enforcement during the course of the investigation, including a false alibi.  Bomar told

investigators he was at a birthday gathering for his stepson, Wayne Roshong, on the night of June

19, 1996, along with his ex-wife (Joyce O'Donald), his stepdaughter (Jessie Ingiosi), and several

others.[7]  *See* N.T. 9/23/98 at 215; N.T. 9/29/98 at 77-78.  However, at trial, O'Donald, Roshong,

and Ingiosi all testified this was not true.  O'Donald stated that while June 19 was Roshong's

birthday, there was no gathering for him that night.  N.T. 9/25/98 at 13, 32, 35.  Roshong and

Ingiosi both denied being present with Bomar at any birthday gathering for Roshong on June 19,

1996.  N.T. 9/25/98 at 40-41; N.T. 9/28/98 at 235.

The defense did not call any witnesses.

On October 1, 1998, the jury returned its verdict, finding Bomar guilty of first-degree

murder, rape, aggravated assault, kidnapping, and abuse of a corpse, but finding him not guilty of

possessing an instrument of crime.  N.T. 10/1/98 at 8-9.

The case proceeded to the penalty phase the next day (a Friday).  The Commonwealth

presented evidence of three aggravating circumstances: (1) that the killing was committed in the

perpetration of a felony, (2) that Bomar had a significant history of felony convictions involving

---

[7] Bomar told investigators that Jessie's baby, the baby's father, and another stepdaughter named
Jackie were also present at the birthday gathering on June 19, 1996.  N.T. 9/23/98 at 215; N.T.
9/29/98 at 77-78.

the use or threat of violence to the person, and (3) that Bomar had previously been convicted of another murder. *See* 42 Pa. Cons. Stat. § 9711(d)(6), (9), (11). To establish the first aggravating circumstance, the Commonwealth relied on the trial record, which was incorporated into the sentencing proceeding. N.T. 10/2/98 at 70. To prove the second and third aggravating circumstances, the Commonwealth presented evidence that Bomar had previously been convicted in Nevada of battery by a prisoner in March 1986, battery with a deadly weapon in July 1979, and second-degree murder in June 1979, including testimony regarding the circumstances of those offenses. *Id.* at 48-51, 55, 61, 67-68.

After the Commonwealth's presentation, the proceedings were adjourned at the request of the defense. When the proceedings resumed the following Monday, October 5, the defense sought to establish two statutory mitigating circumstances: (1) that Bomar was under the influence of extreme mental or emotional disturbance, and (2) any other evidence of mitigation concerning Bomar's character and record (the "catchall" mitigator). *See* 42 Pa. Cons. Stat. § 9711(e)(2), (8). The defense called eight witnesses, most of whom testified only briefly. The defense witnesses included three family members: Bomar's mother, who testified that Bomar was innocent and accused the jury of "looking at his color" in finding him guilty, *id.* at 93-94; his younger brother, who stated he loved Bomar very much and didn't want him to die, and pledged to "find out who did this," *id.* at 92; and his half-sister, who lived with and cared for Bomar for the first six months of his life and described the chaotic and abusive family situation Bomar was born into, including the constant violence between his parents, his father's cruelty, and his mother's volatility and neglect, *see id.* at 106-17. The defense also called two pastors from a church Bomar had attended, an insurance agent who had had a professional relationship with Bomar for several years, and a woman who had previously commended him to his employer for returning a diaper bag and wallet

she had left at the Doylestown Hospital.  *See id.* at 82-83, 90-91, 95-103, 118-26.  Finally, Gerald

Cooke, Ph.D., an expert in the field of forensic and clinical psychology, opined that Bomar suffered

from two different personality disorders—antisocial personality disorder and borderline

personality disorder—and that Bomar's borderline personality disorder qualified as both a mental

illness and an extreme mental or emotional disturbance.  *See* N.T. 10/5/98 at 51-52, 55-56, 78.  Dr.

Cooke further opined that Bomar may have organic brain damage and that this cognitive disorder

would also qualify as an extreme mental disturbance.  *See id.* at 49-50, 56.  He was unable to reach

a "firm conclusion" on the issue, however, because Bomar was unable to sustain his attention and

displayed variable motivation during testing, rendering his test results inconclusive.  *See id.* at 49-

50.

After the defense mitigation presentation, the parties presented closing arguments, and the

jury returned a verdict of death the same day.  The jury unanimously found all three aggravating

circumstances argued by the Commonwealth, but only one of the mitigating circumstances argued

by the defense—any other evidence of mitigation concerning Bomar's character and record and

the circumstances of his offense.  N.T. 10/5/98 at 199-200; Resp'ts' Ex. N, ECF No. 47-8.  The

jury noted the issues considered by the panel as to the catchall mitigator were "apparent remorse,

character, dysfunctional childhood/family life, and mental ability."  Resp'ts' Ex. N, ECF No. 47-

8; N.T. 10/5/98 at 200.  The jury also found that the aggravating circumstances outweighed the

mitigating circumstance.  Resp'ts' Ex. N, ECF No. 47-8.

On December 4, 1998, the trial court formally sentenced Bomar to death on the first-degree

murder conviction and imposed a sentence of 10 to 20 years on both the rape and the kidnapping

convictions and one to two years on the abuse of a corpse conviction, with all terms to run consecutively.  N.T. 12/4/98 at 55-56.[8]

After sentencing, the trial court permitted defense counsel to withdraw and appointed Steven C. Lynch, Esquire, to represent Bomar, who wished to pursue claims of ineffective assistance of trial and penalty phase counsel on direct appeal.  Resp'ts' Exs. O & P, ECF No. 47-8; *see also* N.T. 12/4/98 at 60-62.  Post-trial counsel later filed a post-sentence motion and a supplement, raising various claims of ineffective assistance of counsel.  Resp'ts' Exs. Q & R, ECF No. 47-10.[9]  Counsel then filed a motion to determine competency, noting Bomar was "refus[ing] to follow the advice of present counsel" and citing the possibility, based on prior evaluations and testing, that Bomar "has a cognitive disorder [organic brain dysfunction] which prevents him from participating and assisting in his defense with present counsel."  Resp'ts' Ex. S ¶ 12, ECF No. 47-11.

The trial court held two days of hearings on the post-sentence motions, but ultimately denied them, including the motion to determine competency.  Resp'ts' Ex. U, ECF No. 47-13; *see also* Resp'ts' Ex. Y at 59 n.33, ECF No. 47-15.

---

[8] The court did not impose a sentence on the aggravating assault conviction based on merger principles.  N.T. 12/4/99 at 55.

[9] Counsel ultimately sought to pursue five of the claims set forth in the motion and supplement, asserting that trial and/or penalty phase counsel were ineffective for (1) failing to call any defense witnesses at trial, including Bomar's mother and Betty Powell (who told investigators that, on the morning of June 20, 1996, she saw a white male deposit a large object at the vacant lot where Willard's body was later discovered, while Bomar is Black); (2) failing to present a diminished capacity defense (and to obtain a neuropsychological evaluation before September 26, 1998); (3) failing to move for a second change of venue or venire; (4) failing to request a continuance for additional neuropsychological testing; and (5) failing to challenge the constitutionality and applicability of 42 Pa. Cons. Stat. § 9714, pursuant to which Bomar was deemed to be a "high risk dangerous offender" for purposes of sentencing on the non-murder counts.  *See* Resp'ts' Ex. T, ECF No. 47-12.

Bomar appealed and filed a concise statement of matters complained of on appeal with the trial court, as required. Resp'ts' Ex. W, ECF No. 47-13. The trial court issued a 61-page opinion for appellate review, explaining its reasoning regarding Bomar's clams, in July 2000. *See* Resp'ts' Ex. Y, ECF Nos. 47-14, 47-15.

Before the Pennsylvania Supreme Court, Bomar raised claims of trial court error and ineffective assistance of counsel, and challenged to the constitutionality of Pennsylvania's death penalty statute.[10] *See* Resp'ts' Exs. Z, Z-1, ECF Nos. 47-16, 47-17. In addition to addressing Bomar's claims, the Pennsylvania Supreme Court performed its "self-imposed duty to review the sufficiency of th[e] evidence in capital cases" and found the "physical, confessional, scientific and circumstantial evidence" in the case "overwhelmingly" supported the jury's first-degree murder verdict. *Bomar I*, 826 A.2d at 840, 842. The court affirmed the judgment of sentence of death but vacated the sentences imposed for rape, kidnapping, and abuse of a corpse and remanded the case for resentencing as to those convictions. *Bomar I*, 826 A.2d at 862.[11] The United States Supreme Court denied Bomar's petition for writ of certiorari. Resp'ts' Ex. CC, ECF No. 47-25.

---

[10] In his appellate brief, Bomar argued the trial court erred by (1-3) denying his pre-trial motions to suppress two statements made to the police and one to his ex-brother-in-law, David O'Donald; (4) prohibiting him from "life qualifying" potential jurors during voir dire; (5) permitting Willard's mother to provide improper victim impact testimony; (6) denying his motion in limine to limit the extent of evidence regarding his prior convictions at the penalty phase; (7) granting the Commonwealth's motion to quash a subpoena for the victim's mother's testimony at the penalty phase; (8) sentencing him pursuant to 42 Pa. Cons. Stat. § 9714(a)(1) for the rape and kidnapping counts; and (9) denying his post-sentence motion for a competency evaluation. *See* Resp'ts' Ex. Z, ECF Nos. 47-16, 47-17. He argued his trial counsel was ineffective for (1) failing to call any witnesses on his behalf at trial; (2) failing to present a diminished capacity defense; and (3) failing to move for a second change of venue or venire, and his penalty phase counsel was ineffective for failing to request a continuance for additional neuropsychological testing. *See id.*

[11] Bomar had been sentenced for the rape and kidnapping offenses as a "high risk dangerous offender" pursuant to 42 Pa. Cons. Stat. § 9714(a)(1). His sentences for those offenses and for abuse of a corpse were vacated based on an intervening Pennsylvania Supreme Court decision holding that "§ 9714(a)(1) violated the procedural due process guarantees of the Fourteenth

Bomar next filed a timely pro se PCRA petition.  He was subsequently resentenced on the three convictions: the trial court again imposed a sentence 10 to 20 years each on the rape and kidnapping convictions and one to two years for abuse of a corpse, all to run consecutively to each other and to the death sentence.  N.T. 4/1/04 at 32-33; *see also Bomar II*, 104 A.3d at 1187.[12]  Two weeks later, then-Governor Edward G. Rendell issued a death warrant, scheduling Bomar's execution.

Following the issuance of the death warrant, Bomar filed a motion for appointment of federal habeas corpus counsel and for a stay of execution in this Court.[13]  ECF No. 1.  The court granted the motion, appointed the Capital Habeas Corpus Unit of the Federal Court Division of the Defender Association of Philadelphia (now known as the Federal Community Defender Office for the Eastern District of Pennsylvania, Capital Habeas Unit) to represent Bomar in his upcoming federal habeas proceedings, and stayed the death warrant for the duration of the habeas case or until further court order.  ECF No. 3.  Bomar then filed an initial petition for writ of habeas corpus in this Court and contemporaneously moved to dismiss it without prejudice, to permit him to exhaust state remedies as to his unexhausted claims.  ECF Nos. 13, 14.  This Court granted the motion without opposition from the Commonwealth, dismissed the action without prejudice, and directed counsel to "forthwith exhaust all claims in the state courts."  ECF No. 15.

---

Amendment of the United States Constitution because it placed the burden on the defendant to rebut the presumption he is a high risk dangerous offender."  *Bomar I*, 826 A.2d at 853 (citing *Commonwealth v. Butler*, 760 A.2d 384, 389 (Pa. 2000)).

[12] Bomar appealed, but the Pennsylvania Superior Court affirmed the judgment of sentence on these offenses, and the Pennsylvania Supreme Court denied Bomar's petition for allowance of appeal.  Resp'ts' Exs. MM & OO, ECF Nos. 47-33, 47-35.

[13] This case was initially assigned to the Honorable Michael Baylson and was reassigned to the undersigned on July 14, 2004.  ECF No. 6.

In December 2004, the Capital Habeas Unit filed a counseled PCRA petition in state court on Bomar's behalf, raising 22 claims for relief, including that Bomar was not competent to proceed with his PCRA litigation.  PCRA proceedings were stayed until early 2006, while Bomar's appeals from his resentencing were pending.

In November 2006, PCRA counsel filed a motion for an order finding Bomar incompetent to proceed.  *See Bomar II*, 104 A.3d at 1187.  After a hearing at which both sides presented expert testimony, the PCRA court denied the motion, finding Bomar competent.  Resp'ts' Ex. RR, ECF No. 47-35.

The PCRA court held a series of evidentiary hearings between 2008 and 2011 and, in March 2012, denied all of Bomar's claims.  Bomar appealed, and the PCRA court issued a 214-page opinion explaining its reasoning.  Resp'ts' Ex. UU, ECF Nos. 47-36 through 47-40 (also available at 2012 WL 9515416 (Pa. C.P. Del. Cnty. Sep. 4, 2012) (*PCRA Op.*).  The Pennsylvania Supreme Court affirmed in 2014.  *Bomar II*, 104 A.3d at 197.

Bomar then returned to this Court, filing a new habeas petition.  ECF No. 17.  Briefing was deferred—at Bomar's request and without opposition from the Commonwealth—while Bomar sought certiorari review in the United States Supreme Court.  ECF No. 24.  The United States Supreme Court denied certiorari in October 2015.  Resp'ts' Ex. YY, ECF No. 47-52.  Bomar then filed a memorandum of law in support of his habeas petition.  ECF No. 39.  The Commonwealth filed its response and memorandum, and Bomar filed a reply.  The Court heard oral argument on the petition in February 2020.

Bomar brings nine claims for relief, asserting (1) he was tried when incompetent and unable to rationally assist counsel, in violation of his due process rights (Claim One); (2) due process violations based on the prosecution's failure to disclose consideration promised to two

Commonwealth witnesses (David O'Donald and Quincy Jamal Williams) in exchange for their testimony (Claim Two); (3) ineffective assistance of counsel based on trial counsel's failure to challenge his statements to O'Donald, Williams, and Delaware County CID officers on due process grounds (Claim Three); (4) denial of the right to an impartial jury based on a juror's exposure to extraneous information (Claim Four); (5) denial of the right to a fair trial, an impartial jury, and a reliable sentencing procedure based on the court's improper dismissal for cause of prospective jurors who expressed reservations about the death penalty but did not demonstrate an inability to follow the law and ineffective assistance of trial and appellate counsel (Claim Five); (6) denial of the right to "life qualify" potential jurors during voir dire (Claim Six); (7) a due process violation based on the Commonwealth's presentation of unreliable and misleading DNA evidence and ineffective assistance of trial and appellate counsel for failing to effectively challenge the evidence or raise the issue on appeal (Claim Seven) (8) ineffective assistance of counsel at the penalty phase and for failing to pursue penalty phase counsel's ineffectiveness on direct appeal (Claim Nine); and (9) a claim of cumulative error (Claim Ten).[14]  The Commonwealth opposes the petition on all grounds.

**LEGAL STANDARDS**

**A.     Standard of Review Under AEDPA**

Review of Bomar's habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which requires a reviewing federal court "to afford considerable

---

[14] In his habeas petition, Bomar also raised a claim that the sentences imposed for the rape, kidnapping, and abuse of a corpse convictions violated his Sixth Amendment rights because those sentences were based on factors not submitted to the jury (Claim Eight).  Bomar later withdrew this claim in his memorandum in support of his habeas petition.  *See* Pet'r's Mem. 39, ECF No. 39.

deference to state courts' legal and factual determinations on the merits." *Taylor v. Horn*, 504 F.3d 416, 428 (3d Cir. 2007). Under 28 U.S.C. § 2254(d), a federal court cannot grant habeas relief "with respect to any claim that was adjudicated on the merits in State court" unless the state-court adjudication resulted in a decision that either (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). State-court determinations of factual issues are "presumed to be correct," and the federal habeas petitioner bears the burden of rebutting this "presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1); *see also Burt v. Titlow*, 571 U.S. 12, 18 (2013). This highly deferential standard requires federal habeas courts to presume that state courts "know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

For purposes of § 2254(d)(1), "the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of th[e] [Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also id.* (noting § 2254(d)(1) "restricts the source of clearly established law to th[e] [Supreme] Court's jurisprudence"). "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

A state-court decision is "contrary to" clearly established Federal law if the state court either "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent

16

and arrives at a result opposite to [the result reached by the Court]." *Bell v. Cone*, 543 U.S. 447, 452-53 (2005) (per curiam) (quoting *Williams*, 529 U.S. at 405).

A decision involves an "unreasonable application" of clearly established Federal law "if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law"; hence, a federal habeas court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410, 411.  Even "clear error" will not suffice. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  Rather, relief is available only if "the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409.  Put differently, under the "unreasonable application" standard, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Similarly, in determining whether a state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" within the meaning of § 2254(d)(2), the question is not whether the reviewing court "would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).  Rather, "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Brumfield*, 576 U.S. at 314 (holding relief

is not warranted under § 2254(d)(2) "[i]f [r]easonable minds reviewing the record might disagree about the finding in question" (second alteration in original) (internal quotation marks and citation omitted)).

The presumption of correctness under § 2254(e)(1) "applies to the factual determinations of both state trial and appellate courts," *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001), and applies to implicit factual findings "to the same extent as express factual findings," *Taylor*, 504 F.3d at 433. Whether implicit or explicit, a state court's credibility determinations are findings of fact entitled to deference under AEDPA. *See Rice v. Collins*, 546 U.S. 333, 338-39 (2006); *Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 850, 850 n.9 (3d Cir. 2017). The Supreme Court has recognized that "[f]ace to face with living witnesses the original trier of fact holds a position of advantage from which appellate judges are excluded." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (quoting *United States v. Ore. Med. Soc'y*, 343 U.S. 326, 339 (1952)). Federal habeas courts likewise have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Id.* at 851; *accord Weeks v. Snyder*, 219 F.3d 245, 258 (3d Cir. 2000).

If the petitioner satisfies the requirements of § 2254(d), the federal habeas court must determine whether the state court nevertheless "reached the correct result," as a federal court can only grant habeas relief "if it is 'firmly convinced that a federal constitutional right has been violated.'" *Vickers*, 858 F.3d at 849 (quoting *Williams*, 529 U.S. at 389). The court must therefore "proceed to review the merits of the claim de novo to evaluate if a constitutional violation occurred." *Id.*; *see also Price v. Warren*, 726 F. App'x 877, 884 (3d Cir. 2018) (reviewing a claim de novo upon concluding the state court's adjudication of the claim depended on unreasonable determinations of fact). To obtain habeas relief, the alleged violation must have had a "substantial

18

and injurious effect or influence" on the outcome of the trial.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal citation omitted); *see also Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022) (holding that to grant habeas relief, a court must find both AEDPA and *Brecht* are satisfied).

By its terms, § 2254(d) applies only to claims "adjudicated on the merits in State court proceedings."  Where the state courts did not address a properly preserved claim on the merits, these deferential standards of review do not apply.  *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010).  "In such instances, 'the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact.'"  *Id.* (quoting *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)); *see also Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 281 (3d Cir. 2018).  But "the state court's factual determinations are still presumed to be correct, rebuttable upon a showing of clear and convincing evidence."  *Bennett*, 886 F.3d at 281-82 (quoting *Appel*, 250 F.3d at 210); *see also Taylor*, 504 F.3d at 429 (noting § 2254(e)(1)'s presumption of correctness applies "[w]hether or not the state courts reached the merits of a claim").

### B.    Exhaustion and Procedural Default

Under AEDPA, a petitioner must also "exhaust[] the remedies available" in state court as a prerequisite to federal habeas review.  28 U.S.C. § 2254(b)(1)(A).  Under § 2254(b)(2), "a habeas corpus petition 'may be *denied* on the merits, notwithstanding the failure of the applicant to exhaust' available state remedies."  *Lines v. Larkins*, 208 F.3d 153, 159 n.8 (3d Cir. 2000) (emphasis added) (quoting 28 U.S.C. § 2254(b)(2)).  "But '[w]ithout an express waiver by the state, a federal court is allowed under [§ 2254(b)(1)(A)] to *grant* a state prisoner's habeas petition only if the petitioner has exhausted all available state remedies.'"  *Sharrieff v. Cathel*, 574 F.3d 225, 227 (3d Cir. 2009) (first alteration in original) (emphasis added) (quoting *Bronshtein v. Horn*, 404 F.3d 700, 725 (3d Cir. 2005)).

19

Under AEDPA, a state's waiver of exhaustion must be express: the state "shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."  28 U.S.C. § 2254(b)(3).  Here, the Commonwealth has expressly waived any potential exhaustion issues by admitting, in its answer to Petitioner's habeas petition, signed by counsel and filed on the docket in this case, that "petitioner's *habeas* claims have been previously raised and rejected in state court and have been exhausted for purposes of federal *habeas* review."  Resp'ts' Answer ¶¶ 14-16, ECF No. 45.  Similar statements by counsel for the state have been found to constitute an express waiver of exhaustion, even when counsel's concession was based on a "flawed legal conclusion." *Sharrieff*, 574 F.3d at 229 (holding the state's concession in its answer that petitioner had exhausted a particular claim was "enough to expressly waive the exhaustion requirement under Section 2254(b)(3)," even though the basis for the concession was erroneous); *see also Orie v. Sec'y Pa. Dep't of Corr.*, 940 F.3d 845, 854 (3d Cir. 2019) (holding the Commonwealth had waived the exhaustion requirement based on statements in its answer, signed by counsel and filed on the docket, that petitioner's claims were exhausted and had not been procedurally defaulted). The Court therefore finds exhaustion has been waived here.

### C.    Ineffective Assistance of Counsel Standard

Many of Bomar's claims include allegations that his trial and/or appellate counsel were constitutionally ineffective.  The "clearly established Federal law" to be examined under 28 U.S.C. § 2254(d)(1) for ineffective assistance of counsel claims is *Strickland v. Washington*, 466 U.S. 668 (1984).  *Williams*, 529 U.S. at 390-91.[15]  To prevail on a claim of ineffective assistance of counsel,

---

[15] Although *Strickland* itself involved a claim of ineffective assistance of trial counsel, the *Strickland* standard also applies to claims of ineffective assistance of appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 287-89 (2000).

a petitioner must show, first, "that counsel's performance was deficient," and second, "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

To show deficient performance, the petitioner must demonstrate "that counsel's representation fell below an objective standard of reasonableness," measured under "prevailing professional norms." *Id.* at 688.  The Supreme Court has emphasized that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.  The reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," making "every effort . . . to eliminate the distorting effects of hindsight." *Id.* at 689, 690.  To prevail, the petitioner must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy,'" and show counsel's "acts or omissions were outside the wide range of professionally competent assistance." *Id.* (quoting *Michael v. Louisiana*, 350 U.S. 91, 101 (1955)).

To establish prejudice under the *Strickland* test, the petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability in this context means "a probability sufficient to undermine confidence in the outcome." *Id.*  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.  While the petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case," it is not enough for the petitioner to show "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.  In evaluating prejudice, a court "must consider the totality of the evidence before the judge or jury." *Id.* at 695.

---

To succeed on a claim of ineffective assistance of counsel on habeas review, a petitioner must show the state court's application of *Strickland* was objectively unreasonable. *Visciotti*, 537 U.S. at 25.  Put differently, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.  Review of ineffective assistance of counsel claims under AEDPA is thus "doubly deferential" so as "to afford 'both the state court and the defense attorney the benefit of the doubt.'" *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (first quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); then quoting *Titlow*, 571 U.S. at 15).

**ANALYSIS**

**A.   Claim One**

Bomar first argues his due process rights were violated when he was tried while incompetent and unable to rationally assist counsel.  The PCRA court rejected this claim after a series of evidentiary hearings, holding Bomar had not proved by a preponderance of the evidence that he was, in fact, incompetent at the time of trial.[16]  *PCRA Op.*, 2012 WL 9515416, at *13.  The Pennsylvania Supreme Court affirmed, agreeing with the PCRA court that Bomar had failed to meet his burden to prove he was incompetent at the time of trial.  *Bomar II*, 104 A.3d at 1196.

Bomar argues the Pennsylvania Supreme Court's decision was contrary to and an unreasonable application of clearly established federal law.  Pet'r's Mem. 9, ECF No. 39.  Yet

---

[16] The PCRA court also rejected Bomar's related claims that the trial court erred by not conducting a competency hearing sua sponte and that his trial counsel was ineffective "for failing to adequately investigate Petitioner's social history, and to provide an examining psychiatrist with these records and contemporaneous jail records to enable him to conduct his evaluation and to adequately present a claim of incompetency to the trial court." *PCRA Op.*, 2012 WL 9515416, at *10, *13. Bomar did not press these claims on PCRA appeal. *See* Resp'ts' Ex. VV at 24-30, ECF No. 47-41.

while a state court's competency determination is a finding of fact to which federal habeas courts must defer, *Thompson v. Keohane*, 516 U.S. 99, 108-11 (1995); *Taylor*, 504 F.3d at 433, Bomar does not explicitly assert that the state courts' factual findings were unreasonable, nor does he challenge the presumption of their correctness, *see* 28 U.S.C. § 2254(d)(2), (e)(1).

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439 (1992).  The standard for competency is also well settled: to be competent to stand trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960).

The United States Supreme Court has also recognized that "a State's 'failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial.'" *Medina*, 505 U.S. at 449 (quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1975)).  A state must "afford[] [a] criminal defendant on whose behalf a plea of incompetence is asserted a reasonable opportunity to demonstrate that he is not competent to stand trial." *Id.* at 451.  And a trial court must "inquire *sua sponte* as to the defendant's competence in every case in which there is a reason to doubt the defendant's competence to stand trial." *Jermyn v. Horn*, 266 F.3d 257, 283 (3d Cir. 2001); *see also Drope*, 420 U.S. at 174-75, 179-81.

In applying the deferential AEDPA standards to examine the reasonableness of the state courts' adjudication of this claim, the Court first notes that federal courts distinguish between two

types of competency claims—substantive and procedural.[17]   A claim that a habeas petitioner was tried and convicted while actually incompetent is a substantive competency claim. *Grant*, 886 F.3d at 892.   To establish a due process violation on this basis, a petitioner must prove by a preponderance of the evidence that he was incompetent at the time of trial under the *Dusky* standard. *See Beck v. Angelone*, 261 F.3d 377, 388 (4th Cir. 2001); *Valdez v. Ward*, 219 F.3d 1222, 1239 (10th Cir. 2000); *Watts v. Singletary*, 87 F.3d 1282, 1290 (11th Cir. 1996).   In evaluating such a claim, "post-conviction evidence can often be relevant." *Grant*, 886 F.3d at 893; *see also Williams v. Woodford*, 384 F.3d 567, 608 (9th Cir. 2004); *Watts*, 87 F.3d at 1290. Although a court may consider a petitioner's history of mental illness as part of the competency inquiry, "[i]t does not follow that because a person is mentally ill [that person] is not competent to stand trial." *United States v. Leggett*, 162 F.3d 237, 244 (3d Cir. 1998) (alteration in original) (quoting *United States v. Davis*, 93 F.3d 1286, 1290 (6th Cir. 1996)); *see also United States v. Noble*, 42 F.4th 346, 353-54 (3d Cir. 2022) ("[M]ental illness does not, on its own, mean that a defendant is not competent to stand trial.").   Rather, mental illness is relevant only insofar as it precludes the petitioner from satisfying the *Dusky* standard. *See Leggett*, 162 F.3d at 244.

In contrast, a procedural competency claim challenges the trial court's failure to hold a competency hearing (or an adequate competency hearing) where there was "reason to doubt" the

---

[17] *See, e.g.*, *Raheem v. GDCP Warden*, 995 F.3d 895, 929-30 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1234 (2022); *Grant v. Royal*, 886 F.3d 874, 892-94 (10th Cir. 2018); *Williams v. Woodford*, 384 F.3d 587, 603-10 (9th Cir. 2004); *Walton v. Angelone*, 321 F.3d 442, 459-60 (4th Cir. 2003); *Carter v. Johnson*, 131 F.3d 452, 459 n.10 (5th Cir. 1997); *Vogt v. United States*, 88 F.3d 587, 590-91 (8th Cir. 1996).   The Third Circuit has also distinguished between claims alleging violations of the due process right to a competency hearing and claims alleging violations of the due process right not to be tried while incompetent, albeit without denominating such claims substantive or procedural in a published opinion. *See Taylor*, 504 F.3d at 433-38; *cf. Marrero v. Horn*, 505 F. App'x 174, 179-80 (3d Cir. 2012) (distinguishing between substantive and procedural competency claims).

defendant's competence to stand trial.  *Taylor*, 504 F.3d at 433 (first citing *Drope*, 420 U.S. at 171-72; then citing *Pate*, 383 U.S. at 385); *see also Grant*, 886 F.3d at 892.  To establish a procedural violation, a petitioner need only show that information before the trial court "created a sufficient doubt of [the defendant's] competence to stand trial to require further inquiry on the question" and that the court failed to make the required inquiry.  *Drope*, 420 U.S. at 180.  "In reviewing whether a state trial judge should have *sua sponte* conducted a competency hearing, a federal court may consider only the evidence that was before the trial judge."  *Williams*, 384 F.3d at 604; *see also Jermyn*, 266 F.3d at 292 ("In determining whether there were sufficient indicia of incompetence to warrant the trial court to order a competency evaluation or hearing on its own motion, we must consider the nature and quality of the facts *known to the court*." (emphasis added)).

In his habeas petition, Bomar frames his competency claim primarily as one of substantive competency, alleging, as he did before the Pennsylvania Supreme Court, that his due process rights were violated because he was incompetent at the time of trial.  *See* Pet. ¶¶ 32-33, ECF No. 17.  At oral argument, moreover, Bomar confirmed he was pursuing only a claim that he was tried while incompetent, and not a claim that the trial court had "an indication . . . that [he] was incompetent" or that his trial counsel was ineffective in failing to seek a competency determination.  *See* N.T. 2/7/20 at 67-68, ECF No. 63.  In his memorandum in support of his habeas petition, however, Bomar reframes his claim at least in part as one of procedural competency, arguing the trial court violated his due process rights by failing to assess his competence close to the time of trial and by failing to afford him an adequate hearing on his competency to stand trial despite its knowledge of his history of pronounced irrational behavior.  Pet'r's Mem. 8-9.  Although Bomar raised a

procedural claim in the PCRA court, he did not pursue that claim on PCRA appeal.  Nevertheless, as the Commonwealth has waived exhaustion, the Court will address both aspects of the claim.

The issue of Bomar's competency to stand trial was initially raised by trial counsel shortly after he was appointed.  On December 31, 1997, counsel filed a motion for a competency examination, citing his belief that Bomar had either attempted suicide or expressed a desire to commit suicide earlier that day.  Resp'ts' Ex. E, ECF No. 47-7.  The trial court held a hearing on the motion on January 6, 1998, at which counsel elaborated that the basis for the request was Bomar's two reported suicide attempts[18] as well as counsel's own interactions with Bomar in which he appeared to be delusional.  *See* N.T. 1/6/98 at 16-18, 20-21.  Counsel noted Bomar had questioned whether his attorney was a District Attorney or had raped his fiancée or wife.  *See id.* at 18, 21.

After the hearing, the trial court granted counsel's request and appointed Robert Sadoff, M.D., a psychiatrist, to examine Bomar to determine his competency to stand trial.  Resp'ts' Exs. F, G, ECF No. 47-9.  Dr. Sadoff performed the examination on January 10, 1998, with defense counsel and a psychiatrist retained by the Commonwealth present.  Although Dr. Sadoff was not provided any records to review, defense counsel spoke with him before the examination and advised him of the concerns that prompted it.[19]  Two days later, Dr. Sadoff issued a report concluding Bomar was competent.

---

[18] Bomar had previously attempted suicide in October 1997 while in custody at the State Correctional Institution at Camp Hill.

[19] Trial counsel testified that he told Dr. Sadoff about Bomar's suicide attempt and the comments Bomar made to him about the rape of his wife or fiancée.  N.T. 11/5/08 at 126, 228.  Testifying during the PCRA proceedings, Dr. Sadoff acknowledged being aware of those concerns at the time of the examination.  N.T. 11/7/08 at 64, 72.  Trial counsel also recalled advising Dr. Sadoff that prison personnel had informed him Bomar was acting out in jail, including that he was banging his head against the wall and ranting and raving, N.T. 11/5/08 at 126-27, 227-28, though Dr. Sadoff

In his report, Dr. Sadoff noted he found no evidence of psychosis in Bomar and explained that Bomar's beliefs about his fiancée and wife being raped were not, strictly speaking, delusional because he was willing to give up those beliefs based on their verbal representations that they had not been raped.  Sadoff Report 7, Jan. 12, 1998; *see also id.* at 4.  Dr. Sadoff also observed that while Bomar mentioned he "fe[lt] spirits," which he referred to as "God's spirits," these feelings were "more religious and spiritual" than "hallucinatory or delusional."  *Id.* at 3, 7.  The report noted that although Bomar was cooperative during the interview, there were topics he did not wish to discuss, deeming them not relevant.  *Id.* at 1, 7.  Bomar's unwillingness to discuss these topics— which included his childhood, family, educational, work, and criminal history—prevented Dr. Sadoff from being able to take a full history but did not prevent him from evaluating Bomar's competency.  *Id.* at 7.  Based on his examination, Dr. Sadoff concluded as follows:

> It is my opinion, within reasonable medical certainty, that Arthur Bomar is mentally competent to proceed in his legal situation.  He is aware of the nature and consequences of the legal situation in which he finds himself and he can work with his attorney in preparing his defense.  There are times when he is resistant to working with Mr. Much and reluctant to work with him, but as he indicated, he is able to do so when he chooses to do so.  With Mr. Bomar, in my opinion, it is more a matter of his lack of willingness rather than his lack of ability to work with Mr. Much at various times.  Clearly, he is aware of the participants in the courtroom and their functions and is able to understand his role within the system.

*Id.* at 8; *see also id.* at 9.  While Dr. Sadoff concluded Bomar was competent, he noted Bomar was highly suspicious, characterized him as having paranoid personality disorder, and recommended the use of stabilizing medication in the event his "suspiciousness becomes excessive and interferes with his ability to work effectively with counsel."  *Id.* at 8.

---

did not recall being informed about Bomar's head-banging, N.T. 11/7/08 at 70.  The PCRA court credited trial counsel's testimony and found that Dr. Sadoff was advised of "Petitioner's 'acting out' and disruptive behavior at the prison" at the time of the examination.  *PCRA Op.*, 2012 WL 9515416, at *11.

The parties then appeared in court for a competency hearing on January 16, 1998.  At the outset of the hearing, Bomar's counsel advised the court that the defense "d[id] not have a substantial objection to the conclusions reached by Dr. Sadoff," was not requesting funds for a defense expert,[20] was waiving Dr. Sadoff's presence at the hearing and the right to cross-examine him, and had no additional evidence to present.  N.T. 1/16/98 at 3-4.  Counsel asked that the court consider its own observations of Bomar during the January 6 hearing, counsel's representations at that hearing, and Dr. Sadoff's comments and conclusions in his report in rendering a decision regarding Bomar's competency and that the court consider the issue of competency as a "transitory issue."  *Id.* at 4.  Based on the January 6 proceedings, counsel's representations, and Dr. Sadoff's report, the court found Bomar "competent to proceed in that he understands the nature or object of the proceedings against him, and is capable of assisting and participating in his defense."  *Id.* at 5; *see also* Resp'ts' Ex. H, ECF No. 47-9.

A few months later, trial counsel sought and was granted authorization to retain a forensic psychologist, Gerald Cooke, Ph.D., to perform a psychological evaluation of Bomar.  Order, Apr. 1, 1998.  On April 30, 1998, Dr. Cooke evaluated Bomar both for competency and to determine whether there were any viable mental health defenses available.  N.T. 11/6/08 at 134; N.T. 3/4/99 at 132-33; N.T. 4/20/99 at 115.  Like Dr. Sadoff, Dr. Cooke concluded Bomar was competent.[21] N.T. 4/20/99 at 117, 124-25; N.T. 11/6/08 at 224-27.  He communicated his findings and

---

[20] Under Section 402 of Pennsylvania's Mental Health Procedures Act, defense counsel would have been entitled to funds to employ a psychiatrist of his choosing if the defense had had a substantial objection to the conclusions reached by the court-appointed psychiatrist.  *See* N.T. 1/16/98 at 3 (referencing 50 Pa. Stat. § 7402(f)).

[21] Dr. Cooke later testified that, at the time of his initial evaluation, he had "no question whatsoever" that Bomar was competent, noting Bomar "understood the nature and object of the proceedings against him" and "was certainly able to assist his attorney."  N.T. 4/20/99 at 117.

diagnoses[22] to trial counsel verbally after the evaluation but did not generate a written report until September 18, 1998, by which time he was also involved in the mitigation portion of the case.[23] N.T. 4/20/99 at 126; N.T. 11/6/08 at 136, 226-27.  Dr. Cooke later conducted a further evaluation of Bomar in September 1998, while trial was ongoing, for the purpose of assessing whether Bomar had organic brain dysfunction.  He again did not see anything that raised a concern about Bomar's competence.[24]  N.T. 11/6/08 at 228, 234.

Following Dr. Sadoff's evaluation of Bomar in January 1998, trial counsel did not ask the court to revisit the issue of Bomar's competency at any time before the start of trial in September 1998.  Nor did the trial court raise the issue sua sponte.[25]

---

[22] Dr. Cooke diagnosed Bomar with borderline personality disorder and antisocial disorder and also noted the preliminary data from his evaluation suggested the possibility of organic brain damage, an issue he recommended that counsel pursue.  N.T. 11/6/08 at 152; N.T. 4/20/99 at 117-18.

[23] Dr. Cooke's opinions regarding Bomar's competency were shared only with defense counsel and not with the trial court.

[24] Based on the results of neuropsychological testing administered to Bomar during the September evaluation, Dr. Cooke determined Bomar may have organic brain dysfunction, but was unable to offer an opinion on this issue to a reasonable degree of professional certainty.

[25] Direct appeal counsel later filed a motion to determine Bomar's competency during the post-sentence motions portion of the case.  The motion noted Bomar was "refus[ing] to follow the advice of present counsel" and raised the possibility, based on prior evaluations and testing, that he had organic brain damage, which hindered his ability to participate and assist in his own defense.  *See* Resp'ts' Ex. S ¶¶ 10-13, ECF No. 47-11.  After a hearing, at which Dr. Cooke testified, the trial court denied the motion, noting that both Dr. Sadoff and Dr. Cooke had examined Bomar and found him competent before trial and that, throughout the proceedings, Bomar had actively participated in and made decisions regarding his defense.  Resp'ts' Ex. Y at 59-60, ECF No. 47-15.  The court rejected the argument that Bomar might be incompetent due to a cognitive disorder, finding the possibility that he might have organic brain damage "did not implicate a possible determination of incompetence."  *Id.* at 60.  The Pennsylvania Supreme Court affirmed the trial court's ruling on direct appeal.  *Bomar I*, 826 A.2d at 861.

Bomar raised several competency-related claims in his PCRA petition, including that he had been incompetent when tried and was incompetent to proceed with PCRA litigation.  Resp'ts' Ex. KK at 15-22, 150-52, ECF Nos. 47-27, 47-31.

To establish he was incompetent at the time of trial, Bomar relied in part on records of his pretrial detention in the Delaware County Prison, which he maintains document a pattern of ongoing psychotic behavior during the period between Dr. Sadoff's evaluation and the start of trial and demonstrate that he decompensated while awaiting trial.  The records reflect that, during this period, Bomar was repeatedly observed pacing and talking to himself, the ceiling, or imaginary others; becoming agitated and having loud outbursts; and banging or slamming his head or body against hard surfaces in his cell.  Pet. ¶ 26.  In some instances, these behaviors prompted prison personnel to resort to the use of restraints or other measures to prevent Bomar from injuring himself.  *Id.* ¶¶ 26-27.  The prison records also reflect that Bomar was routinely given anti-anxiety and anti-psychotic medication during his pretrial detention and beyond.  *Id.* ¶ 27.

Bomar also presented evidence to the PCRA court from Richard Dudley, M.D., a psychiatrist retained by PCRA counsel to address competency as well as mitigation.  Dr. Dudley performed a psychiatric examination of Bomar over two days in September 2004, saw him again in 2006 to evaluate his then-current competency to proceed in the PCRA litigation, and was present when Bomar was evaluated by Timothy Michals, M.D., a psychiatrist retained by the Commonwealth, in 2007.  N.T. 10/21/09 at 15-16; Dudley Decl. ¶¶ 4, 69, Dec. 20, 2004; Dudley Decl. ¶ 2, Oct. 10, 2006.  In total, Dr. Dudley spent about 18 hours with Bomar, more than any other evaluator.  N.T. 10/21/09 at 16.  He also reviewed extensive records provided by PCRA counsel.  Dudley Decl. ¶¶ 4, 69, Dec. 20, 2004.  These records included, *inter alia*, affidavits from family members portraying a traumatic childhood in which Bomar "was born to a mother who had

30

her own 'major psychological difficulties,' and . . . appeared to be 'psychotic'"; "was most likely exposed to alcohol"; "witnessed and was the subject of physical abuse"; lived in "environments that were chaotic and violent"; and "was exposed to significant and multiple trauma due to repeated physical, sexual and emotional abuse and abandonment." *PCRA Op.*, 2012 WL 9515416, at *8 (citations omitted). Dr. Dudley also reviewed Bomar's school and juvenile records; prison records, including the records of his pretrial detention in the Delaware County Prison; reports of previous psychological evaluations and counseling records; and records regarding Bomar's suicide attempts in October and December 1997. *See id.*; Dudley Decl. ¶ 4, Dec. 20, 2004.

Dr. Dudley testified at the hearing on Bomar's competency to proceed in the PCRA litigation in July 2007 and at a PCRA hearing in October 2009. Based on all the information available to him, Dr. Dudley opined that as a result of his significant childhood trauma, Bomar suffers from a range of psychiatric symptoms, including "dissociative amnesia and possibly other dissociative phenomena, paranoid thinking that at least at times has reached the level of paranoid delusions, clinically significant depression and cognitive deficits." Dudley Decl. ¶ 75, Dec. 20, 2004; Dudley Decl. ¶ 3-5, Oct. 10, 2006; N.T. 10/21/09 at 149-51, 171; N.T. 7/17/07 at 16-17, 48. He is also "subject to periodic dissociative episodes, which, in effect, constitute breaks from reality." Dudley Decl. ¶ 6, Oct. 10, 2006. Dr. Dudley further opined that Bomar's symptoms are longstanding, were present at the time of trial, and rendered him incompetent to stand trial in that he was unable to adequately assist counsel in his own defense. N.T. 10/21/09 at 154-56; Dudley Decl. ¶ 76, Dec. 20, 2004; Dudley Decl. ¶¶ 4, 8, Oct. 10, 2006. He also found Bomar incompetent to proceed with the PCRA litigation. N.T. 7/17/07 at 65-70; Dudley Decl. ¶¶ 9-10, Oct. 10, 2006. According to Dr. Dudley, Bomar was unable to assist counsel both because, "given the level of stress that he was under, his mental status was incredibly fluid," which impaired his "capacity to

interact in a general matter," and because of his "inability to report significant pieces of his history." N.T. 10/21/09 at 156; N.T. 7/17/07 at 66-68, 118; *see also* Dudley Decl. ¶ 8, Oct. 10, 2006. Dr. Dudley further opined that while Bomar at times has a rational understanding of the judicial system and the charges against him, his understanding fluctuates depending on his level of stress. N.T. 7/17/07 at 65-66; Dudley Decl. ¶ 7, Oct. 10, 2006.

Drs. Sadoff and Cooke also testified during the PCRA proceedings after reviewing the same extensive records as Dr. Dudley. *See* N.T. 11/7/08 at 78, 106-07; Cooke Decl. ¶ 3, Dec. 21, 2004. Dr. Sadoff stated he had not changed his opinion from the time of his examination in January 1998 that Bomar was competent, noting he "had no reason to change what I found at that time." N.T. 11/7/08 at 104. Dr. Sadoff acknowledged he had no records at the time he examined Bomar— and that he would prefer to have records for any kind of evaluation. *Id.* at 65. But he explained that records are not necessary for a competency evaluation, and that he typically would not have them when evaluating someone for competency alone. *Id.* at 65, 102. As to Bomar's competency at the time of trial, Dr. Sadoff stated he could not render an opinion because competency can change, and he had not seen Bomar in the intervening months. *See id.* at 76-77, 104-05, 113. He agreed that, under stress, a person could move from a personality disorder to psychosis. *Id.* at 67. He also agreed that the records of Bomar's pretrial confinement in the Delaware County Prison "might show . . . that he was less able during those times than when I examined him," *id.* at 115-16, and that some of the behaviors documented in those records could be consistent with possible episodes of decompensation, depending on their extent, *id.* at 79. However, he could not say whether Bomar in fact decompensated. *Id.* at 115-16. And while he was unable to opine on Bomar's competency at the time of trial, he also noted he did not "find anything to be inconsistent"

32

with Dr. Cooke's opinion that Bomar was competent as he "didn't see anything that would tell [him] that [Bomar] was not competent at the time of trial." *Id.* at 114.

Dr. Cooke testified that he continued to believe Bomar was competent to stand trial in this case. N.T. 11/6/08 at 227. Like Dr. Sadoff, Dr. Cooke acknowledged that, when he initially evaluated Bomar in April 1998, he did not have any records other than the criminal complaint and affidavit of probable cause, but he stated this would have been sufficient for the purpose of conducting a competency evaluation. *Id.* at 134; *see also id.* at 225-26 (maintaining "an official version of the offense" is all that is needed for a competency evaluation; "I don't need records if it's for that limited purpose"). He explained that the additional records provided by PCRA counsel[26] would have altered his diagnoses of Bomar, in that they would have caused him to add paranoid features to Bomar's personality disorders and would have allowed him to opine to a reasonable degree of psychological or neuropsychological certainty that Bomar had organic brain damage. *Id.* at 201, 204. He also testified that the records of Bomar's pretrial confinement suggested there may have been times when Bomar decompensated to the point of having brief psychotic episodes. *Id.* at 186, 209-10. But Dr. Cooke's opinion that Bomar was competent when he was evaluated in April 1998 and again, mid-trial, in September 1998, remained unchanged. *Id.* at 227-28.

The PCRA court also heard testimony on the issue of Bomar's competency from the Commonwealth's expert, Dr. Michals. Dr. Michals evaluated Bomar's then-current competency in March 2007 and testified at the July 2007 hearing regarding his competency to proceed with the

---

[26] By the time he again evaluated Bomar in September 1998 and testified during the penalty phase shortly thereafter, Dr. Cooke had received some additional records from defense counsel, but he had not received many of the records later provided by PCRA counsel.

PCRA litigation, opining that Bomar was competent.  N.T. 7/17/07 at 205-06 (opining Bomar had "a rational understanding of the judicial system[] [and] the [c]harges against him," and was "able to cooperate to assist his attorneys in defending his case"); Michals Report 9, Apr. 11, 2007.  Like Drs. Sadoff and Cooke, Dr. Michals found Bomar had a personality disorder—in his view, antisocial personality disorder and possibly borderline personality disorder.  But he "did not find the presence of a mental disorder that would interfere making him incompetent to proceed."  N.T. 7/17/07 at 206.  Dr. Michals disagreed with Dr. Dudley that Bomar suffered from dissociative amnesia.  Michals Report 9, Apr. 11, 2007.  He instead found Bomar's memory issues to be volitional to the extent they were not the result of normal forgetfulness, noting Bomar demonstrated the ability to recall and communicate information selectively.  *Id.*; N.T. 7/17/07 at 193-94, 196-97, 204.  And he viewed Bomar's outbursts during his pretrial detention as "[a]cting-out behavior to get attention" as opposed to evidence of psychosis.  N.T. 7/17/07 at 200, 267.  Dr. Michals also testified at a PCRA hearing in February 2010, opining that, based on Bomar's prior evaluations by Dr. Sadoff and Dr. Cooke, Bomar was competent at the time he was evaluated and at trial.  N.T. 2/3/10 at 38-39.[27]

Bomar's trial counsel also addressed the issue of Bomar's competency both in his PCRA testimony and when testifying at an earlier hearing on Bomar's post-sentence motions.  Counsel stated he spent hundreds of hours with Bomar during the course of the representation, meeting

---

[27] Dr. Edward Dougherty, a psychologist retained by the defense for the penalty phase, also testified during the PCRA proceedings.  Dr. Dougherty met with Bomar in August 1998 to conduct a forensic evaluation, but he was not able to complete the evaluation because Bomar refused to have any further psychological testing.  N.T. 4/28/09 at 149, 187; Dougherty Decl. ¶ 1, Mar. 25, 2009.  As Dr. Dougherty did not evaluate Bomar for competency in August 1998, he could not render an opinion on Bomar's competency at that time.  N.T. 4/28/09 at 166-67, 188-91.  Based on his evaluation, however, he did not see anything to suggest Bomar was incompetent or there was a need to explore the issue further.  *Id.* at 194-95; Dougherty Decl. ¶ 6, Mar. 25, 2009.

with him at least once a week over the course of a year.  N.T. 11/5/08 at 128, 179; N.T. 3/4/99 at 101.  Although counsel had a concern about Bomar's competency around the time of his December 1997 suicide attempt, he was satisfied Bomar was competent after Dr. Sadoff's evaluation.  N.T. 11/5/08 at 115, 179; N.T. 3/4/99 at 128, 140.  Apart from this two-week period in late December 1997 and early January 1998, counsel had no concerns about Bomar's mental state and never believed Bomar was not competent.  N.T. 11/5/08 at 114-15, 179; N.T. 3/4/99 at 140.

Trial counsel recounted that Bomar understood the charges against him and the roles of the various case participants, cooperated with counsel in terms of providing him with information, and actively participated in decision-making regarding his defense.  N.T. 11/5/08 at 118-21, 135-36; N.T. 3/4/99 at 62, 164-65.  While counsel did not always agree with Bomar's decisions, the disagreement did not cause him to question Bomar's competency as there was a "logical progression to [Bomar's] thought process."  N.T. 11/5/08 at 142-43.  With regard to jury selection, for example, Bomar wanted a jury from as far away from Delaware County as possible, even if such a jury pool was less advantageous to the defense in other ways.  *Id.* at 138-43.  Bomar also did not want to pursue a mental health defense, saying he was not interested in reducing the charge from first- to third-degree murder because he was innocent and wanted his counsel to focus on obtaining an acquittal.  *Id.* at 130-31; N.T. 3/4/99 at 137-38.

Counsel was aware of the behaviors documented in the records of Bomar's pretrial detention, having heard from prison staff that Bomar "was disruptive, banging his head against the wall" and "ranting and raving," and having received a copy of Bomar's prison records in response to a subpoena.  N.T. 11/5/08 at 98-100.  When he confronted Bomar about his conduct, however, Bomar told counsel he was "playing" with the guards for entertainment.  *Id.* at 100, 211-12.  Counsel perceived Bomar's behavior to be manipulative rather than evidence of mental illness and

therefore saw no reason to provide the records to either of the mental health professionals who evaluated him, both of whom had opined that Bomar was competent.[28]  *Id.* at 104.

The PCRA court rejected Bomar's substantive competency claim, finding Bomar had failed to meet his burden to prove by a preponderance of the evidence that he was, in fact, incompetent at the time of trial.  *PCRA Op.*, 2012 WL 9515416, at *10, *13.  The PCRA court recognized that "competency is not a 'static assessment, but a fluid one.'"  *Id.* at *10 (citation omitted).  The court nevertheless found it significant that while Bomar had been subject to several competency evaluations over the years, and had been repeatedly diagnosed with personality disorders, each evaluator found him competent to stand trial—consistent with "the well-accepted principle that mental illness does not preclude a finding of competency"—except for Dr. Dudley. *Id.*  In evaluating Bomar's substantive competency claim, the court considered the testimony of each of the experts who had examined Bomar, as well as trial counsel's testimony regarding his interactions with and perceptions of Bomar throughout the course of the representation.  The court rejected Dr. Dudley's "hindsight" assessment of Bomar's competency, completed six years after trial, finding more persuasive the evaluations conducted by Drs. Sadoff and Cooke in the months leading up to and during trial.  *Id.* at *11.  The court specifically declined to credit Dr. Dudley's opinion that Bomar was (and continued to be) subject to dissociative episodes that rendered him unable to understand the nature of the proceedings or to assist counsel, "explicitly reject[ing] his testimony in favor of evidence of the evaluations performed before trial, the testimony of trial

---

[28] Counsel recounted that Bomar also engaged in other manipulative behaviors such as telling counsel early on in the representation that he had committed the crime, only to later recant, saying his admissions were a test to see if counsel would still represent him.  N.T. 11/5/08 at 133-34.

counsel and the contrary testimony of Drs. Michals, Cooke and Sadoff regarding this issue."[29] *Id.* at *13; *see also id.* at *10.

The Pennsylvania Supreme Court affirmed, holding the PCRA court did not err in rejecting Bomar's competency claim. *Bomar II*, 104 A.3d at 1197. Like the PCRA court, the Supreme Court found Bomar had failed to meet his burden to prove he was incompetent to stand trial based on Dr. Dudley's "hindsight" evaluation six years later. *Id.* at 1196. Insofar as Bomar argued Dr. Sadoff's January 1998 evaluation failed to establish his competency at the time of trial, the court noted Bomar's additional evaluations by Dr. Cooke in April and September 1998 confirmed his competency closer in time to trial. *Id.* at 1197-98. The court also rejected Bomar's contention that Dr. Sadoff's evaluation was inadequate because he was not provided with Bomar's prison records, noting that "Dr. Sadoff testified during the PCRA hearing that he was informed of the events contained in the prison records prior to conducting his examination of [Petitioner], and that they did not impact his conclusion." *Id.* at 1197.

Without explicitly challenging the state-court factual findings, both implicit and explicit, or credibility determinations, Bomar argues the state courts' adjudications of this claim were contrary to and an unreasonable application of clearly established federal law as set forth in *Pate v. Robinson*, 383 U.S. 375 (1966), and *Drope v. Missouri*, 420 U.S. 162 (1975). These cases involved challenges to a state trial court's failure to hold a competency hearing or otherwise inquire into a defendant's competency to stand trial in the face of evidence giving reason to doubt the defendant's competence. In both instances, the Court recognized that "the failure to observe

---

[29] In crediting trial counsel's testimony, the trial court noted counsel's testimony was consistent with the court's own observations concerning Bomar's "active participation in pre-trial and trial proceedings and jury selection." *PCRA Op.*, 2012 WL 9515416, at *12.

procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Drope*, 420 U.S. at 172 (citing *Pate*, 383 U.S. at 385). And in both cases, the Court found a due process violation based on the trial court's failure to conduct the appropriate inquiry.

In *Pate*, the federal habeas petitioner challenged the state trial court's failure to hold a competency hearing sua sponte, as was required by state law whenever the evidence raised a "bona fide doubt" as to a defendant's competence to stand trial. 383 U.S. at 385. The Supreme Court found the petitioner was constitutionally entitled to a hearing based on evidence presented at trial, at which his counsel raised an insanity defense and also placed petitioner's present sanity directly at issue, calling four witnesses who provided uncontradicted testimony about his "long history of disturbed behavior" and opined that he was presently insane. *Id.* at 378-85. There was also some evidence in the record suggestive of competency: the director of the court's behavior clinic had found the petitioner knew the nature of the charges against him and was able to cooperate with counsel when examined two or three months before trial, *id.* at 383, plus the state supreme court noted the "mental alertness and understanding [petitioner] displayed in [his] 'colloquies' with the trial judge," *id.* at 385 (citation omitted). But the Court held this evidence, while possibly relevant to an ultimate decision on petitioner's sanity, provided "no justification for ignoring the uncontradicted testimony of [petitioner's] history of pronounced irrational behavior" and could "[]not be relied upon to dispense with a hearing on th[e] very issue [of his sanity]." *Id.* at 385-86. Having found a constitutional violation, the Court issued a conditional writ of habeas corpus, ordering the petitioner discharged unless retried within a reasonable time, citing the difficulty of retrospectively determining competency to stand trial. *Id.* at 386-87.

Similarly, in *Drope*, the Supreme Court found a due process violation based on the state trial court's failure to order a competency examination, as required under state law whenever the court "ha[d] reasonable cause to believe that the accused ha[d] a mental disease or defect excluding fitness to proceed." 420 U.S. at 173 (citation omitted). There, defense counsel had twice sought a continuance in the month before trial to permit the petitioner to undergo a psychiatric examination and treatment, as had been suggested by a psychiatrist who had examined him, but both requests were denied. *Id.* at 164-65. When the case proceeded to trial, the petitioner's wife, whom he was accused of forcibly raping, testified that while she had initially signed a statement disavowing a desire to prosecute, believing her husband was sick and needed psychiatric care, she changed her mind after her husband tried to kill her by choking her before trial started. *Id.* at 166. The next day, the petitioner did not appear for trial because he had been hospitalized after shooting himself in a suicide attempt. *Id.* Nonetheless, the trial court denied a defense motion for a mistrial and completed the trial in petitioner's absence. *Id.* at 166-67. The Supreme Court concluded that the petitioner's suicide attempt, together with the information available to the trial court before trial and the trial testimony of petitioner's wife, "created a sufficient doubt of his competence to stand trial to require further inquiry on the question." *Id.* at 180. As in *Pate*, having found a constitutional violation, the Court ordered the petitioner retried, noting it was unable to conclude his "due process rights would be adequately protected by remanding the case now for a psychiatric examination aimed at establishing whether petitioner was in fact competent to stand trial" at the time, six years earlier. *Id.* at 183.

Bomar argues the state court's decision was contrary to and an unreasonable application of *Pate* and *Drope* because, like the petitioners in those cases, he did not receive an adequate hearing on his competency to stand trial at the time of trial "despite the court's knowledge of [his] 'history

of pronounced irrational behavior.'"   Pet'r's Mem. 9-10 (quoting *Pate*, 383 U.S. at 386).   He

further argues a retrospective competency hearing is intrinsically inadequate based on the passage

of time; hence, "the state court's decision was contrary to clearly established federal law where it

failed to retry Petitioner, assuming that at the time of such trial he is competent to be tried."   *Id.* at

9.

Unlike in *Pate* and *Drope*, however, the trial court here *did* inquire into Bomar's

competency to stand trial after his suicide attempt in late-December 1997, and Bomar has not

shown neither that this inquiry was constitutionally inadequate at the time it was made nor that the

court had reason to revisit the issue of competency closer to the time of trial.   These deficiencies

are fatal to Bomar's effort to establish a claim based on *Pate* and *Drope*.

Bomar maintains the procedures used to determine competency were inadequate because

Dr. Sadoff was not provided the information necessary to form an educated opinion and because

no adversarial competency hearing was held.   Both arguments lack merit.   It is true that, when Dr.

Sadoff evaluated Bomar in January 1998, he had no records regarding Bomar.   N.T. 11/7/08 at 65.

Nor had he requested any.   N.T. 11/5/08 at 228.   Although Dr. Sadoff testified that he prefers to

have records when performing any type of evaluation, he also stated it is not necessary to have

records—and he typically does not have them—when conducting an evaluation for competency

alone.[30]   N.T. 11/7/08 at 65, 102.   Dr. Cooke also testified it is not necessary to have records

beyond an official version of the charges when conducting an evaluation limited to competency.

---

[30] Notably, although Dr. Sadoff testified during the PCRA proceedings after reviewing the
extensive records compiled by PCRA counsel, including the records of Bomar's pretrial detention,
he stated that he had not changed his opinion that Bomar was competent at the time of his January
1998 evaluation. N.T. 11/7/08 at 104; *see also* Sadoff Report 8, Dec. 4, 2006 (acknowledging that
while records would have enabled him to reach a more informed conclusion, he could not say, to
a reasonable degree of medical certainty, that his conclusion would have been any different).

N.T. 11/6/08 at 225-26, 231. While Dr. Dudley may have disagreed, the Court cannot conclude the lack of records rendered the procedures used to determine Bomar's competency constitutionally inadequate.[31]

As to the lack of an adversarial competency hearing, the record reflects that, after Dr. Sadoff's evaluation, the trial court did, in fact, convene a hearing on January 16, 1998. *See generally* N.T. 1/16/98; *see also Bomar II*, 104 A.3d at 1195 n.15. At the outset of the hearing, however, counsel—at whose request the examination had been ordered—announced the defense did not object to Dr. Sadoff's conclusion that Bomar was competent, was waiving the doctor's presence at the hearing and the right to cross-examine him, and had no additional evidence to present. N.T. 1/16/98 at 3-4. By convening a hearing after receiving Dr. Sadoff's report, the trial court provided the parties the opportunity "to examine the opinions and conclusions of the expert." Pet. ¶ 34. That defense counsel elected not to contest the expert's findings does not render the hearing constitutionally inadequate. *Cf. Drope*, 420 U.S. at 173 (finding a state court procedure requiring a court to hold a hearing after receiving the report of a defendant's competency examination "if the opinion relative to fitness to proceed . . . is contested" to be, "on its face, constitutionally adequate"); *Medina*, 505 U.S. at 451 (noting that to comport with due process "it

---

[31] As noted, in rejecting Bomar's argument that Dr. Sadoff's evaluation was inadequate because his jail records were not made available to Dr. Sadoff, the Pennsylvania Supreme Court observed that "Dr. Sadoff testified during the PCRA hearing that he was informed of the events contained in the prison records prior to conducting his examination of [Petitioner], and that they did not impact his conclusion." *Bomar II*, 103 A.3d at 1197. This observation appears to overstate what Dr. Sadoff knew regarding Bomar's pretrial detention. While the PCRA court credited trial counsel's testimony that he was aware of, and informed Dr. Sadoff of, some of Bomar's "acting out" and "disruptive" behaviors before the evaluation, *PCRA Op.*, 2012 WL 9515416, at *11, most of the records on which Bomar relies as evidence of decompensation were not generated until after Dr. Sadoff conducted his evaluation. Indeed, only a few of the entries on which Bomar relies predate his evaluation by Dr. Sadoff. *See* Pet. ¶ 26.

is enough that the State affords the criminal defendant on whose behalf a plea of incompetence is asserted a reasonable opportunity to demonstrate that he is not competent to stand trial"); *United States v. Muriel-Cruz*, 412 F.3d 9, 14 (1st Cir. 2005) (noting competency "is to be resolved through the normal workings of the adversarial process," leaving "the decision whether to contest competency primarily to the government and to defense counsel").

Bomar also argues the procedures used to determine competency were inadequate because the evaluation occurred eight months before trial. This argument, however, has no bearing on the adequacy of the court's inquiry at the time it was made. And insofar as Bomar faults the trial court for "failing to assess his competence close in time to trial," Pet'r's Mem. at 8—an argument he did not raise before the Pennsylvania Supreme Court—he has not established a due process violation on this basis.

A trial court is required to inquire into competency sua sponte "only when [the] court has reason to doubt the defendant's competence." *Godinez Moran*, 509 U.S. 389, 401 n.13 (1993). The court's obligation to assess a defendant's competency is ongoing. "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181; *see also Jermyn*, 266 F.3d at 295 n.16 ("[P]roof tending to establish that a defendant was competent at one stage of the proceedings does not preclude the possibility that changed circumstances might instill doubt about his competence."). But absent "indicia of incompetence," a competency inquiry is not required. *Taylor*, 504 F.3d at 433 ("[B]arring indicia of incompetence, due process does not require that a competency hearing be held."); *see also Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010) (holding the standard for

determining whether an additional competency hearing is required is the same as that for deciding if an initial hearing is required).

In analyzing whether such indicia were present at any stage of the proceedings and thus warranted a hearing, a reviewing court "must consider the nature and quality of the facts known to the [trial] court" at that time. *Jermyn*, 266 F.3d at 292; *see also Williams*, 384 F.3d at 604 ("In reviewing whether a state trial judge should have *sua sponte* conducted a competency hearing, a federal court may consider only the evidence that was before the trial judge.").

Here, while Bomar maintains the trial court "had reason at the time of trial to question [his] competence," Pet'r's Mem. 8, he points to no indicia of incompetence that would have been known to trial court in the months between Dr. Sadoff's evaluation in January 1998 and the start of trial eight months later. Apart from the behaviors that led the trial court to order a competency examination in January 1998 (and which were addressed by Dr. Sadoff in his report), the only indicia of incompetence referenced by Bomar are the records of his pretrial detention. Pet. ¶¶ 26-27; Pet'r's Mem. 6. As noted, these records were eventually obtained by trial counsel. But they were never provided to the trial court.[32] Pet'r's Post-Hr'g Mem. 9, July 26, 2011 (noting that although trial counsel were in possession of Bomar's jail records, "[c]ounsel failed to apprise the Court of the content of these records, and . . . failed to request additional competency evaluations or proceedings"). Bomar notes that his "mental state on January 10, 1998, does not resolve the question of [his] mental state eight months later in September 1998." Pet'r's Mem. 7. But absent some further indicia of incompetence after the trial court's initial competency inquiry and

---

[32] Indeed, based on trial counsel's failure to use the records by providing them to a mental health professional or alerting the trial court to their contents, Bomar argued trial counsel was ineffective with respect to the issue of competency, a claim he did not pursue on PCRA appeal. *See* Pet'r's Post-Hr'g Mem. 9, July 26, 2011.

determination, there is no basis to conclude that the trial court violated Bomar's due process rights by failing assess his competency closer to the time of trial.  *Cf. Maxwell*, 606 F.3d at 574-76 (finding a due process violation based on trial court's failure to hold a second competency hearing sua sponte where there was substantial evidence known to the trial court that petitioner's mental condition had significantly deteriorated since the initial competency determination 13 months earlier).[33]  Hence, the trial court's failure to inquire into Bomar's competency at the time of trial is not inconsistent with, much less contrary to or an unreasonable application of, *Pate* and *Drope*.

The absence of indicia of incompetence requiring further inquiry would not have precluded Bomar from establishing in the state courts that there was a due process violation on the basis that he was in fact incompetent when tried.  To obtain relief on such a substantive incompetence claim, however, he was required to "prov[e], by a preponderance of the evidence, that he was incompetent to stand trial."  *PCRA Op.*, 2012 WL 9515416, at *10; *see also Bomar II*, 104 A.3d at 1196; *accord United States v. Riddick*, 15 F. Supp. 2d 673, 678 (E.D. Pa. 1998).  Based on the evidence presented in the PCRA proceedings, both the PCRA court and the Pennsylvania Supreme Court found Bomar had failed to meet this burden, rejecting Dr. Dudley's retrospective competency assessment in favor of the evaluations conducted by Drs. Sadoff and Cooke before and during trial.  Bomar has not shown this decision was contrary to, or involved an unreasonable application of, clearly established federal law, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

---

[33] Although Bomar analogizes his case to *Jermyn v. Horn*, that case does not support his claim.  In *Jermyn*, the Third Circuit found a state trial court's failure to order a competency evaluation or hearing did not violate the petitioner's due process rights even though there were "some facts" known to the trial court "that could be viewed as casting doubt on [the petitioner's] competence." 266 F.3d at 292.  Here, in contrast, Bomar has not pointed to any facts known to the trial court that would have warranted further inquiry into his competency.

Bomar argues that the evidence presented at the PCRA hearings was in equipoise, with one expert (Dr. Dudley) concluding he was incompetent at trial, a second expert (Dr. Sadoff) unable to reach a conclusion, and a third expert (Dr. Cooke) adhering to his former opinion of competence. Pet'r's Mem. 8.  But the state courts' decision to credit Dr. Cooke, who evaluated Bomar twice in 1998, shortly before and during trial, over Dr. Dudley, who first saw him six years later, is not objectively unreasonable.[34]  *See Williams*, 384 F.3d at 608 (noting retrospective determinations of incompetence may be considered in evaluating a substantive competency claim but are disfavored).  Further, such state-court credibility determinations are due deference on habeas review.  Moreover, the PCRA record was not limited to these three experts but also included trial counsel's testimony regarding his extensive interactions with Bomar throughout the representation, which the PCRA court relied on in rejecting Bomar's substantive competency claim.  *See PCRA Op.*, 2012 WL 9515416, at *12-13; *Medina*, 505 U.S. at 450 (noting "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense"); *Williams*, 384 F.3d at 608 (finding "especially relevant" to the analysis of petitioner's substantive competency claim his trial counsel's opinion that he was competent).

Nor has Bomar shown that the state court's decision is contrary to or involved an unreasonable application of *Pate* and *Drope*.  Both of those cases involved procedural competency claims.  As such, neither provides a standard for Bomar's substantive competency claim.

Because Bomar has not shown the state courts' rejection of his competency claim was contrary to, or involved an unreasonable application of, clearly established federal law, or that it

---

[34] Bomar also notes that "Dr. Cooke's post-conviction conclusions that Petitioner was competent could have had no bearing on the soundness of the trial court's decision not to assess Petitioner's competence at the time of his trial," Pet'r's Reply 3, but the trial court's failure to revisit the issue of competency is not at issue in his substantive competency claim.

was based on an unreasonable determination of the facts in light of the evidence presented in the PCRA proceedings, much less that the presumption of correctness of the state courts' factual findings should be overcome, relief on this claim will be denied.

**B.     Claim Two**

Bomar next argues the prosecution violated his due process rights by failing to disclose consideration promised to two Commonwealth witnesses—David O'Donald and Quincy Jamal Williams—in exchange for their testimony, and by knowingly allowing both witnesses to testify falsely that they had not been promised anything in exchange for their cooperation against him. O'Donald and Williams were each detained along with Bomar in the Montgomery County Correctional Facility (MCCF) at different times in 1997 while facing prosecution for unrelated offenses.  At trial, both testified to admissions Bomar made to them about his involvement in the Willard murder but denied having been promised anything from the prosecution in exchange for their testimony.  Bomar argues that, in fact, both witnesses were promised benefits with respect to their sentences in their own criminal cases.  He contends the prosecution violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the consideration offered, and under *Napue v. Illinois*, 360 U.S. 264 (1959), by allowing the witnesses' false testimony to go uncorrected.

The state courts rejected Bomar's *Brady* and *Napue* claims, finding Bomar had not shown that prosecutors had any agreement with Williams or that he was prejudiced by the nondisclosure of any alleged agreement between O'Donald and prosecutors.  Because Bomar has not shown the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts, and because

he has not overcome the presumption that the state-court factual findings are correct, this Court likewise finds he is not entitled to relief on these claims.

Under *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  The *Brady* rule "encompasses impeachment evidence as well as exculpatory evidence," including "evidence 'known only to police investigators and not to the prosecutor.'"  *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) (first citing *United States v. Bagley*, 473 U.S. 667, 676 (1985); then quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)).  And the rule applies "even though there has been no request by the accused."  *Id.* at 280; *see also Kyles*, 514 U.S. at 433.

To establish a *Brady* violation, a petitioner must show three essential elements: "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."  *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler*, 527 U.S. at 281-82).  To establish prejudice, the petitioner must show the evidence in question is material—i.e., that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Bagley*, 473 U.S. at 682.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Id.*  In determining whether this standard is met, the materiality of the suppressed evidence must be "considered collectively, not item by item."  *Kyles*, 514 U.S. at 436, 436 n.10.

In *Napue v. Illinois*, the Supreme Court recognized that "a conviction obtained through use of false evidence, known to be such by representatives of the State," violates due process, whether the State solicits the false evidence or "allows it to go uncorrected when it appears."  360 U.S. at

269.  "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 271).  This principle applies even if "the false testimony goes only to the credibility of [a] witness," as "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence."  *Napue*, 360 U.S. at 269.  To establish a due process claim based on perjured testimony, a petitioner must show (1) a witness committed perjury; (2) the prosecution "knew or should have known that the testimony was false"; (3) "the false testimony was not corrected"; and (4) "there is a reasonable likelihood that the perjured testimony could have affected the judgment of the jury."  *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 146 (3d Cir. 2017).

### 1.  David O'Donald

O'Donald is Bomar's former brother-in-law.  He offered to assist authorities in investigating Willard's murder, ultimately agreeing to be transferred to MCCF in July 1997 to see if Bomar had anything to do with the crime.  N.T. 9/28/98 at 268-69, 283; N.T. 4/22/98 at 11.  O'Donald was in federal custody at the time, awaiting sentencing on armed bank robbery and firearms charges to which he had pleaded guilty months earlier.[35]

---

[35] As the PCRA court found, O'Donald did not become aware of Bomar's suspected involvement in Willard's murder until sometime in June 1997, several months after he entered his federal plea agreement.  *PCRA Op.*, 2012 WL 9515416, at *15.  O'Donald brought his relationship to Bomar to the attention of the federal prosecutor in his case unsolicited, and he initiated discussions about the Bomar case because he thought he could get a reduction in his sentence by cooperating.  *Id.*

When he offered and then agreed to assist local authorities in investigating Bomar, O'Donald was already cooperating with federal authorities under the terms of a guilty plea agreement.  That agreement required him, among other things, "to provide all information concerning his knowledge of, and participation in, bank robberies and any other crimes about which he ha[d] knowledge."  Guilty Plea Agreement ¶ 3.b.  In exchange, federal prosecutors agreed to file a downward departure motion, thereby enabling the federal court to impose a sentence below the applicable Federal Sentencing Guidelines range and any statutory mandatory minimums, if the government determined O'Donald had "provided substantial assistance in the investigation or prosecution of another person who has committed an offense."  *Id.* ¶ 5.b.[36]

On July 2, 1997, O'Donald and his attorney met with state and federal prosecutors and law enforcement agents regarding his cooperation in the Bomar matter.  O'Donald was then transferred to MCCF for two weeks, from July 11, 1997, until July 25, 1997, and was housed on the same cell block as Bomar.  On July 25, 1997, O'Donald again met with state and federal prosecutors and law enforcement agents and gave a written statement about his contacts with Bomar at MCCF.  O'Donald recounted that on July 17, 1997, Bomar expressed concern about the prospect of a grand jury indictment, saying, "if I did with the bitch what I did with the last one, there would be no problem," and elaborating, "no body, no grand jury indictment."  O'Donald Statement 4, July 25, 1997 (PCRA Ex. P41).  O'Donald made a further statement to law enforcement in September 1997, disclosing additional admissions Bomar had made to him on July 17.  In that second statement, O'Donald recounted that Bomar had also admitted he had killed Willard, telling

---

[36] Specifically, the government agreed to file a downward departure motion pursuant to § 5K1.1 of the Federal Sentencing Guidelines and 18 U.S.C. § 3553(e) "[i]f the government in its sole discretion determine[d] that [Bomar] ha[d] fulfilled his obligations of cooperation set forth above."  Guilty Plea Agreement ¶ 5.b.

O'Donald he had "snatched" Willard up, taken her to a van and done what he wanted with her, and then, when "we" were done with her, he had nearly taken her head off before he "crammed a tree branch up her cunt" and "we" dumped her.  O'Donald Statement 3, Sept. 26, 1997 (PCRA Ex. P42).

Three weeks after this second debriefing, O'Donald was sentenced in his federal criminal case.  Before sentencing, federal prosecutors filed a downward departure motion, as contemplated in O'Donald's guilty plea agreement.  The motion noted that, as part of his cooperation, O'Donald had disclosed that he had committed 12 armed bank robberies, four by himself and eight with others, and that information O'Donald provided had enabled the government to obtain the conviction of one of his codefendants.  *See* Gov't's Downward Departure Mot. ¶ 6, Oct. 10, 1997.  The motion also alluded to O'Donald's cooperation in the Bomar matter, noting O'Donald had "provided information in an ongoing local criminal investigation," which had "confirmed the direction that the investigation had taken."  *Id.* ¶ 7.  During O'Donald's sentencing, the parties provided additional information at sidebar regarding O'Donald's cooperation in the Bomar matter.[37]  *See* N.T. 10/17/98 at 16, 22; N.T. 1/7/99 at 19.  The federal court granted the government's motion and sentenced O'Donald to 204 months (17 years), about half the applicable Guidelines sentence, and roughly twice as long as the sentence for which O'Donald's lawyer had advocated.[38]  Although the court noted the 50 percent reduction was the most it could grant

---

[37] The sidebar portion of the hearing was separately recorded, placed under seal, and never transcribed.  During the PCRA proceedings, however, the federal prosecutor in O'Donald's criminal case testified that the purpose of the sidebar would have been to provide the sentencing judge with further information, non-publicly, about what O'Donald's cooperation entailed, so that the judge could evaluate it to determine the extent of the departure.  N.T. 1/16/09 at 31.

[38] Without the government's motion, O'Donald would have been subject to a 30-year statutory mandatory minimum term of imprisonment on the firearms charges, consecutive to any term of imprisonment on the bank robbery charges, resulting in an effective Federal Sentencing Guidelines

O'Donald given the nature of his crimes, it also remarked that O'Donald had "done a commendable thing" by "provid[ing] some very, very valuable information to the police." N.T. 10/17/97 at 27.

Two months after O'Donald's sentencing, in December 1997, Bomar was charged by criminal complaint with Willard's murder and related offenses. O'Donald testified for the Commonwealth both at a suppression hearing in April 1998 and at Bomar's trial in September 1998 regarding the admissions Bomar had made to him at MCCF. At trial, when asked about his conversations with Bomar on July 17, 1997, O'Donald testified as follows:

> Q.    . . . Did the Defendant say to you on that date in your cell, "If I (meaning Arthur Bomar) had disposed of the body there would be no problem?"
>
> A.    Yes.
>
> Q.    He made that statement to you?
>
> A.    Yes.
>
> Q.    Did he also make this statement to you, "No body, no Grand Jury indictment?"
>
> A.    Yes.
>
> Q.    Those conversations were in your cell that day?
>
> A.    Yes.
>
> Q.    Were there any other conversations in your cell that day?
>
> A.    Yes.

N.T. 9/28/98 at 250-51. O'Donald went on to describe a conversation with Bomar later the same day, testifying:

---

range of 406 to 417 months. N.T. 10/17/97 at 2-3. At the sentencing hearing, O'Donald's attorney urged the court to impose a sentence "commensurate with the sentences imposed on [O'Donald's] co-defendants," i.e., 97 months. *Id.* at 13.

> A.    I went in [to Bomar's cell] and asked him what he meant about the first conversation earlier that day. All I did was said I thought you told me you weren't involved in none of this, and he just said, well, he was. He said he grabbed – his words were, I grabbed the bitch and she said please don't do this. He said I'll do whatever the fuck I want, just shut up. She said just don't kill me, I'll do anything. He took her – he said he took her and did whatever he wanted in a van. He used the words we did whatever we wanted with her, she did whatever we told, and when we were done I almost took her head off, and we crammed a tree branch up her cunt then we dumped the bitch. That was the end of the conversation. He went and got on the phone.

*Id.* at 252.

When asked about the first statement he gave to law enforcement on July 25, 1997, O'Donald admitted he did not initially include everything Bomar had said to him because he was concerned for his family, given Bomar's use of the term "we" in describing what he had done. *Id.* at 255-56. O'Donald was concerned about who "we" referred to and whether Bomar had "people out there that might help him." *Id.* at 256. He stated he later disclosed the rest of the conversation after speaking with his sister, who told him Bomar did not have "people." *Id.* at 256-57.

As to his reason for becoming involved in the case, O'Donald, the brother of Bomar's ex-wife, stated he acted out of "concern for [his] sister's welfare." *Id.* at 256. He specifically denied having been offered or promised anything in return for his cooperation in the case:

> Q.    Were you offered anything in return for your cooperation?
>
> A.    No.
>
> Q.    Were you ever promised anything in return for your cooperation in this case?
>
> A.    No.

*Id.* at 256; *see also id.* at 272 (denying he had "any agreement with the U.S. Attorney's Office" or "any understanding of what [his] cooperation would do for [him] as far as sentencing"). Notwithstanding these denials, O'Donald acknowledged having a plea agreement with the

government in his federal case in which he agreed to cooperate with law enforcement in exchange

for the government's filing of a downward departure motion. *Id.* at 260-61. While O'Donald

maintained the downward departure motion was for his cooperation regarding the bank robberies

and associated hidden assets, he acknowledged that his plea agreement required him to cooperate

with local as well as federal law enforcement and that, while assisting in the Bomar matter, he was

aware his federal sentencing date was being continued pending that cooperation. *Id.* at 260-61,

268-70, 272-73. He also admitted his cooperation in the Bomar matter had been brought to the

attention of his sentencing judge and that, although facing 34 years, he had received a sentence of

17 years based on multiple factors, including his cooperation in the Bomar matter. *Id.* at 258-60,

293. When asked by the state trial court whether he believed "the level of [his] cooperation in the

Bomar case would or should have some impact on the sentence [he] received in the Federal Court,"

O'Donald admitted he believed it "might have" some impact. *Id.* at 297. In light of this admission,

the court gave a cautionary instruction that the jury should receive O'Donald's testimony "with

caution." N.T. 9/30/98 at 160. The possibility that O'Donald might receive an additional future

benefit with regard to his federal sentence was not addressed.

Shortly after testifying at Bomar's trial, however, O'Donald in fact received a further

sentence reduction based solely on his cooperation in the Bomar matter. On October 15, 1998, ten

days after Bomar's jury returned its death verdict, federal prosecutors filed a sentence reduction

motion pursuant to Federal Rule of Criminal Procedure 35(b), which then allowed a federal court,

upon motion of the government made within one year of sentencing, to reduce a previously

imposed sentence based on a defendant's substantial assistance in the investigation or prosecution

of another.[39]  The motion recounted that O'Donald had testified at a suppression hearing and at

trial and that, "at least in part based upon [O'Donald's] testimony, a jury convicted Bomar of [all

but one] of the charges against him."  Gov't Mot. for Reduction of Sentence ¶¶ 7-9, Oct. 15,

1998.  The government requested that O'Donald be given a "limited reduction" in the 204-month

sentence he was then serving "based upon his substantial assistance in [Bomar's] . . . prosecution."

*Id.* at 4.  Before filing the Rule 35(b) motion, the federal prosecutor faxed a draft to the lead

Delaware County prosecutor on the Bomar matter to ensure the information relayed was accurate.

PCRA Ex. P86; N.T. 1/16/09 at 35-37.  He also spoke with the Delaware County prosecutor about

O'Donald's cooperation.  *See* N.T. 1/7/99 at 24; N.T. 1/15/09 at 143, 151.  In January 1999, the

federal court held a hearing on the sentence reduction motion and granted the motion, reducing

O'Donald's sentence by three years to 168 months (14 years).  N.T. 1/7/99 at 29.

O'Donald later received two further Rule 35(b) sentence reductions based on his

cooperation in another unrelated matter.  After the hearing on the Bomar-related sentence

reduction motion, O'Donald told federal authorities that two inmates with whom he had been

incarcerated around the time of the hearing had made incriminating statements regarding an

unrelated robbery.  Govt's Mot. for Reduction of Sentence ¶ 12, May 9, 2000.  Based on this new

---

[39] At the time the government filed the sentence reduction motion, Rule 35(b) provided in relevant
part as follows:

> The court, on motion of the Government made within one year after the imposition
> of the sentence, may reduce a sentence to reflect a defendant's subsequent,
> substantial assistance in the investigation or prosecution of another person who has
> committed an offense, in accordance with the guidelines and policy statements
> issued by the Sentencing Commission pursuant to section 994 of title 28, United
> States Code.

The government filed the Rule 35(b) motion almost exactly one year after O'Donald's original
federal sentencing was held on October 17, 1997.

NAV

cooperation, federal prosecutors filed a second Rule 35(b) motion on O'Donald's behalf in May 2000, asking the court to grant a "very limited reduction" of O'Donald's 168-month sentence. *Id.* ¶ 16. The federal court granted the motion and reduced O'Donald's sentence by an additional 12 months to 156 months (13 years). *See* N.T. 8/23/00 at 4.

Dissatisfied with the extent of the reduction, as well as the extent of the reduction he received for his cooperation in the Bomar matter, O'Donald filed a pro se motion for reconsideration in June 2000. In the motion, O'Donald claimed to have been blindsided by the government's request for only a "limited" or "very limited" sentence reduction in the Rule 35 motions as "the government and law enforcement agent[s]" had led him to believe that if he cooperated, he would receive a "substantial reduction" of his 17-year sentence. Mot. for Recons. 1-3, June 27, 2000. In light of the government's [alleged] deceit, O'Donald asked the court to grant a hearing so he and his attorney could address what O'Donald was "le[d] to believe, the government said it would do on h[i]s behalf" and to reduce his sentence to 97 months, commensurate with the sentence his codefendants received. *Id.* at 3-4. At the hearing on the motion, O'Donald's counsel, Emmanuel Dimitriou, acknowledged having advised O'Donald, both as to the Bomar matter and as to the unrelated robbery, that "it would be in his best interest to cooperate" and that doing so would benefit him. N.T. 8/23/00 at 18-19. However, Dimitriou also stated he at no time gave O'Donald "any indication of how much of a benefit," but instead advised him "whatever benefit you get is all to the good." *Id.* at 19. After making clear that reconsideration would be limited to the most recent sentence reduction based on the robbery cooperation, the court granted the motion in part and reduced O'Donald's sentence by an additional 12 months to 144 months (12 years). *Id.* at 20-21, 41.

During his PCRA proceedings, Bomar sought to prove that, contrary to O'Donald's trial testimony, O'Donald had an undisclosed agreement or understanding with the prosecution that, in exchange for his cooperation against Bomar, he would receive a benefit with respect to his federal sentence. The PCRA court heard testimony from four witnesses on the issue: O'Donald; Assistant United States Attorney Joseph Poluka, who prosecuted O'Donald's federal bank robbery case; Pennsylvania State Police Corporal Tedescung Bandy, the lead investigator on the Willard homicide; and Delaware County Deputy District Attorney Daniel McDevitt, the lead prosecutor from the time Bomar was charged through trial. The PCRA court also received stipulated testimony from Delaware County First Assistant District Attorney Joseph McGettigan, the lead prosecutor on the Willard homicide investigation in the period before Bomar was charged.

In his PCRA testimony, O'Donald maintained he was told, at his initial meeting with federal and state prosecutors and law enforcement agents in July 1997, that if he cooperated by serving as a listening post, state prosecutors would report (or "recommend") to federal prosecutors about his cooperation and federal prosecutors would file a Rule 35 downward departure motion[40] in his federal case. N.T. 1/15/09 at 8-9, 14-15. O'Donald also maintained he was told, both at the initial meeting and at the time of his original sentencing in the federal case in October 1997, that if he testified in the Bomar matter, federal prosecutors would file a further Rule 35 motion for a "substantial reduction" in the federal case. *Id.* at 25-29, 58-60. By O'Donald's account, state prosecutors promised him they would make a recommendation to federal prosecutors regarding his level of cooperation, *id.* at 67-70, and the federal prosecutor, AUSA Poluka, promised to file a Rule 35 motion for a substantial reduction in the federal case, *id.* at 60, 66. O'Donald also stated

---

[40] O'Donald used the terms "Rule 35" and "downward departure" interchangeably in his testimony and stated he understood them to be the same thing. N.T. 1/15/09 at 10.

he was unhappy with his original federal sentence of 17 years, as he had been "le[]d to believe" he would receive a sentence closer to the 97-month sentence his codefendant had received, but his attorney told him he was "half way there" and would receive "the other [Rule] 35" after he testified. *Id.* at 20-22.

Poluka denied promising O'Donald he would receive a substantial reduction of his federal sentence in exchange for his cooperation in the state case against Bomar.  N.T. 1/16/09 at 69.  In fact, Poluka denied striking any deals with O'Donald apart from his plea agreement and testified he was not aware of any promises made to O'Donald by state prosecutors.  *Id.* at 54, 67, 70.  Poluka recalled that, when O'Donald was sentenced in the federal case, Bomar had not yet been charged, and Poluka did not know whether O'Donald would be utilized again in the Bomar matter.  *Id.* at 78-79; *see also id.* at 33.  Poluka was advised that O'Donald was a potential Commonwealth witness in the Bomar matter in March 1998, when McDevitt, the lead prosecutor on the state case, wrote to him seeking materials from O'Donald's criminal case.  PCRA Ex. P85.  He later learned that O'Donald had testified at Bomar's trial, likely from the state prosecutor, the agents, and/or the newspaper.  N.T. 1/16/09 at 42.  And he was also "sure" O'Donald's lawyer—"a very forceful advocate for his client"—would have called him and told him what O'Donald did, though he did not remember the call specifically.  *Id.* at 38-39; *see also id.* at 81 (stating it would have been "expected" that O'Donald's attorney would contact him after the trial about his client's cooperation).  Poluka acknowledged having spoken to the state prosecutor about the nature and extent of O'Donald's cooperation before filing the Rule 35 motion, though, again, he did not remember the calls.  *Id.* at 39-40.  He stated the timing of the motion suggests he was trying to make the one-year deadline under the Rule.  *Id.* at 44.

Although McGettigan, the lead prosecutor on the Willard homicide investigation before Bomar's arrest, did not testify during the PCRA hearings,[41] the parties stipulated that, if called as a witness, McGettigan would testify that he was present at the initial July 2, 1997, meeting between O'Donald, his attorney, Poluka, and state and federal law enforcement personnel at which O'Donald's cooperation in the investigation was discussed. Stipulation ¶ 5 (PCRA Ex. P92). At the meeting, McGettigan reviewed the contents of a document captioned "Points to Cover re: Prison Informant" with O'Donald. *Id.* ¶¶ 6-7. The Points to Cover document was prepared by McGettigan before the meeting and outlined the terms and conditions of, and instructions related to, O'Donald's cooperation with Delaware County authorities. *Id.* The document was not disclosed to Bomar's counsel until just before O'Donald testified during the PCRA proceedings. Stipulation 2 (PCRA Ex. P92).

The Points to Cover document begins with a series of questions seeking to confirm that it was O'Donald who brought his familial relationship with Bomar to the attention of law enforcement and that O'Donald was then awaiting sentencing in federal court for a series of bank robberies, had cooperated with the U.S. Attorney's office in the hope of obtaining a reduced sentence, was willing to be transferred to a county prison to be housed with Bomar, and had discussed with counsel his actions and their ramifications. Points to Cover ¶¶ 1-5. The document then provides, in relevant part, as follows:

6.      Do you understand that I am the First Assistant District Attorney of Delaware County, and therefore, not a member of the United States Attorney's Office?

7       Do you understand that since I am not a member of the United States Attorney's Office that I have no authority or capacity to appear in court to make a recommendation to the court which shall sentence you?

---

[41] McGettigan was on extended duty in Iraq at the time. Stipulation ¶ 1 (PCRA Ex. P92).

8.      Do you understand that I will have the ability to provide information to the United States Attorney's Office and to any other relevant party as to my opinion of the sincerity and candor of your cooperation?

9.      Do you understand that any benefit that you may receive for your cooperation is *not* dependent on any information you may or may not provide, but will flow solely from your sincere and candid cooperation in terms of your willingness to serve as a "listening post" for [Bomar]?

10.     Do you understand that no additional benefit will flow to you as a result of any information you may provide?

11.     Do you understand that neither will any penalty be imposed upon you if [Bomar] does not offer information helpful to our investigation?

*Id.* ¶¶ 6-12.  The document then concludes with a series of questions directed to confirming what O'Donald's role as a listening post would entail, including what he could and could not do while housed at MCCF with Bomar.  *Id.* ¶¶ 17-25.

McDevitt, the lead trial prosecutor in the Bomar matter, testified he was never informed the Commonwealth was offering O'Donald anything in exchange for his testimony and understood the only agreement between O'Donald and federal prosecutors was O'Donald's plea agreement, which McDevitt provided to the defense.[42]   N.T. 1/15/09 at 130-31, 156, 180.   McDevitt understood that any benefit O'Donald would receive from his cooperation in the Bomar matter would depend on the federal prosecutor bringing it to the attention of the judge in the federal case and that McDevitt's role would be limited to reporting to the federal prosecutor his opinion regarding the sincerity and candor of O'Donald's cooperation.  *Id.* at 131-32.  But he did not consider this to be a deal, agreement, promise, or consideration.  *Id.* at 133, 157.  McDevitt denied

---

[42] As noted, McDevitt did not assume the role of lead prosecutor in the Bomar matter until shortly before Bomar was arrested for the Willard homicide in December 1997.  He was therefore not present at either the July 2, 1997, meeting with O'Donald or the subsequent debriefing sessions. N.T. 1/15/97 at 126.

there were any express discussions between himself and Poluka, or between members of their respective offices, regarding filing a Rule 35 motion after O'Donald testified, or that there was any agreement between himself and Poluka as to what McDevitt would do after O'Donald testified. *Id.* at 160, 175-76. Rather, he recalled learning that federal prosecutors would be filing a Rule 35 motion on O'Donald's behalf when Poluka called him after trial to ask whether O'Donald had testified.[43]  *Id.* at 143-44. Although McDevitt testified he did not know a Rule 35 motion would be filed until after trial, he was "not surprised" to learn that one was forthcoming. *Id.* at 198. In fact, he admitted he "fully expected" O'Donald to "return to Federal Court and ask the Judge to reduce his sentence from the 17 years." *Id.* at 139; *see also id.* at 138, 183. He also stated he believed the federal government "would feel obligated" to bring O'Donald's cooperation to the attention of the federal court. *Id.* at 197.

Based on O'Donald's testimony, the representations in the Points to Cover document that were communicated to O'Donald, and the post-trial communications between McDevitt and Poluka in connection with the filing of the Rule 35 motion less than two weeks after the trial concluded, Bomar argues O'Donald had an undisclosed agreement or understanding with local prosecutors—namely, that "in exchange for his cooperation against Petitioner, the local prosecutors would report to the federal prosecutors about his cooperation and . . . 'any benefit he would receive' would be based on the Bomar-related cooperation." Pet. ¶ 54 (citation omitted). Bomar further argues that, given this understanding, O'Donald's trial testimony that he was not offered or promised anything in return for his cooperation was false. He also asserts the

---

[43] During the call, McDevitt answered Poluka's questions. N.T. 1/15/97 at 151-52. He did not recall Poluka saying he would be sending a draft of the Rule 35 motion to review, though he acknowledged receiving the draft Poluka ultimately sent. *Id.* at 153.

prosecution's failure to disclose the consideration promised to O'Donald, and its failure to correct his false testimony, prejudiced him at both the guilt and penalty phases.

Bomar raised *Brady* and *Napue* claims relating to O'Donald in state court; however, the PCRA court rejected them, finding as fact that Bomar had failed to establish that O'Donald had an undisclosed agreement with state or federal prosecutors and that, "because no agreement for further consideration existed[,] the prosecutor had no obligation to speculate and advise the jury that O'Donald might seek a further reduction in federal court." *PCRA Op.*, 2012 WL 9515416, at *21; *see also id.* at *13, *19-21. The PCRA court also concluded that, even assuming an agreement existed, there was no reasonable likelihood that any resulting incremental damage to O'Donald's credibility would have affected the verdict. *Id.* at *21. On appeal, the Pennsylvania Supreme Court affirmed. The court declined to reach a "definitive conclusion" as to whether there was any agreement between O'Donald and prosecutors, noting that while evidence cited by the PCRA court "could be construed" as demonstrating that there was no agreement, "other evidence strongly suggest[ed] the existence of such an agreement." *Bomar II*, 104 A.3d at 1192.[44] But the court agreed with the PCRA court that "even if . . . an agreement did exist, any *Brady* violation in this regard did not prejudice [Bomar] in light of the extensive DNA and circumstantial evidence against him" as well as "the fact that the trial court highlighted possible bias in O'Donald's testimony and directed the jury to view the testimony with caution." *Id.* at 1192, 1193. The court also held Bomar had failed to satisfy the materiality standard under *Napue*, as the nondisclosure of any agreement between prosecutors and O'Donald "did not affect the judgment of the jury in light of

---

[44] In a separate concurrence, one justice expressed the opinion that "O'Donald had an understanding, known to both state and federal prosecutors, that if he testified against [Bomar] at trial, the district attorney would provide a favorable recommendation to federal counsel in support of a further reduction of his sentence." *Bomar II*, 104 A.3d at 1219 (Saylor, J., concurring).

the wealth of significant other evidence implicating [Bomar] in the murder." *Id.* at 1194.  The court thus denied the claim.

In reviewing the reasonableness of the state-court adjudication of this claim under AEDPA, the Court first turns to the question whether O'Donald had an undisclosed agreement or understanding with state or federal prosecutors that was subject to disclosure under *Brady*.  The parties disagree as to the applicable standard of review.  Bomar argues because the Pennsylvania Supreme Court declined to reach the issue, review of this element of his claim is de novo as there was no adjudication on the merits requiring deference under § 2254(d).  The Commonwealth maintains the PCRA court's factual finding that there was no undisclosed deal between prosecutors and O'Donald is entitled to a presumption of correctness under § 2254(e)(1), even though the Supreme Court did not expressly adopt it.

Section 2254(d) applies only to claims "adjudicated on the merits in State court proceedings."  If state courts did not reach the merits of a claim, "federal habeas review is not subject to the deferential standard" of § 2254(d), and the claim is instead reviewed de novo.  *Cone v. Bell*, 556 U.S. 449, 472 (2009) (quoting 28 U.S.C. § 2254(d)).  The same is true where state courts decide a claim on the merits but decline to reach an element of a claim.  The Supreme Court has repeatedly held, for example, that where state courts decided a petitioner's ineffective assistance of counsel claim based on only one prong of the *Strickland* test without reaching the other, federal habeas review of the unaddressed element is de novo.  *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).[45]

---

[45] Other courts have applied this principle in the context of *Brady* claims.  *See, e.g.*, *Shelton v. Marshall*, 796 F.3d 1075, 1084 (9th Cir. 2015) (examining the prejudice element of a petitioner's *Brady* claim de novo where "[n]o state court decision ha[d] addressed [that] element").

This case is different in that the element of Bomar's *Brady* claim that the Pennsylvania Supreme Court declined to reach—whether there was evidence favorable to the accused (here, an alleged agreement)—*was* addressed by the PCRA court.  In similar circumstances—where a state appellate court decided a claim on the merits without reaching an element of the claim that was addressed by a lower state court—the Third Circuit has accorded § 2254(d) deference to the lower state court's decision on the element, reasoning that an adjudication on the merits "can occur at any level of state court."  *Collins v. Sec'y of Pa. Dep't of Corr.*, 742 F.3d 528, 545-46 (3d Cir. 2014) (quoting *Thomas v. Horn*, 570 F.3d 105, 117 (3d Cir. 2009)) (holding the PCRA court's determination as to prejudice under *Strickland* was entitled to deference under § 2254(d) where the Pennsylvania Supreme Court affirmed based on performance without ruling on prejudice); *accord Saranchak v. Sec'y, Pa. Dep't of Cor.*, 802 F.3d 579, 597 (3d Cir. 2015); *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008).  In each of these cases, the Court of Appeals emphasized that the state appellate court's decision on the claim did not negate the lower state court's decision with regard to the element in question.  *See Saranchak*, 802 F.3d at 597 ("The lack of an express ruling from the Pennsylvania Supreme Court on the question of prejudice does not negate the PCRA court's decision that [petitioner] was not prejudiced." (quoting *Collins*, 742 F.3d at 546)); *Collins*, 742 F.3d at 545-46 (noting that "nothing in [the Supreme Court's] opinion questioned or undermined the PCRA court's more specific rulings" on issues the Supreme Court declined to address); *Bond*, 539 F.3d at 289 (noting that while the Supreme Court "did not rule explicitly on the prejudice question," it "arguably addressed prejudice" in a manner consistent with the PCRA court and without "add[ing] further reasoning than that provided by the PCRA Court").  The Eleventh Circuit has made the point explicitly, holding that "where a state trial court rejects a claim

on one prong of the ineffective assistance of counsel test and the state supreme court, *without disapproving that holding*, affirms on the other prong, both of those state court decisions are due AEDPA deference." *Hammond v. Hall*, 586 F.3d 1289, 1332 (11th Cir. 2009) (emphasis added).

Had the Pennsylvania Supreme Court declined to reach the agreement element of Bomar's *Brady* claim without elaboration, this Court would have no difficulty concluding that the PCRA court's decision on that issue would be entitled to deference under § 2254(d) based on the foregoing authorities.  The question is whether the Supreme Court's discussion of the issue requires a different result.  The Court concludes it does not.  In discussing the agreement element, the Supreme Court summarized evidence in the record that both supported and refuted the PCRA court's no-agreement finding.  Although the court characterized the evidence suggesting the existence of an agreement as "strong[]," *Bomar II*, 104 A.3d at 1192, it specifically declined to decide whether there was such an agreement, even as a concurring justice wrote separately to express the view that an understanding between O'Donald and prosecutors existed.  This Court concludes the Supreme Court's comments did not sufficiently undermine the PCRA court's decision on the agreement element so as to deprive that decision of the deferential standard of review under § 2254(d)(2).

For similar reasons, the Court concludes the PCRA court's factual finding is also entitled to a presumption of correctness under § 2254(e)(1).  "Whether [a] cooperation agreement[] exist[s] between the prosecution and [a] witnesses[] is a factual determination" to which a presumption of correctness ordinarily applies under § 2254(e)(1).  *Shabazz v. Artuz*, 336 F.3d 154, 161 (2d Cir. 2003); *see also Matthews v. Ishee*, 486 F.3d 883, 896 (6th Cir. 2007); *Moore-El v. Luebbers*, 446 F.3d 890, 900 (8th Cir. 2006).  The presumption of correctness applies "to the factual findings of both the state trial and appellate courts."  *Dickerson v. Vaughn*, 90 F.3d 87, 90 (3d Cir. 1996).  It

also applies "regardless of whether there has been an 'adjudication on the merits' for purposes of § 2254(d)" and even if the state court's order "has been rendered a nullity on other grounds." *Nara v. Frank*, 488 F.3d 187, 200-01 (3d Cir. 2007).  When there are conflicting findings, a federal court must "accept the version reached by the higher court." *Dickerson*, 90 F.3d at 90; *see also Rolan v. Vaughn*, 445 F.3d 671, 679 (3d Cir. 2006).  But where a PCRA court's factual determinations are "left undisturbed" by a higher state court, those findings must be accorded deference under § 2254(e)(1).  *Dickerson*, 90 F.3d at 91; *see also Nara*, 488 F.3d at 202 (suggesting "a state PCRA trial court's factual findings merit deference unless a state appellate court invalidates those findings").  Here, as noted, the Pennsylvania Supreme Court expressly left the PCRA court's no-agreement finding undisturbed by declining to reach the issue, and that finding is therefore also entitled to deference under § 2254(e)(1).

In rejecting Bomar's *Brady* and *Napue* claims, the PCRA court found that O'Donald "did receive consideration for his cooperation in the Bomar matter at his October 17, 1997 sentencing hearing" in federal court, but that this consideration "flowed from his February 1997 plea agreement," which was disclosed to trial counsel and used to impeach O'Donald at trial.  *PCRA Op.*, 2012 WL 9515416, at *20.  The PCRA court went on to find, however, that "before trial no prosecutor, local or federal, promised O'Donald that a motion seeking a further reduction would be filed on his behalf if he testified at trial," rejecting O'Donald's testimony to the contrary as not credible.  *Id.*  The court also rejected the argument that the Points to Cover document evidenced such an agreement, finding the facts of record did not support the conclusion that O'Donald was told at the July 2, 1997, meeting "that his cooperation would be reported to the federal prosecutor and the federal prosecutor would 'in turn' report it to the federal judge via a Rule 35 motion." *Id.* Instead, the court found the Rule 35 motion "was most likely precipitated by a call" from

O'Donald's lawyer to Poluka, and was filed promptly after trial because of the one-year time limit under the Rule. *See id.* at *18. The court also concluded O'Donald's repeated pursuit of sentence reductions based on post-sentencing cooperation did not "evidence the existence of an undisclosed agreement but reflect[ed] the fact that subjectively, Mr. O'Donald was never satisfied with his sentence," which he believed should be consistent with the lesser sentence his codefendants received. *See id.* at *20.

The PCRA court's finding that O'Donald was not promised that if he testified against Bomar, an additional sentence reduction or Rule 35 motion would be filed is not objectively unreasonable in light of the evidence presented. Nor has Bomar presented clear and convincing evidence in the record to rebut the presumption of its correctness. Although O'Donald claimed Poluka made such a promise, Poluka denied having done so, and the PCRA court credited Poluka's testimony over O'Donald's. Bomar argues the PCRA court's finding that O'Donald was not credible is unreasonable and not entitled to deference because O'Donald had nothing to gain from coming forward and testifying about the undisclosed deal, having served his sentence and been released from custody. Pet'r's Reply 6-7, ECF No. 52. But, as the PCRA court noted, while O'Donald may have "believed he was promised an incremental reduction in his sentence each time he 'gave' something to the Government, . . . his subjective belief does not support the conclusion that promises of this nature were made." *PCRA Op.*, 2012 WL 9515416, at *20 (internal citation omitted). Bomar has not satisfied his burden to overcome the PCRA court's credibility finding.

Notably, Poluka consistently maintained that the only agreement between O'Donald and federal prosecutors was O'Donald's plea agreement, which required him to "cooperate in any and all investigations," as requested by the federal government. N.T. 1/7/99 at 22; *see also* Guilty Plea Agreement ¶ 3. Poluka stated as much on the record, without objection from O'Donald or his

counsel, at the January 1999 hearing on the federal government's first Rule 35 motion. N.T. 1/7/99 at 22. It was not until June 2000, after he received a second "limited" sentence reduction for his cooperation in the unrelated robbery, that O'Donald suggested he was "le[]d to believe" that if he cooperated in the Bomar matter, he would receive a "substantial reduction" of his 17-year sentence. Mot. for Recons 1. While Poluka ultimately filed a Rule 35 motion on O'Donald's behalf shortly after Bomar's trial concluded, such "favorable treatment alone is insufficient to state a *Brady* claim." *Simon v. Gov't of the V.I.*, 929 F.3d 118, 127 (3d Cir. 2019); *see also Akrawi v. Booker*, 572 F.3d 252, 263 (6th Cir. 2009) ("[T]he mere fact of favorable treatment . . . following cooperation is . . . insufficient to substantiate the existence of an agreement."); *Shabazz*, 336 F.3d at 165 ("[T]he fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony.") Here, the PCRA court reasonably found the motion was likely filed at the behest of O'Donald's counsel,[46] rather than pursuant to a preexisting agreement with the government, and that the timing of the motion was driven by the rule's one-year time limit. *See PCRA Op.*, 2012 WL 9515416, at *20.

The PCRA court's finding that the Points to Cover document does not support O'Donald's claim that he was told, at the initial July 2, 1997 meeting with prosecutors and law enforcement, that if he testified against Bomar, a further Rule 35 motion would be filed, is also not objectively unreasonable or rebutted by clear and convincing evidence in the record. The document reflects that at the meeting, O'Donald was told that as a local prosecutor, McGettigan had "no authority or

---

[46] It was also Dimitriou who raised the prospect of "another Rule 35" after O'Donald provided federal authorities with information regarding the admissions made to him about the unrelated robbery. *See* N.T. 8/23/00 at 23.

capacity" to make a recommendation to the federal court that would sentence O'Donald, but would have the ability to report to federal prosecutors his opinion of the "sincerity and candor" of O'Donald's cooperation, and that any benefit O'Donald might receive for his cooperation would "flow solely from [his] sincere and candid cooperation."  Points to Cover ¶¶ 6-9.  The only cooperation referenced in the document, however, is O'Donald's "willingness to serve as a 'listening post' for Bomar."  *Id.* ¶ 9.  The document makes no mention of testimony, which would have been entirely speculative at the time, as it was unknown what, if any, information O'Donald might acquire.[47]  And while it references the possibility that O'Donald might receive a "benefit" for his cooperation, the document says nothing about Rule 35 or a second sentence reduction motion contrary to O'Donald's claim he was told that "they would further file a 35 motion after testimony, after further cooperation and, if I testified, they'd file another motion on my behalf." N.T. 1/15/09 at 27.  Instead, the Points to Cover document reflects that, at the time of the meeting, O'Donald had not yet been sentenced in his federal case and was cooperating with federal prosecutors in the hope of obtaining a reduction in that yet-to-be-imposed sentence.  Points to Cover ¶¶ 2, 4.  Given the context, the suggestion that O'Donald might benefit from his Bomar cooperation is most naturally understood to relate to his original sentence.  *See PCRA Op.*, 2012 WL 9515416, at *20 (noting that in accord with the representations in the Points to Cover document, "O'Donald's cooperation was brought before [the federal judge] at the October 1997 sentencing and . . . was considered by the court," resulting in imposition of a reduced sentence).

---

[47] Indeed, at the hearing on O'Donald's first Rule 35 motion, Poluka stated O'Donald's testimony was not anticipated at his original sentencing, by which time O'Donald had completed his stint as a listening post, as Bomar had not yet been charged and McGettigan "was not sure whether he would even use [O'Donald] to testify, if, in fact, Bomar was charged."  N.T. 1/7/99 at 23.

While the Court finds no reason to disturb the PCRA court's finding that there was no undisclosed agreement that, if O'Donald testified against Bomar, a sentence reduction motion would be filed in his federal case, there remains the question whether the Points to Cover document demonstrates an understanding the disclosure of which was required under *Brady*. The *Brady* rule encompasses evidence favorable to the accused because it is impeaching, including evidence of "any understanding or agreement" between the government and a witness relevant to the witness's credibility. *Giglio*, 405 U.S. at 155. *Brady* not only requires disclosure of "formal plea bargains, immunity deals or other notarized commitments," but also "applies to less formal, unwritten, or tacit agreement[s], so long as the prosecution offers the witness a benefit in exchange for his cooperation." *Akrawi*, 572 F.3d at 262 (alteration in original) (internal quotation marks and citations omitted).

The PCRA court acknowledged the Points to Cover document reflects that McGettigan told O'Donald "that he did have the ability to advise the United States Attorney's Office of his 'opinion of the sincerity and candor of [O'Donald's] cooperation' and that any benefit O'Donald might receive would come not from the information he provided but solely from his 'sincere and candid cooperation in terms of [his] willingness to serve as a listening post for [Bomar].'" *PCRA Op.*, 2012 WL 9515416, at *20 (first alteration in original) (citation omitted). However, the PCRA court did not consider whether these representations constituted an undisclosed agreement or understanding between O'Donald and the county prosecutor short of the agreement to file a Rule 35 motion that O'Donald claimed existed. While McGettigan did not promise O'Donald that if he cooperated, he would receive a benefit with regard to his federal sentence, or even that McGettigan would make a recommendation to the federal sentencing court (something McGettigan emphasized he lacked authority to do), the representations in the Points to Cover document arguably created

an understanding that if O'Donald served as a listening post, McGettigan would report to federal prosecutors and "any other relevant party" about the "sincerity and candor" of his cooperation for whatever benefit O'Donald might derive from his cooperation.

Even assuming such an understanding is subject to disclosure under *Brady*,[48] however, as the state court found, Bomar has not shown he was prejudiced by the nondisclosure or by the prosecution's failure to correct O'Donald's false testimony. To show prejudice for a *Brady* violation, a petitioner must demonstrate "there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. The materiality threshold for a *Napue* violation is lower, turning on whether "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue*, 360 U.S. at 271.[49]

---

[48] *See Calderon v. Keane*, No. 97-2116, 2002 WL 1205745, at *14 n.11 (S.D.N.Y. Feb. 21, 2002) (noting a prosecutor "should have made the jury aware of his 'commitment' . . . to report back to the Bronx District Attorney's Office about [a witness's] performance in [petitioner's] case," as a letter from the prosecutor "would serve, at the very least, as a recommendation that the Bronx Court grant some degree of leniency towards the defendant," but rejecting petitioner's *Napue* claim for lack of prejudice), *report and recommendation adopted by* 2003 WL 22097504 (S.D.N.Y. Sept. 9, 2003), *aff'd*, 115 F. App'x 455 (2d Cir. 2004).

[49] The parties dispute whether *Napue* claims are also subject to the harmless error rule of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), a question on which the federal appellate courts are divided. *See Haskell*, 866 F.3d at 150 (describing circuit split). In *Haskell*, a case decided after the briefing of this case was completed, the Third Circuit adopted the minority view, holding the *Brecht* harmless error standard does not apply to perjured testimony cases. *Id.* at 150. On PCRA appeal, the Pennsylvania Supreme Court applied the *Napue* materiality standard, *Bomar II*, 104 A.3d at 1194, and the Court will assume that standard also applies on habeas review.

The Pennsylvania Supreme Court found the *Brady* materiality standard was not satisfied given the strength of the Commonwealth's case against Bomar, which included substantial physical and forensic evidence, plus the fact that O'Donald was heavily impeached at trial, including as to his motivation for cooperating with the prosecution, reasoning as follows:

> Nevertheless, we need not reach a definitive conclusion as to whether or not an agreement existed between O'Donald and prosecutors because, even if such an agreement did exist, any *Brady* violation in this regard did not prejudice [Bomar] in light of the extensive DNA and circumstantial evidence against him, including, *inter alia*, sperm recovered from the victim's vagina which matched [Bomar's] DNA profile, DNA from the victim found on the right door panel of [Bomar's] vehicle; tire patterns at the murder scene which matched tire patterns from [Bomar's] vehicle; and testimony from [Bomar's] ex-girlfriend revealing that [Bomar] confessed to raping and murdering the victim, and describ[ing] specific details surrounding the incident. Moreover, O'Donald admitted during direct examination that he had a plea agreement with federal prosecutors, that his cooperation in [Bomar's] case was brought to the federal judge's attention during his October 1997 sentencing hearing, that he was dissatisfied with his current sentence, and that a motion for further reduction of his sentence was pending, N.T., 9/28/98, at 273, 285-87, prompting the trial court to instruct the jury to consider O'Donald's testimony with caution because O'Donald "believed the level of his cooperation with law enforcement authorities in this case would have a positive impact on the sentence he would receive in federal court." PCRA Opinion, 9/4/12, at 44 (quoting N.T., 9/30/98, at 160). Thus, in light of the substantial evidence against [Bomar] and the fact that the trial court highlighted possible bias in O'Donald's testimony and directed the jury to view the testimony with caution, we find that it is not probable that the result of [Bomar's] trial would have been different if the alleged *Brady* material had been disclosed to him.

*Bomar II*, 104 A.3d at 1192-93. Similarly, the Supreme Court found the *Napue* materiality standard was not satisfied, reasoning that "even if an agreement existed between prosecutors and O'Donald, its nondisclosure did not affect the judgment of the jury in light of the wealth of significant other evidence implicating [Bomar] in the murder." *Id.* at 1194.[50]

---

[50] The Pennsylvania Supreme Court correctly recited the *Brady* and *Napue* materiality standards in its opinion, observing that to prove the prejudice (or materiality) element of a *Brady* claim, a petitioner "must show a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,'" *Bomar II*, 104 A.3d at 1189 (citation omitted), and that the materiality inquiry under *Napue* requires a court to "evaluat[e]

Bomar argues the Supreme Court unreasonably applied the *Brady* and *Napue* materiality standards by erroneously applying a sufficiency of the evidence test, focusing on the strength of the remaining evidence against Bomar rather than on the effect the suppressed evidence had on the judgment of the jury.  Bomar maintains there is a reasonable probability that, had the jury been informed O'Donald's true motivation for testifying was to shave years off his own sentence, it would have rejected his testimony.  He further argues there is a reasonable probability the suppression of this impeachment evidence affected the judgment of the jury both at the guilt phase—because O'Donald's testimony was the only direct evidence of the malice and specific intent elements of first-degree murder—and at the penalty phase, given the aggravated version of the crime to which O'Donald claimed Bomar had confessed.

As Bomar notes, the United States Supreme Court has repeatedly emphasized that the *Brady* materiality standard "is not a sufficiency of evidence test," *Kyles*, 514 U.S. at 434, and is not satisfied simply by "determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions," *Strickler*, 527 U.S. at 290.  Instead, "the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence

---

whether a reasonable likelihood exists that the non-disclosure would have affected the judgment of the jury," *id.* at 1194.  In finding these standards were not satisfied, however, the court noted it was "not probable that the result of [Bomar's] trial would have been different if the alleged *Brady* material had been disclosed to him," *id.* at 1193, and that the nondisclosure of any alleged agreement between O'Donald and prosecutors "did not affect the judgment of the jury," *id.* at 1194.  In light of the court's recitation of the correct standards, and mindful that § 2254(d) "demands that state-court decisions be given the benefit of the doubt," the Court does not interpret the state court's shorthand references to indicate that the court improperly applied a preponderance of the evidence standard.  *See Visciotti*, 537 U.S. at 23-25 (holding a state court's use of "the term 'probable' without the modifier 'reasonably'" when referring to the *Strickland* prejudice standard did not show the state court had held a habeas petitioner to a higher standard where the opinion elsewhere used the correct standard as state courts are presumed to "know and follow the law").

in the verdict.'" *Id.* (quoting *Kyles*, 514 U.S. at 435).  In answering this question, however, the strength of the government's case is highly relevant.  As summarized by the Third Circuit:

> "The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state."  Suppressed evidence that would be cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for *Brady* purposes.  Conversely, however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration.

*Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) (quoting and citing *Rocha v. Thaler*, 619 F.3d 387, 396-97 (5th Cir. 2010)).

Thus, for example, in *Giglio v. United States*, the Supreme Court found a federal prosecutor's undisclosed promise that a witness would not be prosecuted if he cooperated with the government was material where that individual, the petitioner's alleged coconspirator in the offense (passing forged money orders), was "the only witness linking petitioner with the crime." 405 U.S. at 151.  The Court noted that because the government's case "depended almost entirely on [the witness's] testimony," his credibility was "an important issue," and the jury was entitled to know of "any understanding or agreement as to a future prosecution." *Id.* at 154-55.  In *Strickler v. Greene*, in contrast, the Supreme Court found that documents that "cast serious doubt" on an eyewitness's "confident assertion of her 'exceptionally good memory'" regarding events she witnessed were not material where the record "provide[d] strong support for the conclusion that petitioner would have been convicted of capital murder and sentenced to death, even if [the witness] had been severely impeached."  527 U.S. at 273, 294.  Notably, the record included "considerable forensic and other physical evidence linking petitioner to the crime," and although the eyewitness "provided the only disinterested, narrative account of what transpired on [the date of the crime]," her "vivid description of the events at the mall [from which the victim was

abducted] was not the only evidence that the jury had before it," as two other witnesses placed petitioner at the mall and one later saw him driving the victim's car near the murder scene.  *Id.* at 293-94.

In finding Bomar was not prejudiced by the prosecution's failure to disclose any agreement it may have had with O'Donald, the Pennsylvania Supreme Court did not rely solely on the strength of the case against Bomar but also found, in effect, that this evidence would have been largely cumulative of the impeachment material the defense was able to elicit on cross-examination.  *See Bomar II*, 104 A.3d 1192-93.  Certainly, "[t]he mere fact that a witness has been heavily cross-examined or impeached at trial does not preclude a determination that additional impeachment evidence is material under *Brady*."  *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 300 (3d Cir. 2016) (en banc).  The Third Circuit has recognized, for example, that where undisclosed *Brady* material "would have provided a *different* avenue of impeachment," the evidence may be material, "even where the witness is otherwise impeached."  *United States v. Walker*, 657 F.3d 160, 186 (3d Cir. 2011) (citation omitted); *accord Banks*, 540 U.S. at 680, 702 (holding suppressed evidence that key penalty-phase witness was a paid informant was not "merely cumulative," even though witness was heavily impeached for, inter alia, having given false information as a police informant in another state, where impeachment did not concern witness's participation in the current case and impeaching witnesses were themselves impeached).  However, impeachment evidence that is "cumulative of *similar* impeachment evidence used at trial . . . is superfluous and therefore has little, if any, probative value."  *Walker*, 657 F.3d at 186 (citation omitted).

Here, as both the PCRA court and the Pennsylvania Supreme Court noted, even without evidence of an agreement or understanding between O'Donald and local prosecutors, defense counsel was able to show O'Donald expected to benefit—and did, in fact, benefit—from his

cooperation in the Willard homicide investigation as to his own federal sentence.  The jury was informed, for example, that when he agreed to serve as a listening post, O'Donald was awaiting sentencing on federal charges and had a pre-existing plea agreement with federal prosecutors that required him to cooperate with local as well as federal law enforcement in exchange for a downward departure.  N.T. 9/28/98 at 260-61, 268, 272-73.  O'Donald admitted his federal sentencing date was postponed because of his cooperation in the Bomar matter and that, as the new sentencing date approached, the hearing was postponed a second time, after which O'Donald gave a second, more detailed statement regarding the omissions Bomar made to him.  *Id.* at 268-70, 284-85.  He also admitted his cooperation was brought to the court's attention at his federal sentencing hearing and that he received a substantially reduced sentence—17 years, rather than the 34 or more[51] he was facing.  *Id.* at 258-59, 285-86, 293.  While O'Donald maintained the sentence reduction was a result of his cooperation regarding the bank robberies he and others had committed, he admitted, in response to questioning from the prosecution, that the Government's downward departure motion was also based on his cooperation in the Bomar matter.[52]  *See id.* at

---

[51] O'Donald testified he was facing 34 years under the Federal Sentencing Guidelines. N.T. 9/28/98 at 258, 293.  Relying on the statutory penalties set forth in O'Donald's plea agreement, however, defense counsel maintained he was actually facing a maximum of 110 years, including a 30-year mandatory minimum.  *Id.* at 273-75.

[52] The record before the PCRA court reflects that O'Donald's downward departure was based not only on his cooperation regarding unsolved bank robberies and the return of proceeds but also on his cooperation in the investigation of the Willard homicide.  *See* Gov't's Mot. for Reduction of Sentence ¶ 4, Oct. 15, 1998 (motion based on O'Donald's substantial assistance in investigating and prosecuting the co-participants in his armed bank robberies *and* his providing information in the Willard homicide investigation); N.T. 1/7/99 at 21-22 (same); N.T. 1/16/09 at 31 (noting the parties provided the sentencing judge with information about O'Donald's cooperation in the Willard homicide investigation so the judge could evaluate it to determine the extent of the downward departure).

293. He additionally admitted that, despite the reduction, he was not satisfied with the sentence he received and was continuing to challenge it in federal court. *Id.* at 259, 286. Because O'Donald admitted he believed the level of his cooperation in the Bomar matter might have some impact on his federal sentence, N.T. 9/28/98 at 297, the court instructed the jury that his testimony should be "receive[d] . . . with caution," N.T. 9/30/98 at 160; *see also PCRA Op.*, 2012 WL 9515416, at *21.[53]

In his closing, Bomar's defense counsel argued O'Donald sought to cooperate in order to "help [him]self" with regard to his federal sentence and suggested O'Donald "came up with" a second, more detailed statement when he realized, as his sentencing date approached, that he needed "to do a little bit more." N.T. 9/30/98 at 59-62. The prosecution countered by citing O'Donald's testimony that he was not happy with the sentence he received and suggesting O'Donald had no motive to continue cooperating by testifying against Bomar, other than to honor his agreement to cooperate. *Id.* at 105. It is questionable whether disclosure of the understanding embodied in the Points to Cover document would have allowed anything more than "impeachment by the same avenue already taken by the defen[se]," *Walker*, 657 F.3d at 186, given the limited nature of that understanding. Even assuming that disclosure of this understanding would not have been merely cumulative but would have permitted the defense to show O'Donald had an ongoing interest in cooperating to obtain further intervention with regard to his federal sentence—and that

---

[53] As the PCRA court noted, O'Donald was also impeached with other evidence. On cross-examination, defense counsel highlighted his extensive criminal history, which included a dozen armed bank robberies as well as prior convictions for larceny, larceny of automobile, receiving stolen property, retail theft, and submitting a false application for titles. N.T. 9/28/98 at 266-67, 282, 290-91. And in closing, defense counsel pointed out various inconsistencies between O'Donald's two statements to law enforcement and between his testimony regarding Bomar's alleged admissions and other evidence in the case. N.T. 9/30/98 at 61-66.

this additional impeachment evidence would have caused jurors to discredit O'Donald's testimony entirely—Bomar still not demonstrated the state court's conclusion that he was not prejudiced by any *Brady* or *Napue* violation was wrong, much less that this conclusion is contrary to or based on an unreasonable application of clearly established federal law.

As in *Strickler*, the prosecution's case against Bomar was strong, involving "considerable forensic and other physical evidence linking [him] to the crime." 527 U.S. at 293. A tire taken from Bomar's car was consistent in tread, design, and wear with an impression taken from the site where Willard's car was found abandoned shortly after she was abducted. N.T. 9/24/98 at 235, 242. The oil pan taken from Bomar's car—which featured a repeating pattern of a rectangle with a cross in it, vertical lines, and machined edges—matched the pattern injury on the right side of Willard's chest. N.T. 9/25/98 at 87-94. DNA testing of bloodstains from the interior of Bomar's car revealed that the DNA profile of the stains was consistent with Willard's DNA profile and inconsistent with Bomar's DNA profile. N.T. 9/29/98 at 17-18. Most significantly, Bomar's DNA matched the DNA profile of the male fraction of the vaginal swabs taken from Willard in all of the genetic regions for which results could be obtained. N.T. 9/28/98 at 60-63. And the Commonwealth's experts testified that the probability of finding an unrelated individual with that profile was exceedingly low—only one in 1.6 billion for the Caucasian population, one in 500 million for the African American population, and one in 800 million for the Hispanic population. *Id.* at 205-06. Taken together, the physical and forensic evidence provided compelling circumstantial evidence that Bomar was the perpetrator.

Apart from the physical and forensic evidence, the Commonwealth presented other circumstantial evidence, including evidence that Bomar had previously been to the bar in Wayne,

Pennsylvania that Willard left shortly before she was abducted,[54] was familiar with the area in

North Philadelphia where her body was later found,[55] fabricated an alibi,[56] and made other false

statements to law enforcement at various points during the investigation.

The testimony regarding Bomar's confessions was important to the Commonwealth's case,

providing powerful evidence of guilt.  But O'Donald was only one of the three witnesses who

testified that Bomar had admitted the crimes to them.  O'Donald, Rumer, and Williams each

testified that Bomar separately admitted to them that he had raped and killed Willard, though the

details of these admissions varied.  In closing, the prosecutor relied most heavily on Rumer's

account, urging the jury to believe her testimony because "[t]he evidence supports what Mary

Rumer told you Arthur Bomar had told her"—namely, that Bomar had gone to the same bar as

Willard on the night of June 19, 1996; that he followed Willard in his car after she left the bar,

---

[54] In a statement to police on October 15, 1997, Bomar admitted having been to the bar at least once with a former girlfriend.  N.T. 9/23/98 at 164-65, 216; N.T. 9/29/98 at 78-79.  The former girlfriend confirmed this and reported that Bomar told her he had been there a number of times. N.T. 9/24/98 at 33-35, 37.

[55] Notably, a Philadelphia police officer testified he encountered Bomar about eight blocks from the vacant lot where Willard's body was found approximately six hours after the body was discovered.  *See* N.T. 9/22/98 at 231-32.  Bomar was driving the same green 1993 Ford Escort from which much of the physical evidence (the tire track, oil pan, and bloodstain) was later recovered.  *See id.* at 232.  Numerous other witnesses also testified to Bomar's familiarity with the area where Willard's body was found, which was about eight or nine blocks from Bomar's aunt's house, N.T. 9/25/98 at 255, six or seven blocks from clubs he frequented and an area where he worked for a private investigator, N.T. 9/24/98 at 21-22; N.T. 9/25/98 at 255-56, 264; N.T. 9/29/98 at 50-51, and within a mile of his sister's home, N.T. 9/29/98 at 49.

[56] As noted, although Bomar told investigators he was at a birthday gathering for his stepson with other family members on the night of June 19, 1996, *see* N.T. 9/23/98 at 215; N.T. 9/29/98 at 77-78, the family members he identified discredited his story, *see* N.T. 9/25/98 at 13, 32, 35; N.T. 9/25/98 at 40-41; N.T. 9/28/98 at 235.  Joyce O'Donald, Bomar's ex-wife, testified that Bomar encouraged her to believe and tell others she was with him on the night of June 19.  *See* N.T. 9/25/98 at 31.

stopped her on the Blue Route, and knocked her out; that he took her to another location where he had sex with her and hit her in the head with a hard object, killing her; and that he dumped her body and discarded her clothes. *See* N.T. 9/30/98 at 101-04, 134-35. The prosecutor also highlighted aspects of Williams's and O'Donald's testimony in closing. As to O'Donald, the prosecutor emphasized his testimony regarding Bomar's admissions about the tree branch found between Willard's legs—something O'Donald could not possibly have known about unless Bomar had told him—and used this testimony to suggest Bomar had attempted to "violate [Willard] with the tree branch" in a "final act of degradation of her human life." *Id.* at 107-08, 135-36.[57]

Bomar argues the suppressed evidence of O'Donald's understanding with local prosecutors is material to guilt under *Brady* and *Napue* because O'Donald provided the only direct evidence of malice and specific intent. But the state courts found it was not material, and Bomar has not shown that conclusion was objectively unreasonable. Even if this additional impeachment evidence would have led the jury to reject O'Donald's testimony altogether, it could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

In instructing the jury, the trial court made clear that a conviction may be based on circumstantial evidence alone. N.T. 9/30/98 at 167-68. With regard to malice, the court explained:

> [A] killing is with malice if the killer acts with first, an intent to kill; or second, an intent to inflict serious bodily harm; or third, a wickedness of disposition, a hardness of heart, cruelty, a recklessness of consequences and a mind regardless of

---

[57] Although several law enforcement witnesses testified that Willard's body was found with a tree branch between the legs "that appeared to be stuck in her vagina," N.T. 9/22/98 at 75-76; *see also id.* at 93-94, 112, 198-200, the medical examiner who conducted Willard's autopsy found no evidence the branch had been inserted in her vagina, N.T. 9/23/98 at 95. In closing, the prosecutor acknowledged the evidence showed the branch "had not violated [Willard's] body" but argued it "wasn't for lack of trying by [Bomar]." N.T. 9/30/98 at 108.

> social duty, which indicates an unjustified disregard for the probability of death or
> great bodily harm and an extreme indifference to the value of human life.

N.T. 9/30/98 at 173-74.  As to specific intent, the court instructed that "[a] person has the specific

intent to kill if he has a fully formed intent to kill and is conscious or aware of his own intention."

*Id.* at 175-76.  Specific intent to kill "does not require planning or previous thought, or any

particular length of time," but "can occur quickly.  All that is necessary is that there be time enough

so that the Defendant can and does fully form an intent to kill and is conscious or aware of that

intention."  *Id.* at 176.  The court went on explain that "[w]hen deciding whether the Defendant

had the specific intent to kill, you should consider all of the evidence regarding what you believe

to be his words and conduct and the attending circumstances that may show his state of mind";

that the jury could infer specific intent to kill if it believed "the Defendant intentionally used a

deadly weapon on a vital part of the victim's body"; and that "a deadly weapon is simply any

device or instrument, which in the manner it is used or intended to be used, is calculated or likely

to produce death or serious bodily injury."  *Id.* at 176-77.

In closing, the prosecutor alluded to O'Donald's testimony about the tree branch as

evidence of malice, arguing the photograph of Willard with the tree branch between her legs

showed Bomar had a "malicious state of mind" when he killed her.  *Id.* at 136.  But, under

Pennsylvania law, the nature and severity of Willard's injuries alone provided overwhelming

evidence that the killing was with malice.  *See, e.g.*, *Commonwealth v. Sherwood*, 982 A.2d 483,

493 (Pa. 2009) (holding malice may be inferred "from attending circumstances, such as the

seriousness and type of injuries" (citing *Commonwealth v. Paquette*, 301 A.2d 837, 840 (Pa.

1973)); *Commonwealth v. Steele*, 295 A.2d 334, 335 (Pa. 1972) (finding ample evidence of malice

based on the serious injuries the decedent sustained in a beating by her husband, including five

fractured ribs and a laceration of the liver caused by a "sharp external force" as well as "numerous contusions and abrasions, a swelling of the scalp, and a prominently blackened right eye").

The jury heard testimony from the medical examiner who conducted Willard's autopsy about the extensive injuries she sustained and the manner of her death.  The medical examiner testified Willard had multiple blunt force injuries to her head, face, neck, extremities, and back. N.T. 9/23/98 at 52.  These injuries included abraded lacerations to the front and back of the head, indicating that Willard had been struck in the head multiple times with a "rough, hard implement," causing fractures "going all over through the top of the skull, the side of the skull, and the inside and bottom of the skull."[58]  *Id.* at 26-28.  As a result of these injuries, which would have required "a great deal of force," Willard suffered "massive injury to the brain."  *Id.* at 28, 37.  Willard also had multiple other abrasions, lacerations, and contusions on her face, a torn frenulum, an abraded contusion on her left shoulder and upper chest area resembling a heel print or tire, bruises over her upper abdomen and lower chest area, an abraded contusion beneath her left breast, a thermal pattern injury on her right lower chest and upper abdomen, and numerous other abrasions and bruises to the torso (front and back), hips, legs, and arms.  *Id.* at 29-32, 40.  Her hyoid bone, which "sits very high up in the neck and is very hard to injure," was fractured, and bruising, scrapes, and hemorrhage in the neck area indicated a "throttling injury" resulting from someone "gripping the neck strongly," perhaps multiple times.  *Id.* at 30, 36.  The medical examiner also noted that Willard had defensive injuries to both forearms.  *Id.* at 52.  He opined that Willard died as a result of blunt force injuries and ruled the death a homicide.  *Id.* at 50.

---

[58] The medical examiner described this injury as an "eggshell fracture of the skull," and analogized it to the cracks that would materialize if a hard-boiled egg were dropped on the floor.  N.T. 9/23/98 at 28.

Willard's extensive injuries were also the subject of testimony by law enforcement witnesses and were depicted in photographs displayed to the jury. Jeff Piree, a homicide detective with the Philadelphia Police Department, provided a graphic description of the injuries he observed on Willard's body, testifying:

> The body has numerous bruises and abrasions all over the body. There are severe head wounds to the front of the head, and the right nostril is sliced open. There's a large, gaping wound into her skull and the forehead and the back of the head, as may show a type of crushing from apparently multiple blows to the same area in the back of the head, which the brain, I believe, was basically exposed at that point. She had a type of pattern burning markings on her right flank and under her right arm, from some type of element that was hot that would cause burning of the skin. There w[ere] bruises and abrasions, which appear to be defense wounds, on the inside of the right arm and the right wrist. There were drag marks on her back and her shoulders. I think the inside of her lip was split. There w[ere] three or four definite aligned bruised abrasions across the lower part of her spine, as if she was being dragged down something on a hard surface, over several steps, or off of something hard onto something hard. She had on her right—I believe it was her right side, her buttocks area, between the waist and the upper part of the—lower part of the hip, in a six-inch square area, two large, long drag mark cuts from some type of object she was dragged over. They were almost square and rectangular, just surgically implanted, but they were basically dragged over something that was a patterned object that tore the skin from her. There was a cut over her right eye. Again, the forehead there were two severe cuts that penetrated the skull.

N.T. 9/22/98 at 167-68.

Given the evidence regarding Willard's extensive injuries described above, the jury could only reasonably have found the killing was done with malice.

The same is true as to specific intent. The prosecutor did not rely on O'Donald's testimony in urging the jury to find the killing was "premeditated, willful and deliberate," but instead argued the evidence showed Bomar "had fully formed his intention to kill [Willard] when he made the decision to knock her out on the ramp, take her and rape her" because "[o]nce he made a decision to assault her on the ramp, abduct her 20 some miles away from where the car is found, he's not going to leave her alive. He had already decided in his mind, she was going to be killed." N.T.

9/30/98 at 137.  Specific intent, like malice, can be inferred from the surrounding circumstances, including the severity and type of injuries.  *Commonwealth v. Powell*, 956 A.2d 406, 416 (Pa. 2008).  Again, the circumstances here—that Bomar followed Willard in his car, stopped and assaulted her, then abducted her, taking her to another location where he raped and brutally beat her, repeatedly striking her in the head with a hard object with enough force to cause multiple skull fractures—provide overwhelming evidence that he acted with specific intent to kill.  *See Commonwealth v. O'Donnell*, 740 A.2d 198, 203 (Pa. 1999) ("Using a hammer to repeatedly smash a human being's skull undoubtedly . . . permits an inference of a specific intent to kill.").

While O'Donald's testimony strengthened the prosecution's case, it was not critical to convict Bomar, given the strength of the physical and forensic evidence and the other confession evidence.  Even if evidence regarding O'Donald's understanding with local prosecutors would have led the jury to disbelieve that Bomar made the admissions that O'Donald attributed to him, it would still not be reasonably probable that the jury would have concluded Bomar did not kill Willard or that the requirements of first-degree murder were not met.  Nor is there a reasonable likelihood that O'Donald's false denial that he had been offered anything in exchange for his testimony could have affected the judgment of the jury at the guilt phase.

Bomar also argues the undisclosed understanding between O'Donald and local prosecutors is material to punishment.  The Court disagrees.  There is no reasonable probability nor any reasonable likelihood that O'Donald's testimony could have affected the judgment of the jury as to the aggravating factors on which the jury's death verdict was based.  O'Donald's testimony was wholly irrelevant to two of the three aggravating factors—that Bomar had a significant history of felony convictions involving the use or threat of violence to the person and that he had previously been convicted of another murder.  And while his testimony supported the third aggravating

factor—that the killing was committed in the perpetration of a felony (i.e., kidnapping and rape)—the Commonwealth presented ample other evidence of these crimes at trial, including DNA evidence suggesting that Bomar was the source of the sperm found in Willard's body and evidence of Bomar's confessions to Rumer and Williams.[59]

Bomar argues the impeachment evidence is material because it is "more than likely" that jurors considered the nature of O'Donald's testimony in the weighing process.  Pet'r's Mem. 15. In his penalty-phase closing argument, the prosecutor urged the jury to return a death verdict because Bomar had "devoted his life to inflicting pain, suffering and misery upon fellow human beings," as evidenced by his prior convictions, and his past criminal record demonstrated that neither jail nor parole would stop him.  N.T. 10/5/98 at 150-51.  The prosecutor also argued Bomar was unworthy of sympathy and mercy, as he had shown none to Willard, citing O'Donald's testimony that Willard had pleaded with Bomar not to kill her.  *Id.* at 151-52.

While O'Donald's account highlighted Bomar's callousness, the cruelty and brutality of the offense were clear from the other accounts of Bomar's admissions and the physical evidence in the case.  It is not reasonably probable that, even if the undisclosed impeachment evidence would have led the jury to reject O'Donald's testimony altogether, the result at the penalty phase would have been different.  Nor is there a reasonable likelihood O'Donald's false testimony affected the judgment of the jury.

The Pennsylvania Supreme Court did not unreasonably apply *Brady*, *Napue*, and their progeny in concluding that even if an agreement existed between O'Donald and prosecutors, Bomar was not prejudiced by its nondisclosure.  Nor was the court's decision contrary to clearly

---

[59] O'Donald's testimony also had no bearing on the mitigating factors argued by the defense—i.e., that Bomar was under the influence of extreme mental or emotional disturbance and any other evidence of mitigation concerning Bomar's character in the record.

84

established federal law.  Even under de novo review, the court's conclusion was sound, for the reasons set forth above.  Accordingly, Bomar is not entitled to relief on this claim.

### 2.  Quincy Jamal Williams

Williams also testified at trial that Bomar confessed the crimes to him while they were housed on the same cell block at MCCF, where Williams was detained on murder charges, in the summer of 1997.[60]  In August 1997, representatives of the Delaware County CID questioned Williams him about his contacts with Bomar.[61]  Williams told investigators that Bomar admitted he had raped and strangled Willard and thrown her body on the side of the road.  *See* Williams Statement 1-2, 5, 9, Aug. 14, 1997 (PCRA Ex. C4).  He also stated Bomar had used Willard's name and described her as blonde, kind of thin, and pretty.  *Id.* at 3-4.  He denied investigators had promised him anything in exchange for providing a statement.  *Id.* at 8.

Williams later entered an open guilty plea to voluntary manslaughter and a firearms charge in the Montgomery County Court of Common Pleas in March 1998, leaving an appropriate sentence up to the sentencing court's discretion.  The remaining charges were dismissed.  The case proceeded to sentencing in July 1998, two months before Bomar's trial.[62]  At the sentencing hearing, Williams was asked about his cooperation in the Bomar matter, which his counsel urged

---

[60] Williams had been charged with first-degree murder, third-degree murder, voluntary manslaughter, a firearms violation, possession of an instrument of crime, and recklessly endangering another person.  N.T. 9/25/98 at 113.

[61] Williams later explained he had come to meet with investigators after corrections officers noticed Bomar talking to him and asked whether Bomar had said anything about his case.  *See* N.T. 4/1/98 at 8, 27.

[62] After he entered his open guilty plea but before he was sentenced, Williams testified at a suppression hearing in Bomar's case.  He again denied that the CID officers—or anyone—had promised him anything in exchange for his statement, or that he expected anything in exchange for his statement.  N.T. 4/1/98 at 6, 9, 49.

the court to view as a mitigating factor, emphasizing that Williams had not sought to benefit from that cooperation in his own criminal case.  N.T. 7/21/98 at 114-16 (PCRA Ex. C5).  Williams testified that neither the CID officers nor the Delaware County prosecutor in Bomar's case had promised him anything in exchange for his statement or testimony, and he denied asking for anything. *Id.* at 30-31, 34; *see also* N.T. 9/24/09 at 34-35.  He further testified that the Montgomery County prosecutor in his own criminal case had not promised him anything in exchange for his testimony in the Bomar matter.  N.T. 7/21/98 at 40-41 (PCRA Ex. C5); N.T. 9/24/09 at 37.  McDevitt, the lead prosecutor in the Bomar matter, also testified at Williams's sentencing pursuant to a subpoena from Williams's counsel.  McDevitt stated the information Williams provided had confirmed the direction of the investigation and would be useful to the prosecution if Williams were to testify at trial.  N.T. 7/21/98 at 75-76, 78 (PCRA Ex. C5).  He confirmed that Williams was not offered anything, and did not seek anything, in exchange for his statement.  *Id.* at 78-79; N.T. 9/24/09 at 37-38.  At the conclusion of the hearing, Williams was sentenced to five to ten years of imprisonment, to be followed by five years of probation.  N.T. 7/21/98 at 125-26 (PCRA Ex. C5).

In September 1998, Williams testified at Bomar's trial.  Williams stated that while he was on the same cell block as Bomar in the summer of 1997, Bomar disclosed that he had met Willard at a bar, strangled her, and left her body at the side of the road.  N.T. 9/25/98 at 50-51, 53.  Williams also testified that Bomar said he had molested or had sex with Willard and that he was going to beat his case because the police had no physical evidence.  *Id.* at 52-53.  When asked about the sentence he had received in his own criminal case, Williams stated the sentence was imposed by the judge and denied having any agreement with the prosecutor in his case.  *Id.* at 48.  He also denied that he had asked for or been offered or promised anything in return for his testimony from

either the prosecutor in the Bomar matter or anyone else in law enforcement.  *Id.* at 55, 66, 68.

When asked by the court whether he believed that if he cooperated, things might be better for him

in his own criminal case, Williams stated he did not.  *Id.* at 69.

Mark Miller, the prosecutor who handled Williams's case in Montgomery County, also

testified for the Commonwealth.  Miller explained that the decision to allow Williams to plead

guilty to voluntary manslaughter and a firearms charge was made by the Montgomery County

District Attorney's Office and was not based in any way on the statement Williams provided to

the Delaware County CID regarding Bomar.  *Id.* at 113-14.  Miller denied that McDevitt or anyone

in law enforcement had asked him to give Williams a break or reduce his charges in return for his

potential appearance as a witness in the Bomar matter and stated that neither he nor McDevitt had

asked the court to give Williams a break at sentencing because of his cooperation.  *Id.* at 113-15.

Although Williams's own counsel had urged leniency on that basis, Miller recalled that the judge

did not consider Williams's cooperation in sentencing him.  *Id.* at 119-20.

In his closing argument, Bomar's defense counsel observed that while Williams claimed

to have no deal with the Commonwealth in exchange for his testimony, he received a lenient

sentence in his own criminal case (five to ten years, rather than "life or death" or "20 to 40

[years]"), and McDevitt testified at his sentencing hearing.  N.T. 9/30/98 at 56-57.  Counsel also

highlighted various inconsistencies between Williams's testimony and other evidence in the case.

*Id.* at 57-59.  The trial court instructed the jury to receive Williams's testimony with caution:

> With respect to the testimony of Quincy Williams, you should examine his
> testimony closely and carefully and receive it with caution, if you find that he had
> any agreement, either explicit or implicit in nature, with law enforcement
> authorities that he would receive favorable treatment in any criminal matters in
> which he was or is involved, in return for his cooperation and/or testimony in this
> case.  In addition, you should examine his testimony closely and carefully and
> receive it with caution, if you find that he believed in his own mind, regardless of
> any agreement with law enforcement authorities, that he would receive favorable

treatment in any criminal matters in which he was or is involved, in return for his cooperation or testimony in this case.

*Id.* at 160-61.

In October 1998, a few weeks after Bomar's trial ended, McDevitt wrote to the Pennsylvania Department of Corrections to ask that Williams be kept separate and apart from Bomar while serving his sentence, given his role as a prosecution witness in Bomar's case.  PCRA Ex. P87.  Williams's mother later asked McDevitt to verify that Williams had been a witness in the Bomar prosecution in connection with Williams's efforts to obtain parole.  *See* N.T. 1/15/09 at 164.  Thus, in December 2000, McDevitt provided her with a letter recounting that Williams had voluntarily provided a statement to law enforcement regarding admissions Bomar made to him in 1997 and had later appeared as a witness for the Commonwealth at trial, by which time he had already been sentenced and had "nothing hanging over his head."  PCRA Ex. P87.  The letter also noted McDevitt's belief that Williams had done the right thing and testified "at great risk to his personal safety and well being in order to see that justice was served" in the case.  *Id.*  In November 2002, in response to a request from either Williams's mother or the Parole Board, McDevitt wrote to SCI Somerset to confirm that he had authored the December 15, 2000, letter.  *Id.*; N.T. 1/15/09 at 165.

Seven months later, in June 2003, Williams wrote to McDevitt to seek further help in obtaining parole.  In the letter, Williams asked what had happened to the parties' "deal about [Williams's] parole" and "the deal [Williams] took 5 to ten years," and claimed that although Williams had helped McDevitt convict Bomar, McDevitt had not done his part to help Williams make parole.  *Id.*  Williams also complained of adverse consequences as a result of his cooperation, which he "hear[d] about" daily from other inmates, and his inability to return to his neighborhood upon his release.  *Id.*

88

In response, McDevitt wrote to Williams and denied there had ever been "any deal or agreement between [Williams] and the Commonwealth." *Id.* McDevitt recounted that, at the request of Williams's mother, he had written a letter outlining the nature and extent of Williams's cooperation for Williams to use as he wished. However, he denied having agreed to contact the Board of Probation and Parole on Williams's behalf and stated he stood by his argument at Bomar's trial that "there was no deal, agreement or understanding between [Williams] and the Commonwealth of Pennsylvania in return for [Williams's] testimony." *Id.*

Williams then served his entire maximum sentence of 10 years. After his release, Williams testified at Bomar's PCRA hearing on September 24, 2009, newly claiming that his prior statement and testimony in the Bomar matter had been a lie. Contrary to his previous representations that he had neither asked for nor been promised anything in exchange for his testimony, Williams stated that, actually, McDevitt and detectives from Delaware County had promised that if he testified and said "certain things about Mr. Bomar," he would be paroled at the expiration of his minimum term of imprisonment. N.T. 9/24/09 at 5-11. Williams also claimed he testified because of this alleged deal. *Id.* at 12. When asked about timing, Williams initially alleged McDevitt and Delaware County detectives made the promise when he met with them at the courthouse, just before he testified in Bomar's case. *Id.* at 7-9. He later suggested they made this promise earlier, before his own sentencing hearing in July 1998, and that McDevitt had told him to deny at the hearing that he had been promised anything, *see id.* at 34-39.

Williams also recanted the substance of his trial testimony, stating that Bomar had never told him anything about his case and the information in his statement was fed to him by detectives and McDevitt. *Id.* at 21-23, 63-64. He also stated that because of his testimony against Bomar, he had been labeled a "snitch" in prison, suffered other adverse consequences such as fights and a

stabbing, and continued to have difficulty outside prison because people he grew up with did not

trust him.  *Id.* at 67-68.  Finally, Williams testified that in November 1997, while at MCCF, he

received two $40 deposits in his inmate account from individuals he did not know.[63]  *Id.* at 24, 30-

31.

McDevitt, however, denied in his PCRA testimony that any "agreements, understandings,

deals, conditions, [or] contingencies" had existed between the Commonwealth and Williams in

exchange for his testimony.  N.T. 1/15/09 at 166.  McDevitt specifically denied ever telling

Williams that if he testified, McDevitt would contact the Parole Board.  *Id.*  He also stated the

letter he eventually wrote on Williams's behalf was "not a follow-up to any deal or agreement

because we had none," but was written at Williams's mother's request to confirm that he appeared

as a witness at trial.  *Id.* at 177.

Relying on Williams's PCRA testimony, Bomar argues Williams had an undisclosed deal

with the prosecution that if he testified against Bomar and said "certain things," he would be

paroled at the end of his minimum sentence.  He further argues the prosecution violated his due

process rights under *Brady* and *Napue* by failing to disclose the consideration offered to Williams

and to correct his false testimony that he did not receive anything in exchange for his testimony.

Pet. ¶¶ 59-62.

Bomar raised this claim in state court, but the PCRA court rejected the claim on credibility

grounds, finding that "[w]hile Williams may have harbored the subjective hope that at some point

his testimony would garner a benefit, there [was] no credible evidence supporting the conclusion

---

[63] One of the deposits was from Tara Bruno; the other was from John Bruno.  N.T. 9/24/09 at 30.
There is no further information in the record about these individuals, other than that Williams
stated he did not know them.

that Mr. McDevitt, or anyone in law [e]nforcement, promised him parole upon the service of his minimum sentence." *PCRA Op.*, 2012 WL 9515416, at *23.  The court specifically found Williams's testimony regarding the existence of an agreement to be incredible, noting that, before his PCRA testimony, Williams had consistently and repeatedly denied he had been promised anything in exchange for testifying at Bomar's trial.  *Id.* at *22-23.  Instead, the court credited McDevitt's testimony that there was no deal between the Commonwealth and Williams and that he had not promised Williams that if he testified he would only serve his minimum term.  *Id.* at *23.  The court also found "no credible evidence" that McDevitt's December 2000 letter was part of any agreement between Williams and law enforcement, noting McDevitt wrote the letter only after Williams's mother contacted him and had provided the letter—addressed "To Whom It May Concern"—to Williams's mother, not to the Parole Board.  *Id.*  Further, in response to Williams's letter asking McDevitt to contact the Parole Board per their "deal," McDevitt had denied that any deal existed.  *Id.*  Finally, citing Williams's PCRA testimony about the negative consequences he suffered as a result of testifying and being labeled a "snitch," both in and out of prison, the court suggested that Williams "[a]pparently . . . hope[d] that by disavowing his prior testimony he w[ould] alleviate the consequences that remain."  *Id.*

The Pennsylvania Supreme Court affirmed, approving the PCRA court's finding that Williams's PCRA testimony was not credible and finding Bomar had "failed to establish with credible evidence that an agreement existed between Williams and the Commonwealth."  *Bomar II*, 104 A.3d at 1193-94.

Bomar argues the Supreme Court's finding that there was no credible evidence that an agreement existed between the prosecution and Williams was an unreasonable determination of the facts.  Specifically, Bomar argues the Supreme Court's reliance on the PCRA court's fact

91

finding was unreasonable because the PCRA court "failed to articulate any reasonable analysis as to why Mr. Williams would come forward after he had completed his sentence and testify that he lied at Petitioner's trial."  Pet'r's Mem. 17.  According to Bomar, the analysis the PCRA court did offer—that Williams apparently hoped that disavowing his prior testimony would help to alleviate the remaining consequences of being labeled a snitch—is unreasonable because at the time of the PCRA hearing, Williams had already served his sentence and thus no longer had the incentive to disavow his prior testimony.  Bomar argues it is more likely that Williams, who had a lengthy record and knew the implications of being labeled a snitch, "weighed the benefit of a shorter sentence against being labeled a snitch and chose the label with the hopes of an early release date." *Id.*

The Court disagrees.  As noted, under AEDPA a state court's credibility findings are findings of fact that "are presumed correct absent clear and convincing evidence to the contrary, and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340 (internal citations omitted); *see also Collins*, 546 U.S. at 338-39.  Although a federal court "can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence," *Miller-El*, 537 U.S. at 340, Bomar has established no reason to do so here.

Williams's testimony about his alleged deal with the Commonwealth was contradicted by McDevitt.  In evaluating the credibility of these witnesses, the PCRA court had the benefit of observing both of their PCRA testimony, as well as Williams's testimony at the suppression hearing and at trial.  After hearing the evidence, the court found McDevitt's testimony credible

and declined to credit Williams's account.  The court also found the documentary evidence—including the letter McDevitt provided to Williams's mother at her request—did not establish the existence of any agreement.  Bomar has not shown this finding was objectively unreasonable.  In arguing the PCRA court's fact-finding was unreasonable, Bomar focuses solely on the adequacy of the court's analysis as to why Williams would have come forward after completing his sentence.  As noted, however, when asked what had happened to him as a result of having been labeled a snitch, Williams described the adverse consequences he had suffered not only while in prison but also after he was released, stating he "saw the same trouble in my neighborhood" because "a lot of guys . . . still remember" and that the people he grew up with did not trust him.  N.T. 9/24/09 at 68.  While Bomar argues it is "more likely" that Williams lied at trial to receive a shorter prison sentence, knowing he would be labeled a snitch, the PCRA court's suggestion that Williams may have falsely recanted in an effort to avoid the lingering consequences of being so labeled is not objectively unreasonable and was not the only basis for the court's credibility finding in any event.  Because Bomar has not shown the state courts' determination that there was no agreement between Williams and the prosecution was an unreasonable determination of the facts in light of the evidence presented in state court—and because he has not rebutted the state courts' finding by clear and convincing evidence—his *Brady* and *Napue* claims regarding Williams will be denied.

### C.  Claim Three

Bomar next argues the Commonwealth violated his due process rights by using "trickery, false representations, and outrageous conduct" to obtain statements from him through O'Donald and Williams and, later, by using a false "bring-down" order to transport him from a state prison to the Delaware County CID office for questioning.  He also argues his trial and direct appeal

counsel were ineffective for failing to challenge his statements to O'Donald, Williams, and CID officers on due process grounds.

Bomar raised a portion of these claims—those relating to the Commonwealth's use of the bring-down order to question him at the CID office—before the PCRA court.[64]   The PCRA court rejected them, finding there was no evidence of the sort of "outrageous, arbitrary or oppressive government conduct" necessary to establish a due process violation as to Bomar's statements to CID officers, and, as the claim lacked arguable merit, trial and appellate counsel were therefore not ineffective for failing to pursue it.   *See PCRA Op.*, 2012 WL 9515416, at *68.   The Pennsylvania Supreme Court affirmed.[65]   *See Bomar II*, 104 A.3d at 1208-10.   Because Bomar has not shown the state court's decision was contrary to or involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in state court, this Court similarly finds he is not entitled to relief on this claim.

The interview at the Delaware County CID office took place on October 15, 1997, approximately two months before Bomar was arrested and charged in this case, at a time when he was confined at SCI Camp Hill in Dauphin County for unrelated offenses.   On the morning of October 15, Bomar was transported from SCI Camp Hill to the CID office pursuant to court order.

---

[64] Bomar did not challenge the Commonwealth's use of informants O'Donald and Williams as outrageous government conduct in the PCRA court or on PCRA appeal, nor did he allege his trial and appellate counsel were ineffective for failing to raise such a challenge.   While these aspects of his claim thus appear to be unexhausted, the Commonwealth has waived exhaustion, and these allegations lack merit for the reasons set forth below in any event.

[65] The Pennsylvania Supreme Court addressed only Bomar's ineffective assistance of appellate counsel claim, finding he had waived his underlying due process challenge regarding the bring-down order by failing to raise it in the trial court, and had waived his ineffective assistance of trial counsel claim by failing to raise it on direct appeal.   *Bomar II*, 104 A.3d at 1209.

The order had been signed a day earlier and authorized the Superintendent of SCI Camp Hill to release Bomar to Delaware County Detectives John Eaton and Joe O'Berg "for transportation . . . to the office of CID, Dela. County . . . for the purpose of Hearing." Trial Ex. C-193. As the Pennsylvania Supreme Court recognized, "[t]here is no doubt that the 'bring-down' order authorizing the transfer of [Bomar] to the CID offices was erroneous, since it indicated that [Bomar] was to be removed for a hearing, when no hearing was scheduled." *Bomar I*, 826 A.2d at 845. Indeed, as noted, there was not even a case against Bomar in Delaware County at the time. Instead, as law enforcement personnel involved in Bomar's transfer and questioning acknowledged, the order was used to transport Bomar for questioning about the Willard murder. *See* N.T. 3/31/98 at 92, 128-29, 173.

When investigators arrived at SCI Camp Hill to retrieve Bomar on the morning of October 15, Bomar was informed that they wished to speak with him concerning Willard's murder, and he agreed to accompany them back to Delaware County. *Id.* at 128-29; *Bomar I*, 826 A.2d at 845. Upon arrival at the CID office, CID Chief John McKenna again orally advised Bomar that investigators wished to speak with him about Willard's murder and orally advised him of his *Miranda* rights. N.T. 3/31/98 at 80-81; *Bomar I*, 826 A.2d at 845. Bomar orally acknowledged he understood his rights and agreed to speak with investigators, stating he wanted to clear his name. N.T. 3/31/98 at 80-81; *Bomar I*, 826 A.2d at 845. McKenna did not attempt to obtain a written *Miranda* waiver from Bomar because he did not want Bomar to become agitated and refuse to talk, as had happened months earlier, in July 1998, when law enforcement officers attempted to serve Bomar with an inventory receipt from a search of his car at a different prison.[66] *See* N.T.

---

[66] In that instance, Bomar became very agitated, refused to speak with investigators, and was placed in a 24-hour lockup. N.T. 3/31/98 at 84-85, 96, 189-90. McKenna was concerned that asking Bomar to sign something might prompt a similar response. *Id.* at 85, 96.

3/31/98 at 84-85, 189-90.  During the interview, Bomar responded to the officers' questions until he was asked whether he ever had sexual intercourse with Willard, at which point he became upset and stated he would not answer the question.[67]  *Bomar I*, 826 A.2d at 845; N.T. 3/31/98 at 139.

Before trial, Bomar moved to suppress the statements he made during that interview, arguing, inter alia, the bring-down order was based on intentionally false and misleading information and the use of the order to transfer him to the CID office for questioning violated his Fourth Amendment right to be free from unreasonable seizures.  *See* Def.'s Mem. Supp. Mot. to Suppress Oral Statements 7, 14-16, June 18, 1997; Resp'ts' Ex. Y at 25-27, ECF No. 47-14.  After a series of hearings, the trial court denied the motion as to Bomar's statements "up to but not including [the] question as to whether the Defendant had sex with Aimee Willard."  Resp'ts' Ex. J, ECF No. 47-8; *see also* Resp'ts' Ex. Y at 25-27, ECF No. 47-14.

The Pennsylvania Supreme Court affirmed the denial on direct appeal, holding Bomar's transfer from SCI Camp Hill to the Delaware County CID office "did not implicate [his] rights under the Fourth Amendment" because he was already a prisoner, and was therefore already "seized" for Fourth Amendment purposes, at the time of the transfer.  *Bomar I*, 826 A.2d at 845-46.  The court recognized the bring-down order was erroneous, but noted there was no evidence "that the error in the order was the result of false representations or other intentional wrongdoing on the part of the Commonwealth," and observed that Bomar had not been misled regarding the true purpose of the transfer as the officers had "specifically informed [him] that they would be

---

[67] In response to the officers' questions, Bomar made a number of statements that were ultimately admitted at trial, including statements regarding his purported whereabouts on the night Willard was abducted and his familiarity with the bar where Willard had been that night and the area where her body was found.  *See* N.T. 9/23/98 at 214-17.

transporting him to the CID offices to discuss the Willard murder and [he] expressly agreed to go with them." *Id.*   The court also remarked that "procedural irregularities in the transfer of a prisoner" would not be a basis to suppress an otherwise lawful confession under the Fourth Amendment in any event, as "the notion of offensive or outrageous government conduct, not involving a seizure, sounds under due process, not the Fourth Amendment." *Id.* at 846.   In a separate concurrence, one justice criticized the majority's "seemingly dismissive" approach to the Commonwealth's misuse of the erroneous bring-down order, emphasizing that the Commonwealth "should simply not be allowed to use a court order for one purpose when that order explicitly authorizes its use only for a different purpose." *Id.* at 862-63 (Nigro, J., concurring).

Bomar then pursued due process and ineffective assistance of trial and appellate counsel claims regarding the CID interview before the PCRA court.   As noted, the PCRA court denied the claims.   The Pennsylvania Supreme Court affirmed the denial, finding Bomar had failed to meet his burden to prove the Commonwealth had engaged in conduct "so grossly shocking and so outrageous as to violate the universal sense of justice," as required to establish a due process violation based on outrageous government misconduct.   *Bomar II*, 104 A.3d at 1209 (citation omitted).   The court rejected Bomar's contention that he "was 'tricked' into going to CID headquarters," reaffirming its findings on direct appeal that Bomar had failed to prove the bring-down order was "the result of false representations or other intentional wrongdoing on the part of the Commonwealth" and that he was not misled regarding the true purpose of his transfer.   *Id.* at 1209-10.   The court also noted that upon arrival at the CID office, Bomar agreed to speak to investigators after being advised of his *Miranda* rights.   *Id.* at 1210.   Having concluded Bomar's

underlying due process claim lacked merit, the court found his ineffective assistance of counsel claim also failed.[68] *Id.*

The outrageous government conduct doctrine derives from *United States v. Russell*, in which the United States Supreme Court recognized it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." 411 U.S. 423, 431-32 (1973). As Bomar acknowledges, however, the Supreme Court has never defined the parameters of such a due process violation. The only case in which the Court has found law enforcement methods sufficiently outrageous to violate due process—*Rochin v. California*, 342 U.S. 165 (1952)—predates *Russell* by more than 20 years. There, the Court vacated the conviction of a suspected drug dealer based on law enforcement methods that included forcibly pumping the defendant's stomach against his will to extract capsules he had swallowed, finding such conduct "shock[ed] the conscience" and was "bound to offend even hardened sensibilities." *Id.* at 172. In *Russell*, the Court rejected a claim that an undercover agent's conduct in supplying a defendant with a scarce ingredient essential for the manufacture of methamphetamine was sufficiently outrageous to bar prosecution, noting this conduct "stop[ped] far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." 411 U.S. at 432 (quoting *Kinsella v. United States ex rel. Singleton* 361 U.S. 234, 246 (1960)). Post-*Russell*, the Supreme Court has yet to find a due process violation based on outrageous government conduct.

---

[68] Although the Pennsylvania Supreme Court addressed only Bomar's ineffective assistance of appellate counsel claim, the court's reasoning would also have been dispositive of his ineffective assistance of trial counsel claim, which instead was denied as waived.

Although acknowledging that, based on subsequent Supreme Court decisions, the vitality of the outrageous government conduct doctrine appears to be "hanging by a thread," the Third Circuit has concluded that the Supreme Court "continues to recognize a due process claim premised upon outrageous law enforcement investigative techniques." *United States v. Nolan-Cooper*, 155 F.3d 221, 230 (3d Cir. 1998) (quoting *United States v. Voigt*, 89 F.3d 1050, 1064 (3d Cir. 1996)).  Because of the "extraordinary nature of the doctrine," however, courts are "'extremely hesitant' to uphold claims that law enforcement conduct violates the Due Process clause." *Id.* at 230 (citation omitted).  The doctrine does not apply "each time the government acts deceptively or participates in a crime that it is investigating" but is "reserved for only the most egregious circumstances"—i.e., where the challenged conduct is "shocking, outrageous, and clearly intolerable." *Id.* at 230-31 (quoting *United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992)).  Given this high bar, application of the doctrine is "rare." *Id.* at 231.

As noted, the Pennsylvania Supreme Court rejected Bomar's claims regarding his questioning in the CID office on the basis that he had failed to show the Commonwealth had engaged in the type of outrageous conduct necessary to establish a due process violation.  Bomar argues this finding is unreasonable both factually and legally.

Factually, Bomar takes issue with the state court's finding that he failed to prove the bring-down order "was the result of false representations or other intentional wrongdoing on the part of the Commonwealth." *Bomar II*, 106 A.3d at 1209 (quoting *Bomar I*, 826 A.2d at 845).  Bomar argues that, contrary to the state court's finding, the totality of the circumstances show the Commonwealth "had a clear motive to misrepresent the language in the 'bring-down' order in order to deceive [him] into 'voluntarily' going to Delaware County." Pet'r's Mem. 22.  He notes, for example, that investigators sought the bring-down order only after he refused to meet with

them at the Montgomery County Prison and then declined to seek a written *Miranda* waiver for fear he would become agitated and not talk to them.

While Bomar may be correct that the Commonwealth had "motivation to question [him] outside of the prison after previously being unsuccessful in obtaining . . . statements," Pet. ¶ 81, the Supreme Court's finding that the bring-down order was not the result of intentional wrongdoing was not objectively unreasonable.  At the suppression hearing, the Commonwealth maintained the error in the bring-down order was a "mistake" or "oversight" that was apparent from the face of the document, which used the term "hearing" but directed that Bomar be transported to the Delaware County CID office, a location where no court hearings are held.  N.T. 3/31/98 at 86-87; *see also Bomar I*, 826 A.2d at 845.  When offered the opportunity to rebut the Commonwealth's assertion, Bomar declined to do so.[69]  *Bomar I*, 826 A.2d at 845 (citing N.T. 3/31/98 at 87-88).  Notably, there is no indication the Commonwealth had any need to misrepresent the purpose of the transfer to obtain the bring-down order.  Indeed, defense counsel conceded as much at the suppression hearing, agreeing that a bring-down order would be a "valid legal way" to transport a prisoner for questioning, even if the prisoner did not want to be transferred.  *See* N.T. 3/31/98 at 79-80; *cf. Commonwealth v. Watkins*, 750 A.2d 308, 313 (Pa. Super. Ct. 2000) (describing the "administrative process" by which the defendant, a sentenced prisoner, was transported to the police station for questioning pursuant to a court order).

---

[69] Bomar's trial counsel testified during the PCRA proceedings that he believed the bring-down order referred to a "hearing" because the District Attorney's Office employee who prepared the order did not know why Bomar was being transported, not because she was trying to "dupe anybody."  N.T. 11/5/08 at 187-88.  Bomar's direct appeal counsel also testified he did not believe the prosecution attempted to deceive the court by using the word hearing on the order, but instead thought it was "just a typographical[] error."  N.T. 11/7/08 at 41-42.

Nor does the record support Bomar's assertion that the bring-down order was used to deceive him into going to Delaware County. Bomar does not point to any evidence suggesting he relied on the "hearing" language in the order in agreeing to accompany investigators to Delaware County. In fact, at the suppression hearing, Bomar stated he was not shown a copy of the order but was simply told by prison officials that officers were coming to pick him up and take him there. *See* N.T. 4/23/98 at 21-22. Moreover, the state court explicitly found Bomar was not actually misled regarding the purpose of his transfer, since investigators "specifically informed [him] that they would be transporting him to the CID offices to discuss the Willard murder and [he] expressly agreed to go with them." *Bomar II*, 104 A.3d at 1209-10 (citation omitted). Bomar has not shown these findings were objectively unreasonable.

Bomar likewise has not shown the Supreme Court's decision involved an unreasonable application of clearly established federal law. *Rochin*, *Russell*, and their progeny set a high bar for a due process violation based on outrageous government conduct, requiring conduct that "shocks the conscience," *Rochin*, 342 U.S. at 209, or amounts to a denial of "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause," *Russell*, 411 U.S. at 432 (citation omitted). Here, although the bring-down order was erroneous, the state court reasonably found both that it was not intentionally false and that Bomar was not misled by it. The use of an incorrect court order to secure Bomar's presence at the CID office for questioning does not rise to the level of outrageousness required for a due process violation; hence, the state court's conclusion that the Commonwealth did not act so "offensively or outrageously . . . as to deny [him] due process," *Bomar II*, 104 A.3d at 1210, is not objectively unreasonable. And because Bomar's underlying due process claim lacked merit, trial and appellate counsel were not ineffective for failing to challenge Bomar's statements to CID officers on due process grounds. *See Real v.*

*Shannon*, 600 F.3d 302, 310 (3d Cir. 2010) (holding trial counsel was "not ineffective for failing

to raise a meritless claim"); *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) ("There

can be no Sixth Amendment deprivation of effective counsel base on an attorney's failure to raise

a meritless argument.").  Because the underlying claim was meritless, he was not prejudiced by

his trial and appellate counsel's failure to raise it.[70]

Bomar's efforts to expand this claim to include the Commonwealth's use of informants to

obtain evidence against him similarly unavailing, as he has not shown the Commonwealth's use

of O'Donald and Williams was so "shocking, outrageous, and clearly intolerable" as to violate due

process.

Thus, habeas relief is denied as to this claim.

### D.      Claim Four

Bomar next asserts his right to an impartial jury under the Sixth and Fourteenth

Amendments was violated when juror William Mertz had a conversation with a sheriff's deputy,

one of the law enforcement officers guarding the jurors.  Mertz asked the deputy about the amount

of security around the sequestered jury, selected from Westmoreland County for this Delaware

County trial.  The deputy responded that a Philadelphia gang had made a death threat against the

---

[70] Bomar also has not demonstrated the Pennsylvania Supreme Court's decision was contrary to clearly established federal law.  The state court did not apply a rule that contradicts the governing law set forth in the United States Supreme Court's cases.  *Compare Bomar II*, 104 A.3d at 1209 (holding to establish a due process violation based on outrageous government misconduct, a defendant must prove the conduct in question "was 'so grossly shocking and so outrageous as to violate the universal sense of justice'" (citation omitted)), *with Russell*, 411 U.S. at 432 (suggesting that a due process violation would require conduct "violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause" (citation omitted)), *and Rochin*, 342 U.S. at 172-73 (finding a due process violation based on "conduct that shocks the conscience" and "offend[s] 'a sense of justice'" (citation omitted)).  And Bomar has pointed to no case in which the Supreme Court has reached a different result on a set of facts materially indistinguishable from the facts of this case.

jury.  Bomar argues the Pennsylvania Supreme Court unreasonably applied clearly established federal law in concluding the deputy's statement did not cause a reasonable likelihood of prejudice. Respondents answer that the state courts' finding that the claim lacked merit, after a post-conviction hearing, was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court, and that the state courts' determination was based only on reasonable factual findings.

Bomar raised this claim in his PCRA petition, counseled by the same group of attorneys that represents him in these federal habeas proceedings.  Resp'ts' Ex. KK at 50-58, ECF No. 47-28.  Although he preliminarily invoked the U.S. Constitution, Bomar argued the claim on a state-law basis.[71]  He did not explain when or how he came into contact with Mertz or learned of his 1998 conversation with the deputy, but he attached a July 17, 2004 declaration from Mertz stating, among other things:

> 3.  During the trial we were sequestered in a hotel.  We were protected well by two deputies and by two court officers at all times.  They wore bullet[]-proof vests and carried weapons.
>
> 4.  I asked one of the deputies about all the security.  We knew it was a high publicity case, but I didn't think that would be a reason for all the security.
>
> 5.  I asked a deputy about the security and he told me that there had been a death threat against the jury by a gang in Philadelphia. This was during the trial.
>
> 6.  They made sure that we [weren't] sitting ducks. One day we got into traffic and within 30 seconds cops pulled up and we pulled across the median and got moving.
>
> 7.  I feel confident about the verdict and sentence . . . .
>
> 8.  We were confident [] by the end of the trial that Mr. Bomar was guilty.

---

[71] Bomar grouped this allegation with other allegations about the conduct of the jury based on an anonymous letter he had received in August 2003.  He has since abandoned those other allegations.

Mertz Decl. ¶¶ 3-8, July 17, 2004 (PCRA Ex. P103).  The declaration included no allegation that Mertz communicated this conversation to any other juror or that it had any effect upon himself, any other juror, or the jury as a whole.

Bomar argued in his PCRA petition that the deputy's explanation in response to Mr. Mertz's question about the tight security constituted evidence of an extraneous influence upon the jury.  Resp'ts' Ex.t KK at 52 ¶ 119, ECF No. 47-28.  He sought an evidentiary hearing, at which he proposed to prove by competent testimony that this extraneous juror communication was prejudicial, per *Carter v. United States Steel Corporation*, 604 A.2d 1010 (Pa. 1992).  *Id.* at 53-54, 58.  Bomar further argued that Mertz's declaration demonstrated that the tight security went too far and tainted the jury, citing cases about prejudicially excessive courtroom security including *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986).  *Id.* at 58.[72]

The Commonwealth answered that Mertz's declaration did not suggest, much less show, that the jury had been prejudiced by purported comments or observations about security

---

[72] In a footnote, Bomar cited several United States Supreme Court cases in arguing that Mertz's affidavit was admissible:

> Admissibility of this affidavit is clear. While there is a general rule against allowing a juror to testify to matters that impeach a jury's verdict, exceptions to this rule exist where there is an "extraneous influence" upon the jury. *Mattox v. U.S.*, 146 U.S. 140, 149 (1892); *Parker v. Gladden*, 385 U.S. 363, 365 (1966) (bailiff's comments are extraneous influence); *Remmer v. U.S.*, 347 U.S. 227, 228-230 (1954) (bribe offered juror an extraneous influence); *Smith v. Phillips*, 455 U.S. 209 (1982) (juror in criminal trial submitted an application for employment in the District Attorney's office which was extraneous influence); *U.S. v. Thomas*, 463 F.2d 1061 (7th Circuit 1972) (newspaper reports are extraneous influences); *Pittsburgh National Bank v. Mutual Life Insurance Company*, 493 Pa. 96, 101 (1981). Under this exception, jurors may testify to the existence of an outside influence, but not as to the effect of this outside influence on deliberations. *Id.*

Resp'ts' Ex. KK at 52 n.12, ECF No. 47-28.  He did not, however, cite those cases for any other proposition in state court.

precautions undertaken by the Sheriff's Office, and argued the claim should be rejected without a hearing.   Commonwealth Resp. to PCRA Petition at 19-20.

Mertz testified briefly at a 2009 PCRA hearing.   After being shown his 2004 declaration, which refreshed his recollection, he confirmed his 1998 conversation with the deputy.   However, neither side asked him anything more about it.   N.T. 10/20/09 at 8-19.   Although Bomar had admitted, per *Carter*, that it was his own burden to present evidence of prejudice, counsel asked Mertz no questions tending to demonstrate either prejudice or any other details, including when he had first communicated this information to anyone and how he had come to provide the declaration to Bomar.   For its part, the Commonwealth asked Mertz no questions, either.   *See id.* at 19.   No other witness or evidence was presented regarding this sub-portion of the larger multi-allegation claim.

The PCRA court rejected the claim, finding Bomar had failed to meet his burden under the state standard that all agreed applied here:

> The court afforded Petitioner the opportunity to offer proof in support of these claims at an evidentiary hearing.   Petitioner has failed to meet his burden of proof.   In *Carter by Carter v. U.S. Steel Corp.*, 604 A.2d 1010, 1016-1017 (Pa. 1992)[,] the Supreme Court explained:  if the moving party meets the burden of proving by competent evidence the existence of an extraneous influence a new trial will be granted only when there is a reasonable likelihood of prejudice.   In determining the reasonable likelihood of prejudice "the trial judge should consider 1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; 2) whether the extraneous influence provided the jury with information they did not have before them at trial; and 3) whether the extraneous influence was emotional or inflammatory in nature."

*PCRA Op.*, 2012 WL 9515416, at *31.   After concluding the other allegations within this claim (which Bomar does not pursue today) were without support and did not demonstrate prejudice, the court turned to the sparse juror testimony and evidence:

> The testimony of William Mertz, a juror, was brief.   Similarly, it raised no concern that extraneous influences prejudiced the jury against Petitioner and

105

deprived him of a fair trial. *See* N.T. 10/20/09 pp. 7-11. Mertz testified that on one occasion during the two[-]and[-]a[-]half[-]week period that the jury was sequestered in a Delaware County hotel, he had a conversation with a deputy about the level of security that was being provided for the jury and the deputy told him that death threats were made toward the jury. *See id.* at p. 10. This is the extent of the information upon which this claim is based. There is no evidence indicating either that Mr. Mertz was led to believe that Petitioner or anyone associated with him was the source of a threat.

> While Petitioner is entitled to a trial before a fair and impartial jury free from any extraneous influences, *see Carter by Carter v. U.S. Steel Corp.*[,] 604 A[.]2d 1010, 1016-1017 (Pa. 1992), he has offered proof of one isolated and clearly *de minimus* communication that cannot, in light of the length and duration of the trial and the testimony of Mr. Mertz, be considered proof that the jury was influenced by an extraneous fact. Further, Petitioner has completely failed to meet the burden of proving a reasonable likelihood of prejudice. *See also U.S. v. Taliaferro*, 558 F.2d 724 (4th C[i]r. 1977) (mere fact that jurors consumed alcoholic drink while deliberating during dinner did not demonstrate prejudice where there was no evidence that a juror became intoxicated so that he or she was affected in the performance of his or her duties).

> Finally, no evidence has been offered to substantiate the claim that excessive security measures were employed either in the courtroom or in sequestering the jury. *See e.g.*, *Holbrook*[] *v. Flynn*, 475 U.S. 560, 106 S. Ct. 1340 (1986). This claim has no merit.

*Id.* at *32. In denying this claim after hearing Mertz's testimony and observing his demeanor, the PCRA court thus found the information was confined to one juror and that Bomar had failed to present evidence (1) that Mertz was negatively impacted by the deputy's answer to his question, (2) that there was a reasonable likelihood of prejudice to the jury from the conversation, (3) that there was any connection between the alleged threat and Bomar, and (4) that there was any excessive security.

Bomar raised this claim on appeal to the Pennsylvania Supreme Court, basing his argument solely on juror Mertz's testimony and affidavit, as he does today. Resp'ts' Ex. VV at 60-63, ECF No. 47-42. Bomar contended he should have prevailed after the PCRA hearing under his Sixth Amendment right to a fair and impartial jury. Although he agreed that the PCRA court had applied

the correct state standard under *Carter*, he argued it had erred by analyzing prejudice from Mertz's subjective perspective rather than objectively, as required.  Had the PCRA court used the objective approach, Bomar argued, it would have found that he had "established a reasonable likelihood of prejudice" under the three-pronged *Carter* standard even without his having presented further evidence.  *Id.* at 61-63.

In its opinion, the Pennsylvania Supreme Court initially observed that it appeared the claim was waived, as Bomar had not presented it in compliance with state requirements for instances of after-discovered evidence.  *Bomar II*, 104 A.3d at 1210-11.  However, because the Commonwealth had not raised those procedural objections, the court proceeded to the merits.  *Id.* at 1211.  It first agreed with both sides and the PCRA court that it had been Bomar's burden to prove at the PCRA hearing that the extraneous influence caused a reasonable likelihood of prejudice, citing its then-recent opinion, *Commonwealth v. Sneed*, 45 A.3d 1096 (Pa. 2012).  *Id.*

The state high court also agreed with the PCRA court that Bomar had not carried his burden at the hearing to demonstrate such a reasonable likelihood of prejudice arising from the deputy's answer to the juror's question.  *Id.*  It found that the deputy's disclosure that there had been a threat to the jury did not relate to a central issue in the case; that, even if it had hypothetically related to an issue in the case, it would only have been in the most generic sense; that the threat was vague and of unknown origin; and that Bomar had only shown the information was isolated and confined to Mertz, not that it was conveyed to any other members of the jury.  *Id.* at 1211-12.  Although the Pennsylvania Supreme Court agreed that "the PCRA court may have placed too much emphasis on the statement's effect on Mr. Mertz" subjectively, the state high court corrected that error, finding independently based on the evidence that "there was no reasonable likelihood that an objective, typical juror would have been influenced by the threat," and thus, that the PCRA court

107

had reached the correct result.  *Id.* at 1212.  It therefore affirmed the PCRA court's denial of this claim.

In his habeas petition, Bomar contends his rights to an impartial jury and to a verdict based solely on the trial evidence, as guaranteed by the Sixth and Fourteenth Amendments, were violated by this conversation.  He no longer cites the state case of *Carter* at all, let alone as his main authority, as he did in state courts.  Instead, he now relies primarily upon *Mattox v. United States*, 146 U.S. 140, 149-50 (1892) (forbidding "external causes tending to disturb the [jury's] exercise of deliberate and unbiased judgment . . . , at least until their harmlessness is made to appear"), asserting the Pennsylvania Supreme Court's conclusion "that there was no likelihood of prejudice from the juror(s) being exposed to extraneous information is an unreasonable application" of *Mattox* and its progeny.  Pet'r's Mem. 24, 27.

The Commonwealth answers that the state courts' post-hearing determination that this claim lacked merit was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court, and that the state courts' determination was based only upon reasonable factual findings.  Resp'ts' Mem. Opp'n 45-49, ECF No. 45-1.  Neither side addresses the issue of burden, i.e., presumption of prejudice, at such a state-court hearing.

Bomar's claim in state court relied on *Carter* as his main authority, although he cited the United States Constitution initially and mentioned federal law in passing, as well as in a footnote on the topic of admissibility.  Resp'ts' Ex. KK at 52 n.12, ECF No. 47-28.  Accordingly, while the Pennsylvania Supreme Court recognized that Bomar alleged a violation of "his rights under the Sixth and Fourteenth Amendments to the United States Constitution," it analyzed the claim based

solely on the state-court opinions that he and the Commonwealth agreed applied. *Bomar II*, 104 A.3d at 1210.

In his habeas petition, however, Bomar initially faults the state court for citing only state law, arguing that this error entitles him to pre-AEDPA de novo review. Pet'r's Mem. 26. The United States Supreme Court has made clear, however, that a state court's failure to *cite* federal law is not dispositive of whether AEDPA deference applies, holding that qualification for AEDPA deference "does not require citation of our cases—indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradict them." *Early v. Packer*, 537 U.S. 3, 8 (2002). The Court has also emphasized "§ 2254(d)'s 'highly deferential standard for evaluating state-court rulings,' demands that state-court decisions be given the benefit of the doubt." *Visciotti*, 537 U.S. at 24 (citation omitted).[73]

Although Bomar argues that the state courts unreasonably applied *Mattox* and its progeny, he does not explore in any depth what the clearly established federal law actually is, i.e., what the relevant holdings of the United States Supreme Court are, nor exactly how the state courts allegedly unreasonably applied them. Nor do Respondents provide any potentially helpful analysis of applicable Supreme Court holdings. Resp'ts' Mem. Opp'n 45-49 (citing and discussing

---

[73] In arguing de novo review applies, Bomar relies on *Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005), in which the Third Circuit observed that "AEDPA's deferential standards of review do not apply 'unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States,'" citing its own prior decision in *Everett v. Beard*, 290 F.3d 500 (3d Cir. 2002). *Jacobs*, 395 F.3d at 100 (quoting *Everett*, 290 F.3d at 508). As the Third Circuit subsequently recognized in *Priester v. Vaughn*, 382 F.3d 394 (3d Cir. 2004), however, *Everett* is no longer good law on this point in light of the Supreme Court's decisions in *Early* and *Visciotti*, among others. *Priester*, 382 F.3d at 397-98 (holding "the deferential standard of AEDPA applies even if the state court does not cite to any federal law as long as the state court decision is consistent with federal law").

primarily the federal supervisory, non-habeas cases of *United States v. Fumo*, 655 F.3d 288 (3d Cir. 2011), and *United States v. Lloyd*, 269 F.3d 228 (3d Cir. 2001)).[74]

Instead, Bomar quotes at length from a case in which the Ninth Circuit provided the following summary of Supreme Court precedent:

> In sum, the governing Supreme Court case law can be distilled as follows: Where a court receives information, *Remmer* [*v. United States*], 347 U.S. [227,] 229-30 [(1954)] about an unauthorized external contact between a juror and a government agent, whose official position "beyond question carries great weight with a jury," *Parker* [*v. Gladden*], 385 U.S. [363,] 365 [(1966)], that contact has a "tendency to . . . influence" the verdict, and the trial court must presume the external contact prejudiced the defendant unless the government provides contrary evidence. *Mattox*, 146 U.S. at 150. This is true whether or not the contact was intentional, *Gold* [*v. United States*] 352 U.S. [985,] 985 [(1957)]; whether or not the contact involved a verbal communication, *Smith* [*v. Phillips*], 455 U.S. [209,] 212 [(1982)]; *Mattox*, 146 U.S. at 150, and whether or not the trial court or defendant "know[s] . . . what actually transpired," *Remmer*, 347 U.S. at 229. Once a potentially prejudicial contact is alleged, the court should "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id*. at 230.

---

[74] Under the AEDPA analysis, circuit precedent is not binding, though it may be instructive, especially if it concerns AEDPA. *See Williams*, 529 U.S. at 412. The cases Respondents cite, and indeed the great majority of cases regarding extrinsic juror communication, do not concern AEDPA but instead federal appellate courts' supervisory role over federal district courts. That authority, however, does not apply directly to state courts. *See Danforth v. Minnesota*, 552 U.S. 264, 289 (2008) ("While we have ample authority to control the administration of justice in the federal courts—particularly in their enforcement of federal legislation—we have no comparable supervisory authority over the work of state judges."); *Smith v. Phillips*, 455 U.S. 209, 221 (1982) ("Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension"). Although, like circuit precedent, supervisory cases may be instructive, habeas courts must be exacting and cautious in distinguishing supervisory portions of such opinions from those concerning the Constitution. *Early*, 537 U.S. at 10 (finding Ninth Circuit had wrongly utilized Supreme Court's supervisory cases to reverse state courts under AEDPA, since they were based on federal supervisory power, not the Constitution, did not apply to state-court proceedings, and their application to state-court proceedings could not be considered "clearly established"); *see also* B. Samantha Helgason, Note, *Opening Pandora's Jury Box*, 89 Fordham L. Rev. 231, 253-54 (2020) (observing that analysis of extraneous communication with jurors claims is markedly different in Section 2254 cases).

Pet'r's Mem. 25 (quoting *Tarango v. McDaniel*, 815 F.3d 1211, 1223-24 (9th Cir. 2016)).

Bomar asserts that even if the deferential AEDPA standard of review applies, the state courts unreasonably applied *Mattox* and successor cases by finding no reasonable likelihood of prejudice arising from the conversation.  He argues that he demonstrated in the PCRA hearing that the conversation had a prejudicial effect because he was accused of a crime of violence, while the Philadelphia gang's threat (the reason for the security measures) was also one of violence. Although the Pennsylvania Supreme Court noted there was no evidence that the deputy suggested Bomar or "his people" were the source of the threat, Bomar argues the deputy's statement would "be accepted by jurors that [Bomar] or his people could harm the jury."  *Id.* at 27. Contrary to the finding of the state high court, he contends one would expect a typical, objective juror to be emotionally disturbed by such information, and thus, that the state court should have found prejudice.  *Id.* at 26-27.

Neither side addresses the presumption of prejudice, despite Bomar's quoting a passage of the Ninth Circuit's *Tarango* opinion that strongly implies it is required at such a hearing, at least in some circumstances, under federal law.  In this case, where the Commonwealth presented no evidence and Bomar presented a bare minimum, the proper allocation of the burden could well be dispositive.  If the burden was properly on Bomar, as both sides agreed in state court, his failure to demonstrate a reasonable likelihood of prejudice properly doomed his claim, as those courts found.  However, if the burden should have been on the government to disprove presumed prejudice, there may be a possibility the state courts unreasonably applied such law.  A brief overview of the key cases and what they require is in order.

*Mattox v. United States*, 146 U.S. 140 (1892), the main opinion upon which Bomar relies, does not concern federal habeas, but instead federal supervisory authority.  It commands that

evidence of extraneous communications should not be ignored but should be heard and considered for the possibility of prejudice, subject to admissibility limitations. There, post-trial juror affidavits indicated a bailiff in charge of the jury commented improperly about the defendant's guilt while the jury was deliberating, and the jury was exposed to newspaper coverage reinforcing that view. The Supreme Court found the district court's refusal to examine and hear that proposed evidence was error: "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox*, 146 U.S. at 150. Itself examining the affidavits, the Supreme Court found the evidence demonstrated prejudice. It therefore reversed and remanded for a new trial. In Bomar's case, the PCRA court did not refuse to examine proposed evidence. Instead, it considered Mertz's declaration at a hearing regarding the allegations and found no prejudice after hearing his testimony. Assuming *Mattox* were to apply despite its supervisory status, the state court's adjudication of this claim was not an unreasonable application of *Mattox.* Nonetheless, *Mattox* itself did not clarify whether a presumption of prejudice must apply not only in a federal hearing but also at a state-court hearing, with the burden on the government to disprove prejudice, or if placing the burden instead on the petitioner/criminal defendant, as was done here with the agreement of counsel for both sides, suffices under the United States Constitution.

In *Remmer v. United States*, 347 U.S. 227 (1954), another non-habeas, supervisory case, an outsider offered money to a juror if he were to find Remmer not guilty. The F.B.I. interviewed the juror while the trial was ongoing and found the outsider's remark was a joke. After learning of this during the trial, the judge conferred with the prosecutor and the F.B.I. but did not include or inform the defendant or his counsel, then dropped the matter. Defense counsel only learned of

it by reading newspapers after the trial and conviction.  As in *Mattox*, the district court refused to receive evidence regarding it, denying counsel's motion for a new trial without holding a hearing.  The Ninth Circuit affirmed, finding Remmer had failed to prove prejudice.  The Supreme Court, however, noting a trial court should not "decide and take final action ex parte on [such] information," remanded the case for a hearing, concluding: "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties."  *Remmer*, 347 U.S. at 229.  The Court instructed the trial court to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."  *Id.* at 230.  After the remand hearing, on a second appeal, this time from the denial of relief after the hearing, the Supreme Court vacated and ordered a new trial, finding evidence from the hearing demonstrated that the defendant had in fact been prejudiced by the incident.  *Remmer v. United States*, 350 U.S. 377, 382 (1956).  Here, the PCRA court held a *Remmer* hearing/voir dire of the juror, finding no prejudice.  That was not an unreasonable application of the hearing requirement of *Remmer*, even if it were to apply despite being supervisory.  Still, *Remmer*, like *Mattox*, did not clarify whether a presumption of prejudice must apply at a state-court hearing, i.e., if it is based in the Constitution rather than in federal supervisory law alone.

The only applicable federal habeas case among the primary United States Supreme Court authorities is *Smith v. Phillips*, 455 U.S. 209 (1982).  In *Phillips*, during the state criminal trial, a sitting juror submitted an application for employment as an investigator in the District Attorney's Office.  When that came to light, also during trial, the state court held a hearing, found the

application had impaired neither the juror's ability to render an impartial verdict nor the defendant's right to an impartial jury, and denied a new trial motion.  On habeas review, the federal district court, however, imputed bias to the juror and ordered a new trial; the Second Circuit affirmed.  The Supreme Court reversed, upheld the presumptively correct findings of the state court, and found that *Remmer* only prescribed "a hearing in which *the defendant* has the opportunity to prove actual bias" for an alleged Fourteenth Amendment due process violation. *Phillips*, 455 U.S. at 215 (emphasis added).  The state court had held such a hearing, at which defendant had failed to prove actual prejudice.  The Court found that, given that hearing, the habeas petitioner was not denied due process by either the juror's conduct or the prosecutor's failure to disclose the job application.  Here, the state courts' denial of Bomar's claim after it held a *Remmer* hearing was not an unreasonable application of *Phillips*.

In *United States v. Olano*, 507 U.S. 725 (1993), another supervisory case, the defendant contended that the improper presence of alternate jurors in the room during jury deliberations had been an inherently prejudicial extraneous influence, although they were instructed not to participate and did not do so.  Reversing the court of appeals' grant of relief, the Supreme Court found this was not inherently prejudicial.  It emphasized that the inquiry at a *Remmer* hearing is whether the actual effect of the extraneous contact was so prejudicial as to have influenced the verdict.  Although the Court noted "[t]here may be cases where an intrusion should be presumed prejudicial," it found no reason to apply a presumption in the case before it.  *Olano*, 507 U.S. at 737-39.  It instructed courts to inquire at such a hearing into how the extraneous communication influenced the verdict, if at all.  *Id.* at 737-741.  The state-court denial of this claim, after Bomar's state-court hearing, at which the presumption of prejudice was not applied, was not an unreasonable application of *Olano*, even assuming that supervisory case were to apply here, in

light of the facts: a single conversation between one juror and one deputy responding to the juror's question to explain the tight security protecting the jury, plus the absence of any evidence indicating that there was any influence on Mertz, any other jurors, or the verdict.

Two other Supreme Court cases round out the line of cases in this area and illustrate the related limits on conduct of court staff or deputies.  In *Turner v. State of Louisiana*, 379 U.S. 466 (1965), a direct appeal from state court, the two main witnesses against the defendant were the same two deputy sheriffs who were in charge of the sequestered jury during the three-day trial. They fraternized with the jury, drove jurors to a restaurant for each meal and to their hotel each night, and ate with, conversed with, and did errands for them.  The defendant moved for a mistrial before the verdict, then filed a post-trial motion on this ground.  The trial court denied both, and the state supreme court affirmed, finding no showing of prejudice.  The United States Supreme Court reversed, concluding the defendant was denied his right to a fair trial by an impartial jury, although there had been no hearing.  The Court found prejudice inherent in permitting the lead witnesses at trial to be the same officers in charge of the jury, emphasizing it was dealing "not with a brief encounter" between the jurors and the two key witnesses, but with "a continuous and intimate association throughout a three-day trial." *Id.* at 473.  It remanded for a new trial without calling for a hearing (or mentioning *Remmer* or *Mattox*).  *Id.* at 473-74.  Here, the deputy who answered Mertz's one-time question did not testify or fraternize with the entire jury throughout. The state courts' denial of Bomar's claim was not an unreasonable application of *Turner.*

In *Parker v. Gladden*, 385 U.S. 363 (1966) (per curiam), a bailiff told jurors that the defendant was a "wicked fellow," and that even if the jury were to make a mistake in finding the defendant guilty, the Supreme Court would correct it.  After a hearing, the state trial court found this prejudicial and granted a new trial, but the Oregon Supreme Court reversed.  Reversing in turn

on direct appeal, the United States Supreme Court reinstated and affirmed the state trial court's grant of relief, approving its post-hearing finding that the error had violated the defendant's Sixth Amendment fair and impartial jury trial right applicable to the states through the Fourteenth Amendment.  Despite the hearing, the Court added that the bailiff's conduct in commenting on the defendant was so egregious that it was "inherently lacking in due process."  *Id.* at 366 (citation omitted).  Certainly, there was no such egregious misconduct here, as the deputy did not opine on guilt nor even mention Bomar at all.

The guidance from the United States Supreme Court reveals a high degree of ambiguity regarding whether a presumption applies at all as a matter of Constitutional law, as well as fact-sensitivity to the prejudice determination in multiple dimensions, including when and how the extraneous communication came to light (e.g., during trial, immediately afterward, or years later, including whether it was pursued with reasonable diligence); of exactly what it consisted (e.g., news coverage, communication with an individual, the content of the communication, and how closely its topic is factually tied to the case itself); at what stage of trial the communication occurred (e.g., pretrial, during trial, during jury deliberations, or later); and others.  *See, e.g.*, *United States v. Fumo*, 639 F. Supp. 2d 544, 554 (E.D. Pa. 2009) (factors include "(1) whether the extraneous information relates to an element of the case decided against the moving party; (2) the extent of the jury's exposure to the extraneous information; (3) the time at which the jury receives the extraneous information; (4) the length of the jury's deliberations and the structure of its verdict; (5) whether the district court properly instructed the jury to consider only evidence presented at trial; and (6) whether there is a heavy volume of incriminating evidence"), *aff'd*, 655 F.3d 288, 304 (3d Cir. 2011).  All factors are important, and no single one is dispositive.  *Gov't of Virgin*

*Islands v. Dowling*, 814 F.2d 134, 138 (3d Cir. 1987) ("The likelihood of substantial prejudice turns on all of the surrounding circumstances.").

Voir dire of currently sitting jurors may easily occur in a hearing during or immediately after trial, but strong policy considerations disfavor post-trial hearings, often years later (as was Bomar's PCRA hearing relevant to this claim), in which former jurors who previously served are required to appear and testify. As articulated by the Supreme Court over a century ago in an oft-quoted passage:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

*McDonald v. Pless*, 238 U.S. 264, 267-68 (1915).

A further complicating factor is the balance between allowing a juror to present evidence of the effect of the external communication on his or her own subjective ability to remain a fair juror, and the necessity for the court to consider the question using an objective, reasonable-juror standard. This is a delicate balance, given both the necessity for the threshold showing before holding such a hearing, per the Supreme Court guidance and the rule against permitting a juror to impeach his or her own verdict (with an exception for testimony regarding extraneous influences, as embodied in Pa. R. Evid. 606(b)).

This overview suffices to show that the cases of the Supreme Court are difficult to reconcile and do not provide a "clear or consistent path for courts to follow," particularly in the federal habeas context. *Lockyer*, 538 U.S. at 72. They have led to a circuit split. *See* B. Samantha

Helgason, Note, *supra*, at 242 (2020) (examining the circuit split and suggesting possible solutions).  Further, "[t]he unique procedural criteria inherent to habeas cases overlay the existing circuit split with even more confusion."  *Id.* at 254; *see also Bey v. Rozum*, No. 13-325, 2015 WL 12618788, *12 (E.D. Pa. Aug. 21, 2015) (finding no clearly established federal law in light of confusion and circuit split on point), *report and recommendation adopted by* 2016 WL 5404455 (Sept. 27, 2016).

This demonstrates not just a possibility for, but a present and actual, disagreement among fair-minded jurists—which in turn renders it extremely difficult for Bomar to demonstrate an unreasonable application of this confused area of law.  *See Esparza*, 540 U.S. at 17 ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best ambiguous."); *Lockyer*, 538 U.S. at 71.

The Court finds that, per *Phillips*, in the unique Section 2254 habeas context, and under the particular circumstances presented here, a state court that holds a *Remmer* hearing such as the one Bomar's PCRA court held satisfies Fourteenth Amendment due process.  Further, the Court finds that at such a state-court hearing, it is reasonable to place the burden on the petitioner (i.e., the criminal defendant) to prove a reasonable probability of prejudice in order to show a Sixth Amendment violation, as it was at Bomar's hearing.  *See Ewing v. Horton*, 914 F.3d 1027, 1030-34 (6th Cir. 2019) (federal habeas case; Fourteenth Amendment due process satisfied if state court holds a *Remmer* hearing, and at it, burden is properly on defendant to demonstrate actual prejudice in order to show a Sixth Amendment violation of his rights to a fair trial and an impartial jury); *Tunstall v. Hopkins*, 306 F.3d 601, 610-11 (8th Cir. 2002) (presumption of prejudice applicable in federal *Remmer* hearing is not constitutionally mandated, and states are not obliged to follow it). By following this procedure, the state courts in Bomar's instance did not unreasonably apply or

contradict the holdings of the United States Supreme Court.  *See Laird v. Horn*, 159 F. Supp. 2d 58, 79-80 (E.D. Pa. 2001) (state-court finding, after a PCRA hearing, that petitioner's similar claim of improper comment by tipstaff or deputy to juror failed because he had not demonstrated a reasonable likelihood of jury prejudice, was neither contrary to nor an unreasonable application of United States Supreme Court precedent and was not an unreasonable determination of the facts).

After careful and thorough analysis of the law in light of the Section 2254 habeas posture of the case, and the facts of record to which the Court is limited by the AEDPA under cases such as *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), the Court concludes that Bomar has not carried his burden to demonstrate that the state-court denial of this claim was an objectively unreasonable application of clearly established federal law as embodied in United States Supreme Court holdings beyond any possibility of disagreement among fair-minded jurists.  Nor has he shown it was contrary to those holdings.  *See Tunstall*, 306 F.3d at 611 (finding no violation of AEDPA standards in light of circuit split).

The factual and credibility findings of the state courts, both implicit and explicit, were also eminently reasonable and are fully supported in light of the sparse post-trial evidence presented to the state courts before and at the PCRA hearing.

Because this claim lacks merit, relief will be denied.[75]

### E.      Claim Five

Bomar next argues he was deprived of his right to a fair trial, an impartial jury, and a reliable sentencing procedure under the Sixth, Eighth, and Fourteenth Amendments because the trial court improperly dismissed for cause six prospective jurors who expressed reservations about

---

[75] Further, relief would be unwarranted even if *de novo* review were applicable.  Moreover, Bomar has not demonstrated that this alleged error "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623.

the death penalty but did not demonstrate an inability to follow the law.  Bomar further argues his trial counsel provided ineffective assistance during voir dire by failing to question and rehabilitate these jurors or to object to their removal, and his appellate counsel was ineffective for failing to pursue these issues on direct appeal.   The PCRA court rejected these claims, as did the Pennsylvania Supreme Court, finding the trial court "properly exercised its wide discretion in excusing these jurors for cause" and trial and appellate counsel were not ineffective.  *See Bomar II*, 104 A.3d at 1215.  Because Bomar has not shown the Supreme Court's decision on these issues was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts, relief on this claim will also be denied.

"The Sixth Amendment's guarantee of an impartial jury confers on capital defendants the right to a jury not 'uncommonly willing to condemn a man to die.'"  *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968)).  The state infringes on this right when it excludes prospective jurors for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against it." *Wainwright v. Witt*, 469 U.S. 412, 418 (1985) (citation omitted).  At the same time, the Supreme Court has recognized that the state has a "legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially, and who therefore might frustrate administration of a State's death penalty scheme."  *Id.* at 416.  The standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment seeks to balance these interests.  A juror may be excluded for cause when the juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Id.* at 420 (quoting *Adams v. Texas*, 448

U.S. 28, 45 (1980)). "[B]ut if the juror is not substantially impaired, removal for cause is impermissible." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (citing *Witt*, 469 U.S. at 424).

In applying this standard, "reviewing courts are to accord deference to the trial court," especially where, as here, review of the clam is governed by AEDPA. *Id.* at 7; *see also White*, 577 U.S. at 78 ("[F]ederal habeas review of a *Witherspoon-Witt* claim—much like federal habeas review of an ineffective-assistance-of-counsel claim—must be 'doubly deferential.'" (quoting *Titlow*, 571 U.S. at 15)). Deference is warranted "regardless of whether the trial court engages in explicit analysis regarding substantial impairment" because "the granting of a motion to excuse for cause constitutes an implicit finding of bias," and such findings are "based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Uttecht*, 551 U.S. at 7. The need for deference "does not foreclose the possibility that a reviewing court may reverse the trial court's decision where the record discloses no basis for a finding of substantial impairment." *Id.* at 20. But "when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.'" *Id.* at 7 (alterations in original) (quoting *Witt*, 469 U.S. at 434).

During voir dire, the trial court excused for cause six prospective jurors who expressed opposition to or reservations about the death penalty. The trial court excused the jurors in question after conducting individual voir dire, during which each one stated that he or she would not be able to set aside his or her personal beliefs and impose the death penalty if the law permitted it and the juror honestly believed the evidence warranted it—or, in one case, that the juror would not be able to vote to impose the death penalty under any circumstances, no matter what the facts and law

were.  Although Bomar argues all six jurors were improperly excluded, he addresses the individual

voir dire questioning of only two: Carlo Zippi and Doris Shipley.

During Zippi's voir dire, the trial court addressed the limited circumstances in which a

death sentence may be imposed under Pennsylvania law[76] and then asked whether, understanding

this, Zippi had any "personal or religious, moral, ethical or conscientious beliefs which would

prevent [him] from voting to impose the death penalty under any circumstances at all."  N.T.

9/14/98 at 192-94.  Zippi responded he did, explaining he "d[id]n't believe in the death penalty

and . . . wouldn't want to be a part of that decision on a person's life."  *Id.* at 194.  Zippi also stated

this belief was a personal conviction.  *Id.*  The trial court then asked him, "[u]nderstanding the law

as I've just mentioned it to you, would you be able to set aside those personal beliefs you just

mentioned to me, and if you honestly believe that the evidence warranted it and the law permitted

it, would you vote for it?"  *Id.*  Zippi responded with what the PCRA court, which also presided

over jury selection, characterized as "an unequivocal, 'No.'"  *PCRA Op.*, 2012 WL 9515416, at

*70; *see also* N.T. 9/14/98 at 194.  Neither the Commonwealth nor defense counsel asked any

follow up questions, and when the Commonwealth challenged Zippi for cause, the trial court

granted the challenge without opposition from the defense.  N.T. 9/14/98 at 194-95.

---

[76] The trial court explained that the death penalty could only be considered if the jury were to unanimously find the defendant guilty of first-degree murder, in which case the jury could not impose the death penalty automatically but would be required to consider evidence of aggravating and mitigating circumstances at a second hearing.  N.T. 9/14/98 at 192-93.  The court further explained that, under Pennsylvania law, the death penalty could be imposed only "if the jury unanimously finds that the Commonwealth has proven the existence of a specific aggravating circumstance beyond a reasonable doubt and no mitigating circumstances are found by any juror" or if "both aggravating and mitigating factors have been proven and the jury unanimously finds that one or more of those aggravating circumstances outweigh any mitigating circumstance in this case."  *Id.* at 193.

Shipley brought up her personal opposition to the death penalty before the trial court had an opportunity to ask her about it.  After describing how the logistics of jury service would be handled and the anticipated timeframe for the trial, the court asked Shipley whether there was any "significant or compelling reason why you would not be able to sit as a juror in this case just because of the time frames I've mentioned."  N.T. 9/16/98 at 761.  In response to this question, Shipley volunteered that she did not believe in the death penalty and was "afraid of making a decision that I wouldn't be able to live with."  *Id.*  Shipley also stated she was "very sensitive" and provided several examples, noting she "couldn't even take my dog to have her put to sleep because it bothered me," it "bothered [her] terribly" that she had accidentally killed a cat and a squirrel at some point in her 49 years of driving, and she would "sit down and cry" when she saw deer being shot.  *Id.* at 761-62.  In response to these revelations, the trial court asked Shipley, "[a]re you telling me that, judge, no matter what the facts were, no matter what the circumstances were, no matter what the law was, I just would not be able to vote to impose the death penalty, regardless of what the law is or what the facts are?"  *Id.* at 762.  Shipley responded affirmatively, and the PCRA court also characterized her response as unequivocal.  *PCRA Op.*, 2012 WL 9515416, at *71; *see also* N.T. 9/16/98 at 762.  As with Zippi, neither the Commonwealth nor defense counsel asked any follow up questions, and the trial court granted the Commonwealth's unopposed request to excuse her for cause.  N.T. 9/16/98 at 762.

Bomar argues the voir dire examination of these two jurors failed to establish they would not be able to set aside their beliefs about the death penalty and follow the law because the trial court did not explain that their duty as jurors would be to follow the law as explained by the court and make findings about aggravating and mitigating factors, and did not ask either of them whether they could set aside their personal beliefs and follow the law and the court's instructions.  *See* Pet.

¶¶ 101-102, 104.  Bomar also argues defense counsel was ineffective for failing to probe whether the jurors' beliefs would prevent them from following the law and for failing to object to the Commonwealth's motion to strike, and appellate counsel was ineffective for failing to pursue these issues on direct appeal.

Without addressing their individual voir dire examination in any detail, Bomar makes a similar argument as to the other four jurors in question.  He asserts the examination of these jurors failed to establish the propriety of striking them for cause because the trial court did not adequately explain their duty as jurors would be to follow the law as explained by the court and because the questioning improperly focused on whether the jurors would be able to set aside their beliefs and impose a death sentence, rather than on whether they would be able to follow the law and the court's instructions.[77]  *Id.* ¶ 100.  He further argues defense counsel was ineffective for failing to adequately rehabilitate these jurors and to object to their exclusion, and appellate counsel was ineffective for failing to pursue these issues on direct appeal.

---

[77] During individual voir dire, the court explained to each of these prospective jurors the limited circumstances in which the death penalty may be imposed under Pennsylvania law and then asked whether they had any personal, religious, or other beliefs that would prevent them from ever considering imposing the death penalty, regardless of the evidence or the law.  N.T. 9/15/98 at 468-71, 533-36, 604-07; N.T. 9/16/98 at 685-89.  Three of the jurors testified that they had personal or religious beliefs that would prevent them from doing so.  N.T. 9/15/98 at 471, 536, 607.  After further questioning, these jurors stated they would not be able to set aside personal or religious beliefs and vote to impose the death penalty, even if they believed the evidence warranted it and the law permitted it.  *Id.* at 471-72, 536-37, 607, 609.  The fourth juror testified she believed the death penalty should be imposed in some cases, but because of her personal beliefs, she did not know whether she could vote for it.  N.T. 9/16/98 at 689.  When asked variations of the question whether she could set her personal beliefs aside and vote for imposition of the death penalty, if she honestly believed the evidence warranted it and the judge told her the law permitted it, the juror gave several different responses, initially stating she did not think she could, then stating she could not vote for it, and then stating she "[p]ossibly" could, before finally stating she did not think she could.  *See id.* at 691-97.  After considering the entirety of her testimony, the court granted the Commonwealth's motion to exclude that juror for cause.  *Id.* at 698-99.

The PCRA court rejected these claims.  The court noted that, prior to individual voir dire, all prospective jurors were advised that they would be asked about "their opinions and personal beliefs to determine ultimately whether, as jurors[,] they could put aside any beliefs or information they might have about the case, follow the law as it would be given by the court and decide the issues in the case based solely on the evidence presented in the trial."  *PCRA Op.*, 2012 WL 9515416, at *70 (citing N.T. 9/14/98 at 7-8).  Then, during individual voir dire, before asking jurors whether they had any personal, religious, or other beliefs that would preclude them from considering imposing the death penalty, the court explained the law in Pennsylvania as to when the death penalty may be imposed, including the need to consider aggravating and mitigating factors and the possible outcomes. *See id.* at *70, *72 (citing N.T. 9/14/98 at 192-94).  The PCRA court noted this questioning was designed to "inform each juror regarding the law so that his ability to follow that law could be ascertained" and confirmed that, for each juror struck for cause,

> the court determined, based on the questions posed and the answers given, the demeanor and level of equivocation or lack thereof, whether [the juror's] personal beliefs would prevent or substantially impair the particular juror in the performance of his . . . duties as a juror in accordance with his instructions and . . . oath.

*Id.* at *72.  Insofar as Bomar argued trial counsel was ineffective for failing to rehabilitate these jurors, the PCRA court rejected this argument, finding such efforts would have been futile.[78]  *Id.* (noting the court ruled on the Commonwealth's motions to strike "after having observed these jurors and having seen the physical manifestation that accompanied their verbal responses"). Having rejected Bomar's underlying claim that these jurors were improperly dismissed for cause,

---

[78] Out of the six jurors in question, defense counsel failed to question only Zippi and Shipley.  The PCRA court noted that trial counsel's inquiries of the other four jurors "served only to reinforce the conclusion that the juror was unequivocal in his inability to put personal beliefs aside under the circumstances."  *PCRA Op.*, 2012 WL 9515416, at *72.

the PCRA court found neither trial nor appellate counsel was ineffective for failing to pursue this meritless claim.  *Id.*

The Pennsylvania Supreme Court affirmed, finding the trial court's voir dire inquiry "sufficiently established that the six excused jurors who expressed that they could not vote to impose the death penalty lacked the ability to perform their duties in accordance with the judge's instructions and their oath" and the trial court "properly exercised its wide discretion in excusing these jurors for cause."  *Bomar II*, 104 A.3d at 1215.  The court further found Bomar's claim that trial counsel was ineffective for failing to rehabilitate the jurors also lacked merit.  Finally, having determined Bomar's underlying claim lacked merit, the court also concluded "appellate counsel was not ineffective for failing to raise a claim of trial counsel's ineffectiveness on direct appeal." *Id.*[79]

Bomar argues the Supreme Court's decision that the exclusion of these jurors did not violate his constitutional rights is both an unreasonable determination of the facts and an unreasonable application of clearly established federal law because the questioning of the jurors improperly focused on whether they would be able to set aside their beliefs and *impose a death sentence* rather than on whether their beliefs would impair their ability to *follow the law*, as required under *Witherspoon* and *Witt*.  This argument lacks merit.

The standard for determining whether a prospective juror may be excluded for cause based on the juror's views on capital punishment is whether those views "would 'prevent or substantially

---

[79] The Supreme Court determined Bomar had waived any claim that the jurors were improperly dismissed for cause by failing to object to the Commonwealth's motions to strike, and had waived his ineffective assistance of trial counsel claim by failing to raise it on direct appeal.  *Bomar II*, 104 A.3d at 1214.  The Court thus purported to address only Bomar's claim that appellate counsel was ineffective.  In the course of addressing this claim, however, the Court addressed the merits of Bomar's underlying claim and also addressed his claim of ineffective assistance of trial counsel.

impair the performance of his duties as a juror in accordance with his instructions and his oath.'"
*Witt*, 469 U.S. at 425 (quoting *Adams*, 448 U.S. at 45).  As Bomar notes, the questions posed by
the trial court during voir dire in this case did not precisely track this standard.  Nor were they
required to do so.  The Supreme Court has made clear that voir dire questions "need not be framed
exclusively in the language of the controlling appellate opinion" to support a finding of substantial
impairment.  *See id.* at 433-34.

While Bomar faults the trial court for focusing on the jurors' willingness to impose a death
sentence, the questioning in this case was consistent with phrasing the Supreme Court has upheld
as proper.  In *Darden v. Wainwright*, the Supreme Court held a juror had been properly excused
for cause even though "[t]he precise wording of the question asked of [him], and the answer he
gave, d[id] not by themselves compel the conclusion that he could not under any circumstance
recommend the death penalty," where the juror was "present throughout an entire series of
questions that made the purpose and meaning of the *Witt* inquiry absolutely clear."  477 U.S. 168,
178 (1986).  The Court noted the state trial court had "ask[ed] the proper *Witherspoon* question
over and over again," citing as examples the court's question to one juror "[d]o you hold such
conscientious moral or religious principles in opposition to the death penalty that you would be
unwilling under any circumstances to recommend the death sentence?" and to another, who
answered the first question affirmatively, "[i]n the event that the evidence should be such that
under the law that should be the recommendation you would be unwilling to return such a
recommendation because of your conscientious beliefs?"  *Id.* at 177 n.3.  The Court also noted the
judge "correctly stated the general standard for dismissal" in ruling that a prospective juror who
states that "because of his moral, religious or conscientious principles and beliefs he would be
unwilling to recommend a death penalty, even though the facts and circumstances meet the

requirements of law, . . . in effect has said he would be unwilling to follow the law." *Id.* at 177
n.2.  The federal appellate courts have also routinely found jurors were properly excused for cause
based on questioning or testimony regarding their willingness to impose the death penalty.[80]

The state courts here therefore did not unreasonably apply clearly established federal law
in rejecting this claim.  Nor has Bomar shown the state court's decision is based on an unreasonable
determination of the facts in light of the jurors' responses to the questions posed during voir dire.

---

[80] *See, e.g.*, *United States v. Snarr*, 704 F.3d 368, 379-80 (5th Cir. 2013) (interpreting the *Witt*
standard as permitting dismissal of a prospective juror for cause "if, regardless of the facts and
circumstances of a case, he indicates that he personally could not impose the death penalty" and
finding no abuse of discretion in the dismissal of a juror who responded affirmatively when asked
"whether her 'personal feelings against the death penalty would always prevent [her] from voting
for the death penalty'" and whether "she thought her 'feelings against the death penalty would
substantially impair [her] or prevent [her] from ever voting for it regardless of what the evidence
and the law instructed'"); *Bedford v. Collins*, 567 F.3d 225, 231 (6th Cir. 2009) (holding state trial
court had "ample cause" to excuse jurors who stated they "'definitely' did not think [they] could
sign a death-penalty recommendation, even if the aggravating factors outweighed the mitigating
factors" or "could not sign a verdict recommending the death penalty"); *Beuke v. Houk*, 537 F.3d
618, 638-39 (6th Cir. 2008) (finding no constitutional error in the dismissal for cause of jurors who
either stated unequivocally that they "would not impose the death penalty under any
circumstances" or "would be unable to join a verdict that imposed the death penalty even if
mandated by law"); *United States v. Sampson*, 486 F.3d 13, 39-40 (1st Cir. 2007) (holding the
record "amply supported" the dismissal for cause of a juror who indicated on a juror questionnaire
that she was "opposed to the death penalty, and . . . would have a difficult time voting to impose
it," and who, when asked whether she automatically would vote against the death penalty, stated,
"I can't think of what the government would prove that would make me change my opinion on the
death penalty"); *Martini v. Hendricks*, 348 F.3d 360, 363 (3d Cir. 2013) (upholding on habeas
review a trial court's decision to exclude for cause a juror whose answers during voir dire
"demonstrated that he would have substantial difficulty voting for the death penalty"); *Riley v.
Taylor*, 237 F.3d 300, 308-09 (3d Cir. 2003) (finding "adequate record support" for the trial court's
decision to excuse jurors based on their responses to questioning as to whether they would "be
able to impose the death penalty" (citation omitted)), *vacated on reh'g en banc by* 237 F.3d 348
(3d Cir. 2001), *and decision reinstated in relevant part*, 277 F.3d 261, 273 n.1, 307-09 (3d Cir.
2001) (en banc); *Pitsonbarger v. Gramley*, 103 F.3d 1293, 1303 (7th Cir. 1996) (upholding on
habeas review a trial court's decision to excuse for cause jurors who responded affirmatively when
asked whether they "just couldn't impose the death sentence no matter what the evidence and the
law is" or whether they "just could not impose the death penalty in any case, no matter what the
evidence, circumstances, or the law is"), *vacated on other grounds*, 522 U.S. 802 (1997), *and
decision reinstated in relevant part*, 141 F.3d 728 (7th Cir. 1998).

Because each of the jurors in question was properly excused for cause, Bomar has not shown trial counsel was ineffective for failing to object or that appellate counsel was ineffective for failing to pursue the issue on direct appeal.

Finally, insofar as Bomar argues defense counsel was ineffective for failing to rehabilitate prospective jurors who expressed general objections to the death penalty, he has not shown the state courts' rejection of this claim was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts.  Defense counsel did ask follow-up questions of four of the six jurors at issue, but counsel's efforts to rehabilitate these jurors were ultimately unsuccessful.  Although Bomar suggests counsel "compounded" the trial court's "error" by framing their questions in terms of the jurors' ability to impose a death sentence, Pet. ¶ 100, this argument lacks merit for the reasons set forth above. While defense counsel did not pose follow-up questions to the remaining two jurors (Zippi and Shipley), both were "unequivocal" in their assertions that they would not be able to vote to impose the death penalty, no matter what the circumstances, and regardless of the facts and the law.  *PCRA Op.*, 2012 WL 9515416, at *70-71.  Bomar offers no reason to believe further questioning of these jurors would have elicited a different response; hence, the state courts did not err in rejecting this claim.  *See Hale v. Gibson*, 227 F.3d 1298, 1319 (10th Cir. 2000) (holding counsel was not ineffective for failing to rehabilitate jurors whose responses to questioning made clear they could not impose the death penalty regardless of the evidence or the facts presented where petitioner advanced no evidence to suggest further cross-examination would have been helpful); *Foster v. Delo*, 39 F.3d 873, 878 (8th Cir. 1994) (rejecting a claim that trial counsel was ineffective for failing to rehabilitate jurors who unequivocally stated they could not in any circumstances consider

the death penalty as "it was reasonable for . . . trial counsel to conclude that there was no point in attempting to rehabilitate these two jurors").

Bomar is therefore not entitled to relief on this claim.

## F.      Claim Six

Bomar also maintains the trial court erred in denying him the right to "life-qualify" potential jurors during voir dire by prohibiting defense counsel from questioning jurors about the types of mitigating evidence they would or would not consider. Bomar raised this claim on direct appeal, but the Pennsylvania Supreme Court rejected it, finding the trial court had life-qualified the jury through its own questioning and did not err in disallowing the additional questions posed by defense counsel. *Bomar I*, 826 A.2d at 846-49. Bomar argues the state court's resolution of the claim was both contrary to and an unreasonable application of the United States Supreme Court's decision in *Morgan v. Illinois*, 504 U.S. 719 (1992), and was based on an unreasonable determination of the facts in light of the state court record.

Before the Pennsylvania Supreme Court, Bomar identified three instances when defense counsel was precluded from questioning prospective jurors about mitigating circumstances. *See Bomar I*, 826 A.2d at 847-49. Bomar relies on the same three exchanges here.[81]

---

[81] On direct appeal, Bomar argued the trial court erred in prohibiting counsel from questioning prospective jurors about both specific aggravating and specific mitigating circumstances. *See* Resp'ts' Ex. Z at 19-24, ECF No. 47-16. Because Bomar failed to identify any instances when he attempted to question a prospective juror about the potential aggravating circumstances in his case or was prevented from doing so, the Supreme Court found he was not entitled to relief on this aspect of his claim. *Bomar I*, 826 A.2d at 847. In his federal habeas petition, Bomar again alleges he was "prevented from informing the jurors at voir dire of the precise [aggravating] circumstances" the Commonwealth intended to pursue and "to question them about the potential impact of these circumstances on their ability to follow the court's instructions." Pet. ¶ 110. Again, however, Bomar does not identify any instances when he attempted to question prospective jurors about the potential aggravating circumstances, and, in his memorandum, he argues only that he was improperly precluded from questioning jurors about particular mitigating circumstances

The first exchange occurred during the examination of juror number 8:

[Defense Counsel]:  If you were chosen as a juror in this case would you want to hear or would you consider evidence of the Defendant's childhood as supported by the facts?

[Prosecutor]:  Objection.

[The Court]:  Sustained.  This would be the mitigating.  I've ruled on that.

[Defense Counsel]:  Oh, okay.  I don't have any other questions.

N.T. 9/14/98 at 202.

The second exchange occurred during the examination of juror number 9:

[Defense Counsel]:  Are there circumstances, the judge talked about mitigating circumstances and aggravating circumstances, are there, some mitigating circumstances may be presented by the defense.  That would include the defendant's character or the defendant's record, the defendant's good deeds. Would these types of circumstances be considered by you?  Would they be considered by you or would you consider them irrelevant if you had to make a decision?

[Prosecutor]:  I object, your Honor.

[The Court]:  The objection is sustained as asked.  You can't ask him what his conclusion's going to be under a set of circumstances that don't yet exist.

[Defense Counsel]:  Your Honor, I simply want to find out if these types of circumstances would be considered irrelevant by the juror.

[The Court]:  Well, I think you need to ask him in the right context.  And let me add to what your question is.  If you need to supplement it, you may.  If the law told you, I told you, that the law said, look, these are the mitigating circumstances that you may consider if you believe evidence is presented. Would you fail to follow the law and at least consider [what] I told you was to be considered by you?

[Juror Number 9]:  Yes, sir, if it was presented in evidence and it was for our consideration, I would consider it, yes.

---

that might have led them to vote for a life sentence.  Pet'r's Mem. at 34.  The Court therefore construes Bomar's claim to be limited to the three exchanges addressed by the Supreme Court.

[Defense Counsel]:  Okay.  Thank you.  I have no other questions.

*Id.* at 209-10.

The third exchange involved juror number 13:

[Defense Counsel]:  Ma'am, do you believe that the death penalty is warranted in every First Degree Murder case?

[Juror Number 13]:  No.

[Defense Counsel]:    Okay.    Would  you  consider  circumstances  about  the Defendant, if it came to a situation where we're in a sentencing hearing, would you consider, would you be able to consider circumstances about the Defendant if the judge instructed you to listen to those circumstances?

[Juror Number 13]:  Could you repeat that?

[Defense Counsel]:  Sure.  Would you be able to consider circumstances about the Defendant in a sentencing hearing if the judge instructed you to consider those circumstances?  Are there any circumstances that you would not be able to consider.

[The Court]:  I think we've got two questions now.

[Defense Counsel]:    Are there any circumstances about the Defendant, any defendant, in a sentencing hearing that you would find irrelevant or would not consider?

[Prosecutor]:  Objection, your Honor.

[The Court]:  Sustained.

[Defense Counsel]:  Despite the judge instructing you to consider that?

[Prosecutor]:  Objection.

[The Court]:  Well, the first question, the objection has been sustained so there's nothing to tag the end line.  Let me ask a question and then I'll give you another chance.  If the Defendant's convicted of First Degree Murder, and only if the Defendant's convicted of First Degree Murder, what I will do is tell the jury that they must consider the evidence, if any, of aggravating circumstances and the evidence, if any, of mitigating circumstances.  And I'm going to tell the jury these are the factors that you must consider.  These are the aggravating factors that have been presented and these are the mitigating factors that have been

presented.  And you must consider the evidence that's been presented with
respect to each one of those in making your determination.  Would you do that?

[Juror Number 13]:  Yes.

[The Court]:  Follow my instruction and do that?

[Juror Number 13]:  Yes.

[The Court]:  Okay.  That's all the question is.

[Defense Counsel]:  Are there any circumstances, generally speaking, that you
would not be able to consider that you would find irrelevant.

[Prosecutor]:  Objection.

[The Court]:  Sustained.

[Defense Counsel]:  I have no further questions.

*Id.* at 249-52.

On direct appeal, Bomar argued the trial court erred in prohibiting his counsel from
questioning prospective jurors about their ability to consider particular kinds of mitigating
evidence that he planned to present at sentencing.  In making this argument, Bomar relied in part
on *Morgan v. Illinois*, in which the United States Supreme Court recognized that, based on the
requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a
defendant in a capital case is entitled both to challenge for cause any prospective juror who will
automatically vote for the death penalty in every case, regardless of the facts or the court's
instructions, and to adequate voir dire to enable him to identify such persons.  *See* 504 U.S. at 729-
34.  Citing *Morgan*, Bomar argued to the Pennsylvania Supreme Court that to determine whether
prospective jurors could give weight to mitigating evidence, he should have been permitted to ask
them "about their ability to weigh not only 'mitigating evidence' in the abstract, but also particular

133

kinds of mitigating factors which [he] planned to present at a sentencing hearing."  Resp'ts' Ex. Z
at 22-24, ECF No. 47-16.

As noted, the Pennsylvania Supreme Court rejected the claim.  The Court recognized that,
pursuant to *Morgan*, if a defendant "wishes to life qualify any or all venirepersons, . . . the *voir
dire* procedure must include such an inquiry."  *Bomar I*, 826 A.3d at 846.  But the Court noted that
the trial court had, in fact, made the required inquiry, having "specifically queried each of the
jurors ultimately seated . . . whether they would automatically impose the death penalty simply
because a defendant had been convicted of first-degree murder, and each juror answered that he or
she would not automatically impose the death penalty in this instance."  *Id.* at 846-47.  As to the
additional questioning defense counsel sought to pursue, the Court held these questions were
properly disallowed because they were "not relevant in seeking to determine whether the jurors
would be competent, fair, impartial and unprejudiced," but instead "sought to gauge the efficacy
of potential mitigation strategies" by eliciting how the jurors would react to certain types of
mitigating evidence.  *Id.* at 849.  The Court also noted that, in place of counsel's "inappropriate
questions," the trial court asked "appropriate general questions which revealed that the jurors . . .
would consider all the evidence, both aggravating and mitigating, and follow the court's
instructions."  *Id.*

Bomar argues the Pennsylvania Supreme Court's decision on this claim was both contrary
to and an unreasonable application of clearly established federal law as set forth in *Morgan*.  The
Court disagrees.

As stated above, in *Morgan*, the United States Supreme Court held that during voir during
in a capital case, a defendant is entitled, upon request, to "inquiry into whether a potential juror
would automatically impose the death penalty upon conviction of the defendant."  504 U.S. at 721.

The Court also held that general questions regarding a prospective juror's ability to "be fair and impartial" or to follow the court's instructions on the law are insufficient for this purpose. *Id.* at 724, 736. As the Court explained, "[a]ny juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of the law" because he "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id.* at 729, 735. Yet such a juror "could, in good conscience, swear to uphold the law[,] . . . unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *Id.* at 735. Accordingly, "[a] defendant on trial for his life must be permitted on *voir dire* to ascertain whether his prospective jurors function under such misconception." *Id.* at 735-36.

Although the Court in *Morgan* recognized that a juror to whom mitigating factors are irrelevant should be disqualified for cause because "that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial," the Court had no occasion to address what, if any, inquiry regarding jurors' ability to consider mitigating evidence would be constitutionally required. *Id.* at 739. The defendant in the case had requested only that the trial court ask all prospective jurors whether, if they found him guilty, they would automatically vote to impose the death penalty. *Id.* at 723. And the Court held the defendant was entitled to have that inquiry made. *Id.* at 739.

Following *Morgan*, at least one circuit has interpreted the case to "mandate[] that a capital defendant be allowed to make an essential inquiry at voir dire: the prospective jurors' ability to give due consideration to mitigating evidence at sentencing." *Richmond v. Polk*, 375 F.3d 309, 330 (4th Cir. 2004) (internal quotation marks and citation omitted). But courts have rejected the notion that *Morgan* mandates inquiry regarding jurors' views as to specific mitigating factors. *See*

*Hodges v. Colson*, 727 F.3d 517, 529 (6th Cir. 2013) (holding *Morgan* does not require a trial court

to "ask[] questions about the specific aggravating and/or mitigating factors actually at issue in a

case" because such questions are not an "attempt[] to identify members of the venire who would

*always* vote for the death penalty" but are an "attempt[] to preview how prospective jurors will

vote given the specific facts of the individual case"); *Sellers v. Ward*, 135 F.3d 1333, 1341 (10th

Cir. 1998) ("[A] trial court is not 'required . . . to allow inquiry into each juror's views as to specific

mitigating factors as long as the voir dire was adequate to detect those in the venire who would

*automatically* vote for the death penalty.'" (quoting *United States v. McCullah*, 76 F.3d 1087, 1114

(10th Cir. 1996))).

   In arguing the Pennsylvania Supreme Court's decision was contrary to *Morgan*, Bomar

asserts, without elaboration, that the Court "did not apply the proper standard under *Morgan*."

Pet'r's Mem. 34.  Although a petitioner may satisfy the "contrary to" prong of § 2254(d)(1) by

showing the state court "applie[d] a rule that contradicts the governing law set forth in [the

Supreme Court's] cases," *Williams*, 529 U.S. at 405, Bomar has not made such a showing here.

For purposes of § 2254(d)(1), "'[c]learly established Federal law' . . . includes only 'the holdings,

as opposed to the dicta, of [the Supreme] Court's decisions.'"  *White v. Woodall*, 572 U.S. 415,

419 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2014)).  Here, the trial court asked the

question expressly required by *Morgan*, inquiring whether jurors would automatically impose the

death penalty simply because a defendant had been convicted of first-degree murder.  *Bomar I*,

826 A.2d at 846; *see also* N.T. 9/14/98 at 201, 207-08, 248.  The state court's disallowance of

questions regarding jurors' willingness to consider specific mitigating factors was not "contrary

to" the holding of *Morgan* within the meaning of § 2254(d)(1).  *See Ochoa v. Davis*, 50 F.4th 865,

881 (9th Cir. 2022) (noting "*Morgan* established the minimum constitutional requirement to life-

qualify a jury, . . . [but] left unanswered whether any case-specific inquiry is appropriate to determine whether a juror can consider both a life and a death sentence in a particular case"); *Trevino v. Johnson*, 168 F.3d 173, 183 (5th Cir. 1999) (interpreting *Morgan* as "only 'involv[ing] the narrow question of whether, in a capital case, jurors must be asked whether they would automatically impose the death penalty upon conviction of the defendant'" (citation omitted)).

Nor has Bomar shown the state court's decision involved an unreasonable application of *Morgan*. Trial courts enjoy considerable discretion in conducting voir dire. "The Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury." *Morgan*, 504 U.S. at 729. As the state court recognized, in addition to asking jurors whether they would automatically impose the death penalty, the trial court advised jurors 9 and 13 that they would be instructed on mitigating circumstances to consider and asked the jurors whether they would consider evidence of those mitigating circumstances as instructed by the court. While not as extensive as in some other cases, similarly general questioning regarding jurors' ability to consider mitigating circumstances has been held constitutionally sufficient in other cases. *See United States v. Whitten*, 610 F.3d 168, 183-84, 186 (2d Cir. 2010) (holding trial court's refusal to ask prospective jurors how relevant the defendant's childhood and background would be when making a decision about punishment did not amount to constitutional error; also holding questioning that apprised jurors they would determine the sentence based on various factors, including the defendant's character and background, was constitutionally sufficient); *Richmond*, 375 F.3d at 330-31 (holding questions such as whether, in reaching a "determination about the appropriate sentence to vote for, either life or death," jurors would "be able to give fair consideration to mitigating circumstances" were constitutionally sufficient). While some courts have *permitted* more extensive questioning about jurors' ability to consider evidence of various

types of mitigating evidence (as opposed to whether jurors would consider the evidence mitigating), Bomar cites no authority suggesting such questioning is *required* by *Morgan*.  Bomar has not shown the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103; hence, the state court's decision did not involve unreasonable application of clearly established federal law.

Bomar also argues the state court's decision was based on an unreasonable determination of the facts in light of the state court record because, contrary to the state court's finding, the disallowed questions were not aimed at gauging jurors' reactions to potential mitigation for strategic reasons but merely sought to determine whether jurors would give consideration to certain types of mitigation.  Numerous courts have recognized that *Morgan* does not require a trial court to allow questions about how a potential juror would vote based on specific types of aggravating or mitigating evidence.  *See, e.g.*, *Richmond*, 375 F.3d at 330 ("*Morgan* does not require that a capital defendant be allowed to determine at *voir dire* what a prospective juror's sentencing decision will be if presented with a specific state of evidence of circumstances."); *Sellers*, 135 F.3d at 1341-42 (holding "whether prospective jurors would find specific facts mitigating . . . is not equatable to whether a juror would refuse to consider mitigation of any kind").  Consistent with these cases, the Pennsylvania Supreme Court observed that "[n]either counsel for the defendant nor the Commonwealth should be permitted to ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion as to what his decision will likely be under certain facts which may be developed in the trial of the case."  *Bomar I*, 826 A.2d at 849.  The state court's finding that defense counsel's attempted questioning of juror 8 was improper was not objectively unreasonable, as the question whether the juror "would want to hear" evidence of

138

Bomar's childhood could reasonably be understood as an attempt to gauge not just the juror's ability to consider such evidence but whether the juror would be receptive to the evidence. While the questions defense counsel sought to pose to jurors 9 and 13 were less obviously inappropriate, when the prosecutor objected, the trial court asked "appropriate general questions" as to these jurors' ability to consider evidence of mitigating circumstances in accordance with the court's instructions.  *See id.*  Even if the state court's conclusion that counsel's questions were inappropriate was unreasonable, the questions were not constitutionally required, so Bomar is not entitled to relief.

### G.    Claim Seven

Bomar next argues his conviction and death sentence violate the Sixth, Eighth, and Fourteenth Amendments because they were imposed based on unreliable and misleading DNA evidence, trial counsel was ineffective in challenging this evidence, and appellate counsel was ineffective in failing to raise the issue on appeal.  The state courts rejected these claims, primarily on the basis that the expert Bomar relied on to establish the unreliability of the DNA evidence was not credible.  Because, among other reasons, the state courts' credibility finding was not objectively unreasonable, these claims also lack merit.

At trial, the Commonwealth presented evidence that Bomar's DNA profile matched the DNA profile developed for the male fraction of the vaginal swabs taken from Willard and that the frequency with which that profile occurred in the population was extremely low—only one in 1.6 billion for the Caucasian population, one in 500 million for the African American population, and one in 800 million for the Hispanic population.  The Commonwealth presented this evidence through three expert witnesses: Sarah Kucherer,[82] a forensic DNA analyst at the Pennsylvania

---

[82] When she testified at trial, Kucherer used the surname Gotwald.

State Police Crime Lab in Greensburg who performed the DNA testing on the vaginal swabs; Christine Tomsey, the DNA laboratory manager at that same lab; and Christopher Basten, Ph.D., an expert in population genetics and statistics related to DNA analysis.

Kucherer testified regarding the two types of DNA testing she performed in the case— preliminary chain reaction (PCR) testing and restriction fragment length polymorphism (RFLP) testing. Bomar's federal habeas claims focus on the Commonwealth's evidence regarding the results of the Crime Lab's RFLP testing. At the time the testing was done, RFLP testing was more discriminating than PCR testing but required more and higher quality DNA, whereas PCR testing was less discriminating but could be performed on small or degraded stains. N.T. 9/28/98 10-11, 18. Kucherer initially performed PCR testing because, when she extracted DNA from the swabs, the samples were small and low levels of sperm were detected. *Id.* at 33, 56. She developed a DNA profile for the male fraction of the swabs, obtaining results in each of the six genetic locations tested. *Id.* at 60. After completing PCR testing, Kucherer extracted more DNA using more of the swabs and was able to obtain a sufficient quantity to proceed with RFLP testing. *Id.* at 56. Although RFLP testing also tests six genetic locations,[83] Kucherer obtained results in only three of those locations: D1S7, D4S139, and D5S110. *Id.* at 62-63. The remaining three locations— D2S44, D10S28, and D17S79—yielded no results because of the low level of DNA present, and Kucherer therefore deemed them inconclusive. *Id.* at 62-64.

---

[83] Kucherer explained that while PCR and RFLP testing each test six genetic locations, the two tests look at "completely different areas of the DNA molecule." N.T. 9/28/98 at 62.

In July 1997, after the DNA testing of the vaginal swabs was completed,[84] Kucherer received a blood sample from Bomar and performed PCR and RFLP testing on the sample. *Id.* at 58-59. She determined Bomar's DNA profile matched the profile developed for the male fraction of the swabs in all six genetic locations tested by PCR testing and that the probability of finding that same profile in an unrelated individual was one in 5,400 from the Caucasian population, one in 2,110 from the African American population, and one in 3,240 from the Hispanic population. *Id.* at 60-62. Kucherer also determined that Bomar's DNA profile matched the profile developed for the male fraction of the swabs in all three locations for which results could be obtained through RFLP testing. *Id.* at 63. She testified that the probability of finding the same partial RFLP profile in an unrelated individual was one in 3 million for the Caucasian population, one in 2.3 million for the African American population, and one in 2.4 million for the Hispanic population. *Id.*

During Kucherer's testimony, the Commonwealth, using an overhead projector, showed the jury the autorads[85] depicting the results of the RFLP testing for one of the three genetic locations—D5S110—for which Kucherer determined that Bomar's DNA matched the DNA for the male fraction of the vaginal swabs. *See id.* at 65-69. Using the two autorads (one showing the

---

[84] Kucherer received the vaginal swabs on August 15, 1996. N.T. 9/28/98 at 35. The PCR testing of the swabs was completed by October 1, 1996, when Kucherer's PCR report was issued. *Id.* at 51. The RFLP testing was begun the following month, in November 1996, and continued for some time thereafter as Kucherer gave the sample additional time to develop due the low level of DNA. *See id.* at 28, 57, 96. Although Kucherer's RFLP report was not issued until September 1997, she analyzed the results of the RFLP testing using a computerized sizing program on May 13, 1997, before Bomar became a suspect in the case. *Id.* at 57, 69.

[85] An autorad is "a piece of X-ray film upon which the pattern of DNA fragments—similar to a supermarket bar code—collected from testing is recorded." *Bomar II*, 104 A.3d at 1205 n.22 (quoting Norah Rudin & Keith Inman, *An Introduction to Forensic DNA Analysis* 74 (2d ed. 2002)); *see also* N.T. 9/28/98 at 23 (explaining that the "end product" of RFLP testing is X-ray film with a series of dark bands "similar to bar codes in appearance").

results of the RFLP testing of the vaginal swabs and the other showing the results of the RFLP testing for Bomar's sample), Kucherer explained how she determined there was a match, first by visually comparing the DNA bands for the male fraction of the swabs to the DNA bands for Bomar's sample, and then by using a computerized sizing program to determine whether the bands met the criteria for a match. *Id.* at 68-69. Kucherer noted the bands on the autorad for the male fraction of the swabs were faint and explained the faintness was due to the low levels of seminal material. *Id.* at 66. When asked whether the autorads for the two other genetic locations for which she determined there was a match—D1S7 and D4S139—were similar to the autorads for D5S110, Kucherer responded they were, noting "[t]here were bands from the male fraction of Q3 which matched the blood labeled as Arthur Bomar's on those two autorads as well. So there were similar results." *Id.* at 116.

On cross-examination, defense counsel questioned Kucherer's determination that there was a match at D5S110, contrasting the faintness of the bands for the male fraction of the vaginal swab (which counsel referred to as "a shadow of a band") with the dark bands for Bomar's sample and pointing out the failure of the bands from the two autorads to line up exactly and the existence of other marks in the lane for the male fraction that Kucherer claimed were not bands. *See id.* at 88-89, 92-93. Counsel did not object to the Commonwealth's use of an overhead projector to show the D5S110 autorads to the jury, nor did he challenge Kucherer's assertion that the results for the matching autorads not displayed to the jury—D1S7 and D4S139—were "similar" to the results for the D5S110 autorads.

The Commonwealth also presented expert testimony from DNA laboratory manager Tomsey, who reviewed Kucherer's reports and the underlying case file, including the autorads,

and agreed with Kucherer's results.[86]  *Id.* at 166-67.  Finally, the Commonwealth called Dr. Basten, an expert in population genetics and statistics related to DNA analysis, who calculated an overall population frequency statistic for the combined DNA profile developed for the male fraction of the vaginal swabs through both forms of testing.  *Id.* at 202-04.  Dr. Basten opined that the frequency with which the combined DNA profile would appear in the population was one in 1.6 billion for the Caucasian population, one in 500 million for the African American population, and one in 800 million for the Hispanic population.  *Id.* at 205-06.

Although defense counsel retained Cellmark Diagnostics, Inc., a private DNA testing lab, to review the DNA evidence before trial, counsel did not present any countervailing expert testimony because the expert he consulted agreed with the conclusions of the Pennsylvania State Police Crime Lab.  Lisa Grossweiler, a senior DNA analyst at Cellmark, conducted a review of the work done by the Crime Lab and performed independent PCR testing of the vaginal swabs.[87] N.T. 1/20/11 at 14, 16, 22, 29-30.  After completing her review and testing, Grossweiler advised defense counsel she "did not identify any errors in the processing of the case or in the results or conclusions reached by the Greensburg DNA Laboratory."  PCRA Ex. C18 (9/10/98 letter from Grossweiler to Much); *see also* N.T. 1/20/11 at 27-28.  As to the Crime Lab's RFLP testing, Grossweiler reported that "[a]fter reviewing the autoradiograph copies generated by the Greensburg DNA Laboratory . . . , very faint bands were observed in the DNA banding pattern obtained from the vaginal swabs using the single-locus probes D1S7, D4S139, and D5S110"; that,

---

[86] Tomsey explained that the Crime Lab had a two-level review process whereby, after a report was completed, the report and the entire case file were reviewed first by another scientist and then by the DNA laboratory manager.  *Id.* at 166-67; *see also id.* at 32.

[87] Grossweiler performed only PCR testing because she was unable to extract enough DNA for RFLP testing.  N.T. 1/20/11 at 29-30.

in her opinion, "these faint bands d[id] visually match the corresponding bands observed in the

DNA banding pattern obtained from the blood swatch from Arthur Bomar"; and that there was "no

indication of DNA from another individual."[88]  PCRA Ex. C18 (9/10/98 letter from Grossweiler

to Much); *see also* N.T. 1/20/11 at 31, 57.  She also reported that the results of her independent

PCR testing supported the State Police Crime Lab's conclusion that the DNA from the male

fraction of the vaginal swabs matched Bomar's DNA.  N.T. 1/20/11 at 30-31.  Defense counsel

understood that if called to testify, Grossweiler would have stated she "agreed with the

Pennsylvania State Police Crime Lab."  N.T. 11/5/08 at 167.

After trial, Bomar's appellate counsel, Steven Leach, retained Paul Goldstein, Ph.D., a

professor of genetics and forensic science at the University of Texas at El Paso and an expert in

the field of forensic and DNA analysis, to review the DNA evidence in the case.  After reviewing

the materials Leach sent to him, including photocopies of autorads, Dr. Goldstein wrote to Leach

in July 1999 and outlined three potential issues he had identified with the DNA testing done by

---

[88] In conducting her review of the RFLP testing done by the Pennsylvania State Police, Grossweiler reviewed "first generation" copies of the autorads—i.e., copies of the originals—as the originals were retained by the Crime Lab.  N.T. 1/20/11 at 17.  Had the autorad copies been of insufficient quality for her to analyze, Grossweiler would have contacted defense counsel to obtain better copies or to arrange to view the originals, but she had no need to do so in this case.  *Id.* at 18, 20. Defense counsel also understood that if there was a need for the original autorads, Cellmark would request them.  N.T. 11/5/98 at 167-68.  Because the lab had no question as to whether there was a match based on the copies, however, counsel was not asked to provide anything further.  *Id.* at 168.
     When Grossweiler later testified during the PCRA hearings, she acknowledged that on one of the three autorads for the male fraction that the State Police Crime Lab labeled a match (D1S7), she was able to see only one of the two bands observed by the Crime Lab on the copy she had. N.T. 1/20/11 at 23, 27.  Given the low level of DNA in the sample and the faintness of the bands, Grossweiler's inability to see the one of the bands did not concern her, and she did not mention it to defense counsel.  *Id.* at 23-25, 28, 40.

the State Police Crime Lab.[89]  N.T. 10/20/09 at 27-28, 30; PCRA Ex. P75.  Leach did not follow

up with Dr. Goldstein after receiving his letter, N.T. 10/20/09 at 30, and did not raise any issues

regarding the DNA evidence on appeal.

Dr. Goldstein later became re-involved in this case at the request of PCRA counsel and

testified during the PCRA proceedings.   In advance of his PCRA testimony, Dr. Goldstein

reviewed the original autorads at the State Police Crime Lab in Greensburg.  N.T. 10/20/09 at 41.

Based on his examination, Dr. Goldstein disagreed with the Crime Lab's conclusion that Bomar's

DNA matched the male fraction of the vaginal swabs at D1S7, D4S139, and D5S110.  *Id.* at 47,

55.  Viewing the autorads for these three genetic locations on an overhead projector during the

PCRA hearing, Dr. Goldstein testified there was no match at either D1S7 or D4S139, noting there

were no "discrete bands" in the lane for the male fraction of the vaginal swabs on the autorad for

D1S7 and there was "nothing" in the lane for the male fraction on the autorad for D4S139.  *Id.* at

43-44, 47.  Although Dr. Goldstein observed "a variety of different markings" in the lane for the

male fraction on the autorad for D5S110, he opined it was not possible to tell whether the markings

were bands and the autorad was therefore "arguably inconclusive, but . . . still unreliable."  *Id.* at

44-45, 47, 51.  Dr. Goldstein also disagreed with Kucherer's trial testimony that the results for the

D1S7 and D4S139 autorads were similar to the results for the D5S110 autorads.  *Id.* at 52.[90]

---

[89] In his letter, Dr. Goldstein first noted there were problems with the data for two of the autorads that the Crime Lab found yielded no results—D10S28 and D2S44—both of which reflected issues with "overload in the amount of DNA placed on the gel" and/or overexposure of the film, as well as underload of DNA.  PCRA Ex. P75.  Second, he identified certain limitations of the specific PCR test used by the Crime Lab—the DQ Alpha test—including that the test lacked "specific probe for the 1.2 locus, yet this locus was used to determine the relationship of Mr. Bomar to this case."  *Id.*  And third, Dr. Goldstein noted the possibility there might be DNA fragments too long or too short to be detected by the Lab's tests.  *Id.*

[90] With regard to the three autorads the Crime Lab deemed inconclusive—D2S44, D10S28, and D17S79—Dr. Goldstein disagreed these autorads could properly be considered inconclusive since

On cross-examination, Dr. Goldstein acknowledged he had not viewed the autorads using a light box,[91] the standard means of providing proper illumination of autorads, either at the State Police Crime Lab or in court. *Id.* at 61-62. Although he requested a light box during his visit to the Crime Lab, the Lab no longer had one, as it had stopped doing RFLP testing some years earlier. *Id.* at 61, 82, 84; N.T. 2/1/10 at 129. As a result, Dr. Goldstein viewed the autorads using only the "regular lights in the room" for illumination at the Crime Lab and using an overhead projector in court. N.T. 10/20/09 at 61; *see also* N.T. 2/1/10 at 128-29. Dr. Goldstein also agreed the issues he identified with the Crime Lab's RFLP testing were not "protocol issues" but reflected his disagreement with the Lab's interpretation of the test results. N.T. 10/20/09 at 81.[92]

---

there was no data on them. N.T. 10/20/09 at 39, 47-50; *see also id.* at 85 (explaining the term inconclusive "can only be used when there is something to see"). Whether properly characterized as inconclusive or a containing no results, these autorads were not declared a match and were not used either to include or to exclude Bomar as a possible contributor of the male DNA on the vaginal swabs. As he had done in his letter to appellate counsel in July 1999, Dr. Goldstein again criticized the Crime Lab's technique, noting the autorads for D10S28 and D2S44 reflected problems with overload in the amount of DNA placed on the gel or overexposure of the film, causing an overlapping of certain bands, as well as problems with underload of DNA, resulting in the absence of data where bands would be expected to develop. *See id.* at 33-41.

[91] As Sarah Kucherer explained, a light box is a source of even, consistent, high-intensity light such as that used for viewing X-rays. N.T. 2/1/10 at 39-40.

[92] Dr. Goldstein disagreed with the results of the Crime Lab's PCR testing, opining that the Lab's use of the 1.2 locus to find a match between the male fraction and Bomar's sample was improper because the DQ Alpha test used by the Lab could not detect a 1.2 allele. N.T. 10/20/09 at 75-78. He further opined the use of the 1.2 locus rendered the PCR test results unusable in their entirety because the Lab was "calling a phantom allele that they can't see." *Id.* at 96.

Kucherer and Grossweiler disagreed with Dr. Goldstein on this point, testifying that protocols used by the FBI, the Pennsylvania State Police Crime Lab, and Cellmark—as well as the DQ Alpha test manufacturer's own protocols—allowed an analyst to conclude the 1.2 allele was present based on deduction, and that this was an accepted method in the field of forensic DNA analysis. N.T. 2/1/10 at 44-47; N.T. 1/20/11 at 35-36, 71, 77. Dr. Goldstein acknowledged the existence of these protocols used by accredited labs, but stated he disagreed with them. N.T. 10/20/09 at 77-78, 91 (referring to published papers in peer reviewed journals "discussing the impertinence of using 1.2 in a forensic DNA case").

The Commonwealth presented three experts to rebut Dr. Goldstein's PCRA testimony.

Sarah Kucherer described the Crime Lab's protocols for "calling" results from an autorad and confirmed that the protocols were followed in this case.[93]   She also testified that, after reviewing the file in light of Dr. Goldstein's comments and testimony, she continued to believe to a reasonable degree of professional certainty the results she generated in the case were accurate. N.T. 2/1/10 at 57-58.   When asked on cross-examination about the decision to show only the D5S110 autorad to the jury, Kucherer explained the presentation was "intended to show the Jury what an autorad looks like and what, in this particular case, we were dealing with" in terms of the faintness of the samples and the bands.  *Id.* at 82-83.   She also testified that, given "the limitations of the viewing conditions" at trial—i.e., a "lower power overhead projector system"—the autorad selected was the one "which showed the strongest bands."  *Id.* at 84.   Kucherer conceded she did not tell the jury the D5S110 autorad had stronger bands than the two others declared a match but instead told the jury that the results for the other two were similar to the results for D5S110.  *Id.* However, she continued to maintain the results for all three autorads were, in fact, similar, explaining that while the intensity of the bands on the D1S7 and D4S139 autorads was "slightly" weaker, all three autorads were "in the same range" as "[t]hey were all very weak."  *Id.* at 84-85.

The Commonwealth also presented testimony from Beth Anne Marne, the supervisor at the State Police Crime Lab in Greensburg who conducted the first-level review of the RFLP testing

---

Although Bomar raised issues regarding the PCR testing in his PCRA petition, he did not pursue those issues on PCRA appeal and does not raise them in his federal habeas petition.

[93] Specifically, Kucherer described the controls employed to ensure the testing was being done correctly, the characteristics necessary to visually identify a band on an autorad, the process by which bands were sized using an FBI computer-assisted imaging program, and the Crime Lab's internal review process whereby all results in the RFLP process are independently reviewed by another analyst.  *See* N.T. 2/1/10 at 23-28, 30-31.

performed by Kucherer in this case.[94]   N.T. 2/1/10 at 119.   As part of her review, Marne

independently evaluated the autorads for bands and then used the computer-assisted program to

assign a numerical value to the bands, all without knowing Kucherer's results.   *Id.* at 120.   She

also evaluated whether the Crime Lab's protocols had been followed.   *Id.*   Marne testified that,

based on her independent evaluation, she reached the same conclusions as Kucherer regarding both

the presence of bands on the autorads and the degree of match between the RFLP profile for Bomar

and for the male fraction of the vaginal swab.   *Id.* at 121, 124.   She also determined that the Lab's

protocols had been followed by Kucherer.   *Id.* at 120, 124-25.   She further testified that, after

reviewing the case file more recently, it was her opinion to a reasonable degree of professional

certainty that the results generated by the Crime Lab for the RFLP testing were highly accurate.

*Id.* at 138.

Finally, the Commonwealth called Lisa Grossweiler, who testified regarding the work she

performed at the request of defense counsel in this case, as discussed above.   Grossweiler also

stated that the opinions she provided to defense counsel before trial had not changed based on the

additional training and education she had received since the time of the trial.[95]   N.T. 1/20/11 at 33,

76.

All three Commonwealth witnesses addressed the importance of using a light box to

analyze autorads.   Kucherer explained that a light box is the optimal means of observing autorads

because it provides an even, consistent, high intensity source of light, whereas an overhead

---

[94] At the time she worked on this case, Marne's surname was Giles.   N.T. 2/1/10 at 118.   By the time she testified during the PCRA hearings, Marne was the forensic DNA manager and technical leader at the Greensburg Crime Lab.   *Id.* at 106.

[95] At the time she testified at the PCRA hearings, Grossweiler was employed by the FBI as a DNA examiner in the Federal DNA Database Unit.   N.T. 1/20/11 at 4.

projector provides inconsistent illumination that loses intensity and resolution in the projection process.  N.T. 2/1/10 at 39-41.  Kucherer also noted that use of a light box was required under national and Greensburg Crime Lab protocols.  *Id.* at 40.  Grossweiler testified that while DNA bands could be seen on an autorad using an overhead projector if they were strong, a projector is a substandard means of analyzing autorads, and a light box would be necessary in a case like this one involving very faint bands.  N.T. 1/20/11 at 32-33, 65-66.  Although Grossweiler was able to observe all but one of the bands identified by the Greensburg Crime Lab when she viewed the autorad copies at Cellmark using a light box, when shown the original autorads using an overhead projector during the PCRA hearings, she was unable to identify the bands on the projection.  *See id.* at 23, 27, 32, 62-69.  While Marne testified that she was able to see bands on the autorads without a light box, she agreed that a light box would be required for forensic DNA analysis.  N.T. 2/1/10 at 128-30, 132-33, 145.

Based on Goldstein's testimony, Bomar argues the DNA evidence presented at trial failed to meet a minimum standard of reliability and his conviction and death sentence imposed on the basis of this evidence violate the Due Process Clause of the Fourteenth Amendment.  Pet'r's Mem. 36-37.  He further argues his trial counsel was ineffective in responding to the Commonwealth's DNA evidence in several respects: in failing to effectively cross-examine Kucherer regarding her comparison of the D5S110 autorad for the male fraction of the vaginal swabs to the D5S110 autorad for Bomar; in failing to challenge Kucherer's testimony that the autorads for D1S7 and D4S139, the other two genetic locations for which she determined there was a match, were similar to the results for D5S110; and in failing to object to the misleading presentation of DNA evidence to the jury using an overhead projector.  Pet. ¶¶ 125-26; Pet'r's Mem. 37.  Bomar also argues his appellate counsel was ineffective for failing to raise this issue on appeal.  Pet. ¶ 127; Pet'r's Mem.

¶¶ 37-38.  He contends that "[h]ad both trial and appellate counsel effectively challenged the DNA evidence, the jury could have heard compelling evidence that none of the RFLP autorads reliably matched Petitioner," or, "[a]t a minimum, that two of the three purported matches should not have been declared matches."  Pet. ¶ 128.

The PCRA court and the Pennsylvania Supreme Court rejected Bomar's claims regarding the DNA evidence.  The PCRA court found Bomar's challenge to the accuracy and validity of the DNA evidence presented at trial was waived because defense counsel failed to object to the admission of the evidence at trial and failed to raise the issue on direct appeal.  *PCRA Op.*, 2012 WL 9515416, at *24.  Nevertheless, the PCRA court also found Bomar had failed to prove the Commonwealth's DNA evidence was "false, misleading or 'overstated'" because the evidence showed the DNA testing was conducted in accordance with generally accepted standards and protocols, and Dr. Goldstein's testimony that the test results reported by the Crime Lab and confirmed by Cellmark were inaccurate was not credible.  *Id.* at *24, *28-29.  In addressing Dr. Goldstein's testimony, the PCRA court emphasized that Dr. Goldstein did not find fault with the Crime Lab's protocols and that, while he disagreed with the Lab's conclusions regarding the existence of a DNA match at D1S7, D4S139, and D5S110, in reaching his own conclusions, he reviewed the autorads not under forensic laboratory conditions using a light box but in ambient office light and, later, using an overhead projector.  *Id.* at *28-29.

The PCRA court specifically rejected any claim that the use of an overhead projector to display the autorads to the jury rendered Kucherer's testimony either false or misleading, noting the jury was not asked to determine "either whether DNA bands existed on the autorads that were developed from the vaginal swabs or whether they matched bands developed from Petitioner's known DNA sample," as these were matters "that clearly required both expert analysis and

testimony." *Id.* at *29.  The court concluded that although an overhead projector is a "substandard and inappropriate" means for an expert to analyze RFLP autorads, that did not preclude use of a projector as a visual aid.  *Id.*

Having found the Commonwealth's DNA evidence was not false or misleading, the PCRA court also rejected the claim that trial counsel was ineffective in failing to challenge this evidence, finding Bomar's evidence failed as to each of the three prongs of Pennsylvania's ineffective assistance of counsel test—i.e., that the underlying substantive claim had "arguable merit," counsel "did not have a reasonable basis for his actions or failure to act," and "Petitioner suffered prejudice as a result of counsel's deficient performance."  *See id.* at *24 (citing *Commonwealth v. Martin*, 5 A.3d 177, 183 (Pa. 2010)).[96]  The PCRA court further found that trial counsel reasonably relied on "the findings of a qualified independent expert [Grossweiler] who confirmed the [Greensburg Crime Lab's] findings regarding RFLP test results," noting that, because Cellmark's findings were damaging, counsel "chose to challenge the chain of custody of the Petitioner's DNA samples to attack the reliability of the DNA evidence," rather than offering expert testimony on the issue.  *Id.* at *27.

On appeal, the Pennsylvania Supreme Court agreed Bomar had "waived his underlying challenges to the validity of the Commonwealth's DNA evidence and the manner in which this evidence was presented" by failing to object at trial.  *Bomar II*, 104 A.3d at 1207.  The Supreme Court also agreed that, in light of the PCRA court's rejection of Dr. Goldstein's testimony as not credible, Bomar's claim based on that testimony—that counsel was ineffective for failing to

---

[96] The Third Circuit has repeatedly held that Pennsylvania's ineffective assistance of counsel test is consistent with *Strickland* "because it requires 'findings as to both deficient performance and actual prejudice.'"  *Tyson v. Superintendent Houtzdale SCI*, 976 F.3d 382, 391 (3d Cir. 2020) (quoting *Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 476 (3d Cir. 2017)).

challenge the results of the Commonwealth's DNA testing and analysis—lacked merit. *Id.* And because the underlying ineffective assistance of trial counsel claim was meritless, appellate counsel was not ineffective for failing to raise the claim on direct appeal. *Id.*

Bomar argues the Pennsylvania Supreme Court's conclusion that counsel was not ineffective is contrary to and an unreasonable application of clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented in state court. Specifically, Bomar contends the Supreme Court's determination that his underlying due process claim was meritless was based on an unreasonable determination of the facts because it was unreasonable to conclude that Goldstein was not credible when he opined that the autorads were inconclusive. Bomar further argues the Supreme Court's conclusion that counsel was not ineffective because the underlying constitutional claim was without merit is an unreasonable application of clearly established law.

As to the underlying due process claim, Bomar has not shown the state courts' rejection of this claim was based on an unreasonable determination of the facts. As noted, in concluding this claim lacked merit, the Pennsylvania Supreme Court relied on the PCRA court's finding that Dr. Goldstein's testimony was not credible insofar as he opined the State Police Crime Lab's interpretation of the RFLP test results was inaccurate. This credibility finding was not objectively unreasonable in light of the evidence presented in the PCRA proceedings, nor has Bomar rebutted the statutorily applicable presumption of its correctness by clear and convincing evidence. The state courts declined to credit Dr. Goldstein's testimony about the results of the State Police Crime Lab's RFLP testing because his disagreement with the Crime Lab was not based on any protocol issues but on interpretation of the autorads, which he did not review under standard forensic laboratory conditions. All four experts who testified about the RFLP test results during the PCRA

proceedings, including Dr. Goldstein, agreed a light box is the "standard means of providing proper illumination of autorads."  N.T. 2/1/10 at 61.  Kucherer, Marne, and Grossweiler also agreed a light box would be required for forensic analysis.  N.T. 2/1/10 at 40, 128-30; N.T. 1/20/11 at 32-33, 65-66.  Indeed, as noted, because the bands on the autorads for the vaginal swabs in this case were very faint, Grossweiler "needed every bit of light" to see them and was only able to identify them using a light box.  *See* N.T. 1/20/11 at 27, 32-33, 62-69.  Given this consensus, at a minimum, reasonable minds could disagree as to Dr. Goldstein's credibility.  Hence, the state courts' finding that Dr. Goldstein's testimony was not credible is not objectively unreasonable, and the conclusion that Bomar's underlying due process claim lacked merit is not based on an unreasonable determination of the facts.[97]  *See Brumfield*, 576 U.S. at 314 (holding a state court factual determination is entitled to deference under § 2254(d)(2) if "[r]easonable minds reviewing the record might disagree about the finding in question" (alteration in original) (quoting *Wood*, 558 U.S. at 301)).

Even if it was unreasonable for the state courts "to discount in total" Dr. Goldstein's testimony, which represented "what defense counsel could have presented to counter the prosecution's misleading presentation at trial," Pet'r's Mem. 39, that testimony still falls short of establishing that the admission of the Commonwealth's DNA evidence rose to the level of a due process violation, even under de novo review.  A petitioner seeking to establish a due process violation based on the admission of unreliable evidence at trial faces a high bar.  "The Constitution

---

[97] Bomar notes Dr. Goldstein was "forced" to view the autorads without a light box because, although he requested one, the Crime Lab did not provide it.  Pet'r's Mem. 38.  But there is nothing in the record to suggest the Lab intentionally deprived him of this necessary equipment.  On the contrary, Marne explained that, when Dr. Goldstein came to the Lab, he "requested equipment which was not requested before his visit," including a light box, which the Lab was unable to provide because it no longer had one.  N.T. 2/1/10 at 145-46.

153

. . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit," through, for example, "the Sixth Amendment rights to counsel, compulsory process, and confrontation plus cross-examination of witnesses." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) (internal citations omitted).  The Due Process Clause imposes a constraint on the admission of evidence "[o]nly when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

In *Lee v. Superintendent Houtzdale SCI*, for example, the Third Circuit held a habeas petitioner could prevail on a claim that his conviction violated due process because it was based on inaccurate and unreliable evidence from fire experts only if he showed "that the admission of the fire expert testimony undermined the fundamental fairness of the entire trial because the probative value of [the fire expert] evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission."  798 F.3d 159, 162 (3d Cir. 2015) (alteration in original) (quoting *Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012)).  The court found this standard satisfied where the petitioner's conviction was based almost entirely on expert evidence that even the prosecution conceded had become invalid due to scientific developments since the petitioner's trial. *Id.* at 166-67.

Here, in contrast, Dr. Goldstein did not raise any issues regarding the State Police Crime Lab's protocols with regard to RFLP testing but instead disagreed with the Lab's (and Cellmark's) interpretation of the results of that testing.  N.T. 10/20/09 at 62-63, 81.  Even after reviewing the test results in light of Dr. Goldstein's comments and testimony, however, Kucherer, Marne, and Grossweiler all continued to believe the results generated by the Crime Lab were accurate. *See*

N.T. 2/1/10 at 57-58, 138; N.T. 1/20/11 at 33, 76-77.  Dr. Goldstein's testimony thus establishes only a disagreement among qualified experts as to whether the autorads showed a DNA match at D1S7, D4S139, and D5S110.  Such "[d]isagreements among experts [are] not unusual," *Davido v. Beard*, No. 06-917, 2021 WL 3051904, at *8 (E.D. Pa. July 20, 2021), and the one here does not show the admission of the Commonwealth's DNA evidence rendered Bomar's trial fundamentally unfair.

Bomar also argues the DNA evidence violated due process because the Commonwealth's presentation of the evidence was misleading in that the prosecution showed the autorads to the jury "through unreliable and substandard means"—i.e., an overhead projector.  Pet. ¶¶ 120, 125.  As noted, the PCRA court rejected this claim, finding that while an overhead projector may be a substandard means of conducting forensic analysis of autorads, that did not preclude the prosecution from using a projector as a visual aid to assist the jury in understanding Kucherer's testimony.  *PCRA Op.*, 2012 WL 9515416, at *29.  The Pennsylvania Supreme Court cited the PCRA court analysis approvingly on PCRA appeal.  *Bomar II*, 104 F.3d at 1207.  Bomar does not address the state courts' analysis on this point, nor has he shown the state courts' rejection of this claim was contrary to or based on an unreasonable application of clearly established federal law, or that it was based on an unreasonable determination of the facts.[98]

---

[98] Instead, Bomar argues misleading testimony deprives a defendant of a fair trial, citing *Troedel v. Wainwright*, in which a district court found a prosecutor's knowing use of misleading expert testimony rendered the petitioner's trial fundamentally unfair.  667 F. Supp. 1456, 1458-60 (S.D. Fla. 1986), *aff'd*, 828 F.2d 670 (11th Cir. 1987).  *Troedel*, however, is inapposite.  There, the prosecution pressed its expert to opine that one of two defendants charged with the same murders had fired the murder weapon, despite knowing that this opinion was not based on the results of testing performed by the expert—or on any scientific certainty or even probability—as the expert had previously concluded gunpowder residue from the defendants' hands suggested both could either have discharged a firearm or been in close proximity to a discharging firearm.  Here, in contrast, Kucherer's opinions regarding the results of the RFLP testing never changed and were confirmed by Tomsey at trial and by Marne and Grossweiler during the PCRA hearings.  During

As to Bomar's ineffective assistance of counsel claims, the Pennsylvania Supreme Court found no merit to Bomar's claim that trial counsel was ineffective for failing to challenge the results of the DNA testing and analysis because that claim was based on Dr. Goldstein's expert opinion, which the PCRA court rejected as not credible.  *See Bomar II*, 104 A.3d at 1207.  The Court further found "appellate counsel was not ineffective for failing to raise this meritless claim on direct appeal."  *Id.*

Bomar argues the Pennsylvania Supreme Court's conclusion that counsel could not have been ineffective because "the underlying constitutional claim" lacked merit is both contrary to and an unreasonable application of clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented in state court.  Pet'r's Mem. 37-38. As an initial matter, while the Supreme Court rejected Bomar's ineffective assistance of appellate counsel claim on the basis that the underlying ineffective assistance of trial counsel claim was meritless, the Court did not reject the ineffective assistance of trial counsel claim because Bomar's underlying due process claim lacked merit.[99]  Instead, the Court rejected the claim because it was

---

Kucherer's trial testimony, the prosecution used an overhead projector to display to the jury the D5S110 autorad for the male fraction of the vaginal swabs, and Kucherer pointed out what she identified as faint bands in the relevant lane.  N.T. 9/28/98 at 66.  Although Dr. Goldstein disagreed that the markings on the autorad were bands, and although there was some disagreement among the Commonwealth's PCRA witnesses as to whether bands could be identified without a light box, the disagreement on both matters does not establish that the use of an overhead projector at trial amounted to a due process violation.  Notably, defense counsel used the faintness of the bands on the projection to his advantage, urging the jury to question whether they existed.

[99] Bomar does not argue trial and appellate counsel were ineffective for failing to challenge the DNA evidence on due process grounds.  Nor could he prevail on such a claim as the underlying due process claim lacks merit for the reasons stated above.  *See, e.g.*, *Real*, 600 F.3d at 309-10 (holding trial counsel is not ineffective for failing to raise a meritless claim); *Sanders*, 165 F.3d at 253 ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument."); *Parrish v. Fulcomer*, 150 F.3d 326, 328 (3d Cir. 1998) (holding appellate counsel is not ineffective for failing to raise an issue "when convincing Supreme Court case law shows it to be without merit").

based on Dr. Goldstein's expert opinion regarding the results of the State Police Crime Lab's RFLP testing, which the PCRA court rejected as not credible. Although Bomar argues otherwise, the state courts' finding that Dr. Goldstein's testimony was not credible is not objectively unreasonable, nor is there clear and convincing evidence in the record to rebut the presumption of its correctness, for the reasons set forth above.

As to whether the Supreme Court's rejection of Bomar's ineffective assistance claim based on this credibility finding was contrary to or an unreasonable application of clearly established federal law, Bomar argues trial counsel was ineffective in three respects—in failing to effectively cross-examine Kucherer regarding her comparison of the D5S110 autorads shown to the jury, in failing to challenge her testimony that the D1S7 and D4S139 autorads produced results similar to those for the D5S110 autorads, and in failing to object to the prosecution's use of an overhead projector to display autorads to the jury. Pet. ¶¶ 125-26.

Bomar's claim that counsel's cross-examination regarding the D5S110 autorads was deficient is based entirely on Dr. Goldstein's opinion that the D5S110 autorad for the male fraction was at best inconclusive and could not reliably be called a match to Bomar's profile. *See* Pet. ¶¶ 122-23. The state courts' rejection of Dr. Goldstein's testimony as not credible was therefore a sufficient basis for the courts to find this claim lacked merit and appellate counsel was not ineffective for failing to raise it. *See Eichinger v. Wetzel*, No. 07-4434, 2019 WL 248977, at *35 (E.D. Pa. Jan. 16, 2019) (finding state courts' conclusions that counsel were not ineffective for failing to present mitigation evidence was not an unreasonable application of *Strickland* where the state courts found the expert and lay testimony on which the petitioner relied to support the claim not credible and the petitioner failed to rebut the presumption of correctness by clear and

convincing evidence in the state courts); *Fowler v. Mooney*, No. 14-1768, 2015 WL 7007772, at *8 (E.D. Pa. Aug. 31, 2015) (rejecting claim that trial counsel was ineffective for failing to call an expert witness based on the PCRA court's finding that, had the witness testified, the court, sitting as trier of fact, would have rejected the testimony as not credible based on other evidence in the record), *report & recommendation adopted by* 2015 WL 6955434 (E.D. Pa. Nov. 9, 2015).  Bomar cites no clearly established federal law that the state courts contravened or applied unreasonably in rejecting this claim.

Even if the state courts' rejection of this claim were unreasonable and de novo review were to apply, Bomar still cannot prevail because he cannot show counsel performed deficiently in cross-examining Kucherer regarding the D5S110 autorads.  On the contrary, at the time of trial, defense counsel had no reason to question Kucherer's conclusion that Bomar's DNA matched the DNA for the male fraction of the vaginal swabs at any of the three genetic regions that Kucherer declared a match: he had consulted with a qualified expert who, after reviewing the Crime Lab's work and conducting independent PCR testing of the vaginal swabs, agreed with Kucherer's conclusions.  The PCRA court recognized as much, noting "it was reasonable for counsel to rely on the findings of a qualified independent expert who confirmed the [Pennsylvania State Police] findings regarding RFLP test results."  *PCRA Op.*, 2012 WL 9515416, at *27.  And while the Pennsylvania Supreme Court did not cite this aspect of the PCRA court's analysis, it is nevertheless correct, as the Commonwealth notes.  *See* Resp'ts' Mem. Opp'n 68-69 ("Clearly, prior counsel could not be ineffective for failing to 'counter' the Commonwealth's DNA evidence where independent testing by competent experts hired by petitioner revealed the Commonwealth's evidence to be reliable, accurate, and inculpatory of petitioner."), ECF No. 45-2.

In preparing for trial, defense counsel recognized the importance of the DNA evidence to the Commonwealth's case, took steps to educate himself about that body of evidence, and employed an independent lab—Cellmark—to assist him in determining whether there was any way to attack or otherwise discredit the State Police Crime Lab's work.  N.T. 11/5/08 at 162-63, 167.  Based on his independent research, counsel determined Cellmark was a reputable lab.  *Id.* at 163.  He also chose Cellmark because the lab had done both prosecution and defense-side work, and had been hired by the District Attorney's Office in the past, which would make it more difficult for the prosecution to discredit its findings.  *Id.* at 162.  Counsel provided Cellmark with all materials requested and spent a day at the lab, interviewing the scientists and observing their work.  *Id.* at 164, 166.  The results of Cellmark's analysis and additional testing, however, were not helpful to the defense, as the lab expressed no concerns or doubts about the State Police Crime Lab's results, and, if called to testify, lab personnel would have said they agreed with the Crime Lab.  *Id.* at 164-65, 167; *see also* PCRA Ex. C18 (8/18/98 letter from Much to Grossweiler).  Based on Cellmark's analysis, which counsel had no reason to doubt, counsel determined he would address the DNA evidence by attacking the chain of custody of the evidence that was tested rather than the testing procedure.[100]  N.T. 11/5/08 at 83-84, 169, 189.  Nevertheless, counsel also cross-

---

[100] In closing, defense counsel highlighted conflicting testimony from prosecution witnesses as to the number of vials of Bomar's blood that were drawn and the number delivered to the Crime Lab in Philadelphia for use in preparing the sample that was then used to perform DNA testing of Bomar's blood.  Counsel noted that while the technician who drew Bomar's blood testified he drew *two* vials of blood, another witness (a detective) testified he retrieved *four* vials of blood from the technician and brought them to the Crime Lab, and an evidence-receiving clerk in the Philadelphia Police Department's Forensic Chemistry Laboratory, also testified she logged in four tubes of blood samples from Detective Baker.  *See* N.T. 9/30/98 at 46-48; *see also* N.T. 9/22/98 at 242-45, 248-49; N.T. 9/23/98 at 6-8.  These samples were then used by a forensic scientist in the Crime Lab to prepare a sample for DNA testing.  *See* N.T. 9/22/98 at 255-59.  Based on this discrepancy, counsel argued it was not clear *whose* blood was used to prepare the sample and that it could have come from other "criminals and killers, rapists in custody" in the City of Philadelphia.

examined Kucherer about the faintness of the bands on the autorad for the male fraction of the vaginal swabs (which he referred to as a "shadow of a band"), the existence of other markings in the lane for the male fraction which Kucherer claimed were not bands, and the fact that RFLP testing relies on visual inspection to identify bands in the first instance, later using these points to urge the jury to question the validity of the RFLP testing. *See* N.T. 9/28/98 at 88-89, 92-93; N.T. 9/30/98 at 37-39.

The Third Circuit has recognized that "lawyers can and often do reasonably rely on experts, especially in navigating a field in which they have no training." *Lesko v. Sec'y Pa. Dep't of Corr.*, 34 F.4th 211, 243 (2022). Indeed, "[t]he selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (second and third alterations in original) (quoting *Strickland*, 466 U.S. at 690). Here, there is no evidence that counsel's selection of Cellmark was inappropriate, that Grossweiler was not qualified, or that counsel had reason to question her qualifications or conclusions. *See Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001) (finding it "objectively reasonable" for trial counsel to rely on his expert, a trained psychologist, where there was no evidence the expert was incompetent or that counsel had any reason to question his professional qualifications). Nor is there anything to suggest counsel acted unreasonably in not seeking a second opinion. *Cf. Showers v. Beard*, 635 F.3d 625, 633 (3d Cir. 2011) (noting counsel may be ineffective for failing to seek a second opinion "when the facts so warrant[]"). While Dr. Goldstein later offered a different opinion, that disagreement does not render counsel's reliance on Cellmark and Grossweiler unreasonable. Viewing the

---

N.T. 9/30/98 at 49; *see also* N.T. 11/5/08 at 169 (describing trial strategy of challenging the chain of custody to suggest the Commonwealth "test[ed] something that's not [Bomar's]").

challenged conduct from counsel's perspective at the time of trial, counsel reasonably relied on a qualified expert who confirmed the State Police Crime Lab's test results, and there is therefore no basis to conclude counsel was ineffective in cross-examining Kucherer regarding the D5S110 autorads.

Bomar's claim that counsel was ineffective in failing to challenge Kucherer's testimony that the D1S7 and D4S139 autorads produced results similar to those for the D5S110 autorads does not rely entirely on Dr. Goldstein's testimony, but is also based on Kucherer's PCRA testimony that the results for the D1S7 and D4S139 autorads were slightly weaker than those for the D5S110 autorads.[101]  Even on de novo review, however, this claim also lacks merit.  As noted, at the time of trial, defense counsel had no reason to question the State Police Crime Lab's findings that there was a DNA match between the male fraction of the vaginal swabs and Bomar's sample at either the D1S7 or the D4S139 genetic location, as his own independent expert had reported observing faint bands on the autorad for the male fraction of the vaginal swabs that visually matched the bands from Bomar's sample.  Although counsel was not asked during the PCRA proceedings why he did not challenge Kucherer's testimony that the results for all three matching autorads were similar, when asked why he did not present the D1S7 and D4S139 autorads to the jury, counsel explained he did not see any benefit to doing so because it would only serve to underscore that there were three matches.  *See* N.T. 11/5/08 at 169-70 (explaining if he showed the other two autorads to the jury, "[w]ell, now it's three matches[,] [and] the jury looks at it and

---

[101] Insofar as this claim is based on Dr. Goldstein's opinions that there was no match at any of the three genetic locations that the State Police Crime Lab labeled a match, the claim also fails for the same reasons as the claim regarding the D5S110 autorads: first, because the state courts' discrediting of Dr. Goldstein's testimony was a sufficient basis on which to reject the claim, and second, because defense counsel reasonably relied on a qualified expert who confirmed the Crime Lab's findings.

says, okay, that's three").  Lacking any basis to believe the Crime Lab's testing was inaccurate, counsel also pursued a strategy of challenging the chain of custody of the DNA evidence rather than the testing procedure.  *See id.* at 83-85, 169.  Given the circumstances, counsel's failure to highlight what Kucherer later characterized as a "[s]light[]" or "[v]ery slight[]" difference in the intensity of the bands was not objectively unreasonable.

Nor is there a reasonable probability that, had counsel pressed Kucherer on this point, it would have led to a different outcome.  When Kucherer testified that the D1S7 and D4S139 autorads were similar to the D5S110 autorads, she had already acknowledged the bands on the autorads for the male fraction were faint, which she explained was due to the low level of seminal material on the swabs.  *See* N.T. 9/28/98 at 66, 89, 96-97.  During her PCRA testimony, Kucherer agreed the intensity of the bands on the D1S7 and D4S139 autorads was "[v]ery . . . slightly different" from that of the D5S110 autorads, but she continued to assert the results for the autorads for all three genetic locations were similar, in that they were all "still in the same range" as they were all "[v]ery faint."  N.T. 2/1/10 at 84-85.  It is not reasonably probable that, had defense counsel elicited this testimony at trial, the jury's assessment of the Commonwealth's DNA evidence, or the result of the case, would have been any different.

As to Bomar's allegation that counsel was ineffective for failing to challenge the prosecution's misleading presentation of DNA evidence to the jury using an overhead projector, while this claim also does not rely on Goldstein's testimony, it is nevertheless meritless.  As noted, the state courts found there was nothing false or misleading about the Commonwealth's use of an overhead projector to help illustrate Kucherer's testimony, remarking that the fact that a projector is an inappropriate means of performing forensic analysis of autorads does not preclude its use as a visual aid at trial.  *Bomar II*, 104 F.3d at 1207; *PCRA Op.*, 2012 WL 9515416, at *29.  Bomar

does not address this statement, nor has he shown it was contrary to or involved unreasonable application of clearly established federal law, or was an unreasonable determination of the facts. Given the state courts' findings, it is apparent that, had counsel objected to the use of the overhead projector, the challenge would have been unsuccessful.  Even assuming that an objection to the use of an overhead projector would have been sustained, it is not reasonably probable that the result of the proceeding would have been different.  As Kucherer explained in her PCRA testimony, the RFLP evidence could have been presented without showing the jury any of the autorads, as had often occurred in cases in which she testified.  N.T. 2/1/10 at 82.  Alternatively, the prosecution could have used a light box, which would have provided better illumination. Bomar offers no reason to believe there is a reasonable probability that using one of these alternatives would have affected the jury's assessment of the RFLP DNA evidence, or that the jury's verdict would have been any different.

Because Bomar's underlying claim that trial counsel was ineffective in failing to effectively challenge the Commonwealth's DNA evidence lacks merit for the reasons set forth above, his claim that appellate counsel was ineffective for failing to raise the issue on direct appeal also fails as "[t]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument."  *Sanders*, 165 F.3d at 253; *see also Real*, 600 F.3d at 309-10 (same); *Parrish*, 150 F.3d at 328 (same).[102]

---

[102] The Court recognizes that, unlike trial counsel, who consulted an independent DNA expert who confirmed the State Police Crime Lab's analysis, appellate counsel consulted Dr. Goldstein and thus could have obtained the same opinions PCRA counsel later presented, had he pursued the matter.  Even if appellate counsel had done so, however, there is no reasonable probability that this would have provided the basis for a meritorious ineffective assistance of trial counsel claim because it would not have changed the fact that trial counsel reasonably relied on a qualified expert who agreed with the Crime Lab's analysis.

Because Bomar has not shown the state court's rejection of his claims regarding the DNA evidence was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts, and/or because, even under de novo review, the claims lack merit, relief on these claims will be denied.

### H.    Claim Nine[103]

Bomar next argues he was denied a reliable sentencing hearing and effective assistance of counsel at the penalty phase in violation of his Sixth, Eighth, and Fourteenth Amendment rights. He asserts penalty-phase counsel provided constitutionally ineffective assistance by failing to adequately investigate, develop, and present available mitigation evidence regarding his childhood and mental health history, and appellate counsel was ineffective for failing to investigate and present a claim of penalty-phase counsel's ineffectiveness on direct appeal.  The state courts addressed the claim on the merits and rejected it, finding counsel's investigation was reasonable under the circumstances and, even if counsel had uncovered the additional mitigation evidence presented at the PCRA hearings, it was not reasonably probable that that any of the jurors would have voted to return a life sentence.

Bomar argues the state courts' conclusions as to both prongs of the *Strickland* test—i.e., that the scope of counsel's investigation into his background and mental health did not constitute deficient performance and that counsel's failures were not prejudicial—are contrary to and an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1).  The state courts' adjudication of this claim was not contrary to *Strickland*.  As to counsel's investigation and presentation of evidence regarding his childhood and family history, Bomar has not

---

[103] As noted, in his memorandum, Bomar withdrew the claim initially raised as Claim Eight in his habeas petition.

demonstrated the state courts unreasonably applied *Strickland*.  Concerning counsel's failure to obtain available mental health records and provide them to defense mental health experts, the state courts did not directly address the issue, and Bomar has demonstrated counsel's performance may have been deficient in this regard.  However, because Bomar has not shown he was prejudiced by any such deficiencies, even under de novo review, and because both prejudice and unreasonable performance must be shown in order for a *Strickland* claim to have merit, the state-court adjudication that counsel did not provide ineffective assistance remains reasonable under the applicable "doubly deferential" standard of review, and relief on this claim will be denied.  *See Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (emphasizing the "special importance of the AEDPA framework in cases involving *Strickland* claims").

### 1. Penalty-Phase Investigation

As the state courts recognized, this is not a case in which defense counsel simply ignored their obligations and failed to investigate.  Rather, counsel "attempted to conduct a thorough investigation into potential mitigating evidence over the course of several months, hired investigators to assist her with this task," and ultimately presented mitigation evidence, including evidence regarding Bomar's childhood and mental health issues, though less than what PCRA counsel later uncovered.  *Bomar II*, 104 A.3d at 1203.  Because the reasonableness of counsel's investigation is at issue, the Court begins with an overview of counsel's efforts to prepare for the penalty phase.

Bomar was represented at the penalty phase by Shawn McLaughlin, who replaced Mary Welch as penalty-phase counsel in May 1998 when Welch withdrew for personal reasons.[104]  N.T.

---

[104] McLaughlin had worked for the public defender's office and had worked on three other death penalty cases, assisting with mitigation in two of those cases.  N.T. 11/5/08 at 64; N.T. 11/6/08 at

11/6/08 at 17, 105-07; PCRA Ex. P53.  By the time McLaughlin entered the case, Welch had already hired investigators (RBA Associates) and a mental health expert (psychologist Edward Dougherty, Ed.D.) and had also secured funds for a mitigation specialist.[105]  N.T. 3/4/99 at 224; N.T. 11/6/08 at 16-18, 107; PCRA Exs. P50, P57.  In addition, trial counsel, Mark Much, had subpoenaed some of Bomar's prison, employment, and school records, N.T. 3/4/99 at 130-31, and had persuaded Bomar to undergo a psychological evaluation by Dr. Cooke, which was completed on April 30, 1998.  N.T. 11/5/08 at 137-38.  Based on testing administered during the evaluation, Dr. Cooke suspected the presence of organic brain dysfunction and recommended that a full neuropsychological examination be conducted.[106]  N.T. 3/4/99 at 134, 136-37; N.T. 4/20/99 at 118; Cooke Report 4-5, Sept. 18, 1998.  Bomar, however, would not agree to further testing, saying he had no desire to see any more psychiatrists or psychologists but instead wanted to focus on guilt.  N.T. 3/4/99 at 136-37, 143, 145-46, 150, 193.[107]

---

59-61.  She had also attended seminars regarding penalty phase litigation.  N.T. 11/5/08 at 64; N.T. 11/6/08 at 60.

[105] Although Welch had obtained funds for a mitigation specialist, McLaughlin instead used those funds for her investigators, believing she would be able to get more information that way.  N.T. 11/6/08 at 17, 105-06.  McLaughlin was concerned using a mitigation specialist would be cost-prohibitive.  *Id.*  Whereas the court's initial allocation for the mitigation specialist was $1,500, the mitigation specialist the court had authorized Welch to hire told McLaughlin he would need at least 30 hours per family member at a rate of $160 per hour—or approximately $4,800 per family member, more than three times the initial allocation.  *Id.*; PCRA Ex. P57 (April 1, 1998 Order).  McLaughlin did not speak with any other mitigation specialists or ask the court for additional funds before deciding against using a mitigation specialist.  N.T. 11/6/08 at 17, 106.

[106] As noted in the discussion of Claim One above, although Dr. Cooke discussed his findings with Much immediately after the evaluation, he did not prepare a written report until months later, in September 1998.  N.T. 3/4/99 at 133-36.

[107] Much tried to persuade Bomar to undergo further testing, explaining that organic brain damage could support a diminished capacity defense, which might reduce his degree of culpability at the guilt phase.  N.T. 3/4/99 at 136-37.  He also explained organic brain damage would be a viable defense at the penalty phase.  *Id.* at 146.  Bomar was adamant that he did not want to pursue a

From the outset of McLaughlin's representation, Bomar was not interested in presenting mitigation evidence.  N.T. 3/4/99 at 262-63; *see also* N.T. 11/5/08 at 136-37.  When McLaughlin first interviewed Bomar on May 13, 1998, he told her he would help in gathering information but emphasized "he did not, at that time, want to put on a penalty or any kind of defense at a penalty phase.  He was going to concentrate on the guilt phase of this."  N.T. 3/4/99 at 225.  And he consistently said he did not want any further psychological testing.  *Id.* at 263.

McLaughlin pursued the mitigation investigation anyway, looking for evidence that would humanize Bomar by presenting him as someone the jury could relate to, such as a brother, a son, or a friend.  N.T. 11/6/08 at 73.  She also sought to find some way of convincing the jury "that there was something tangible that caused him to do this and that he was a victim too," whether from medical evidence or family history.  *Id.*  Although McLaughlin was "looking for anything," she was "most convinced" that if there was "something physically wrong with him that caused him to do this"—i.e., "an organic dysfunction as opposed to simply a syndrome"—that would be "very compelling for the jury."  *Id.* at 74.

McLaughlin met or talked repeatedly with Bomar and sought information about his family, childhood, and education.  N.T. 3/4/97 at 237, 263.  Bomar provided names of family members and other witnesses to contact and information as to where they might be located.  N.T. 3/4/99 at 237; N.T. 11/6/08 at 70-72.  He also provided information about his schooling.  N.T. 11/6/08 at 52.  But he did not otherwise provide background information about his childhood, instead leading McLaughlin to believe he had a normal family background.  N.T. 11/6/08 at 52, 72.  McLaughlin

---

mental health defense and did not want to present psychiatric or psychological testimony at the penalty phase.  *Id.*  Instead, he maintained his innocence and told Much he wanted to focus on convincing the jury he was not guilty.

also spent many hours with Bomar's mother, Carrie Ganges, and met at length with Ganges's cousin, Mabel Sherman, both of whom gave her names and addresses or states of residence for relatives but provided limited information about Bomar's family history.  N.T. 3/4/99 at 237-38, 269-70; N.T. 11/6/08 at 42, 77-79, 81.  Sherman depicted a family that was well adjusted and had no problems.  N.T. 11/6/08 at 78.  Ganges did not share information about Bomar's childhood with McLaughlin, claiming not to remember what was going on at various points in time.  *Id.* at 81.  McLaughlin had a sense that Ganges was not giving her the full picture.  *Id.* at 43-44.  She was aware there were times during Bomar's youth when he was not in his mother's care.  *Id.* at 81-82.

With investigators,[108] McLaughlin made efforts to locate and interview family members in Pennsylvania, Florida, Nevada, California, Louisiana, and Wisconsin, with limited success.  N.T. 11/6/08 at 119.  While investigators had addresses for some family members, in most instances, they were given only a city and state.  N.T. 4/20/99.  Most family members McLaughlin and investigators were able to contact either claimed to have had minimal contact with Bomar or did not want to get involved.[109]  Other family members either could not be located or did not respond to calls and visits to their homes.[110]  At some point, Much and McLaughlin became aware that

---

[108] McLaughlin worked with RBA Associates, the investigators selected by Welch.  Because as former FBI agents, they were not very experienced in conducting mitigation investigations, McLaughlin provided them with materials on how to do so, as well as specific instructions regarding the witnesses and records she was seeking.  N.T. 11/6/08 at 21-22, 64.

[109] The family members with whom McLaughlin and investigators spoke included Charles Sherman, a brother of Carrie Ganges in Florida, and several family members in Philadelphia, including Catherine and William Burn, Fred Sherman, Fred Sherman, Jr., and William Ganges, Carrie's husband and Bomar's stepfather.  N.T. 3/4/99 at 248-252; *see also* N.T. 4/20/99 at 98-99.  McLaughlin also spoke with Sonny Ganges, Bomar's half-brother, who testified during the penalty phase.  N.T. 11/6/08 at 45-46.

[110] McLaughlin and investigators attempted to contact Margaret Sherman in Florida and Anna Wilson in Nevada, both sisters of Carrie Ganges, but were unable to reach them.  N.T. 3/4/99 at 249-50; N.T. 11/6/08 at 78, 107-08.  Efforts to reach Bomar's sisters Willie Mae in California,

Carrie Ganges was instructing family members not to cooperate with the mitigation investigation. N.T. 11/5/08 at 156; *see also* N.T. 11/6/08 at 82-83 (recounting that one of Carrie Ganges's brothers told investigators he had promised her he would "keep his conversation limited"). When confronted, Ganges would tell McLaughlin "[y]ou don't need to know that" or "they don't want to talk to you." N.T. 11/6/08 at 83. Much also testified that when he told Bomar about the difficulty McLaughlin was having communicating with family members, Bomar stated, "my people aren't talking to anybody about, you know, my childhood. I've directed them that they—I'm not—I didn't do this. My childhood has nothing to do with this." N.T. 11/5/08 at 157.

McLaughlin and investigators also contacted other potential mitigation witnesses, including friends, employers, and Bomar's former wife. N.T. 11/6/08 at 105; N.T. 4/20/99 at 103; N.T. 3/4/99 at 253. For the most part, these witnesses were either unhelpful or did not want to testify. 11/6/08 at 105; N.T. 3/4/99 at 242; N.T. 4/20/99 at 103; N.T. 3/4/99 at 253.

In addition to attempting to identify and locate potential mitigation witnesses, McLaughlin worked with investigators to obtain relevant records for Bomar. McLaughlin had been told by Dr. Dougherty's office that they would need "a copy of all the charges, prior charges, school records, child study team records, and any records from hospitalizations." N.T. 3/4/99 at 225-26. She and investigators worked to locate Bomar's school, medical, prison, employment, and other records. *Id.* at 238-44; N.T. 4/20/99 at 102.

---

Lorraine in Florida, and Betty Ganges in Philadelphia were also unsuccessful. N.T. 3/4/99 at 252; N.T. 11/6/08 at 31-32, 78, 91-92. Although investigators went to Willie Mae's residence, knocked on the door, and left a business card, they were unable to make contact with her. N.T. 11/6/08 at 91-92. McLaughlin also called Willie Mae many times and left messages for her, but never reached or heard back from her. *Id.* at 31-32, 91-92. Investigators were also unable to locate Bomar's brother Alonzo in Nevada and Carrie Ganges's brother Andrew Sherman in Louisiana, despite efforts to do so. N.T. 3/4/99 at 250, 252; N.T. 11/6/08 at 78.

By the end of July 1998, RBA had submitted bills for services rendered significantly in excess of the amount approved by the court at that time. *See* PCRA Ex. P46. McLaughlin instructed RBA to suspend its investigation until additional funds were approved. *See id.*; N.T. 11/6/08 at 22. Around the same time, she also requested that RBA provide an estimate of the cost of completing additional investigative work which she deemed necessary to conduct an effective mitigation investigation. PCRA Ex. P48. This work included locating and/or interviewing a number of family members and other potential witnesses with whom McLaughlin and investigators had not yet made contact (despite efforts to do so) and obtaining additional records.[111] *Id.* Even after she instructed RBA to suspend its investigation, McLaughlin continued to receive information from RBA, though she did not recall the firm submitting additional bills. N.T. 11/6/08 at 98. She also continued to investigate on her own, making additional efforts to contact witnesses, including Bomar's siblings. *See id.* at 31, 78, 91-92; N.T. 3/4/99 at 252-53; PCRA Ex. P48.[112]

McLaughlin also continued to pursue the neuropsychological testing recommended by Dr. Cooke, despite Bomar's resistance to it. In August 1998, Dr. Dougherty met with Bomar to evaluate him but was unable to complete the evaluation because Bomar refused any further testing. N.T. 4/28/09 at 149, 186-87; N.T. 11/6/08 at 65. Before the evaluation, McLaughlin provided Dr.

---

[111] As discussed above, it is clear that McLaughlin and investigators attempted to locate and contact many of these witnesses, though the timing of those efforts is unclear.

[112] In August 1998, McLaughlin filed a petition for payment to RBA, seeking payment of the firm's outstanding bills as well as authorization for RBA to conduct an additional 27 hours of work to complete the investigation. *See* PCRA Ex. P46; PCRA Ex. P47. Although the issue regarding RBA's outstanding bills was not resolved until after trial, the court authorized the 27 additional hours of work in an order dated September 10, 1998, days before the start of jury selection, which McLaughlin did not receive until September 18 or 19. N.T. 11/6/08 at 114-15; PCRA Ex. P50. RBA did not conduct the additional hours of investigation. N.T. 11/6/08 at 115.

Dougherty with records she had compiled to date, as directed by his office.[113]  N.T. 3/4/99 at 244-45.  After seeing Bomar and reviewing the records provided by counsel, Dr. Dougherty told McLaughlin his hypothesis was that Bomar suffered from intermittent explosive disorder.  *Id.* at 151; N.T. 11/6/08 at 66.  McLaughlin did not ask Dr. Dougherty for a report because, after discussing it with Dr. Dougherty, she felt his diagnosis would not be helpful for mitigation purposes.  N.T. 3/4/99 at 248; N.T. 11/6/08 at 66-67, 129-30.  Although Dr. Dougherty recommended additional testing, Bomar would not agree to it.  N.T. 3/4/99 at 268-69.

After numerous attempts, McLaughlin eventually made contact with Joyce Batchelor, Bomar's half-sister, reaching her by phone in September 1998, before trial.  N.T. 11/6/08 at 33-35, 87.  Although Batchelor was initially reluctant to speak, she opened up as the call when on and shared a lot of information about Bomar and their traumatic childhood before ending the call.  *Id.* at 35, 87-89, 102-03; *see also* PCRA Ex. P60.  McLaughlin testified during the PCRA proceedings that Batchelor provided her with the social history she was looking for and confirmed her suspicion that the family was not presenting the whole story.  N.T. 11/6/08 at 89.  Batchelor did not want to testify but reluctantly agreed to do so.  *Id.* at 40-41, 88.

---

[113] By the time he testified in the PCRA hearings in 2009, Dr. Dougherty no longer had a file for Bomar, likely because it had been destroyed in a flood.  N.T. 4/28/09 at 149-51.  He recalled having a "few documents" at the time he saw Bomar but less than what he typically has in a capital case and than what he was later provided by PCRA counsel.  *Id.* at 149, 152, 155-56.  Testifying at a post-trial motion hearing in 1999, McLaughlin stated the records she provided to Dr. Dougherty included presentence reports from Bomar's prior Nevada convictions; violation of parole reports; Dr. Sadoff's psychiatric evaluation from January 1998; medical records from Doylestown Hospital, Crozer Hospital, Montgomery County Prison, and Camp Hill SCI; a classification summary from Montgomery County Prison, including a counselor evaluation and psychological report; and some school records.  N.T. 3/4/99 at 244-45.  The PCRA court credited McLaughlin's testimony in this regard.  *PCRA Op.*, 2012 WL 9515416, at *43.

As trial approached, Bomar became more resistant to presenting a mitigation case, but McLaughlin and Much continued to prevail on him to undergo additional psychological testing. N.T. 3/4/99 at 272-73; N.T. 11/6/08 at 128.  When Bomar finally agreed, jury selection was already underway.  *Id.* at 273.  McLaughlin arranged for Dr. Cooke to evaluate Bomar on September 26, a Saturday, while trial was ongoing.  *Id.*  At Dr. Cooke's request, she provided him with school and other records for Bomar, including earlier evaluations.  N.T. 4/20/99 at 118; 11/6/08 at 138. In the cover letter accompanying the materials, she also noted she had spoken to Bomar's sister, Batchelor, and conveyed some of what Batchelor relayed, including that she had "spoke[n] of sexual abuse to herself by Arthur's father, physical abuse by both Arthur's father and her mother and neglect of Arthur"; that she was "unsure of whether Arthur was sexually abused"; and that "Arthur was sent to live for a number of years with his father in Milwaukee by his mother because she had just met a man."  PCRA Ex. P64.[114]

During the evaluation, Dr. Cooke completed IQ testing of Bomar and administered a battery of tests to assess organic brain dysfunction (the Reitan Neuropsychological Battery).  N.T. 4/20/99 at 120; N.T. 11/6/08 at 154.  He was unable to complete the neuropsychological battery, however, because Bomar became frustrated and refused to complete one subtest which generated multiple scores.  4/20/99 at 120; 11/6/08 at 155-56.

---

[114] McLaughlin testified that before the September 26 evaluation, she sent Dr. Cooke the materials referenced in her September 22, 1998, cover letter to Dr. Cooke (i.e., the same materials she provided by Dr. Dougherty), which also described information she received from Joyce Batchelor. N.T. 11/6/08 at 123-25; PCRA Ex. P64.  Dr. Cooke did not recall McLaughlin's letter, which was not in his file, though he stated he had no doubt that if the letter was sent, he received it.  N.T. 11/6/08 at 182, 243-46, 257-59, 300-01.  He also did not believe he had received all the records referenced in the letter before the September 26 evaluation, but he acknowledged he did receive the records before testifying at trial.  *Id.*  Crediting McLaughlin's testimony, the PCRA court found the September 22 letter and the materials referenced therein were sent to Dr. Cooke before the September 26 evaluation.  *PCRA Op.*, 2012 WL 9515416, at *46.

Dr. Cooke conveyed the results of the evaluation to McLaughlin on September 28, explaining that while Bomar's test results were consistent with organic brain dysfunction, he displayed variable attention and motivation during the testing, raising questions about the validity of the results.  N.T. 3/4/99 at 232; N.T. 4/20/99 at 123-24, 129-30.  As a result, Dr. Cooke could not reach a final conclusion until he received the results of a "Validity Indicator Profile," an assessment designed to identify valid and invalid responses, which had been sent away for separate computer scoring.  N.T. 3/4/99 at 232.  Dr. Cooke also summarized the results of the evaluation in written report issued the same day.  Cooke Report, Sept. 28, 1998.  Two days later, on September 30, Dr. Cooke reported to McLaughlin that because of the results of the Validity Indicator Profile, he was unable to conclude to a reasonable degree of psychological certainty whether Bomar had organic brain dysfunction.  N.T. 3/4/99 at 232-33; N.T. 4/20/99 at 139-40.

## 2.  *Evidence Presented at the Penalty Phase*

The day after Dr. Cooke reported the results of the Validity Indicator Profile to McLaughlin, the jury returned a verdict, finding Bomar guilty of first-degree murder.  The penalty phase began the next day, on October 2, a Friday.  The Commonwealth offered evidence of three aggravating circumstances.  To establish the first aggravating circumstance—that the killing was committed in the perpetration of a felony—the Commonwealth relied on trial record of the guilt phase, which was incorporated into the sentencing hearing.  N.T. 10/2/98 at 70.  To prove the remaining two aggravating circumstances—that Bomar had a significant history of felony convictions involving the use or threat of violence to the person and had previously been convicted of another murder—the Commonwealth introduced certified copies of Bomar's prior Nevada convictions for second-degree murder; battery with a deadly weapon; and battery by a prisoner. *Id.* at 48-52.  The Commonwealth also presented testimony from two Nevada police officers and

a Nevada correctional employee who testified regarding the circumstances of each offense. The police officers testified that the battery with a deadly weapon and second-degree murder convictions were based on incidents in which Bomar shot one victim (Sherry Nowman) with a shotgun while she was sitting in the living room of her mother's house, *id.* at 55, and shot and killed another victim (Larry Carrier) with a rifle, *id.* at 61. The correctional employee testified that the battery by a prisoner offense involved an incident in which Bomar, while in prison, attacked a female visitor while the staff member was escorting her out of the prison visiting area. *Id.* at 66-67. Bomar approached the visitor from behind and struck her several times, causing her to fall between two vending machines. *Id.* at 67. He then proceeded to kick and punch her all over the face and body while uttering obscenities at her. *Id.* at 67-68.

After the Commonwealth rested, the proceedings were adjourned for the day to permit McLaughlin to consult with Dr. Cooke and to secure to presence of Joyce Batchelor, who had failed to appear in court, despite having been served with a subpoena a day earlier.[115] N.T. 3/4/99 at 234, 259; N.T. 10/5/98 at 14; N.T. 11/6/08 at 88. Following the guilty verdict, Bomar "became even more difficult in terms of presenting mitigation." N.T. 3/4/99 at 235-36. At the time the case was continued, Bomar did not want McLaughlin to put on any kind of mitigation evidence. *Id.* at 234-36, 257, 260.

Over the weekend, McLaughlin met with Dr. Cooke and provided him with additional records, including reports of earlier psychiatric evaluations she had received from the public defender who represented Bomar in his Nevada murder case and additional school records. N.T.

---

[115] Batchelor's husband was in the hospital at the time, and she had told McLaughlin the best day for her to testify would be Friday. N.T. 11/6/08 at 40-42, 88. She was reluctant to testify, however, saying it was embarrassing for the family. *Id.* Much recalled Carrie Ganges telling Batchelor not to cooperate. N.T. 11/5/08 at 160.

3/4/99 at 255; N.T. 11/6/08 at 125-27.  When the proceedings resumed on Monday, October 5, Bomar agreed to allow McLaughlin to present mitigation evidence.  N.T. 3/4/99 at 236, 258, 260.

Based on the foregoing mitigation investigation, McLaughlin presented eight witnesses: Dr. Cooke, Joyce Batchelor, two additional family members (Carrie Ganges and Sonny Ganges), two pastors, a professional acquaintance, and a witness for whom Bomar had done a good deed.

Dr. Cooke testified about Bomar's intellectual functioning and his diagnoses of Bomar based on the records he reviewed and his evaluations of Bomar in April and September 1998.  As to Bomar's intellectual functioning, Dr. Cooke testified that Bomar's early educational records showed that, by second grade, he was classified as "educably mentally retarded" and in need of special education.  N.T. 10/6/98 at 42, 47.  Bomar remained in special education for the next seven to eight years and was "way behind in achievement levels" in high school, testing at a fourth or fifth grade level in reading, math, and language at age 17.  *Id.* at 47.  After graduating from high school in 1982, Bomar took courses at Nevada Community College for two years, from 1988 to 1990, earing a C+ average.  *Id.* at 47-48.  He later attended Bucks County Community College in 1992-1993, but either failed or withdrew from all his classes there.  *Id.* at 48.  An October 1997 psychological evaluation of Bomar placed him in the borderline range of intellectual functioning.  *Id.*

Dr. Cooke's own testing of Bomar revealed a slightly higher IQ, placing him at the very bottom of the low average range (and in the ninth percentile overall); however, the test results also suggested organic brain damage.  *Id.*  Dr. Cooke explained he could not say for certain that Bomar had organic brain damage because Bomar was distracted and displayed variable motivation during the testing.  *Id.* at 49-50.  But he opined that Bomar may have organic brain damage, which would explain his early diagnosis as "educably mentally retarded" and placement in special education

classes. *Id.* at 50.  He further opined that if Bomar had organic brain damage, it would likely have resulted from something associated with birth or early childhood, given the early onset of his special education needs. *Id.*

Dr. Cooke also testified that, based on personality testing, he diagnosed Bomar with a combination of two personality disorders: anti-social personality disorder and borderline personality disorder. *Id.* at 51-52.  He explained that borderline personality disorder means a person has "some really deep-seated problems with identity and sense of self," opining that, for Bomar, these issues revolved around "the kind of person he is and the roles he should take in life," as well as his conflicted feelings about racial issues, having grown up as one of few African Americans in a predominantly Caucasian environment. *Id.* at 52.  He noted the testing revealed that Bomar was impulsive and self-centered, acted on his own impulses without thinking of the consequences to himself or others, and had "a lot of confusion as to love, sex, and aggression" and poor emotional control. *Id.* at 53.  He also opined these characteristics "are the kinds of things that . . . come from a combination of the anti-social personality disorder and the borderline personality disorder" and led Bomar to engage in some of the behaviors reflected in his past history. *Id.*

As to the cause of these disorders, Dr. Cooke explained they can have a physiological or organic basis, such as organic brain damage, or can develop based on other life experiences, adding that "[i]f there is neglect or abuse in the home, that can aggravate the situation . . . in terms of poor self-image, poor coping techniques, a lot of build-up of frustration and anger." *Id.* at 53-54.  He opined that Bomar's disorders appeared to be a combination of organic causes (as to which he could not reach a definite conclusion) and his early experiences with special education. *Id.* at 54.  He also noted that ingestion of drugs and alcohol during pregnancy can cause various types of brain damage in the fetus and that while Bomar did not show all the features of fetal alcohol

syndrome, it was likely that the cause of any organic issue was "a pre-natal or perinatal kind of problem." *Id.* at 55.

With regard to statutory mitigating factors, Dr. Cooke opined to a reasonable degree of psychological certainty that, as a result of his borderline personality disorder, Bomar had an "extreme mental or emotional disturbance." *Id.* at 55-56, 78. He also opined that organic brain dysfunction (or cognitive disorder) would qualify as an extreme mental or emotional disturbance, though he could not say with certainty whether Bomar had organic brain damage. *Id.* at 56.[116]

Batchelor also testified during the penalty phase.[117] She explained she was one of eight children born to Carrie Ganges and was thirteen years older than Bomar, with a different father. *Id.* at 106. She recalled that when Bomar was born, she was living in Milwaukee with her mother, Bomar's father, and a sister (Willie Mae) who was one or two years old. *Id.* at 107. Batchelor lived with her mother and Bomar's father from fourth to seventh grade,[118] and described her living

---

[116] On cross-examination, the prosecutor revisited Dr. Cooke's findings that Bomar was impulsive and had poor self-control and low self-esteem, and asked whether he could predict how Bomar would react if confronted with "the same stimuli that he faced . . . [w]hen he murdered people in 1978 and 1996," prompting an outburst from Bomar. N.T. 10/5/98 at 70-71. Dr. Cooke agreed a psychiatric report prepared in connection with Bomar's sentencing for his 1978 murder conviction found no evidence of psychiatric disease at that time; however, he noted the evaluator had performed only a psychiatric interview and had not done any psychiatric testing. *Id.* at 64, 78. He was also asked about records from Bomar's hospitalization following his December 1997 suicide attempt. He agreed that a psychiatric consultation report in those records indicated that no psychiatric diagnosis was warranted at that time, but noted the report indicated further evaluation was needed. *Id.* at 79-80. He also pointed out that the records included an EEG finding of "moderate diffuse disturbance of cerebral function," which could have been due to the physical effects of the suicide attempt but was also consistent with his findings. *Id.* at 77.

[117] Batchelor appeared pursuant to a material witness warrant, which was issued at McLaughlin's request after Batchelor failed to appear in court on October 2 in response to a subpoena served the previous day. *See* N.T. 10/5/98 at 14-15; N.T. 3/4/99 at 259.

[118] Before fourth grade, Batchelor lived with her grandmother. N.T. 10/5/98 at 107. After seventh grade, she lived with an aunt in Philadelphia. *Id.*

conditions during that time as "hell." *Id.* at 107-08. She was sexually abused by Bomar's father,[119] and there was "constant violence all the time" between her mother and Bomar's father, who fought every day. *Id.* at 108. Bomar's father hit her mother "[a]ll the time," and her mother fought back. *Id.* at 109. During a couple of fights, her mother would "go[] crazy" and chop up the furniture with an axe. *Id.* Another time, before Bomar was born, while his father was cooking breakfast after a fight, her mother "poured gasoline under the door and lit a match," blowing him out in the snow. *Id.* at 109-10. Batchelor did not remember the physical fighting ever stopping, even when her mother was pregnant with Bomar. *Id.* at 110-11. She also noted Bomar's father "drank every day." *Id.* at 111.

Although Batchelor was living with her mother and Bomar's father when Bomar was born, she left the house when he was six or seven months old. *Id.* at 112. Before leaving, Batchelor took care of Bomar, changing his diapers and giving him bottles. *Id.* She did not see Bomar's father beat Bomar and his sister, but she described his cruel treatment of them, noting he would shake a coffee can with money inside in their ears, continuing to do so as they screamed. *Id.* at 113.

Batchelor recounted that another sister a year older than Bomar had also lived in Milwaukee with her mother and Bomar's father until she was six months old and that, when she left the home, the family said Bomar's father had ruptured her eardrum. *Id.* Batchelor's older brother Charles also lived in the home in Milwaukee for a time but then went to Florida with her grandmother before eventually moving to Philadelphia. *Id.* at 114-15. Another brother three or

---

[119] Although Batchelor did not witness any sexual abuse of her other siblings, she stated she believed something happened to her older brother, who had since passed away. N.T. 10/5/98 at 111.

four years younger than Bomar (Alonzo) was raised from birth by an aunt, who adopted him. *Id.* at 114.

After she left Milwaukee, Batchelor did not see Bomar again until she got married in 1965, at which time Bomar would have been around six. *Id.* at 115-16. She recalled that Bomar stayed in the Philadelphia area with their mother for a couple of years and that, when he lived in Philadelphia, he was "in a class for emotionally retarded children," though "no one ever really talked about it." *Id.* Eventually, Bomar was sent to Milwaukee to live with his father, whom Batchelor described as "a very cruel person" who never "exhibit[ed] any kind of parenting" when he and Batchelor were living in the same household. *Id.* at 117.

Batchelor did not recall their mother ever holding Bomar when he was a baby. *Id.* She noted her last memory before leaving Milwaukee is of Bomar saying "momma" to her while she held him. *Id.* at 117-18.

The remaining six witnesses each testified only briefly. Sonny Ganges, Bomar's half-brother, stated he loved his brother very much and did not want him to die. *Id.* at 92. He also expressed his belief in Bomar's innocence and vowed to find out who committed the crime. *Id.* Carrie Ganges vehemently denied that Bomar had killed Willard, accused the jurors of "looking at his color" instead of the evidence, and referenced Hitler and Mussolini. *Id.* at 94.

The pastors, Caroline Ripley and Glen Thomas Serino, recalled meeting Bomar in the early 1990s through Joyce O'Donald, Bomar's ex-wife, whom he was dating at the time. *Id.* at 96, 119. Ripley testified about Bomar's church attendance and participation in a marriage counseling group, describing the growth she saw in him in terms of his interest in church and in learning skills to help his marriage. *See id.* at 96-98. She also stated Bomar responded very well to structure and noted she would be saddened to see him get the death penalty. *Id.* at 98-99. Serino described an

179

interaction he had with Bomar in March 1997 when he encountered him in the foyer of the church after observing him kneeling in prayer in the sanctuary. *Id.* at 120. Serino asked Bomar what he was doing, and he responded that he "came to pray" and "just need[ed] to get some things right with the Lord." *Id.*

Carol Butterworth, an insurance agent, testified she saw Bomar often from 1990 to 1993, when he would come to her office to make payments on his car insurance policies. She described him as very polite and respectful, with a nice personality. *Id.* at 82-83.

Finally, Linda Robinson testified that in May 1993, Bomar returned a diaper bag and wallet to her, leaving all items intact. *Id.* at 86-87. In gratitude, Robinson wrote a note to Bomar's boss at the Doylestown Hospital commending him. *Id.* at 87.

In closing, McLaughlin asked the jury to impose a life sentence, citing a variety of mitigating circumstances, including Bomar's "emotional and mental disorders, his low I.Q., his disability, his possible organic brain damage," as well as the testimony regarding his "wanting to change in spite of his disabilities[,] . . . his neglect[,] . . . his remorse[,] . . . the suicide attempt[,] . . . his prayer," and acts of kindness he did. *Id.* at 157-58. She urged the jury to credit Dr. Cooke's opinion that Bomar had an extreme emotional and mental disturbance and to find Bomar had organic brain damage, noting that although Dr. Cooke couldn't conclusively diagnose it, Bomar's test results and school records supported the diagnosis. *Id.* at 158-60. She also urged the jury to consider Batchelor's testimony about Bomar's childhood—growing up with a mother who never held him as an infant, a father who sexually abused his older sister, and extreme violence in the household—and the impact it must have had on him. *See id.* at 159-60.

After receiving further instructions, the jury began their deliberations and returned a sentencing verdict of death the same day. *Id.* at 198. The jury unanimously found all three

aggravating circumstances charged by the Commonwealth. *Id.* at 199; Resp'ts' Ex. N, ECF No. 47-8. One or more jurors also found the "catchall" mitigating factor to be applicable based on Bomar's "apparent remorse, character, dysfunctional childhood/family life and mental ability." Resp'ts' Ex. N, ECF No. 47-8.

### 3. *Mitigation Evidence Presented in PCRA Proceedings*

In his PCRA petition, Bomar argued counsel failed to adequately investigate, develop, and present mitigating evidence regarding his traumatic childhood, dysfunction, and serious mental illness. Resp'ts' Ex. KK at 59-91. To support this claim, during the PCRA proceedings, Bomar presented additional evidence regarding his childhood and mental health issues from a variety of sources.

Kathleen Kaib, a mitigation specialist and licensed social worker, testified about the social history she prepared for Bomar after reviewing records compiled by PCRA counsel and speaking with witnesses. N.T. 11/7/08 at 123. Kaib described in general terms the challenge of interviewing witnesses who have themselves experienced trauma or domestic violence, noting it is often necessary to "make many trips to speak with the client and sometimes the family members to get them to open up" about traumatic experiences in their lives. *Id.* at 123-24. In preparing Bomar's social history, Kaib relied on information from several of Bomar's family members: Batchelor, who also testified at the penalty phase; Lorraine Cotton and Bettie McCullen, both sisters of Bomar; Anna Sherman Wilson, Bomar's maternal aunt, with whom he lived for a time in elementary school; and Herbert Levy, Carrie Ganges's ex-husband and Batchelor's father. *Id.* at 141-43; PCRA Ex. P78.

Kaib identified two major themes that emerged from her work: the abandonment Bomar had experienced, emotional and otherwise, from his mother, siblings, father, and stepfather, and

the severe domestic violence he witnessed between his mother and father or stepfather.  N.T.
11/7/08 at 126.  With regard to abandonment, Kaib described Bomar's chaotic and geographically
unstable childhood, noting his mother left him with many different family members at various
times and her own presence in his life was sporadic.  *Id.* at 129.  As a baby, Bomar lived with his
mother and father, but a sister (Batchelor) was the one who cared for him.  *Id.*  Family members
reported that Bomar's mother did not hold her children or otherwise show them love and nurturing.
*Id.* at 126.  When his parents separated, Bomar was sent to Reno, Nevada, to live with an aunt
(Wilson) who was already caring for another of his siblings (Alonzo).  *Id.* at 129-30.  While in
Wilson's care, Bomar, then age seven, exhibited behavioral and learning problems at school, and
the principal reported Bomar had psychological problems and said his sister was beating him.[120]
*Id.* at 130.  Unable to care for Bomar, Wilson attempted to return him to his mother in Philadelphia,
eventually leaving him with a grandmother when his mother could not be found.  *Id.*  From there,
Bomar went back to Reno with his mother for a short time and then returned to Philadelphia before
being sent to live with his father in Wisconsin until his father died.  *Id.*  He then returned to Reno,
where he lived alone at the age of 13.  *Id.*  During this period, Bomar was never in the same school
for long enough for his psychological, behavioral, and educational problems to be addressed, and
his mother refused all efforts at intervention in any event.  *Id.* at 130-31.

---

[120] In a December 1966 letter to Carrie Ganges, Wilson reported that the school thought Bomar
had psychological problems, possibly as a result of something that happened in his early childhood
or at birth, and forwarded paperwork the school wanted Ganges to complete so they could help
him.  McCullen Decl. ¶ 18 & attachment, Dec. 13, 2004 (attaching a December 20, 1966 letter
from Wilson to Ganges).  The letter also noted Bomar was hyperactive in school, had "a hostile
reaction to women," and told the psychologist his sisters beat him up and made him cry all the
time.  *Id.*; N.T. 11/7/08 at 159.

Kaib also described the violence Bomar had witnessed as a child as well as the abuse he himself suffered.  *Id.* at 126, 132.  Both of his parents were alcoholics, and his mother drank excessively when pregnant with him, raising the possibility of fetal alcohol syndrome.  *Id.* at 131-32.  When Bomar was only 11 or 12, his father required him to have sex with prostitutes and killed his pet pigeon when he refused to do so.  *See id.* at 133; Wilson Decl. ¶ 21, July 25, 2004.  When he was 13 or 14, Bomar was beaten so badly in a juvenile facility that family members who visited him there did not recognize him in the visiting room.  N.T. 11/7/08 at 132-33.  Bomar told family members he had been gang-raped in the facility.  *See id.* at 133; Batchelor Decl. ¶ 32, Dec. 13, 2004.  Family members also described the abuse they observed between Bomar's mother and father or stepfather, including instances when knives were pulled or people were stabbed or shot at, as well as instances when Carrie Ganges "threaten[ed] to burn the house down and kill everyone in it," "threw kerosene on one of her husbands and chased him around trying to light him on fire," and "destroy[ed] furniture with an ax."  *Id.* at 133-34.  Family members further detailed Carrie Ganges's lifelong history of violent behavior.  *Id.* at 134-35.  Despite the vivid accounts provided by family members, Bomar himself refused to discuss his childhood except to say that it was "fine" and "normal just like anyone else's."  *Id.* at 135.

Although the family members Kaib relied on in preparing the social history did not testify at the PCRA hearings, Bomar submitted a sworn declaration from each of them.  The declarations provide additional detail about Carrie Ganges's neglect of her children, apparent mental illness, and violent rages, beyond those recounted by Kaib in her PCRA testimony, and they address the circumstances and events of his childhood to varying degrees.  As Kaib acknowledged, Batchelor and Wilson provided the most information about Bomar's childhood, though "[e]ach family

member has a little piece [of that history] because Mr. Bomar was never in one place for very long. N.T. 11/7/08 at 146-47.

Bomar also presented testimony from several experts: Dr. Cooke and Dr. Dougherty, who evaluated (or attempted to evaluate) him prior to trial; Dr. Richard Dudley, a psychiatrist who evaluated him post-conviction; and Daniel Martell, Ph.D., a forensic neuropsychologist, who provided rebuttal testimony in response to the Commonwealth's expert, Dr. Timothy Michals, who also evaluated Bomar post-conviction.

Drs. Cooke and Dougherty testified after reviewing Kaib's social history and the underlying declarations as well as other materials compiled by PCRA counsel which were not provided to them when they saw Bomar before or during trial.  Those materials included records penalty-phase counsel did not have at the time of trial—specifically: (1) records from Aldie Counseling Center, where Bomar underwent a drug and alcohol evaluation in 1990 as part of his parole from his Nevada convictions and later received counseling for anger issues following a parole violation in 1991, *see* N.T. 11/7/08 (Browne) at 71-73, 77; (2) Bomar's prison records from the Nevada Department of Corrections, which include a brief "Intake Psychological Evaluation" done for classification purposes by Dr. Robert Whittemore, a psychologist, in July 1979; and (3) an April 1979 report by John Chappel, M.D., a psychiatrist who evaluated Bomar while he was awaiting trial in Nevada, which was part of Bomar's Nevada court files.

The Aldie records reflect that, when Bomar was evaluated in 1990, he was extremely resistant to providing background information about his family, had difficulty completing an alcoholism screening test and questionnaire because he feared his responses would be used against him, and, on discharge, was diagnosed by the counselor who evaluated him (Marissa Browne, M.S., CRC, NCC) with paranoid personality disorder and alcohol and cannabis abuse in remission.

*See* PCRA Exs. P23, P67.   Although Browne found much of the information Bomar provided about himself to be suspect, she noted he reported having moved frequently as a child and told her that, in addition to living with his mother at various times, he lived for a time with an aunt in Nevada, later moved to Wisconsin to live with his father, who died of cancer not long thereafter, and lived on his own in Nevada during high school.   *See* PCRA Exs. P23, P67.

The Whittemore evaluation notes that Bomar's Psychological Profile suggested he was "fairly sick," with "below average intelligence," emotional instability, and "ten out of the 11 Psychopathological Characteristics . . . well above average."   Pet'r's App'x Supp. PCRA Pet. Vol. III, Ex. O.   The evaluation reports that Bomar received an IQ score of 83, placing him in the "dull-normal" category; had "a lot of trouble sequencing"; could not "easily distinguish between similar stimuli"; and tested in the "mildly visually-perceptually impaired area" on the Bender Visual Gestalt Test.   *Id.*   Dr. Whittemore also commented on Bomar's "extremely high score on dejection," opining that "most of his instability" was "due to his sentence and the very real possibility that he has another sentence coming."   *Id.*

The Chappel report reflects the results of a competency evaluation conducted in April 1979, when Bomar was facing criminal charges for having shot at his girlfriend and her mother.   *See* Pet'r's PCRA Ex. Packet 4, Ex. 27.   Dr. Chappel noted Bomar was "very guarded" when interviewed and "appeared to have some difficulty with remote and recent memory," but found this "seemed to be more a result of difficulty concentrating on past events rather than due to some brain dysfunction."   *Id.*   He also commented that Bomar had "[c]oncentration difficulties . . . in subtracting serial sevens" and "was very reluctant to engage in any abstract thinking," and that he had no confidence in his lawyer, who he believed lied to him.   *Id.*   Dr. Chappel concluded that Bomar "present[ed] no evidence of severe mental disorder at the present time" but may have an

antisocial personality disorder, and was "of sufficient mentality to understand the nature of the charges against him[,] . . . to understand the difference between right and wrong[,]" and "to aid and assist in the defense of the offense charged."  *Id.*

Drs. Cooke and Dudley also reviewed records trial or penalty-phase counsel possessed but did not provide to defense experts, such as Bomar's prison records from the Delaware County Prison, the Montgomery County Prison, and Camp Hill, all of which documented behaviors evincing Bomar's mental health issues, as well as a statement to the police by Ralph Rumer, Mary Rumer's father, which described an instance of Bomar's bizarre behavior he had observed.  The Delaware County Prison records document what Bomar maintains was a pattern of ongoing psychotic behavior in the months leading up to trial, including paranoia, delusions, and self-destructive outbursts, as well as the administration of large doses of sedative and anti-psychotic medication, as discussed in Claim One, *supra*.  He asserts the other prison records also document behaviors relevant to mental health, such as paranoia, a suicide threat, and other bizarre conduct. *See* Pet. ¶¶ 177, 179.

In his PCRA testimony, Dr. Cooke addressed the significance of these additional materials, stating that while they would not have changed his personality disorder diagnoses, the cumulative weight of all the records taken as a whole would have allowed him to conclude to a reasonable degree of psychological certainty that Bomar had organic brain damage.  N.T. 11/6/08 at 171, 201-02, 204.  For example, the family member affidavits recounting that Bomar's mother drank alcohol and got into physical fights when pregnant with him provided a likely etiology for brain damage and substantiated Dr. Cooke's hypothesis that Bomar may have been injured in utero.  *Id.* at 200-01, 297.  Dr. Cooke also explained the Whittemore evaluation contained observations consistent with organic brain dysfunction—namely, that Bomar scored in the mildly impaired range on the

186

Bender Visual Gestalt Test, a test that was previously widely used to evaluate individuals for organic brain damage,[121] and had trouble sequencing and could not easily distinguish between similar stimuli.  *Id.* at 169-70.  Although the evaluation did not explain how Dr. Whittemore analyzed the latter two issues, Dr. Cooke considered these observations to be "an important manifestation of organic brain dysfunction."  *Id.*  Dr. Cooke acknowledged the Whittemore evaluation did not include a diagnosis of organic brain dysfunction and would not, by itself, have caused him to change his testimony at the time of trial.  *Id.* at 171, 265.  However, he stated that, when considered cumulatively with the other records provided by PCRA counsel, the evaluation would have "allowed him to come to a conclusion within a reasonable psychological certainty that there was organic brain dysfunction."  *Id.* at 171.  His opinion, based on the totality of the records he reviewed, is that Bomar falls in the range of mild organic brain dysfunction, that he sustained organic brain damage due to alcohol exposure or trauma in utero, and that this impacted his learning disabilities and his emotional functioning throughout his life.  *Id.* at 201-02, 239.  Had he been able to make this diagnosis at the time of trial, he would have included organic brain dysfunction as a serious mental or emotion disturbance that would impact Bomar's behavior.  *Id.* at 216.

Dr. Cooke also noted that while the additional materials provided by PCRA counsel would not have changed his diagnoses of antisocial personality disorder and borderline personality disorder, they would have strengthened the borderline personality disorder diagnosis by allowing him to "check off" additional diagnostic criteria such as transient paranoid episodes and transient

---

[121] Dr. Cooke explained that the Bender test is no longer widely used because it is more limited than newer instruments in that it detects brain damage only in certain areas of the brain.  N.T. 11/6/08 at 169.  However, he opined the Bender test is still "good for analyzing those areas."  *Id.*

dissociative episodes. *Id.* at 305. The Delaware County Prison records, which reflect what appear to be psychotic-like episodes, would have permitted him to add these features to his diagnosis. *Id.* at 209, 214; *see also id.* at 186. Dr. Cooke also suggested paranoia was a theme reflected in various records, including the records from Aldie, where a counselor diagnosed Bomar with paranoid personality disorder based in part on his reluctance to complete drug and alcohol screening tests for fear his answers might be used against him, *id.* at 175-77, 202, and the Chappel report, which noted Bomar's belief his lawyer was lying to him, *id.* at 196.

Dr. Dougherty testified that after reviewing the additional materials provided by PCRA counsel, he no longer believed his preliminary diagnosis of intermittent explosive disorder was appropriate and instead believed a more appropriate preliminary diagnosis would be borderline personality disorder and antisocial personality disorder, the same diagnoses that Dr. Cooke offered during the penalty phase. N.T. 4/28/09 at 163.

Bomar also presented PCRA testimony from Dr. Dudley, the psychiatrist who evaluated him for competency and mitigation purposes in 2004 and 2006 and reviewed extensive records provided by PCRA counsel. Based on the family history information compiled by PCRA counsel, Dr. Dudley testified that Bomar had an extremely difficult childhood characterized by repeated instances of abuse, neglect to the point of substantial lack of adequate parenting and periodic abandonment, instability in care, exposure to significant trauma, and the absence of any sort of nurturing and support that would have helped him to deal with the kind of trauma he witnessed. N.T. 10/21/09 at 23-24. Dr. Dudley explained that a history of abuse, trauma, dysfunction, and abandonment can contribute to significant psychiatric symptoms and difficulties.[122] *Id.* at 26-27;

---

[122] Dr. Dudley explained that, for example, abandonment and substantial neglect can result in attachment issues when lack of adequate nurturing and bonding prevents a child from developing a primary attachment with a caregiver. N.T. 10/21/09 at 30. He also explained that children with

*see also id.* at 149-51.  For Bomar, these include longstanding difficulties with memory, paranoid thinking, impulsivity, mood instability with periods of profound depression and suicidality, attachment issues, dissociation and depersonalization, and difficulty managing anger.  *Id.* at 28-29, 150-51.  While Dr. Dudley acknowledged that many of these are also symptoms of paranoid personality and borderline personality disorders, in his view, neither fully covers all of Bomar's symptoms, and he did not offer a specific diagnosis beyond identifying a range of psychiatric symptoms from which Bomar suffers.  *Id.* at 41-42, 171, 222.

Based on Bomar's history and symptoms, Dr. Dudley opined to a reasonable degree of psychiatric certainty that Bomar suffered (both at the time of the offense and thereafter) from a longstanding extreme mental or emotional disturbance, and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.  *Id.* at 151-53.  He also testified that Bomar's conditions, symptoms, and history were mitigating under the "catch-all" mitigating circumstance.  *Id.* at 26, 153-54.  Based on Dr. Cooke's materials and testimony and other indicia in the records he reviewed, Dr. Dudley further opined to a reasonable degree of psychiatric certainty that Bomar suffers from organic brain dysfunction. *Id.* at 140.

Dr. Michals, the psychiatrist who evaluated Bomar for competency in 2007 on behalf of the Commonwealth, also testified regarding the mitigation portion of the case and disagreed with the conclusions of the defense experts that the record supported a finding either that Bomar had organic brain damage or that he was under an extreme mental or emotional disturbance at the time

---

a substantial history of being exposed to traumatic situations often display hyper-reactivity and impulsivity, particularly in the absence of adequate parenting to help the child learn to cope.  *Id.* at 31-32.  Rages can be another symptom of repeated exposure to trauma.  *Id.* at 32.

of the crime.  Although Dr. Michals agreed that Bomar displayed a variety of symptoms that can be signs and symptoms of organic brain damage,[123] he opined that there was a lack of data to support the diagnosis in this case.  N.T. 2/3/10 at 119, 173-74, 183.  Unlike Dr. Dudley, Dr. Michals opined that Bomar's memory was not impaired and that any memory problems were volitional, as evidenced by, among other things, his ability to "come up with a variety of memories concerning excuses for where he was" at the time of the crime.  *Id.* at 81-82, 173, 175-76.  Thus, in Dr. Michals's view, Bomar did not exhibit the most common signs of organic brain damage— difficulties in concentration and memory.  *Id.* at 175-76.  Dr. Michals also noted that Dr. Cooke did not do a complete neuropsychological evaluation and cited the lack of any imaging studies or other documentation of organic brain damage.  *Id.* at 113, 119, 183, 198.  He found the lack of imaging studies particularly significant, opining that "if you think there's organic brain damage you look at the brain" via CAT scans, MRIs, PET scans, and other imaging studies.  *Id.* at 198; *see also id.* at 119 (noting "the best way to find out if there's something wrong with the brain is to evaluate it by physiological studies, x-rays, and other studies").  Dr. Michals rejected the notion that the Whittemore evaluation would have permitted Dr. Cooke to conclude Bomar had organic brain damage, given the evaluator's statement that Bomar's instability was likely due to his sentence and the possibility of another, which could have affected Bomar's functioning on neuropsychological testing.  *Id.* at 190.  As for whether Bomar was under an extreme mental or emotional disturbance at the time of the crime, Dr. Michals opined he was not, citing the lack of

---

[123] Dr. Michals agreed Bomar displayed anxiety, poor judgment, poor insight, low achievement relative to IQ scores, emotional lability, sleep disorders, low frustration tolerance, and difficulty with proverbs, all of which can be signs or symptoms of organic brain damage.  N.T. 2/3/10 at 180, 182; *see also id.* at 111, 113-15, 176-77.

documentation of ongoing emotional distress in the record, including the lack of any diagnosis of or treatment for emotional illness during his incarceration.  *Id.* at 45, 46, 48-49, 58-59, 149-50.

Dr. Martell, an expert in the field of neuropsychology, testified as a rebuttal expert for Bomar.  Dr. Martell did not conduct a clinical evaluation of Bomar, but instead performed an "academic laboratory analysis" of Bomar's history based on the available records and the neuropsychological test data that Dr. Cooke had obtained.  N.T. 7/28/10 at 12, 22.  Whereas Dr. Cooke had been unable to reach an opinion regarding the presence of organic brain damage because of concerns about the validity of the test results, Dr. Martell testified that using other accepted methods available at the time of trial, he was able to determine that the results for all but two of the tests reflected valid effort.  *See id.* at 23-24, 31-45.[124]  Dr. Martell opined that the test scores for the tests that could be validated indicated moderate levels of brain dysfunction and that, had Dr. Cooke used a different methodology, he could have reached the conclusion that there was some kind of brain dysfunction at the time of trial.  *See id.* at 45, 115.  He disagreed with Dr. Michals that medical or imaging studies are necessary to diagnose organic brain damage, as some types of brain impairment may show up in neuropsychological testing but not on a scan.  *Id.* at 52-53.  He further opined to a reasonable degree of neuropsychological certainty that, based on the totality of the evidence he reviewed, including the raw data from Dr. Cooke's testing, the affidavits and declarations, the records, and the neuropsychological history, Bomar's history and

---

[124] Dr. Cooke was concerned about the validity of the test results both because Bomar did not complete one of the tests in the battery, preventing him from obtaining an overall score based on the entire battery (known as a Halstead Impairment Index), and because Bomar was careless and prone to giving up easily when he got frustrated with the testing. N.T.7/28/10 at 23-24. Dr. Martell testified that an accepted (and preferred) alternative to relying on the Halstead Impairment Index was to look at the results on a test-by-test, function-by-function basis and compare them to appropriate norms tailored to the patient being evaluated. *Id.* at 31-34. He also testified that validity could be evaluated on a test-by-test basis using empirical techniques to assess the level of performance and effort. *Id.* at 34-37.

neuropsychological data were consistent with organic brain dysfunction.  *Id.* at 68, 120; *see also id.* at 23.

### 4.  *Analysis*

Bomar argues his counsel provided ineffective assistance at the penalty phase by failing to adequately investigate, develop, and present available mitigating evidence regarding his childhood and mental health history.  He asserts counsel performed deficiently by failing either to hire a mitigation specialist or to conduct a reasonable background investigation through other means, including by failing to interview available mitigation witnesses, to obtain readily available mental health records, and to provide records and information that were (or should have been) in her possession to defense mental health experts.  He also argues counsel unreasonably failed to present significant mitigating evidence of which she was aware to the jury.  Bomar maintains that had counsel conducted an adequate investigation and shared critical mental health records with defense experts, she could have presented a more substantial mitigation case—one that included more compelling evidence of Bomar's traumatic upbringing, a firm diagnosis of organic brain damage, and an explanation of how his difficult childhood and mental illness affected him.  He also argues that had the jury heard this unpresented mitigation evidence as well as the evidence counsel did present at the penalty phase, there is a reasonably probability that one juror would have returned a different sentence.

As noted, Bomar raised this claim in state court, but the PCRA court rejected it.  With regard to Bomar's childhood and family history, the PCRA court found "both trial counsel and penalty counsel conducted reasonable investigations . . . given the circumstances" confronting them, including "[Bomar's] and family members' refusal to cooperate in terms of supplying an accurate account of his upbringing."  *PCRA Op.*, 2012 WL 9515416, at *51; *see also id.* at *39.

The court noted that penalty-phase counsel's persistence in investigating despite these challenges ultimately enabled her to secure Batchelor's testimony, and found Bomar had not shown further investigation would have uncovered the additional family members later contacted by PCRA counsel and their proposed testimony or that they would have appeared and testified in conformity with their PCRA affidavits.  *Id.* at *51.  The PCRA court also rejected Bomar's argument pertaining to counsel's failure to obtain additional mental health records and to provide those and other records to defense mental health experts.  It found the additional institutional records counsel failed to obtain did not provide information unavailable to Dr. Cooke from other sources and would not have permitted Dr. Cooke to diagnose organic brain damage in any event, as they did not "contain a history of childhood abuse and neglect," the "fundamental underpinning" of both Dr. Cooke's and Dr. Dudley's later findings of organic brain damage.  *Id.* at *39, *54, *61.  As to prejudice, the PCRA court found that even if Dr. Cooke had been able to provide testimony "enhanced by the additional evidence of prior evaluations and reports," the weight the additional reports would have added to his opinion would have been "insubstantial," and it was not reasonably probable "that a single juror would choose life, given the facts."  *Id.* at *63-64.[125]

The Pennsylvania Supreme Court affirmed, agreeing with the PCRA court that penalty-phase counsel "was not ineffective in her investigation and presentation of mitigation evidence." *Bomar II*, 104 A.3d at 1202.  The court summarized its holding as follows:

> [U]nder the circumstances of the case *sub judice*, where [Bomar's] counsel attempted to conduct a thorough investigation into potential mitigation evidence over the course of several months, hired investigators to assist her with this task,

---

[125] Although the PCRA court did not factor it into its prejudice analysis, the court found "the substance of the additional evidence offered by way of the affidavits of family members in these PCRA proceedings" was "cumulative" of Batchelor's testimony, which the jury relied on in finding Bomar's dysfunctional childhood and family life were mitigating factors supporting the catchall mitigator.  *PCRA Op.*, 2012 WL 9515416, at *53.

> and, ultimately, presented mitigating testimony during the penalty phase from
> several of [Bomar's] acquaintances and family members—all with little to no
> cooperation from [Bomar] throughout the entirely of counsel's investigation and
> the course of the trial—we decline to find that penalty phase counsel's failure to
> uncover additional mitigating evidence was unreasonable. Likewise, as [Bomar]
> refused to discuss his childhood with Dr. Cooke, we decline to find that penalty
> phase counsel was unreasonable in failing to elicit testimony from Dr. Cooke
> concerning the significance of [Bomar's] childhood on his mental health.

*Id.* at 1203. The court also found that even if additional mitigating evidence concerning Bomar's abusive childhood and mental health had been introduced, it was not reasonably probable that any of the jurors would have voted to return a life sentence. *Id.* at 1204. Having found Bomar's underlying ineffective assistance of penalty-phase counsel claim meritless, the court found appellate counsel was not ineffective for failing to raise the claim on direct appeal. *Id.* at 1205.

Bomar argues the Pennsylvania Supreme Court's denial of this *Strickland* claim is contrary to and an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1). The Court turns first to the performance prong.

### a.   *Deficient Performance*

Bomar argues the penalty-phase investigation was deficient in two main respects, faulting counsel for unreasonably failing to interview available mitigation witnesses and for failing to obtain readily available mental health records. The state courts found counsel's investigation and presentation of mitigating evidence regarding Bomar's childhood and family history was reasonable but, as discussed below, did not fully address whether counsel's failure to obtain records and provide them to defense mental health experts amounted to deficient performance, while still denying the claim as a whole. With regard to his childhood and family history, Bomar has not shown the state courts unreasonably applied *Strickland* in concluding counsel's investigation of his family history was reasonable.

194

To establish that counsel's performance was deficient, a petitioner must show the representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms." *Strickland*, 466 U.S. at 687-88.  Regarding the duty to investigate, *Strickland* made clear that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.  The Supreme Court has recognized that, under prevailing professional norms predating the trial in this case by at least a decade, defense counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background" for mitigating evidence. *Porter*, 558 U.S. at 39 (quoting *Williams*, 529 U.S. at 396) (referring to norms in effect in 1988).  Under "well-defined norms" in effect since at least 1989, moreover, this investigation "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor," *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)), and should include topics such as the defendant's "medical history educational history, employment and training history, family and social history, [and] prior adult and juvenile correctional experience," *id.* (emphasis omitted) (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6, p. 133 (1989)).[126]

---

[126] The Supreme Court has recognized that "American Bar Association standards and the like are guides to determining what is reasonable," *Strickland*, 466 U.S. at 688, but has emphasized that such standards are "only guides," not "inexorable commands with which all capital defense counsel must fully comply," *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (per curiam) (internal quotation marks and citation omitted).  Nevertheless, relying on the ABA's 1980 Standards for Criminal Justice and 1989 Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the Court has held that under prevailing professional norms predating the trial in this case, capital defense counsel has an "obligation to conduct a thorough investigation of the defendant's background" for "all reasonably available mitigating evidence." *Wiggins*, 539 U.S. at 522, 524 (emphasis omitted).

While *Strickland* recognized that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," 466 U.S. at 691, a lack of cooperation by the defendant "does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation," *Porter*, 558 U.S. at 40; *see also Rompilla*, 545 U.S. at 377 (recognizing counsel's duty to investigate "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available"). "[A] defendant's failure personally to inform his counsel of possible avenues of investigation does not absolve his attorney from pursuing those avenues, particularly where counsel is already aware of facts demonstrating that such an investigation may be fruitful." *Saranchak*, 802 F.3d at 595; *see also Wiggins*, 539 U.S. at 524-25 (holding counsel's investigation was unreasonable where they "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources"); *Bond*, 539 F.3d at 288 (holding defendant and his family were not required to "volunteer 'red flags' about [the defendant's] mental health when trial counsel should have discovered this information through a basic inquiry into his background").

To obtain information about Bomar's family history, penalty-phase counsel interviewed Bomar, his mother, and his mother's cousin (Mabel Sherman). None provided any meaningful information about his childhood except to say it was normal. Suspecting that Bomar's mother was not telling the whole story, counsel investigated further, working with investigators to locate and interview other family members in six states using the limited information Bomar and other family members provided (which in most cases was limited to a city and state of residence). Counsel and investigators were able to reach some family members in Philadelphia and Florida, but those individuals provided no information regarding family dysfunction, either claiming to have had

minimal contact with Bomar or saying they did not want to get involved.[127]   Counsel and

investigators also made efforts to contact other family members, including four of the five

individuals who later provided declarations to PCRA counsel (Joyce Batchelor, Anna Wilson,

Lorraine Cotton, and Bettie McCullen),[128] as well as two other siblings of Bomar (Willie Mae and

Alonzo) and two additional siblings of Carrie Ganges (Andrew Sherman and Margaret Sherman).

Except for Joyce Batchelor, these witnesses either could not be located or did not respond to calls

and visits to their homes.[129]   Compounding the defense team's difficulties, McLaughlin and Much

---

[127] McLaughlin identified at least seven family members who were interviewed but provided no information, not including Carrie Ganges and Mabel Sherman.  N.T. 3/4/99 at 248-52; N.T. 11/6/08 at 45-46; *see also* n.109, *supra*.

[128] The fifth declaration was provided by Herbert Levy, Carrie Ganges's ex-husband and the father of Joyce Batchelor.  According to his declaration, Levy was married to Carrie Ganges for two years and had three children with her: Prince (who died as a baby), Charles, and Joyce.  Levy Decl. ¶ 1, Dec. 1, 2004.  The relationship ended after Carrie learned Levy was having an affair with her friend and hit him in the head with a tire iron. *Id.* ¶ 2.  Levy did not meet Batchelor until she was an adult; Carrie had told Batchelor her father was dead. *Id.* ¶ 3.  During her PCRA testimony, McLaughlin candidly admitted she did not recall trying to contact Levy as he was somewhat outside the realm of people she thought would possess helpful information.  N.T. 11/6/08 at 104, 109-10.  Bomar has not shown counsel acted unreasonably in this regard.

[129] McLaughlin testified that she and investigators made efforts to contact each of these witnesses.  N.T. 3/4/99 at 249-52; N.T. 11/6/08 at 31-34, 71, 78-79, 92, 108-09.  Although she did not recall the specific efforts made as to each witness, McLaughlin explained that, in general, investigators attempted to find addresses for witnesses, would physically go to a witness's address if they had one, and would talk to neighbors if they could not find the person they were looking for.  N.T. 11/6/08 at 79.   She recalled, for example, that in trying to reach Willie Mae, a sister of Bomar for whom the defense team was able to obtain an address and phone number, investigators attempted to contact her in person and by phone, and McLaughlin herself called her repeatedly and left many messages, all with no response.  N.T. 3/4/99 at 252; N.T. 11/6/08 at 31-32, 91-92.

In finding counsel directed RBA to locate and interview Wilson, Cotton, and McCullen, the PCRA court cited McLaughlin's July 28, 1998 letter to RBA seeking an estimate of the cost to complete the mitigation investigation around the time RBA's work was suspended.  *PCRA Op.*, 2012 WL 9515416, at *52 (citing PCRA Ex. P48).  The letter, however, is not the only evidence that efforts were made to contact these witnesses, as McLaughlin also testified on this point.  N.T. 11/6/08 at 30, 78, 102, 108-09.

learned that Bomar's mother had been instructing family members not to cooperate with investigators, and Bomar also told Much he had directed his "people" not to discuss his childhood with anyone.   Although RBA's work on the case was suspended before all of the potential witnesses McLaughlin identified were contacted, McLaughlin continued to investigate on her own, attempting to contact witnesses, including Bomar's sisters, and eventually reaching Joyce Batchelor, who provided the first information about Bomar's traumatic childhood, shortly before the start of trial.

Citing *Wiggins v. Smith*, Bomar argues the scope of counsel's investigation was unreasonable because she "abandoned her investigation of Petitioner's background after 'having acquired only rudimentary knowledge of his history from a narrow set of sources.'"  Pet'r's Mem. 51 (quoting *Wiggins*, 539 U.S. at 524).  *Wiggins*, however, is distinguishable.  There, counsel's penalty-phase investigation consisted, in its entirety, of arranging for the petitioner to undergo psychological testing, reviewing a written presentence investigation report which included a one-page account of the petitioner's personal history that mentioned the time he had spent in foster care, and tracking down records from the Department of Social Services documenting the petitioner's various foster-care placements.  *Wiggins*, 539 U.S. at 523.  The records counsel obtained revealed the petitioner's mother was an alcoholic who on at least one occasion had left him and his siblings alone without food and that he had been shuttled from foster home to foster home, displayed emotional difficulties, and had frequent lengthy absences from school. *Id.* at 525.  Yet counsel investigated no further, failing to conduct the broad-ranging inquiry required under prevailing professional norms or to pursue the leads they had even though "any reasonably competent attorney would have realized that [doing so] was necessary to making an informed

choice among possible defenses." *Id.*  And ultimately, counsel presented no evidence regarding the petitioner's life history or family background.

Here, in contrast, penalty-phase counsel "attempted to conduct a thorough investigation into potential mitigation evidence," *Bomar II*, 104 A.3d at 1203, working with investigators to obtain school, medical, prison, employment, and other records for Bomar, and to contact potential mitigation witnesses, including family members, friends, employers, and others.  As trial approached, counsel knew that Bomar had moved around as a child, had at times not been in his mother's care, and had been placed in special education at an early age and done poorly in school. *See* N.T. 3/4/99 at 240-43; N.T. 11/6/08 at 81-82, 110.  But neither the records she collected nor the witnesses she was able to contact revealed any information about the abuse, neglect, and trauma Bomar had experienced and witnessed as a child.  Counsel continued to investigate, and when she finally reached Batchelor, near the start of trial, Batchelor provided her with new information about Bomar's family history that she had not received from other sources, confirming her suspicion that "there was more than was being presented by the family."  N.T. 11/6/08 at 89.  Bomar argues that, had counsel continued her investigation, she might well have been able to make contact with the additional family members who later spoke with PCRA counsel, noting that in their declarations, these individuals stated they would have been willing to share the information provided to PCRA counsel had trial counsel contacted them.  Pet'r's Mem. 52.  By the time penalty-phase counsel spoke with Batchelor, however, she had already attempted to reach these and other family members of whom she was aware without success, in some instances because these individuals were unresponsive to her and investigators' calls and visits.  Counsel was also aware Carrie Ganges was telling family members not to cooperate.  Given the circumstances, counsel could reasonably have

concluded that further efforts to reach additional family witnesses would not have been productive. *See* N.T. 11/6/08 at 120.

In concluding penalty-phase counsel's failure to uncover additional mitigating evidence here was reasonable, the Pennsylvania Supreme Court cited its own prior decision in *Commonwealth v. Bond*, 819 A.2d 33 (Pa. 2002), for the proposition that "[c]ounsel cannot be found ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family which is not provided to counsel." *Bomar II*, 104 A.3d at 1203 (alteration in original) (quoting *Bond*, 819 A.2d at 45-46). Bomar argues the court's reliance on the state court decision in *Bond* is itself unreasonable, as the federal courts later found the state court's application of *Strickland* was unreasonable and granted the petitioner a new sentencing hearing. *See Bond*, 539 F.3d at 292. In that case, however, counsel failed to prepare for the penalty phase until *after* they received a guilt-phase verdict and then "conducted an *ad hoc* and perfunctory preparation for the penalty phase *the night before it began*." *Id.* at 288. Counsel "did not obtain readily available school records portraying [the petitioner's] much troubled youth," failed to "seek medical records or conduct a meaningful inquiry into [his] family life," and thus "failed to give their consulting expert sufficient information to evaluate [the petitioner] accurately." *Id.* In finding counsel's performance inadequate, the Third Circuit noted it would not excuse counsel's conduct "on the ground that [petitioner] and his family members did not tell counsel that his background provided fertile territory for mitigation arguments" as "[n]either [petitioner] nor his family had a duty to instruct counsel how to perform such a basic element of competent representation as the inquiry into a defendant's background." *Id.*

This case is readily distinguishable for all the reasons discussed above: while Bomar's family members also failed to volunteer "red flags" about his childhood and mental health, counsel

investigated both areas nonetheless.  As the state courts found, counsel did not "merely accept [Bomar's] assertion that his childhood was 'normal' and investigate no further," but instead "continued to investigate . . . [,] collecting [Bomar's] prison, employment, and school records, personally speaking with members of [his] family on multiple occasions, hiring investigators, and attempting to convince [Bomar] to submit to mental testing numerous times." *Bomar II*, 104 A.3d at 1202 (quoting *PCRA Op.*, 2012 WL 9515416, at *39).  Yet apart from Batchelor, none of the family members counsel spoke with revealed any information regarding Bomar's abusive childhood.  While PCRA counsel later uncovered more mitigating evidence, the additional information regarding Bomar's childhood came almost entirely from family members whom counsel had attempted to contact.  Given the significant factual differences between this case and *Bond*, the state court's reliance on *Bond* does not render its decision in this case unreasonable.  *See Blystone v. Horn*, 664 F.3d 397, 427-28 (3d Cir. 2011) (upholding on habeas review state court's determination that counsel was not ineffective in investigating and developing lay witness testimony where family members counsel interviewed regarding mitigating circumstances did not provide information later provided to PCRA counsel).  Bomar has not shown the state court's conclusion that counsel's investigation of Bomar's family history was reasonable under the circumstances was "so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (quoting *Richter*, 562 U.S. at 103).[130]

---

[130] Bomar's alternative argument that counsel performed deficiently by failing to hire a mitigation specialist also lacks merit.  As an initial matter, Bomar has not shown prevailing professional norms at the time of his trial in 1998 required the hiring of a mitigation specialist.  *See Kemp v. Kelley*, 924 F.3d 489, 501 (8th Cir. 2019) (holding there was "no absolute requirement" in 1994 and 1997 that counsel hire—or seek funds to hire—a mitigation specialist).  Since 2003, the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases—a source the Supreme Court has looked to as a "'guide[]' to what reasonableness entails," *Van Hook*, 558 U.S. at 7—have provided that the defense team in a capital case should include both an investigator and a mitigation specialist.  ABA Guidelines for the Appointment and Performance of Counsel in

In addition to arguing counsel's investigation of his childhood and family history was unreasonable, Bomar argues counsel was ineffective for failing to use the information she did uncover about his background.  Specifically, Bomar argues counsel was ineffective for failing to have Dr. Cooke address his traumatic childhood and explain how it was relevant and mitigating. Pet'r's Mem. 53.  He also argues counsel unreasonably failed to elicit some of the most salient information Batchelor disclosed to her—that Bomar had been raped and severely beaten by a guard at a juvenile facility—during Batchelor's penalty-phase testimony.  *Id.* at 52.

The Pennsylvania Supreme Court found penalty-phase counsel was not ineffective for failing to elicit testimony from Dr. Cooke concerning the significance of Bomar's childhood to his mental health because Bomar refused to discuss his childhood with Dr. Cooke.  *Bomar II*, 104 A.3d at 1203.  As Bomar notes, however, even if he was not forthcoming in this regard, Dr. Cooke

---

Death Penalty Cases, Guideline 4.1(A)(1) & cmt., p.33 (2003) (noting a mitigation specialist is "an indispensable member of the defense team throughout all capital proceedings").  But the Guidelines in effect when Bomar was tried in 1998 did not include this requirement, instead providing that the sentencing phase investigation "should comprise efforts to discover all reasonably available mitigating evidence" and suggesting "investigators and other assistance" would be necessary to such efforts.  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 8.1 cmt., p.70, Guideline 11.4.1, p.13 (1989).

Here, counsel hired investigators and chose to use the funds the court had approved for a mitigation specialist for her investigators, believing that using a mitigation specialist would be cost-prohibitive and she would get more information by using investigators for more hours at a substantially lower rate. N.T. 11/6/08 at 17, 105-06.  While Bomar faults counsel for jettisoning the idea of a mitigation specialist based on cost concerns without first seeking out competing rates or asking the court for more money, counsel's costs concerns were not unfounded.  When McLaughlin talked to the mitigation specialist the court had authorized the defense to retain, he told her he would need at least 30 hours per family member at a rate of $160 per hour—or approximately $4,800 per family member, more than three times the court's initial $1,500 allocation.  While it may have been preferable to have a mitigation specialist involved in the case for the reasons explain by in Kaib's PCRA testimony and the ABA's 2003 Guidelines, the Court cannot say counsel's decision to forego a mitigation specialist and conduct the mitigation investigation using only investigators fell outside the wide range of reasonable professional assistance at the time of trial in 1998.

could have addressed the issue based on information provided from other sources.  Indeed, Dr. Cooke acknowledged as much, stating that while he could not rely on an attorney's account of what a witness told the attorney, N.T. 11/6/08 at 183, 244-47, he could and frequently did rely on official accounts, such as affidavits from witnesses or mitigation specialists, *id.* at 183, 245, 279.

Here, counsel was eventually able to obtain information about Bomar's childhood from Batchelor, and the PCRA court found, as a matter of fact, that McLaughlin provided the substance of Batchelor's account to Dr. Cooke before he testified.  *PCRA Op.*, 2012 WL 9515416, at *53; *see also id.* at *46.  That finding is binding on this Court as Bomar has neither shown it was objectively unreasonable in light of the evidence presented in the PCRA proceedings nor rebutted it by clear and convincing evidence.[131]  Although the information was not in a form Dr. Cooke could rely on, there is no evidence he requested that McLaughlin obtain an affidavit, *see* N.T. 11/6/08 at 101; *PCRA Op.*, 2012 WL 9515416, at *53, something he acknowledged he should have done, *see id.* at 245.  As the PCRA court concluded, once McLaughlin alerted him to Batchelor's revelations of abuse and neglect in Bomar's childhood, it was incumbent upon Dr. Cooke to advise McLaughlin he would need an affidavit to consider the information.  *PCRA Op.*, 2012 WL

---

[131] In both her post-trial and PCRA testimony, McLaughlin stated she provided Dr. Cooke with the family background information she obtained from Batchelor, N.T. 3/4/99 at 244-45; N.T. 11/6/08 at 123, and her testimony was corroborated by a letter she sent to Dr. Cooke on September 22, 1998, days before his neuropsychological evaluation on September 26, PCRA Ex. P64.  The letter confirmed that the court had approved funds for the evaluation, the purpose of which was "to determine the existence of any mitigating circumstances for a possible sentencing hearing"; listed the various records McLaughlin was enclosing for Dr. Cooke's review; and recounted some of what McLaughlin had learned from Batchelor, including Batchelor's disclosure of "sexual abuse to herself by Arthur's father, physical abuse by both Arthur's father and mother and neglect of Arthur."  *Id.*  While Dr. Cooke did not recall receiving this information and did not recall McLaughlin's letter, which was not in his file, N.T. 11/6/08 at 182, 243, 300-01, the PCRA court credited McLaughlin's testimony and "determined, as a matter of fact that Ms. McLaughlin did provide the substance of Ms. Batchelor's account of Petitioner's childhood circumstances to Dr. Cooke," *PCRA Op.*, 2012 WL 9515416, at *53.

9515416, at *53.  While McLaughlin surely could have done more to pursue the issue, the Court cannot say her reliance on Dr. Cooke to take account of that information as he evaluated Bomar "to determine the existence of any mitigating circumstances," PCRA Ex. P64, fell outside the wide range of professionally competent assistance.

As to counsel's failure to elicit relevant mitigation evidence from Batchelor, although Bomar raised this allegation in the PCRA proceedings and on PCRA appeal, Pet'r's Post-Hr'g Mem. 55, 60; Resp'ts' Ex. VV at 33, 43, ECF No. 47-42, the state courts did not address it.  The PCRA court did not mention this aspect of the ineffective assistance claim, and the Pennsylvania Supreme Court did not discuss it beyond noting that, in the declaration she provided to PCRA counsel, Batchelor stated she had told penalty-phase counsel that Bomar had been raped and beaten by a guard in a juvenile facility, *Bomar II*, 104 A.3d at 1198.

While the state courts did not make a finding on the allegation, the evidence presented in the PCRA proceedings demonstrates that Batchelor did tell McLaughlin about the incident.[132] According to Batchelor's declaration, however, it was her mother and older brother (Charles) who visited Bomar in the juvenile facility, were unable to recognize him at first because his face was so swollen and beaten, and were told by Bomar that he had been gang raped and beaten in the facility.  Batchelor Decl. ¶ 32, Dec. 13, 2004.  The declaration makes clear that any testimony by Batchelor about the incident would have been inadmissible hearsay.  Thus, although McLaughlin

---

[132] In her declaration, Batchelor stated she had told McLaughlin about this incident before trial. Batchelor Decl. ¶ 43, Dec. 13, 2004.  Testifying at a PCRA hearing, McLaughlin admitted her handwritten notes of her conversation with Batchelor include the reference "Guard Raped him + beat him up."  N.T. 11/6/08 at 39; PCRA Ex. P60.  Although McLaughlin did not recall the meaning of the reference, she agreed it was a note of information provided by Batchelor.  N.T. 11/6/08 at 39-40.  In addition, the Commonwealth concedes the record reflects that Batchelor told McLaughlin about the incident but faults Batchelor for failing to mention it.  Resp'ts' Answer ¶ 186.

recognized the significance of this information, and admitted it was information she would have wanted to elicit from Batchelor on the stand, N.T. 11/6/08 at 40, she was not ineffective for failing to do so.  *See Armstrong v. Mahally*, No. 18-4256, 2021 WL 4926975, at *18 (E.D. Pa. Apr. 23, 2021) (upholding under AEDPA state court's determination that counsel was not ineffective for failing to elicit testimony that would have been inadmissible hearsay), *report and recommendation adopted by* 2021 WL 4924773 (E.D. Pa. Oct. 21, 2021).

Bomar also argues the mitigation investigation was deficient because counsel failed to obtain readily available mental health records and to provide those and other records in her possession to defense mental health experts.  The Pennsylvania Supreme Court did not address this argument.  In his memorandum, Bomar faults that court for "solely focusing on counsel's investigation of Petitioner's family background," and "unreasonably fail[ing] to even mention any of the institutional records counsel undisputedly failed to obtain."  Pet'r's Mem. 67.  But while Bomar now argues counsel was ineffective for not obtaining records from Aldie Counseling Center, the Nevada Department of Corrections, and a Nevada court file, all of which contained additional mental health evaluations, his own brief on PCRA appeal did not mention any of these records, so it is not surprising that the court did not mention them, either.  *See* Resp'ts' Ex. VV at 30-47, ECF No. 47-41, 47-42.  Bomar's appellate brief refers to the fact that defense experts, including Dr. Cooke, were provided "additional records" post-conviction, *id.* at 38; *see also id.* at 34, 37, 39, but the only records specifically referenced are his Delaware County Prison records, *id.* at 33, 36.  Bomar did raise counsel's failure to obtain these records before the PCRA court, *see* Pet'r's Post-Hr'g Mem. 61-66, and the PCRA court addressed the issue, ultimately finding the absence of the records did not prejudice Bomar because, standing alone, they would not have enabled Dr. Cooke to conclude to a reasonable degree of psychological certainty that Bomar had

organic brain damage, *see PCRA Op.*, 2012 WL 9515416, at *39, 54, 61.  Because neither the

PCRA court nor the Pennsylvania Supreme Court addressed whether counsel's failure to obtain

the records amounted to deficient performance, and in light of the Commonwealth's waiver of

exhaustion, the Court assumes de novo review applies to this issue.

"Supreme Court precedent makes clear[] [that] defense counsel has a duty to obtain

administrative records . . . as part of the 'obligation to conduct a thorough investigation of the

defendant's background.'"  *Blystone*, 664 F.3d at 422 (quoting *Williams*, 529 U.S. at 396).  The

Third Circuit has recognized that obtaining such records may be necessary to enable counsel "to

glean the background information necessary to direct the rest of an investigation."  *Abdul-Salaam*

*v. Sec'y Pa. Dep't of Corr.*, 895 F.3d 254, 267 (3d Cir. 2018).  And the Supreme Court and the

Third Circuit have repeatedly found counsel ineffective for failing to obtain known institutional

records, such as school, medical, military, juvenile, social services, and prison records.  *See, e.g.*,

*Porter*, 558 U.S. at 39 (noting counsel's failure to obtain any of petitioner's "school, medical, or

military service records"); *Williams*, 529 U.S. at 373, 395-96 (holding counsel was ineffective for,

inter alia, failing to obtain the petitioner's juvenile, social services, and prison records); *Blystone*,

664 F.3d at 422 (finding counsel performed deficiently where he failed to obtain defendant's

military and prison records, despite knowing defendant "had served in the Navy and been

incarcerated in Maryland for robbery"); *Bond*, 539 F.3d at 288 (holding trial counsel performed

inadequately by failing to "obtain readily available school records" or to "seek medical records"

for the defendant).[133]  Whether a mitigation investigation was deficient is a distinct inquiry from

---

[133] As the courts in these cases have recognized, the duty to obtain administrative records is part
of capital defense counsel's "obligation to conduct a thorough investigation of the defendant's
background."  *Williams*, 529 U.S. at 396.  In holding counsel has such an obligation, the Supreme
Court relied on the 1980 ABA Standards for Criminal Justice as evidence of prevailing
professional norms at that time.  *Id.* (citing 1 ABA Standards for Criminal Justice 4-4.1,

whether "omissions [in the investigation] were sufficiently prejudicial to have affected the outcome of sentencing." *Sears v. Upton*, 561 U.S. 945, 954 n.10 (2010) (alteration in original) (quoting *Williams*, 529 U.S. at 396).

Here, counsel recognized the need to obtain records and searched for "any records that were available," N.T. 11/6/08 at 47, instructing investigators to obtain "records on schools, hospitals, his probation parole, anything they could get," *id.* at 64. Counsel also sought the records Dr. Dougherty's office advised would be needed to evaluate Bomar, including "prior charges, school records, child study team records, and any records from hospitalizations." N.T. 3/4/99 at 225-26. While counsel was not able to obtain all the records she sought, her efforts were at least partly successful, as she ultimately obtained school, medical, correctional, and employment records from a number of different sources, N.T. 3/4/99 at 238-44; N.T. 11/6/08 at 64, 75, 78-80, 92-93, 102, 120-22, 125. Among the records she did not obtain, however, were Bomar's records from Aldie Counseling Center, the Nevada Department of Corrections, and the court file for at least one of the Nevada convictions on which the Commonwealth relied as proof of his significant history of felony convictions involving the use or threat of violence.

Counsel's failure to obtain these records raises questions about her performance. Although "[t]he right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued," *Jermyn*, 266 F.3d at 308 (alteration in original) (quoting *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996)), these are the types of records the Supreme Court has suggested counsel should obtain as part of the obligation "to conduct a thorough investigation

---

commentary, p. 4-55 (2d ed. 1980)); *see also Strickland*, 466 U.S. at 688 (citing the 1980 ABA Standards as reflecting "[p]revailing norms of practice"). Thus, while the cases cited above were decided after Bomar's trial in 1998, they nevertheless apply prevailing professional norms in effect much earlier.

of the defendant's background." *Williams*, 529 U.S. at 396.  And counsel had no apparent strategic reason not to obtain them.

As to the Aldie records, penalty-phase counsel was aware Bomar had been required to attend counseling at Aldie as a condition of his parole and sought to obtain the Aldie records from the beginning of her representation.[134]  N.T. 11/6/08 at 99.  Dr. Cooke also asked counsel to obtain these records after learning from Bomar that he had been required to participate in an anger management class at Aldie.[135]  *Id.* at 137-38; PCRA Ex. P4 at 4 (Cooke Report, Sept. 18, 1998).  Counsel eventually received these records but not until after the penalty phase had concluded.  N.T. 11/6/08 at 50, 121.  While the Commonwealth argues counsel was not responsible for the delay, the records were not provided initially only because counsel had provided a deficient release.  PCRA Ex. P63; *see also* N.T. 11/6/08 at 112-13.[136]  Moreover, it is apparent counsel could have had the records sooner had she made alternative arrangements to retrieve them, as Aldie sent the records accompanied by a cover letter dated September 24, 1998, a full week before the start of the penalty phase.  PCRA Ex. P23.  It is difficult to see how counsel's failure to obtain these mental health records before the start of the penalty phase was reasonable, when both she and her mental health expert regarded them as potentially significant, and when they would have been readily available with a proper release.

---

[134] Counsel recalled having conversations with Aldie staff and stated she may even have gone to the counseling center to try to get the records.  N.T. 11/8/08 at 76, 99.

[135] Based on what Bomar told him, Dr. Cooke initially thought the records were for a "Dr. Aedi" but later learned they were from Aldie Counseling Center.  N.T. 11/6/08 at 137-38; *see also* PCRA Ex. P4 at 4 (Cooke Report, Sept. 18, 1998).

[136] By letter dated September 9, 1998, Aldie notified counsel the release she provided was inadequate but indicated the records would be provided with a proper release.  PCRA Ex. P63; N.T. 11/6/08 at 112-13.

Counsel's apparent failure to obtain Bomar's records from the Nevada Department of Corrections is also perplexing.  Counsel was certainly aware Bomar had spent time in prison in Nevada and obtained some records regarding his criminal cases there, including records from the Nevada Department of Probation and Parole and from his Nevada public defenders.  Yet while counsel obtained other prison records for Bomar (e.g., from the Montgomery County Prison, the Delaware County Prison, and the Pennsylvania Department of Corrections, *see* N.T. 3/4/99 at 244, N.T. 11/6/08 at 46, 102, 121; PCRA Ex. P64), she apparently failed to obtain records from his Nevada incarceration.[137]  Counsel had no strategic reason not to obtain records; on the contrary, she acknowledged she was pursuing mental health records in connection with prison records.  N.T. 11/6/08 at 102.  As noted, the Supreme Court and the Third Circuit have repeatedly found counsel ineffective for failing to obtain client prison records as part of the mitigation investigation.  *See Williams*, 529 U.S. at 395-96; *Blystone*, 664 F.3d at 422-23.

Bomar alleges, and the Commonwealth does not deny, that the Chappel report was "part of the Nevada court files," Pet. ¶ 174, and was "readily available," *id.* ¶ 190.  The report pertains to case number C79-311 in Washoe County, Nevada, which resulted in Bomar's conviction for battery with a deadly weapon and was used by the Commonwealth to prove that Bomar had a history of felony convictions involving the use or threat of violence.  *See* N.T. 10/2/98 at 49. Hence, the Court assumes, without deciding, that it was unreasonable for counsel not to obtain the

---

[137] It is not clear exactly which records counsel obtained concerning Bomar's Nevada convictions and incarceration.  At the post-trial motions hearing, Much testified he had subpoenaed records from the Nevada State Prison, and McLaughlin stated she had obtained medical records from the same facility.  N.T. 3/4/99 at 130, 243; *see also* N.T. 11/5/08 at 198 (Much's testimony that he had records "from where Mr. Bomar was incarcerated in Nevada").  Even if counsel had the Nevada prison records, however, it is undisputed that McLaughlin did not provide Dr. Whittemore's Nevada "Intake Psychological Evaluation" to Dr. Cooke, even though she was specifically looking for mental health records within Bomar's prison records.  N.T. 11/6/08 at 102.

file.  *See Rompilla*, 545 U.S. at 377 (holding capital defense counsel "is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial).[138]

As to counsel's failure to provide Bomar's Delaware County Prison records to Dr. Cooke, as the Commonwealth notes, these records were not among the categories of records that Dr. Cooke (or Dr. Dougherty) requested.[139]   Nevertheless, McLaughlin admittedly had them before trial, and although she acknowledged she was pursuing mental health records in connection with Bomar's prison records, she merely flipped through the Delaware County records and did not spend much time reading them.  N.T. 11/6/08.  Bomar argues counsel's failure to provide these records to defense mental health records was unreasonable and deficient, given the documentation they provide of his mental health in the months leading up to trial.

While counsel's failure to obtain the above records and provide these and the other correctional records in her possession to defense mental health experts gives the Court pause, the Court need not decide whether her failure to do so amounted to constitutionally deficient performance.  Even if counsel performed deficiently in this regard, these deficiencies did not

---

[138] Although *Rompilla* was also decided after the trial in this case, in finding that capital defense counsel "must obtain information that the State has and will use against the defendant," the Supreme Court relied on the ABA Standards from 1982 as a guide to determining what was reasonable when Rompilla was tried in 1988.  545 U.S. at 387.

[139] Before evaluating Bomar a second time in September 1998, Dr. Cooke discussed with McLaughlin the kinds of records he would need for that evaluation.  N.T. 4/20/99 at 118.  He stated that, at that time, he "thought it was important to go back and get school records from Nevada and other such things that would give [him] some baseline information and some earlier evaluations." *Id.*  He also sought Bomar's treatment records from Aldie.  Cooke Report 4, Sept. 18, 1998. McLaughlin testified that Dr. Dougherty's office instructed her to obtain "a copy of all the charges, prior charges, school records, child study team records, and any records from hospitalizations." N.T. 3/4/99 at 225-26.

prejudice Bomar, thus demonstrating that the state-court denial of the ineffectiveness clam as meritless was reasonable.

### b. *Prejudice*

As with any ineffective assistance of counsel claim, to prevail, Bomar must show prejudice—"that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Where, as here, the challenge is to a death sentence, "the question is whether there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. Because a death sentence must be unanimous in Pennsylvania, Bomar may establish prejudice by showing that, but for counsel's errors, there is a reasonable probability that "even one juror [would have] found that the aggravating circumstances did not outweigh any mitigating circumstances." *Saranchak*, 802 F.3d at 597. A reasonable probability "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 563 U.S. at 189 (citation omitted). To evaluate whether the petitioner has made the required showing, the court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter*, 558 U.S. at 41 (alteration in original) (quoting *Williams*, 529 U.S. at 397-98).

The Pennsylvania Supreme Court found Bomar had not satisfied this standard. Having found counsel did not perform deficiently at the penalty phase, the court, in addressing prejudice, assumed the introduction of additional mitigating evidence about Bomar's abusive childhood and mental health "would have caused the jury to find the additional 'extreme mental or emotional disturbance' mitigator and give more weight to the catchall mitigator that it already found." *Bomar*

*II*, 104 A.3d at 1204.  However, the court found it was not reasonably probable "that any of the jurors would have concluded the mitigating circumstances outweighed or were 'as weighty as' the patently grave aggravating circumstances in this case."  *Id.*

In reaching this conclusion, the Pennsylvania Supreme Court recognized that the prejudice inquiry requires the "reweigh[ing] [of] the evidence in aggravation against the totality of available mitigating evidence, which includes the evidence presented at the penalty hearing and the evidence that would have been presented had counsel conducted a proper investigation."  *Id.*  The court purported to apply this standard and to "embrace [Bomar's] additional mitigating evidence."  *Id.* Yet it is not at all clear the court considered *all* the additional mitigating evidence presented in the PCRA proceedings as part of the reweighing process.  In discussing Bomar's penalty-phase ineffective assistance claim, the Pennsylvania Supreme Court summarized the mitigating evidence introduced at trial and then proceeded to describe in some detail the additional mitigating evidence presented during the PCRA hearings, which Bomar claimed counsel unreasonably failed to uncover.  *See id.* at 1198-1201.  The court described the family member declarations addressing Bomar's childhood and family history, evidence from mitigation specialist Kathleen Kaib, Dr. Dudley's declaration, and the PCRA testimony of Marissa Browne, the counselor at Aldie who performed the drug and alcohol evaluation of Bomar in 1990, and Dr. Dougherty, who attempted to evaluate Bomar before trial.  *See id.* at 1198-1201.  The court then concluded this summary by characterizing Bomar's argument as follows:

> [Bomar] contends that, given the abundance of highly compelling evidence that was available to penalty phase counsel, her failure to present and explain *the foregoing evidence* was unreasonable, and he claims that, had counsel properly presented and explained *such evidence*, "at least one juror would have reached a different conclusion with regard to sentencing."

*Id.* at 1201 (emphasis added) (quoting Appellant's Br. 43).

Notably, the court did not mention Dr. Cooke's PCRA testimony (or declaration), even though Bomar's appellate brief emphasized Dr. Cooke's PCRA testimony that, with the additional records and information he reviewed post-conviction, he was able to conclude to a reasonable degree of psychological certainty that Bomar had organic brain damage.  Appellant's Br. 38, ECF No. 47-42.  Nor did the court discuss Dr. Dudley's PCRA testimony opining that Bomar suffers from organic brain damage, which was also highlighted in Bomar's appellate brief.  *Id.* (citing N.T. 10/21/09 at 140).  Indeed, the court's only mention of organic brain damage appears in its description of the evidence presented at the penalty phase, at which time Cooke testified he was unable to reach a firm conclusion on the issue.  *Bomar II*, 104 A.3d at 1198 (citing N.T. 10/5/98 at 48-50, 58).  Given the court's otherwise thorough description of the additional mitigating evidence presented during the PCRA proceedings, its review of the thorough PCRA-court opinion which itself did discuss organic brain damage, and its characterization of Bomar's claim as having been based solely on the evidence described, the court's failure to discuss this additional mitigating evidence suggests the court did not consider it.

"In reweighing the aggravating and mitigating evidence, a state court's failure 'to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—is an unreasonable application of *Strickland*'s prejudice test." *White v. Ryan*, 895 F.3d 641, 671 (9th Cir. 2018) (quoting *Williams*, 529 U.S. at 397-98)); *see also Williams*, 529 U.S. at 397-98 (holding state court's prejudice analysis was unreasonable where the court "failed to evaluate the totality of the available mitigating evidence" by not even mentioning the sole argument in mitigation trial counsel advanced at the penalty phase); *Gray v. Branker*, 529 F.3d 220, 235 (4th Cir. 2008) (holding state court unreasonably applied *Strickland* by "fail[ing] entirely to mention any of the mitigating evidence presented at trial and improperly discount[ing]

the mitigation evidence that could have been introduced at sentencing" (internal citation omitted)). Here, the Pennsylvania Supreme Court failed to consider mitigating evidence regarding organic brain damage in evaluating prejudice, even though that evidence was introduced during the PCRA proceedings, considered by the PCRA court in its opinion, and highlighted in Bomar's appellate brief.  Because the court unreasonably applied *Strickland* in doing so, this Court will address the issue of prejudice de novo.  In performing this legal analysis de novo, the Court "must afford AEDPA deference to factual findings by the Commonwealth courts regarding the weight of th[e] evidence, so long as they are not unreasonable in light of the record." *Abdul-Salaam*, 895 F.3d at 269.[140]

While the prejudice inquiry requires consideration of the totality of the available mitigation evidence, including the evidence presented in the PCRA proceedings, it is the additional evidence that might reasonably have been uncovered but for counsel's failure to investigate that is relevant. *See Rompilla*, 545 U.S. at 390-91 (limiting prejudice analysis to mitigation leads and evidence counsel might have discovered, had they examined a court file they unreasonably failed to obtain, the sole basis on which counsel's performance was found to have been deficient); *Blystone*, 664 F.3d at 426-27 (considering prejudice stemming from counsel's failure to investigate and develop expert mental health testimony and institutional records in mitigation but not from counsel's failure

---

[140] In performing a de novo review of whether uninvestigated mitigation evidence would have changed one juror's mind in *Abdul-Salaam*, the Third Circuit deferred to the Pennsylvania Supreme Court's "fact-finding that [the petitioner] did not suffer at the time of the crime from organic brain damage or any other mental illness warranting the application of either of . . . two mental-health mitigators."  895 F.3d at 270.  Here, of course, the Pennsylvania Supreme Court made no finding regarding organic brain damage.  The PCRA court also made no express finding on the issue, but accorded Dr. Cooke's opinion little weight, finding it seriously flawed. *See PCRA Op.*, 2012 WL 9515416, at *57-58, *64.  The PCRA court found it significant that although both Drs. Cooke and Dudley had recommended medical studies as a means of confirming brain damage, no such studies had been performed. *See id.* at *60, *64.

to adequately investigate and present lay witness testimony, where lay witness investigation did not amount to deficient performance under AEDPA standard of review); *cf. Strickland*, 466 U.S. at 695 (holding that in a challenge to a death sentence, the prejudice inquiry focuses on the impact counsel's errors might have had on the balance of aggravating and mitigating factors).  Because Bomar has not shown the state courts' conclusion regarding the reasonableness of counsel's investigation of his childhood and family history was itself objectively unreasonable, the Court considers only the mitigating evidence stemming from counsel's failure to obtain records and provide them to defense mental health experts.  As discussed below, given the centrality of the family history information to most of the mental health evidence introduced in the PCRA proceedings, the evidence stemming from these lapses would have enhanced the mitigation presentation only modestly.

Despite the many challenges she faced, counsel succeeded in presenting significant mitigating evidence at penalty phase.  In addition to presenting testimony from several character witnesses, she also presented testimony about Bomar's abusive childhood and mental health issues from Joyce Batchelor and Dr. Cooke.

Batchelor provided a graphic description of the chaotic and abusive family situation Bomar was born into, which she characterized as "hell."  N.T. 10/5/98 at 107.  She described Bomar's mother as a "crazy person," *id.* at 110, who did not care for or even hold Bomar as a baby and sent several of her children away to live with other family members, one from birth and another at the age of just six months.  As for Bomar's father, Batchelor testified he was a "very cruel person," *id.* at 117, who sexually abused her, drank constantly, and never exhibited any kind of parenting.  She described his cruel treatment of Bomar and another sister as babies, shaking a coffee can filled with coins in their ears while they screamed.  Batchelor also described the constant and disturbing

violence between Bomar's parents, including their nonstop physical fighting as well as instances when her mother chopped up the family's furniture with an axe and lit a match to gasoline she poured under a kitchen door, blowing Bomar's father out of the house. Batchelor managed to escape this horrific living situation, and thus only lived with Bomar during the first year of his life, before moving in with an aunt in Philadelphia. However, she alluded to Bomar's problems growing up, noting that, when living with his mother in Philadelphia, he was "in a class for emotionally retarded children," *id.* at 115, and was eventually sent to Milwaukee to live with his cruel father.

The jury also heard about Bomar's intellectual functioning and mental health issues from Dr. Cooke. Dr. Cooke explained that Bomar was classified as "educably mentally retarded" and placed in special education classes from an early age, and noted he was at the very bottom of the low average range of intellectual functioning based on IQ testing. He also testified that Bomar suffered from antisocial personality disorder and borderline personality disorder and that testing he administered suggested Bomar also suffered from organic brain damage. Although Dr. Cooke could not say for certain that Bomar had such damage because he displayed variable motivation during the testing, Dr. Cooke opined that Bomar may have had organic brain damage, that this diagnosis would be consistent with his early classification as "educably mentally retarded" and special education placement, and that such brain damage would likely be the result of something associated with birth or early childhood. Dr. Cooke noted that Bomar displayed characteristics associated with his personality disorders—such as impulsiveness, acting on his own impulses without thinking of the consequences to himself or others, confusion as to love, sex, and aggression, and poor emotional control—and that these characteristics led Bomar to engage in some of the behaviors reflected in his past history. He explained that personality disorders can

have an organic basis such as organic brain damage or can develop based on life experiences, and although he did not address Bomar's childhood, he noted that neglect and abuse in the home can aggravate the situation in terms of poor self-image, poor coping techniques, and build-up of frustration and anger.  He opined that Bomar's disorders appeared to have developed in part due to organic factors and in part as a result of his early experiences with special education, that both borderline personality disorder and organic brain damage qualified as an extreme mental or emotional disturbance, and that Bomar had such a disturbance.

Based on this mitigation presentation, one or more jurors found the catchall mitigator, identifying as mitigating factors Bomar's "apparent remorse, character, dysfunctional childhood/family life and mental ability."  Resp'ts' Ex. N, ECF No. 47-8.

Had trial counsel obtained the additional mental health records identified by PCRA counsel and provided those and other records in her possession to defense mental health experts, the jury could also have heard some additional evidence regarding Bomar's mental health issues.  Without the additional family history information, however, the impact the records would have had on the mitigation presentation is significantly muted.

Although the records would not have changed Dr. Cooke's personality disorder diagnoses, they would have strengthened his diagnosis of borderline personality disorder.  The Aldie records and the Chappel report, among others, would have allowed him to add paranoid features to this diagnosis.  The Delaware County Prison records would have allowed him to add psychotic or dissociative features, in that records showed what appeared to be "psychotic like episodes" and appeared to be consistent with decomposition under stress."  N.T. 11/6/08 at 214-15; *see also id.* at 186-87.  According to his declaration, Dr. Cooke could have used the records to "provide the jury with concrete evidence of how Mr. Bomar's illnesses impacted upon his behavior," allowing

him to present a picture of Bomar showing "far greater pathology."  Cooke Decl. ¶ 12, Dec. 21, 2004.

The PCRA court found, however, that the records, taken in isolation, would not have permitted Dr. Cooke to conclude Bomar had organic brain damage because those records did not "contain a history of childhood abuse and neglect," the "fundamental underpinning" of both Dr. Cooke and Dr. Dudley's opinions finding organic brain damage.  *PCRA Op.*, 2012 WL 9515416, at *39, *61; *see also id.* at *54 (noting that "[t]aken in isolation, the additional institutional records offered in PCRA proceedings do not provide a sufficient basis for [Dr. Cooke's] current opinion" regarding organic brain damage).[141]  This factual finding is binding on this Court "so long as [it is] not unreasonable in light of the record" or rebutted by clear and convincing evidence.  *Abdul-Salaam*, 895 F.3d at 269; 28 U.S.C. § 2254(e)(1); *see also Price v. Thurmer*, 637 F.3d 831, 840 (7th Cir. 2011) (treating as a factual determination state court's finding that providing expert with investigators' reports rather than relaying their contents would not have changed the expert's testimony).

The PCRA court's finding in this regard is reasonable and supported by the evidence presented in the PCRA proceedings.  As the PCRA court observed, "[i]n drawing the conclusion that organic brain damage could be found, Dr. Cooke relied heavily on information contained [i]n the affidavits of family members, information that was unavailable to trial counsel."  *PCRA Op.*, 2012 WL 9515416, at *58 (citing N.T. 11/6/08 at 200-01, 240-41, 302-03).   In his PCRA testimony, Dr. Cooke explained that the affidavits were significant to his finding of organic brain

---

[141]  Although McLaughlin provided Dr. Cooke with a description of the family background information she obtained from Batchelor, Dr. Cooke could not rely on McLaughlin's informal account and failed to request that McLaughlin obtain an affidavit from Batchelor, as he acknowledged he should have done.

damage in that they provided information about Bomar's mother drinking alcohol and getting into physical fights while pregnant with him, substantiating his hypothesis that Bomar had been damaged in utero. N.T. 11/6/08 at 200-01; *see also id.* at 240-41, 297. He also emphasized that it was "[t]he cumulative weight of all the[] records," including the lay affidavits, that allowed him to opine to a reasonable degree of psychological or neuropsychological certainty that Bomar "did sustain organic brain damage of some sort either due to alcohol or trauma probably in utero and that this . . . had an impact on his learning disabilities as well as his emotional functioning throughout his life." *Id.* at 201-02.[142]

On the other side of the balance, as the Pennsylvania Supreme Court noted, the aggravating factors in this case were "patently grave." *Bomar II*, 104 A.3d at 1204. The circumstances of the crime, from which the jury found the killing in perpetration of a felony aggravator, provided strong evidence that Bomar committed "an intentional murder of extraordinary brutality." *Wong v. Belmontes*, 558 U.S. 15, 26 (2009) (citation omitted). The Pennsylvania Supreme Court noted the evidence showed Bomar "followed his 22-year-old victim, pulled over her vehicle while posing as a police officer, and proceeded to kidnap, rape, and bludgeon the victim to death, supporting the 'killing in perpetration of a felony' aggravator on two separate grounds." *Bomar II*, 104 A.3d at

---

[142] Bomar maintains Dr. Cooke testified in the PCRA proceedings that "with Dr. Whittemore's report, his diagnosis of Petitioner's cognitive impairments would be certain," Pet. ¶ 173, but this is inaccurate. In support of this assertion, Bomar cites to Dr. Cooke's declaration, not his PCRA testimony. *Id.* In his declaration, Dr. Cooke states the Whittemore report "provide[d] compelling evidence of longstanding organic brain damage" and would have enabled him to present a "much stronger opinion regarding organic brain damage," but he did not say the report would have enabled him to diagnose it to reasonable degree of psychological certainty. Cooke Decl. ¶ 14, Dec. 21, 2004. Moreover, in his actual PCRA testimony, Dr. Cooke denied that the Whittemore report alone would have enabled him to diagnose organic brain damage to a reasonable degree of psychological certainty, instead stating that the report, cumulatively with other information, would have allowed him to reach that conclusion. N.T. 11/6/08 at 171.

1204.  The PCRA court also noted "the litany of injuries [Willard] sustained was staggering and would serve as evidence of [Bomar's] calculated, premeditated, vicious, horrific and unprovoked assault."  *PCRA Op.*, 2012 WL 9515416, at \*62.

The other aggravating circumstances found by the jury were also serious.   The Commonwealth established that Bomar had previously been convicted of second-degree murder after shooting and killing a man with a rifle.   As the state supreme court noted, "the multiple murders aggravator[] . . . is widely considered to be the 'most powerful imaginable aggravating evidence.'"  *Bomar II*, 104 A.3d at 1204 (quoting *Belmontes*, 558 U.S. at 28).  The jury also found Bomar had a significant history of violent felony convictions based on the murder and prior convictions for battery with a deadly weapon (after shooting a woman with a shotgun in her mother's home) and battery by a prisoner (after he attacked his female visitor while serving his prison sentences for the aforementioned crimes).  *Id.*

The additional mitigating evidence that would have been available, had counsel provided mental health experts with additional records, would have altered the sentencing profile only modestly.  Even assuming testimony about the paranoid and dissociative aspects of Bomar's borderline personality disorder would have led at least one juror to find that Bomar was under the influence of extreme mental or emotional disturbance or to have given more weight to the catchall mitigator, it is not reasonably probable that, had this additional evidence been presented at trial, it would have swayed at least one juror to vote against the death penalty.

Indeed, this Court is not persuaded there is a reasonable probability of a different sentence even if the mitigating evidence presented at trial had been supplemented by *all* the mitigating evidence presented during the PCRA proceedings, given the "patently grave" aggravating circumstances in this case.

The underlying claim that counsel provided ineffective assistance at the penalty phase therefore lacks merit.  And because the underlying claim lacks merit, appellate counsel was not ineffective for failing to raise it.  Relief will therefore be denied on this claim.

## I.     Claim Ten

Finally, Bomar asserts a standalone cumulative error claim, arguing the cumulative prejudicial effect of all the constitutional errors in this case "so undermined the fairness of the trial that [his] convictions and death sentence should be overturned."  Pet'r's Mem. 72.

Bomar raised a cumulative error claim in state court, but the state courts denied it.  The Pennsylvania Supreme Court found no basis for such a claim, as it had rejected all of Bomar's claims "on the grounds that they are waived, lack merit, or both."  *Bomar II*, 104 A.3d at 1216.  The court further held that even if Bomar's claims were not waived, it had rejected only two—his *Brady* claim and his claim that penalty-phase counsel was ineffective for failing to present additional mitigating evidence—on the alternative ground of lack of prejudice.  *Id.* at 1217.  As to these errors, the court found that "in light of the overwhelming DNA and circumstantial evidence implicating [Bomar] in this murder[,] . . . there is no cumulative error warranting relief."  *Id.*

The Third Circuit has recognized that cumulative error may be a basis for habeas relief, holding:

> Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'"

*Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (quoting *Albrecht v. Horn*, 471 F.3d 435, 468 (3d Cir. 2006)).

In rejecting the claims in Bomar's federal habeas petition, this Court has identified only two potential constitutional errors: the prosecution's failure to disclose an understanding referenced in the Points to Cover document and defense counsel's failure to obtain mental health records and provide them to defense mental health experts.  As discussed above, neither error was prejudicial on its own under the applicable standard.  In light of the extensive evidence of guilt presented at trial and the evidence presented at the penalty phase, the Court is not persuaded the cumulative prejudice resulting from these potential errors is sufficient to undermine the fundamental fairness of either the trial or the sentencing proceeding in this case so as to constitute a denial of Bomar's constitutional right to due process.  Relief on this claim will therefore be denied.

**CONCLUSION**

For the reasons set forth above, the Court concludes Bomar is not entitled to habeas relief on any of his claims.  His habeas petition will therefore be denied.

Under Local Rule of Civil Procedure 9.4(12), and in accordance with Third Circuit Local Appellate Rule 111.3(b), at the time a final decision is entered, the district court must state whether a certificate of appealability is granted or denied.  To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), a habeas petitioner must make "a substantial showing of the denial of a constitutional right."  Where the district court has rejected the petitioner's constitutional claims on the merits, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  The Court finds Bomar has failed to make the required showing.  Accordingly, the Court declines to issue a certificate of appealability.

An appropriate order follows.

BY THE COURT:


   /s/ Juan R. Sánchez   
Juan R. Sánchez, C.J.